IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JAMES PATTERSON and ANTONIO MAY, | § § § | |
| Plaintiff, | § § | No. 3:16cv103 |
| VS. | § § | Jury Trial Demanded |
| DIAMOND OFFSHORE DRILLING, INC., | § § § | |
| Defendant. | § | |

## PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

David C. Holmes, Attorney in Charge
State Bar No. 09907150
Southern District No. 5494
13201 Northwest Freeway, Suite 800
Houston, Texas 77040
Telephone: 713-586-8862
Fax: 713-586-8863

ATTORNEY FOR PLAINTIFFS

# **TABLE OF CONTENTS**

NATURE AND STAGE OF THE PROCEEDING . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

SUMMARY OF THE ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

I.   The "Contributing Factor" Standard Applies to This Case . . . . . . . . . . . . . 4

    A.   The Statutory Framework . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

    B.   The Contributing Factor Test . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

II.   Diamond Offshore Is Liable Under the SPA . . . . . . . . . . . . . . . . . . . . . . . 9

    A.   Plaintiffs Engaged in Protected Activity . . . . . . . . . . . . . . . . . . . . . . 9

        1.   The Protected Activity Is Not Limited to Two Incidents . . . . . 9

        2.   Mr. Patterson and Mr. May Engaged in Extensive Conduct
           That Is Protected Under the SPA . . . . . . . . . . . . . . . . . . . . . . 10

    B.   Diamond Offshore Knew About the Protected Conduct . . . . . . . . . 16

    C.   Mr. Patterson and Mr. May Suffered an Unfavorable Personnel
        Action . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

    D.   The Protected Activity Was a "Contributing Factor" . . . . . . . . . . . 17

III.   Diamond Offshore Cannot Prove by Clear and Convincing Evidence
    That It Would Have Fired Mr. Patterson and Mr. May in the Absence
    of the Protected Activity . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV.   The Discrimination Claim May Be Dismissed . . . . . . . . . . . . . . . . . . . . . 24

V.   Conclusion . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | | |
|---|---|---|
| JAMES PATTERSON and ANTONIO MAY, | § § § | |
| Plaintiff, | § § | No. 3:16cv103 |
| VS. | § § | Jury Trial Demanded |
| DIAMOND OFFSHORE DRILLING, INC., | § § § | |
| Defendant. | § | |

## PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT

Plaintiffs James Patterson and Antonio May file this response to Defendant's Motion for Summary Judgment (Doc. 13).

## NATURE AND STAGE OF THE PROCEEDING

This is a wrongful termination suit under the Seaman's Protection Act. The case is set for a jury trial in September 2017.

## STATEMENT OF ISSUES

1.    Whether Mr. Patterson and Mr. May's protected activity under the Seaman's Protection Act was a contributing factor in their terminations.

2.    Whether Diamond Offshore can prove by clear and convincing evidence that it would have fired Mr. Patterson and Mr. May even without the protected activity.

1

The standard of review is the conventional summary judgment standard under Fed. R. Civ. P. 56: whether there is a genuine issue of material fact.  This standard is affected by Diamond Offshore's burden to prove its defense by clear and convincing evidence.  *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986) ("Consequently, where the *New York Times* 'clear and convincing' evidence requirement applies, the trial judge's summary judgment inquiry as to whether a genuine issue exists will be whether the evidence presented is such that a jury applying that evidentiary standard could reasonably find for either the plaintiff or the defendant.").

## SUMMARY OF THE ARGUMENT

The Seaman's Protection Act (SPA) protects seamen from retaliation if, among other things, they refuse to perform tasks when they have a reasonable apprehension or expectation that performing such duties would result in serious injury to them, other seamen, or the public.

Mr. Patterson and Mr. May worked on a drilling rig owned by Diamond Offshore.  Over a period of years, Mr. Patterson and Mr. May refused to perform a number of tasks assigned by their supervisor, Mike Williams, because those tasks violated a host of safety rules and were dangerous.  Over time, Williams became increasingly hostile.  In October 2014, Mr. Patterson complained to Diamond Offshore in writing about both the safety violations and the hostility.

2

On May 30, 2015, yet another incident occurred in which Mr. Patterson and Mr. May refused to perform a dangerous task. Williams then moved quickly to get rid of Mr. Patterson and Mr. May, and he succeeded. He manufactured a situation in which Mr. Patterson and Mr. May would be set up for termination. He ordered them to perform an unfamiliar task under the direction of another employee, who lied that he completed the paperwork required by Diamond Offshore policy. When the procedure went wrong, Williams' ally revealed that he had not completed the paperwork, and Mr. Patterson and Mr. May were scapegoated. Williams then falsified the computer records on the vessel support his scheme. Diamond Offshore then fired Mr. Patterson and Mr. May for failing to complete the paperwork, but significantly it did not fire the third employee.

Diamond Offshore seems to believe that this case is akin to an ordinary retaliation case, such as a claim under Title VII. For example, Diamond Offshore argues that Mr. Patterson and Mr. May must prove that the reasons for their termination were a "pretext."

This is wrong. The SPA incorporates the remedial structure that applies to the federal whistleblower retaliation statutes. This structure is intended to give greater protections to employees and to place a greater burden on employers to ensure that they are complying with the law. Mr. Patterson and Mr. May need only prove that their protected activity was a <u>contributing factor</u> to their termination. Diamond

3

Offshore must prove, by <u>clear and convincing evidence</u>, that Mr. Patterson and Mr. May would have been fired even without the protected activity.

The evidence is more than sufficient to show that Williams' retaliation was a contributing factor that led to the termination.  Diamond Offshore can never meet its burden of proving by clear and convincing evidence that it would have fired Mr. Patterson and Mr. May anyway, given that (1) the whole scheme that led to the terminations would not have occurred without the retaliatory motive, (2) there were no other grounds for firing Mr. Patterson and Mr. May, (3) Williams falsified computer records to support his scheme, and (4) Diamond Offshore did not fire the third employee.

Accordingly, Diamond Offshore's motion should be denied.

## **ARGUMENT**

I.    <u>The "Contributing Factor" Standard Applies to This Case</u>.

The primary claim in this case arises under the Seaman's Protection Act, though Diamond Offshore spends only about five pages discussing that claim. Diamond Offshore argues that this claim is governed by the same standards as a Title VII claim.  Motion at 20 n.21.  This is wrong.

A.    <u>The Statutory Framework</u>

The legal standard involves the interplay of three separate federal whistleblower statutes:

4

(1)     The Seaman's Protection Act (SPA), 46 U.S.C. § 2114: This is the statute under which Plaintiffs are suing.  The statute protects seamen from retaliation when they refuse to perform unsafe tasks.

(2)     The Surface Transportation Assistance Act (STAA), 49 U.S.C. § 31105: This is a separate statute that governs truck drivers.  However, its remedial provisions are incorporated in section (b) of the SPA.

(3)     Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (AIR21), 49 U.S.C. § 42121: This is a separate statute for employees in the airline industry.  However, subsection (b)(1) of STAA adopts the burdens of proof from AIR21.  This was the result of a 2007 amendment contained in the 9/11 Commission Act.

In implementing the regulations under SPA, OSHA summarized the interplay between the statutes as follows:

> As explained above, SPA adopts the process for filing a complaint established under subsection (b) of STAA. 46 U.S.C. 2114(b).  It further incorporates the other "procedures, requirements, and rights described in" STAA, id., described below.   OSHA therefore understands SPA to incorporate STAA subsections (b) through (g). . . .
>
> . . . .
>
> Section (b)(1) of STAA states that STAA whistleblower complaints will be governed by the legal burdens of proof set forth in AIR21, 49 U.S.C. 42121(b), which contains whistleblower protections for employees in the aviation industry.   49 U.S.C. 31105(b)(1). Accordingly, these burdens of proof also govern SPA whistleblower complaints.

5

78 Fed. Reg. 8392 (Feb. 6, 2013).[1] Diamond Offshore cites a 2004 case for the proposition that the Title VII standards apply to a STAA claim. That was true in 2004, but the 9/11 Commission Act changed this in 2007. *E.g., Maverick Transp., LLC v. United States Department of Labor*, 739 F.3d 1149, 1153 n.2 (8th Cir. 2014).

     B.    The Contributing Factor Test

The AIR21 standards apply to many different federal whistleblower statutes, including Sarbanes-Oxley (SOX). Like most of the federal whistleblower statutes, the SPA, STAA, and AIR21 require an employee to file an initial complaint with OSHA. AIR 21 provides for the following burdens of proof:

> (i)    **Required showing by complainant.**—The Secretary of Labor shall dismiss a complaint filed under this subsection and shall not conduct an investigation otherwise required under subparagraph (A) unless the complainant makes a prima facie showing that any behavior described in paragraphs (1) through (4) of subsection (a) was a <u>contributing factor</u> in the unfavorable personnel action alleged in the complaint.

> (ii)    **Showing by employer.**—Notwithstanding a finding by the Secretary that the complainant has made the showing required under clause (i), no investigation otherwise required under subparagraph (A) shall be conducted if the employer demonstrates, <u>by clear and convincing evidence</u>, that the employer would have taken the same unfavorable personnel action in the absence of that behavior.

---

[1]    SPA cases are uncommon compared to cases under STAA and the other whistleblower statutes. However, an ALJ recently issued a decision under SPA and applied the contributing factor standard. App. at 59-60.

49 U.S.C. § 42121(b)(2)(B).  After varying time periods, the employee may elect to file a lawsuit in federal court for *de novo* review.  In the case of SPA and STAA, the applicable time period is 210 days.  49 U.S.C. § 31105(c).  In this case, there is no dispute that Mr. Patterson and Mr. May filed this lawsuit on a timely basis.

The Fifth Circuit has explained the operation of the AIR21 burden of proof and has provided the elements of a claim:

> The legal burdens of proof set forth in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR 21"), govern SOX whistleblower actions.  To prevail, an employee must prove by a preponderance of the evidence  that (1) she engaged in protected activity; (2) the employer knew that she engaged in the protected activity;  (3) she suffered an unfavorable personnel action; and  (4) the protected activity was a contributing factor in the unfavorable action.
>
> If the employee establishes these four elements, the employer may avoid liability if it can prove "by clear and convincing evidence" that it "would have taken the same unfavorable personnel action in the absence of that [protected] behavior."  This "independent burden-shifting framework" is distinct from the *McDonnell Douglas* burden-shifting framework applicable to Title VII claims.

*Allen v. Admin. Review Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008) (citations omitted).

In a case involving the Federal Rail Safety Act (another whistleblower protection statute), the Third Circuit explained the "contributing factor" standard in detal:

> The term "contributing factor" is a term of art that has been elaborated upon in the context of other whistleblower statutes. The Federal Circuit noted the following in a Whistleblower Protection Act case:

> The words "a contributing factor" . . . mean *any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision*. This test is specifically intended to overrule existing case law, which requires a whistleblower to prove that his protected conduct was a "significant", "motivating", "substantial", or "predominant" factor in a personnel action in order to overturn that action.

Furthermore, an employee "*need not* demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his disclosure was a contributing factor to the personnel action."

> Once the employee asserts a prima facie case, the burden shifts to the employer to demonstrate, "by clear and convincing evidence, that the employer would have taken the same unfavorable personnel action in the absence of that behavior." The "clear and convincing evidence" standard is the intermediate burden of proof, in between "a preponderance of the evidence" and "proof beyond a reasonable doubt." To meet the burden, the employer must show that "the truth of its factual contentions are highly probable."

> It is worth emphasizing that the AIR-21 burden-shifting framework that is applicable to FRSA cases is much easier for a plaintiff to satisfy than the *McDonnell Douglas* standard. As the Eleventh Circuit noted in a case under the Energy Reorganization Act, a statute that uses a similar burden-shifting framework, "[f]or employers, this is a tough standard, and not by accident." The Eleventh Circuit stated that the standard is "tough" because Congress intended for companies in the nuclear industry to "face a difficult time defending themselves," due to a history of whistleblower harassment and retaliation in the industry. The 2007 FRSA amendments must be similarly construed, due to the history surrounding their enactment.

*Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 158-59 (3d Cir. 2013)

(citations omitted) (emphasis in original); *see Abbott v. BNSF Ry. Co.*, 2014 U.S.

8

Dist. LEXIS 189763, at *4-5 (S.D. Tex. Nov. 12, 2014) (Froeschner, J.), *adopted,*

2014 U.S. Dist. LEXIS 189768 (S.D. Tex. Dec. 19, 2014) (Costa, J.).

This is the correct legal framework for the SPA claim in this case, not the

Title VII standard.

II.   <u>Diamond Offshore Is Liable Under the SPA</u>.

As discussed above, a claim under the SPA follows the AIR21 framework,

which has four elements: "(1) [the plaintiff] engaged in protected activity; (2) the

employer knew that [the plaintiff] engaged in the protected activity; (3) [the

plaintiff] suffered an unfavorable personnel action; and (4) the protected activity was

a contributing factor in the unfavorable action."  *Allen*, 514 F.3d at 475-76.  The

summary judgment evidence establishes each of those elements.

A.   <u>Plaintiffs Engaged in Protected Activity</u>.

1.   <u>The Protected Activity Is Not Limited to Two Incidents</u>.

As a threshold matter, Diamond Offshore pretends that the protected activity

in this case involves only two incidents: the fluorescent light bulb incident on May

30, 2015, and the reverse power testing incident on June 1, 2015.  Motion at 21-22.

This is wrong, and Diamond Offshore knows better.  This case involves a series of

events that stretch back several years.  In a footnote, however, Diamond Offshore

claims that any events that occurred more than 180 days prior to the filing of the

OSHA complaint are barred by limitations.  Motion at 21 n.22.

9

This argument is frivolous.  The SPA is a retaliation statute.  The retaliation occurred when Mr. Patterson and Mr. May were fired, not when they engaged in the conduct that motivated their termination.  Mr. Patterson and Mr. May are not suing over the protected conduct.  They are suing over the termination that <u>resulted from</u> the protected conduct.  They filed their charge within 180 days of the termination.

By Diamond Offshore's reasoning, the 180 day filing period would be a safe harbor for employers who wish to violate the law.  Once the protected activity occurs, the employer can wait 181 days, and then do whatever it wants.  This interpretation would eviscerate the whistleblower retaliation statutes.[2]

In sum, the limitations argument is wholly without merit.  Mr. Patterson and Mr. May filed their OSHA complaint within 180 days of their terminations, which were the relevant retaliatory acts.

      2.    <u>Mr. Patterson and Mr. May Engaged in Extensive Conduct That Is Protected Under the SPA.</u>

The SPA protects seaman from retaliation in a variety of circumstances.  The portion of the SPA that is relevant to this case is the following:

---

[2]    This argument is akin to the argument that courts should exclude evidence of discriminatory acts more than 300 days prior to the filing of a charge of discrimination with the EEOC.  Such arguments have been rejected many times, because such evidence can be relevant even if a claim based on the conduct is time barred.  *E.g., Rutherford v. Harris County*, 197 F.3d 173, 186 (5th Cir. 1999).  In this case, the protected conduct remains relevant even if Mr. Patterson and Mr. May were not immediately fired as a result.

10

(1)     A person may not discharge or in any manner discriminate against a seaman because—

. . . .

    (B)     the seaman has refused to perform duties ordered by the seaman's employer because the seaman has a reasonable apprehension or expectation that performing such duties would result in serious injury to the seaman, other seamen, or the public;

. . . .

(2)     The circumstances causing a seaman's apprehension of serious injury under paragraph (1)(B) must be of such a nature that a reasonable person, under similar circumstances, would conclude that there is a real danger of an injury or serious impairment of health resulting from the performance of duties as ordered by the seaman's employer.

(3)     To qualify for protection against the seaman's employer under paragraph (1)(B), the employee must have sought from the employer, and been unable to obtain, correction of the unsafe condition.

46 U.S.C. § 2114(a).

Most of the protected activity in this case relates to Mike Williams, who was the Rig Maintenance Supervisor on the *Ocean Endeavor*.  While this case was proceeding before OSHA, Mr. Patterson and Mr. May listed a variety of safety-related issues with Williams going back to 2012.  Appendix at 118-25.  Diamond Offshore has not moved for summary judgment on the existence of protected conduct, and thus we will not burden the Court with a detailed discussion of the history of incidents involving Williams.

11

Mr. Patterson was an Electrical Technician.  Mr. May was an Electrician. They reported to Mike Williams, who was the Rig Maintenance Supervisor.

As early as 2012, when the rig was off the coast of Egypt, Mr. Patterson and Mr. May heard about unsafe activity involving Williams.  Patterson Dep. at 220-21.[3] Around March 2013, they were directly involved in an incident involving cabling. They refused to follow Williams' directions because they were unsafe, and they found a safe way to perform the task.  Afterwards, Williams threatened them, telling them that there were other electricians looking for jobs.  Patterson Dep. at 222-31. About a month later, Williams ordered Mr. Patterson to adjust the LEL (lower explosive limit) gas detector so that it would not go off at such a low level.  Williams did not want the alarm to be going off so often.  This would have presented a major safety hazard.  Mr. Patterson refused to perform this task without approval from the Offshore Installation Manager (OIM).  At that point, Williams backed off.  Patterson Dep. at 232-43.  A few months later, there was get another incident involving lifting a heavy cable to the top of the rig.  Mr. Patterson and Mr. May refused to do this because people could die.  Williams said, "Anyone who tries to stop the work will be on the next helicopter off the rig."  Patterson Dep. at 252-59.

The rig (which is a mobile vessel) sailed to Sicily and then to the Black Sea off the coast of Romania.  The incidents involving Williams continued.  In July 2014,

---

[3]     All deposition excerpts are in the Appendix.

Mr. Patterson sent an e-mail to Ken Falke, the shore-side electrical supervisor, discussing some of his problems with Williams:

> Am I that horrible of an ET that my job is in jeopardy?  I ask because I have personally heard Mike make the following statements to us and to other people in earshot of us: "People get written up and run off for shoddy work", "I haven't run anyone off in a while", "You guys might want to get your resumes ready", "If you keep working like that you may find yourself looking for another job", "That Jimbo thinks he's so smart", "Jimbo better look out, he might not make it to Subsea" and "People are easier to replace than equipment".  Following this are Mike telling Jonathan Wilborn that "Subsea made a mistake in hiring Jimbo" and when I approached him, he confirmed his doubt in my abilities. The extreme micromanagement clearly demonstrates a complete lack in trust or confidence in his people (especially electrical department). Blaming the Electricians and ETs for anything that goes wrong (our problem or not), taking credit for anything that goes right and openly criticizing us (and bragging about finally getting to write us up) to others is very demoralizing.

App. at 107.

It was an incident in  September 2014 which started the series of events that led to the terminations. Williams ordered Mr. Patterson and Mr. May to replace some light bulbs that were 25 feet off the floor, without proper safety gear.  Mr. Patterson and Mr. May refused to do this, and Mr. Patterson filled out a "DODI card," which is an incident report form.  This matter came to the attention of the "company man" from Exxon, and apparently Exxon told Diamond Offshore to get proper safety gear. Patterson Dep. at 300-06.   Williams was furious, and his hostility toward Mr. Patterson and Mr. May became much more intense.  Patterson Dep. at 307.

13

The following month, Williams found a reason to write up Mr. Patterson and to place him on 90 days probation.  Patterson Dep. at 318.  Mr. Patterson knew that this was retaliation, and he took the matter to HR and to the OIM.  App. at 108.  He reported some of the prior safety incidents, then stated:

> I am in a rush to submit this report as Mike Williams will retaliate against me for submitting this rebuttal.  Please forgive my rushed tone and please contact me should you have any further inquiries. If necessary, I have a much more detailed log and notes. (Please note that if required, these logs primarily focus on Mike Williams overriding stop work authority, causing near misses, racial comments about Egyptians, ordering unsafe equipment returned to service and covering up when a person got injured, witnesses to said, threats of write ups, a detailed account of how he tried to sabotage me going to Subsea and all events in kind from October 30th 2012 through current). I hope that this provides you sufficient countervailing proof as to rebuff these accusations against me. I am out here trying to do my best because I work to support my family. While I am loyal to Diamond Offshore, this appears to be an effort to run me off, please just let me know so I can find another employer. I would prefer resigning to being fired over false accusations in a hostile work environment.

App. at 110.  Mr. Patterson later added a short addendum:

> Due to this, it looks like Mike Williams is trying to bypass company procedures to run me off.  I am not sure if he has ever had anyone else wrongfully terminated before, but he appears to be pushing hard to run me off by ignoring company policies and procedures. Thank you for your time and please forgive my incessant push on this issue, but he is placing my family in jeopardy and I will not just stand by and let him wrongfully terminate me.

App. at 111.  In this litigation, the OIM (Randy Sutfin) stated that he did not look into any of these matters because "This is just hearsay by Patterson here on this one."

14

Sutfin did not investigate anything, and declared that it was "hogwash."  Sutfin Dep. at 39-40.[4]

There were additional incidents in April 2015.  At one point, Williams tried to entrap Mr. Patterson and Mr. May into taking some scrap materials home with them, which would have been a serious violation of company policy.  Patterson Dep. at 353-61.  Mr. Patterson complained again to HR, but the HR rep (Janice Dugger) told Mr. Patterson that she was sick of hearing about Mr. Patterson and Williams. Patterson Dep. at 361-62.

The final major incident took place on May 30, 2015.  Williams ordered Mr. Patterson and Mr. May to replace light bulbs on a beam 115 feet above the deck under unsafe conditions.  They refused to do it and reported the matter to the Toolpusher, who is a higher level manager.  Patterson Dep. at 367-68.

The following day, Williams ordered Mr. Patterson and Mr. May to assist in the reverse power testing, which is the incident that was used as an excuse for their termination.  This incident is discussed more fully below.

In sum:

(1)     Mr. Patterson and Mr. May refused to perform dangerous tasks assigned by Williams many times over a period of years;

---

[4]     Despite calling this "hogwash," Sutfin admitted that Williams eventually got fired in 2016 for a major safety violation that nearly got a co-worker killed.  Sutfin Dep. at 42-43.

(2)     Mr. Patterson and Mr. May informed higher level managers at Diamond Offshore about these issues, both orally and in writing;

(3)     Mr. Patterson specifically warned Diamond Offshore that Williams would retaliate against him; and

(4)     Diamond Offshore did nothing at all.

The first element is thus established by the summary judgment evidence.

B.     <u>Diamond Offshore Knew About the Protected Conduct</u>.

Williams was a supervisor for Diamond Offshore, and thus Diamond Offshore's knowledge is not seriously in dispute.  Anyway, as shown above, Mr. Patterson and Mr. May reported the incidents to higher level supervisors and to HR, both orally and in writing.

Diamond Offshore claims that the decision makers for the termination did not know about the May 30 light bulb incident.  Motion at 22.  The protected activity in this case extends far beyond the light bulb incident, and there is no dispute that Diamond Offshore had been informed of much of the activity.  Anyway, as the Third Circuit noted in *Araujo*, "an employee '*need not* demonstrate the existence of a retaliatory motive on the part of the employee taking the alleged prohibited personnel action in order to establish that his disclosure was a contributing factor to the personnel action.'" *Araujo*, 708 F.3d at 158-59.  The summary judgment evidence thus establishes the second element.

C.    <u>Mr. Patterson and Mr. May Suffered an Unfavorable Personnel Action</u>.

This element is undisputed: Diamond Offshore fired Mr. Patterson and Mr. May.

D.    <u>The Protected Activity Was a "Contributing Factor."</u>

As discussed above, a contributing factor is "any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Araujo*, 708 F.3d at 158-59. Temporal proximity, by itself, can establish this element. *Id.* at 160 ("Temporal proximity between the employee's engagement in a protected activity and the unfavorable personnel action can be circumstantial evidence that the protected activity was a contributing factor to the adverse employment action."). Given that the termination occurred about two days after the May 30 light bulb episode, this element is satisfied simply by temporal proximity.

However, there is considerably more evidence to support this conclusion. This evidence includes (1) the circumstances of the reverse power testing, (2) the doctoring of the computer records, and (3) the fact that the third employee involved in the reverse power testing was not fired. All of this is discussed in Part III of this Response. In the interest of brevity, we will not repeat it here.

In sum, the summary judgment evidence establishes all four elements under the AIR21 standard. The remaining issue is whether Diamond Offshore can prove by clear and convincing evidence that it would have fired Plaintiffs anyway.

17

III.   Diamond Offshore Cannot Prove by Clear and Convincing Evidence That It
       Would Have Fired Mr. Patterson and Mr. May in the Absence of the Protected
       Activity.

Not surprisingly, the parties have starkly different accounts of what happened
with the reverse power testing on May 31 and the early morning hours of June 1,
2015.[5]  From the perspective of Mr. Patterson and Mr. May, the whole thing was a
set up concocted by Williams to get them fired.  In particular:

(1)    Reverse power testing is normally done on the day shift.  This is
because there is a risk that the testing will cause a loss of power and because the
most senior personnel are on the day shift.  Patterson Dep. at 34-35.  In this case,
however, Williams decided to conduct the test on the night shift, when Mr. Patterson
and Mr. May were on duty.

(2)    The reverse power testing was part of engine shutdown testing.  The
supervisors over the engines are the Mechanic and the maintenance supervisors.
Patterson Dep. at 44.  The Mechanic on duty was Kenneth Johnson, was a friend of
Williams.   While only an Electrical Technician or Electrician can perform the

---

[5]    Diamond Offshore claims that "Plaintiffs do not even believe that any alleged
SPA safety incident had anything to do with their terminations."  Motion at 22.
While Mr. May did say that he thought he was fired because of his race, he later
clarified his testimony during the deposition.  May Dep. at 289.  Patterson testified
that he thought race was a motivating cause, but specified that he did not know what
was in Williams' mind.  Patterson Dep. at 372.  In any event, a plaintiff's subjective
beliefs are irrelevant.  *Byers v. Dallas Morning News, Inc.*, 209 F.3d 419, 426-27
(5th Cir. 2000).

electrical part of the testing, the Mechanic is there to run the operation because it is an engine test.  Patterson Dep. at 61-62.

(3)     Williams told Johnson to perform the engine shutdown testing.  He then separately met with Mr. Patterson and Mr. May and told them to assist Johnson. Patterson Dep. at 75-76; May Dep. at 54-55.  Mr. May told him that they had never done this testing before.  Patterson Dep. at 87-88.  In fact, this testing had never been done on the night shift before, which is suspicious in and of itself.  Patterson Dep. at 34-35.

(4)     Johnson told Mr. Patterson and Mr. May that he had done the testing before and that he had obtained the work permit required by Diamond Offshore procedures.  Patterson Dep. at 64-66, 131-32; May Dep. at 31, 36.

(5)     There was no approved procedure in the ordinary database.  Mr. Patterson went to the Electrical Technician computer and found an approved procedure.  Patterson Dep. at 166-67.  Mr. Patterson and Mr. May looked for an approved Job Safety Analysis (JSA) on the Check-6 computer system, but did not find one.  Apparently, an approved JSA existed on a separate system called Orion, but Mr. Patterson and Mr. May did not have access to that system.  Patterson Dep. at 96-97.

(6)     In the early morning hours of June 1, 2015, Mr. Patterson performed the reverse power test under the supervision of Johnson.  The test caused a brief

shutdown of the engines, which activated the emergency lighting system.  Then, and only then, Johnson revealed that he did not really have any paperwork for the test, such as the work permit:

> Q. Okay. So, after the engines are tripped, you say, "At least we have a permit" to Kenneth Johnson?
>
> A. Yes, sir.
>
> Q. And he says, "What permit?"
>
> A. He laughed and said, "What permit?
>
> . . . .
>
> Q. Did you say anything to Antonio May after the engines were tripped?
>
> A. After the engines were tripped and Kenneth Johnson said, "Ha, ha, what permit." Then, we looked at each other and said, "Oh, [expletive deleted]." And then, "Let's go get everything back online."

Patterson Dep. at 130, 133; May Dep. at 66-67.  Naturally, Williams and Johnson proceeded to claim that it was Mr. Patterson's responsibility to get a work permit because this was an Electrical Technician task.

(7)     But this was not quite the end of it.  The lack of a work permit could be – and was – used as a pretext for firing Mr. Patterson.  But what about Mr. May? Under any set of circumstances, he was not responsible for getting a work permit. To cover that base, Williams accessed the maintenance log (RigMS) and altered the records to make it appear that Mr. May had prior experience with this particular test

20

(and thus should have known what to do).  Patterson Dep. at 184; May Dep. at 247-50, 287-89.  In other words, Williams fabricated evidence.  This part of his scheme went awry because the RigMS system recorded the fact that he had altered the records and the date and time at which he did it.

(8)     The next day, Diamond Offshore fired Mr. Patterson and Mr. May. Williams was openly happy about it:

> Q. How did you learn you were being terminated?
>
> A. The next day, when Mike Williams had come into the -- or come into the gym after tour, he was smiling, happy and said, "Come on, we need to go to the OIM's office."
>
> I was thinking, "Okay. I'm being written up."
>
> I come in there, and he stands in the corner smirking and smiling while I'm presented that –
>
> Q. Show me the smile, the smirk that he gave.
>
> A. Sir?
>
> Q. Do your best impression of the smirk that he gave.
>
> A. I'm not really an impressionist, sir.
>
> Q. Well, you said he smirked. How would you try to imitate the smirk?
>
> A. It was a big smile (indicating).

Patterson Dep. at 177.

(9)   The pretense behind all of this is revealed by the fact that Diamond Offshore did not terminate Johnson, who was actually in charge of the testing. Instead, Johnson just got a written warning.  App. at 106.

In light of these facts, (1) Diamond Offshore has not proven its defense by clear and convincing evidence, and (2) if the jury believes our version of the facts, it would be impossible for Diamond Offshore ever to meet that burden.  This is because the reverse power testing was a set up all along.  Mr. Patterson and Mr. May would not have been performing the testing under ordinary circumstances.  It would be done on the day shift by more senior personnel who had experience with the procedure.  Johnson would not have lied that he had a work permit.  Williams would not have doctored the computer records.

Diamond Offshore insists that Williams was not an actual decisionmaker. This may or may not be true.[6]  But even if it is true, this does not mean that Williams' actions did not cause the terminations.  It is Diamond Offshore's burden to prove, by clear and convincing evidence, that Williams did not cause the terminations.

This is similar to a "cat's paw" analysis in a discrimination case.  Even if the actual decisionmakers have no animus, an employer can still be liable if the actions

---

[6]   We note that Williams signed the termination paperwork (App. at 104-05) and that he was present at the termination meeting.  A jury would be justified in reacting skeptically to Diamond Offshore's attempt to distance itself from Williams, now that he has been fired.

of a person with animus are the proximate cause of the decision.  *E.g., Staub v. Proctor Hospital*, 562 U.S. 411, 149 (2010) ("Animus and responsibility for the adverse action can both be attributed to the earlier agent (here, Staub's supervisors) if the adverse action is the intended consequence of that agent's discriminatory conduct.  So long as the agent intends, for discriminatory reasons, that the adverse action occur, he has the scienter required to be liable under USERRA. And it is axiomatic under tort law that the exercise of judgment by the decisionmaker does not prevent the earlier agent's action (and hence the earlier agent's discriminatory animus) from being the proximate cause of the harm.").  In this case, it is Diamond Offshore's obligation to negate this by clear and convincing evidence.

The Court need not tackle that issue in this procedural context.  The question raised by this motion is simply whether a reasonable jury could find that Diamond Offshore <u>did not</u> meet its burden of proof by clear and convincing evidence.  The mere fact that Diamond Offshore did not fire Johnson is enough to raise a fact question under these circumstances.  In this context, it is significant to compare Mr. May and Johnson.  Even if Mr. Patterson was responsible for getting a work permit, why was Mr. May fired?  He would have been in the same position as Johnson, yet Johnson merely received a verbal warning stating "Kenneth was requested to assit [sic] some other crew members with a job they were doing.  Later it was determined that the other crew did not do a permit to work and did not go over the JSA for that

23

job." App. at 106. The fact that Diamond Offshore contorted itself <u>not</u> to fire Johnson suggests that Diamond Offshore's actions are suspect. A reasonable jury could find that this renders Diamond Offshore's entire story non-credible.

In sum, there is at least a genuine issue of material fact with respect to whether Diamond Offshore has proven its defense by clear and convincing evidence. The motion should therefore be denied.

IV.    <u>The Discrimination Claim May Be Dismissed</u>.

Mr. Patterson and Mr. May also asserted a race discrimination claim. While Mr. Patterson and Mr. May do believe that race was a motivating factor for some of Williams' actions, the evidence indicates that the more immediate motivation was the safety-related concerns. Accordingly, the Court may dismiss this claim.

V.    <u>Conclusion</u>

For the foregoing reasons, Diamond Offshore's motion should be denied.

Respectfully submitted,

/s/ David C. Holmes
David C. Holmes, Attorney in Charge
State Bar No. 09907150
Southern District No. 5494
13201 Northwest Freeway, Suite 800
Houston, Texas 77040
Telephone: 713-586-8862
Fax: 713-586-8863

ATTORNEY FOR PLAINTIFFS

## <u>CERTIFICATE OF SERVICE</u>

I certify that a copy of this document was served electronically on counsel for Defendant on June 14, 2017.

/s/ David C. Holmes