IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

JAMES PATTERSON and      §
ANTONIO MAY,      §
     §
     Plaintiff,      §
     §      No. 3:16cv103
VS.      §
     §      Jury Trial Demanded
DIAMOND OFFSHORE      §
DRILLING, INC.,      §
     §
     Defendant.      §

## **APPENDIX**

## **TO**

## **PLAINTIFFS' RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

David C. Holmes, Attorney in Charge
State Bar No. 09907150
Southern District No. 5494
13201 Northwest Freeway, Suite 800
Houston, Texas 77040
Telephone: 713-586-8862
Fax: 713-586-8863

ATTORNEY FOR PLAINTIFFS

## **TABLE OF CONTENTS**

| **Description** | **Page** |
|---|---|
| Patterson Deposition Excerpts | 1 |
| May Deposition Excerpts | 44 |
| Sutfin Deposition Excerpts | 53 |
| ALJ Decision in *Loftus* | 56 |
| Termination Form for Patterson | 104 |
| Termination Form for May | 105 |
| Termination Form for Johnson | 106 |
| E-Mail to Falke | 107 |
| Rebuttal to Write-Up | 108 |
| E-Mails with HR | 111 |
| ALJ Complaint in This Case | 114 |

James Christopher Patterson    3/23/2016

---

**[Page 1]**

2016-SPA-1
2016-SPA-2

IN THE MATTER OF JAMES        )
PATTERSON AND ANTONIO MAY,    )
        Complainants,         )
                              )
VS.                           )
                              )
DIAMOND OFFSHORE, INC.,       )
        Respondent.           )

ORAL DEPOSITION OF JAMES CHRISTOPHER PATTERSON
March 23, 2016

        Oral deposition of JAMES CHRISTOPHER
PATTERSON was taken on March 23, 2016, in the Law
Offices of David C. Holmes, 13201 Northwest Freeway,
Suite 800, Houston, Texas, from 10:00 a.m. to 6:30 p.m.,
before Dickie Zimmer, Certified Shorthand Reporter,
pursuant to Notice and the Federal Rules of Civil
Procedure and under the following agreement of counsel
for the respective parties that:
        The deposition may be signed by the witness
before any Notary Public or officer authorized to
administer oaths.

---

**[Page 2]**

1        A P P E A R A N C E S
2
3    FOR THE COMPLAINANTS:
       Law Offices of David C. Holmes
4      13201 Northwest Freeway, Suite 800
       Houston, Texas  77040
5      Phone:  713.586.8862
       Fax:  713.586.8863
6      Email:  dholmes282@aol.com
       By:  David C. Holmes
7
8
       FOR THE RESPONDENT:
9      Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
       One Allen Center
10     500 Dallas Street, Suite 3000
       Houston, Texas  77002
11     Phone:  713.655.5758
       Fax:  713.655.0020
12     Email:  jim.staley@olgetreedeakins.com
       By:  Jim Staley
13
14
       ALSO PRESENT:
15     William "Chip" Rice
16
       * * * * * * * * * * * *
17
18
19
20
21
22
23
24
25

---

**[Page 3]**

1                    INDEX
2
3    TESTIMONY OF:  JAMES CHRISTOPHER PATTERSON
4    EXAMINATION BY:                    PAGE
5      Mr. Staley.............................. 4
6
7              EXHIBIT INDEX
8    NO.         DESCRIPTION          PAGE
9    1   Hand Drawing of Decade Box........ 106
     2   DODI Permit to Work (DODI 0599)...... 146
     3   Job Safety Analysis Worksheet Dated
10       7-10-13 (DODI 0505-06)............... 149
     4   Injury/Illness Report of Patterson
11       (DODI 0511)............................ 162
     5   Supervisor's Conference Record Dated
12       6-2-15 (DODI 0551-52)................. 186
     6   Diamond Offshore Worldwide Competency
13       Program Dated 1-23-14 (DODI 0464-68).. 201
     7   Diamond Offshore Worldwide Competency
14       Program Dated 8-9-13 (DODI 0478-82)... 203
     8   Diamond Offshore Worldwide Competency
15       Program Dated 9-4-11 (DODI 0489-93)... 206
     9   Diamond Offshore Working Safely is a
16       Condition of Your Employment Dated
         6-13-11 (DODI 0237)................... 210
17   10  Handwritten Document Dated 3-15-14 of
         Patterson (DODI 0688)................. 261
18   11  Supervisor's Conference Record Dated
         10-25-14 (DODI 0246).................. 318
19   12  Letter to Dugger From Patterson
         (DODI 0247-50)........................ 336
20   13  Email Dated 2-10-15 From Falke
         (DODI 0671-72)........................ 356
21   14  Planned Work Order Dated 3-29-12
         (DODI 0855-56)........................ 369
22   15  Charge No. 460-2015-02946 Received
         7-22-15............................... 371
23   16  Email From Patterson To May Dated
         6-9-15................................ 376
24   17  Email From Patterson To Naquita
         Dated 3-14-14......................... 378
25

---

**[Page 4]**

1        JAMES CHRISTOPHER PATTERSON,
2    having been first duly sworn, testified as follows:
3                  EXAMINATION
4    BY MR. STALEY:
5        Q.  Good morning, Mr. Patterson.  My name is Jim
6    Staley, and I'm an attorney for Diamond Offshore.
7            Do you understand that?
8        A.  Yes, I do, sir.
9        Q.  And we are here today -- you're here today to
10   give a deposition in a Department of Labor -- in
11   connection with the Department of Labor Complaint that
12   you filed against Diamond Offshore; is that correct?
13       A.  Yes, sir.
14       Q.  Forgive me, my pen doesn't have ink; so, I'm
15   getting another one.
16           And we have not met before today, have we?
17       A.  No, we have not, sir.
18       Q.  And what is your complete name?
19       A.  James Christopher Patterson.
20       Q.  And what is your address?
21       A.  4407 Bandera Branch Lane.
22       Q.  And is that Houston?
23       A.  That is in Katy, Texas, sir.
24       Q.  And the ZIP Code?
25       A.  77494.

O'Neal Probst Wells - 713-521-1314
Houston/Galveston    Dallas/Fort Worth    Austin/San Antonio    Bryan/College Station    Corpus Christi

APPENDIX 1                                                    DODI 912

James Christopher Patterson   3/23/2016

[Page 33]

1  safety protocol for any given task?
2      A. Yes, sir.
3      Q. Why is it important to conduct a JSA?
4      A. To be aware of the hazards or potential issues
5  involved with -- involved with the job, sir.
6      Q. And how many JSAs did you conduct during your
7  employment at DODI?
8      A. A lot.
9      Q. Hundreds?
10     A. At least, sir.
11     Q. Thousands, perhaps?
12     A. I could honestly only speculate, sir.
13     Q. You know it's at least hundreds, though, correct?
14     A. Yes, sir.
15     Q. And you started conducting JSAs when you went
16 aboard the Ocean Endeavor in August of 2011?
17     A. Yes, sir.
18     Q. What is a permit to work?
19     A. That allows -- or that is a permit that actually
20 gives people the permission to work.  It has to be
21 signed by the initiator, then the area supervisor gives
22 their authorization, because they control the area; and
23 then, an authorized person allows for us to work.
24     Q. And is the authorized person, typically, the OIM
25 or the toolpusher?

[Page 34]

1      A. Yes, sir.
2      Q. Why is it important to get a permit to work or a
3  work permit?
4      A. It is required for any time that there is unusual
5  work that has not been completed within the last 72
6  hours, anything that could potentially cause an issue;
7  and, also, for tracking purposes.
8      Q. When you said rig -- when you said reverse power
9  testing is unusual work, what did you mean by that?
10     A. As in it's not conducted daily, and it had never
11 been conducted by the nightshift before.
12     Q. Why do you believe it had never been conducted by
13 the nightshift?
14     A. Because myself, Antonio May and Kenneth Johnson
15 were the nightshift; and we had never conducted it.  And
16 on the Ocean Endeavor it had not been conducted by the
17 nightshift before.  It's a test that's conducted only
18 when ABS is present to observe it.
19     Q. Well, aren't you aware that prior to ABS coming
20 for inspections that DODI, as a normal course of
21 practice, does a pre-ABS test to make sure that there
22 are no problems so there won't be a surprise when the
23 ABS crew is there?
24     A. Yes, sir, and it's done by the dayshift.
25     Q. Okay.  And is there any rule that says it has to

[Page 35]

1  be done by the dayshift?
2      A. No, sir, it's because they are people who are
3  most senior -- or because they are the senior most
4  people, and they are the ones that do it continuously.
5      Q. So, that's just what you think should happen,
6  correct?  There's no policy or procedure that says only
7  the dayshift can conduct a reverse power test?
8      A. Oh, no, sir, the issue with that is that, if it's
9  a dark outside, the primary -- the primary concern of
10 the JSA, as it states, is that the rig can go on
11 emergency power, which is why the emergency generator
12 has to be on standby.  And if it's dark outside, if they
13 conduct the reverse power testing and it does cause all
14 of the engines to drop out, it's not any less dark
15 outside, sir.
16     Q. I understand, but --
17        MR. STALEY:  I'm going to object to the
18 nonresponsive portion of that.
19     A. Oh, I'm sorry.
20     Q. (By Mr. Staley)  My question is --
21        MR. HOLMES:  Just so you understand, when he
22 makes a statement like that or if I say something, it's
23 just for the record.  You don't have to --
24        THE WITNESS:  Oh.
25        MR. HOLMES:  You don't have to respond to it

[Page 36]

1  or --
2      Q. (By Mr. Staley)  You don't need to respond to our
3  objections.  It's for the record.
4        MR. HOLMES:  Yeah.
5      Q. (By Mr. Staley)  And let me clarify.
6        You've stated reasons why you think only the
7  dayshift should perform reverse power testing.  That's
8  not in any DODI policy that you're aware of, is it?
9      A. Not that I'm aware of, sir.
10     Q. Okay.  And who performed -- who performed reverse
11 power testing on the dayshift that you're aware of?
12     A. John Smith.
13     Q. And what was his position?
14     A. Senior electrician.
15     Q. Okay.  Anybody else?
16     A. Scott Cannon.
17     Q. And what was his position?
18     A. Senior electrician.  And the mechanics involved
19 with that, as well.
20     Q. Any other electricians or electrical technicians
21 that assisted with reverse power testing on the
22 dayshift?
23     A. Yes, the mechanic and the electrician who were
24 performing that would be Mark McPhail, mechanic.
25 P-H-A-I-L, sir.

[9]  (Pages 33 to 36)

O'Neal Probst Wells - 713-521-1314
Houston/Galveston   Dallas/Fort Worth   Austin/San Antonio   Bryan/College Station   Corpus Christi
APPENDIX 2

DODI 920

James Christopher Patterson    3/23/2016

[Page 41]

1    A. Yes, sir, in electronic format.
2    Q. On a computer, correct?
3    A. Yes, sir.
4    Q. And there was a video, as well?
5    A. Yes, sir.
6    Q. And you'd watch that video and see the electronic
7    training once a year for JSAs, right?
8    A. Yes, sir.
9    Q. Now, when is it your understanding when a JSA is
10   required for electronic technician tasks?
11   A. For -- most of our tasks required a JSA --
12   Q. Okay.
13   A. -- as opposed to basic troubleshooting, sir.
14   Once it goes beyond basic troubleshooting, then, a JSA
15   is required.
16   Q. So, was a JSA required for reverse power testing?
17   A. Yes, sir.
18   Q. And a work permit was required for that, too,
19   right?
20   A. Yes, sir.
21   Q. And for someone like me who hasn't been on the
22   Ocean Endeavor, if I was to go to the Ocean Endeavor and
23   want to find where the JSAs are kept, where would
24   they -- where would I look?  Where should it be?
25   A. On the computer under the Check-6 program.

[Page 42]

1    Q. Check sticks program?
2    A. Check-6.  Yes, sir.
3    Q. Would you spell that?
4    A. C-H-E-C-K; and then, just the No. 6.
5    Q. Oh, okay.  Check-6 program.
6    A. And then, the JSAPs.
7    Q. Okay.  So, pretty much most computers on the --
8    on the rig, I could go into any of them and go to the
9    Check-6 program; and then, look for the JSAs?
10   A. Yes, sir.
11   Q. And they're easily accessible on this web browser
12   interface?
13   A. Yes, sir.
14   Q. And where would you typically get JSAs when you
15   needed one?
16   A. Up in my shop, up in the LEL, local equipment
17   room -- or local electrical room; and that's where the
18   electronics technician job is.
19   Q. Okay.  And you had a computer in there that you
20   would use as you needed to?
21   A. Yes, sir.
22   Q. And on that you could get your JSA from that
23   computer, correct?
24   A. Yes, sir.
25   Q. And you could get a work permit from that

[Page 43]

1    computer?
2    A. No, sir, I had to go down to the control room in
3    order to get the work permit.
4    Q. Okay.  You can only printout a work permit from
5    the control room?
6    A. No, sir.  Work permits are written by hand; but
7    all the work permits are kept locally at the control
8    point, which is --
9    Q. So, you couldn't print out a form that was
10   a work permit that you were to fill out by hand?
11   A. No, sir.
12   Q. So, when you needed a work permit, you
13   went to the control room?
14   A. Yes, sir.
15   Q. And when is a work permit required for electronic
16   technician tasks?
17   A. Anything going beyond typical troubleshooting or
18   another -- to be quite clear, Diamond has in GEMS a
19   policy when a JSA is required; and it states all the
20   conditions within that.
21   Q. So, often the JSA itself will identify you
22   need a work permit for this, correct?
23   A. Yes, sir.
24   Q. And reverse power testing requires a work permit,
25   correct?

[Page 44]

1    A. Yes, sir.
2    Q. Who can sign the work permit, as far as
3    authorizing the work?
4    A. For the reverse power testing?
5    Q. Yes.
6    A. On that it requires the area supervisor, which is
7    the mechanic, followed by the OIM.
8    Q. Okay.  So, the OIM is required to authorize it?
9    A. Yes, sir.
10   Q. Can the toolpusher authorize that?
11   A. No, sir.
12   Q. Why did you refer to the mechanic as the area
13   supervisor?
14   A. Because it is on the engines, and a mechanic --
15   both the mechanic and the maintenance supervisor are the
16   area supervisors over the engines; and reverse power is
17   in engine testing, sir.
18   Q. Well, it also involves electrical, right?
19   A. But the thing is --
20   Q. Hold on.
21   A. Yes, sir.
22   Q. Does it involve electricity?
23   A. Yes, sir.
24   Q. Okay.  Is the mechanic an electrician?
25   A. No, sir.

[11] (Pages 41 to 44)

James Christopher Patterson    3/23/2016

[Page 57]

1  first half of 2013?
2      **A.** I do not know, sir.
3      **Q.** Do you know -- you weren't on the ship when this
4  happened?
5      **A.** No, sir.
6      **Q.** Who told you about it?
7      **A.** That would be Nick Coverstone and John Smith.
8      **Q.** Okay. And did they -- were they the ones that
9  told you that Mike Williams was excited that Tommy Wells
10  was written up?
11      **A.** No, sir, we were down on one of our first days on
12  the rig; and he -- Mike Williams had come to the SCR
13  room and was really excited and bragging about it.
14      **Q.** Okay. I guess, what did he say that led you to
15  believe that he was really excited?
16      **A.** He had a big smile on his face, "I got him" --
17  that he got wrote up.
18      **Q.** How would he get him if -- I mean, Tommy is on a
19  totally different shift than Mike, right?
20      **A.** Yes, sir. They have a bit of animosity towards
21  each other.
22      **Q.** I mean, Mike wasn't even on the ship when this
23  happened, right, because Tommy was the mirror?
24      **A.** Yes, sir.
25      **Q.** How would he get him, if he's not even on the

[Page 58]

1  ship?
2      **A.** He wouldn't. They -- Mike Williams and Tommy
3  Wells argued about over whether to maintain split bus
4  or -- a split bus or a continuous bus operation. And
5  this is how they operated, and it ended up causing -- or
6  the open -- or the split bus ended up causing the lights
7  to go out, Tommy Wells got written up, and Mike was
8  excited about it.
9      **Q.** Okay. So, Mike felt vindicated that the way he
10  thought he should do the job would have been a better
11  way to do it?
12      **A.** Yes, sir.
13      **Q.** Okay. Any other instance that you've heard of of
14  a rig going dark due to human error, other than the one
15  you described that happened this last week with John
16  Smith and the second instance of the split bus, which
17  didn't involve the rig going dark, but some engines were
18  tripped?
19      Are you aware of any additional instances where
20  the rig went dark due to human error?
21      **A.** Not off the top of my head, sir.
22      **Q.** Do you think Tommy, when he was written up for
23  the split bus incident in 2013 in Egypt, do you think
24  that he didn't follow proper procedure?
25      **A.** I'm not aware of any of that information, sir.

[Page 59]

1      **Q.** It's possible, you just don't know?
2      **A.** I do not know, sir.
3      **Q.** Where do you work now?
4      **A.** I'm a contractor for Core-Tech.
5      **Q.** And what do you do for Core-Tech as a contractor?
6      **A.** I'm a mechanical technician and right now working
7  at the Cameron facility.
8      **Q.** Where is the Cameron facility?
9      **A.** Brookshire right off of the 10.
10      **Q.** And what do you do for them as a --
11      **A.** Mechanical technician?
12      **Q.** Yeah.
13      **A.** All things mechanical; hydraulic, PLCs,
14  electrical, all maintenance items.
15      **Q.** And when did you start working for them?
16      **A.** I started working for them January 11th.
17      **Q.** And do you work full time?
18      **A.** Yes, sir.
19      **Q.** And do you work any overtime?
20      **A.** Yes, sir.
21      **Q.** How much overtime do you, typically, work?
22      **A.** As much as I possibly can, sir. Which right now
23  they are allowing 12 hours a day and Saturday and Sunday
24  work for eight hours.
25      **Q.** Okay. Are you working all of that?

[Page 60]

1      **A.** Yes, sir, as much as I can.
2      **Q.** So, the way I -- my rough math is --
3      **A.** 60.
4      **Q.** -- 60 during the week; and then, 16 during the
5  weekend?
6      **A.** Sometimes, sir. It averages to be about 60 hours
7  a week.
8      **Q.** Okay. And are you paid by the hour or are you
9  salary?
10      **A.** Paid by the hour, sir. $28.
11      **Q.** So, overtime is --
12      **A.** Time and a half.
13      **Q.** When you were interviewing with Core-Tech --
14  would you spell Core-Tech?
15      **A.** C-O-R-E, dash, T-E-C-H.
16      **Q.** -- did you tell them that -- did you tell them
17  about the June 1, 2015 reverse testing incident where
18  all the engines were tripped?
19      **A.** Yes -- yes, sir, I told them extensively about
20  it.
21      **Q.** Did you tell them all seven engines were tripped?
22      **A.** Yes, sir.
23      **Q.** What did they say about that?
24      **A.** They asked -- or they still asked me if I wanted
25  to go interview.

[15] (Pages 57 to 60)

James Christopher Patterson   3/23/2016

[Page 61]

1    **Q.** Okay.  Were they -- did they ask any questions
2  about it?
3    **A.** They leave that to the people they've contracted
4  out to, and that would be the Cameron facility.
5    **Q.** So, you work for Core-Tech; but you work at the
6  third-party facility, Cameron?
7    **A.** Yes, sir.
8    **Q.** What does the Cameron facility produce?
9    **A.** They produce elastomers, blowout preventer parts.
10    **Q.** Who's your supervisor at Core-Tech?
11    **A.** I don't report to anyone directly at Core-Tech.
12  At Cameron I report to Jay Findley.
13    **Q.** Jay Findley?
14    **A.** Uh-huh.  Yes, sir.
15    **Q.** And what is his position?
16    **A.** Senior maintenance supervisor.
17    **Q.** Okay.  So, a reverse power test cannot be
18  performed by anyone other than an electrical technician
19  or an electrician, correct?
20    **A.** And the mechanics, sir.
21    **Q.** The mechanics are there to throttle the engine,
22  right?
23    **A.** Yes, sir, the mechanic is there to run the
24  operation.
25    **Q.** So, I mean, what does the engine -- what does the

[Page 62]

1  mechanic do, other than throttle the engine?
2    **A.** He monitors all the operations -- or he monitors
3  the panel and all the operations.
4    **Q.** Okay.  What do you mean by all the operations of
5  the panel?
6    **A.** When the panel is open, it can only be seen by
7  one person.  And since the mechanic is the one in
8  charge, he monitors and reports what to do.
9    **Q.** But he -- you testified the mechanic can't --
10  can't mess with any electrical cords, correct?
11    **A.** He does not mess with the electrical cords, sir;
12  but it is the mechanic and the motor hand who start up
13  the engines, who place them on-line, who shut Albrecht
14  or who open and close the transformers.  And they adjust
15  the frequencies, they adjust the voltage.  They are the
16  ones who are in charge of the engines.
17    **Q.** They adjust the voltage on the --
18    **A.** Engines.
19    **Q.** Okay.  You adjust the voltage on the jumper
20  cords, right?
21    **A.** With the jumper cords, you have the throttle --
22  or you have the throttle coming out.  It goes to a
23  decade box, which is a series of resistors; and then, it
24  goes to the outlets.  The idea is to decrease the
25  resistance slowly to give it the -- or to shut down the

[Page 63]

1  throttle signal until the point where it -- the engine
2  is slow enough so that way power then comes back into
3  the engine to cause the reverse power testing.
4    **Q.** If you were to do the reverse power testing job
5  again today, would you do it the same way that you
6  did -- as far as the procedures you followed, that you
7  followed on June 1, 2015?
8    **A.** The procedures or --
9    **Q.** I'm not talking about the JSA or the work permit.
10  Let's assume that's taken care of.
11    Would you conduct the reverse power testing with
12  the exact same steps that you took on June 1?
13    **A.** I would I hope, being as that I had not actually
14  conducted it before, I'd place an all stop and request
15  that I be walked through the entire procedure before
16  doing it.
17    **Q.** Okay.  And when you're walking through that
18  procedure, would you do it exactly as you did on June 1?
19    **A.** I would follow the JSA --
20    **Q.** Okay.  What you did on June 1 was different than
21  what's in the JSA, correct?
22    **A.** I did what the mechanic had -- or the procedures
23  the mechanic had provided, yes, sir.
24    MR. STALEY:  I'm going to object to the
25  responsiveness.

[Page 64]

1    **A.** Okay.
2    **Q.** (By Mr. Staley)  The steps that you took on
3  June 1, 2015 are different than what the JSA provides,
4  correct?
5    **A.** Yes, sir.
6    **Q.** Okay.  Very quickly.  On June 1, 2015, you didn't
7  get a permit, a work permit, for the reverse power
8  testing, correct?
9    **A.** That is correct.  The mechanic had stated that he
10  had it.
11    **Q.** I understand what you claim about the mechanic;
12  but my question is narrower for you, and it's simply:
13  Did you get a work permit?
14    **A.** I personally did not get a work permit.
15    **Q.** Did you review a work permit prior to the reverse
16  testing -- reverse power testing job on June 1?
17    **A.** I did not review the -- I did not review the work
18  permit.
19    **Q.** Did you see a work permit for the reverse power
20  testing job on June 1?
21    **A.** No, sir, I did not see the work permit.
22    **Q.** You didn't ask Randy Sutfin to sign a work permit
23  on June 1 for the reverse power testing, did you?
24    **A.** No, sir, because Kenneth Johnson had stated that
25  he'd completed it.

[16]  (Pages 61 to 64)

James Christopher Patterson    3/23/2016

---

[Page 65]

1    **Q.** I understand your reasons, but -- you know, I
2  understand why you say you didn't; but my question is
3  simply narrower.
4        You didn't have a conversation with Randy Sutfin
5  on June 1 asking him to sign a work permit?
6    **A.** No, sir.
7    **Q.** And you didn't talk to any other OIM on June 1
8  asking him to sign a work permit for the reverse power
9  testing?
10   **A.** No, sir.
11   **Q.** And could Ronny Davis sign a work permit for that
12  kind of reverse power testing?
13   **A.** No, sir.
14   **Q.** Who else besides Randy Sutfin could sign that
15  work permit?
16   **A.** Johnny Moore.
17   **Q.** What --
18   **A.** That would be his back-to-back OIM.
19   **Q.** That's his mirror?
20   **A.** Yes, sir.
21   **Q.** Given that the work involved, you know, hooking
22  up electrical jumpers to the engine, why didn't you ask
23  to see the work permit?
24   **A.** We had made the mistake of trusting the mechanic
25  when he had said he had completed all of the

---

[Page 66]

1  paperwork -- or that he had completed all of the
2  paperwork.
3    **Q.** I know, but why wouldn't you want to see it,
4  period?
5    **A.** Because it was 2:00 o'clock in the morning and
6  instead of re-reviewing it, Kenneth Johnson had stated
7  he had done this before; and this is what needed to be
8  done.
9    **Q.** And was it your understanding that it was a hot
10  work permit?
11   **A.** I did not know, sir.  I trusted the mechanic on
12  that part.
13   **Q.** You didn't know whether it was a hot work permit
14  or a cold work permit, you just thought there was a
15  permit that you hadn't seen, correct?
16   **A.** Yes, sir.  It should have been a -- I'm not
17  really sure, sir.
18   **Q.** If it was a hot work permit, could a mechanic
19  even request that to be done?
20   **A.** Yes, sir, he's the area supervisor over the
21  engines.
22   **Q.** So, it's your understanding that for hot work the
23  mechanic is in charge of getting the permit?
24   **A.** For anything relating to the engines, the area
25  supervisor is responsible -- or it would have to go

---

[Page 67]

1  through the mechanic to get the mechanic to sign off on
2  the permit, anyway, before going to the OIM.
3    **Q.** I guess, my question is:  Do you think the
4  mechanic is the only one that can go to the OIM for hot
5  work involving reverse power testing?
6    **A.** No, sir, we would still have to go to the
7  mechanic first and get him to sign off on the permit
8  before going to the OIM.
9    **Q.** On June 1, 2015, you did not complete a JSA for
10  the reverse power testing, did you?
11   **A.** I did not personally complete the JSA.
12   **Q.** And you didn't -- on June 1, 2015, you didn't
13  even participate in the JSA for the reverse power
14  testing, did you?
15   **A.** We did not -- we had reviewed what Kenneth
16  Johnson had said that he had done before.
17   **Q.** Okay.  And my question is narrower about a JSA.
18       On June 1, 2015 did you participate in a JSA for
19  the reverse power testing?
20   **A.** No, we did not print out; and we did not review
21  the JSA, that Electrical 171.
22   **Q.** And not only did you not review it; but you
23  didn't, like, participate with somebody else kind of
24  just reading it?
25   **A.** No, sir, we did -- we had not done that.

---

[Page 68]

1    **Q.** In retrospect, was it a mistake for you not to
2  obtain a permit to work for the reverse power testing?
3    **A.** It was reported to me that the permit was
4  obtained.  That was a mistake not to -- or to trust
5  Kenneth Johnson in stating that he had done that.
6    **Q.** Was it a mistake for you not to review the permit
7  that you thought existed?
8    **A.** Yes.
9    **Q.** What, if anything, good can happen by failing to
10  obtain a work permit for reverse power testing?
11   **A.** Can you say that, again, sir?
12   **Q.** Sure.
13       What, if anything that is good, can happen by a
14  failure -- by virtue of a failure to get a work permit
15  for reverse power testing?  Is there any upside to doing
16  it that way?
17   **A.** No, sir.
18   **Q.** In retrospect, was it a mistake for you not to
19  complete a JSA for the reverse power testing?
20   **A.** On that part, yes.
21   **Q.** And it was a mistake for you not to insist on
22  reviewing it and participating in the JSA, correct?
23   **A.** The JSA that -- or that we had found was not --
24  or it was -- that we had found was not authorized.
25  Antonio May said to stop.  He was going to go look for

---

[17] (Pages 65 to 68)

James Christopher Patterson  3/23/2016

[Page 69]

1  one.  And at that point Kenneth Johnson had stated that
2  we need -- this is how we do it.
3       MR. STALEY:  I'm going to object to the
4  responsiveness.
5       A.  Okay.
6       Q.  (By Mr. Staley)  I'm not asking about what you
7  did during the process yet.  I'm going to get to those
8  questions.
9       My question is:  Was it a mistake for you not to
10  insist upon reviewing and participating in a JSA prior
11  to completing the reverse power testing on June 1?
12       A.  Yes.
13       Q.  And what, if anything good can happen, by
14  refusing to complete a JSA for reverse power testing?
15       A.  None.
16       THE COURT REPORTER:  Did you say "none" or
17  "nothing"?
18       THE WITNESS:  "None."
19       Q.  (By Mr. Staley)  Now, during your attempt to
20  conduct the reverse power testing, the engines were
21  tripped, and I think you said three or four seconds,
22  then the emergency generator came on.
23       A.  Yes, sir.
24       Q.  Did the rig go quiet?
25       A.  The emergency -- or the backup lights came on,

[Page 70]

1  the engines shut down and the emergency generator came
2  up.
3       Q.  Did the rig go quiet?
4       A.  Yes, sir, ventilation shuts down during an
5  emergency -- or during engines dropping out.
6       Q.  And just to be clear, all seven engines tripped
7  and stopped working?
8       A.  Yes, sir.
9       Q.  And the emergency lights came on?
10       A.  Yes, sir.
11       Q.  When the engines tripped and the rig went quiet,
12  who all was in the engine room?
13       A.  Myself, Kenneth Johnson and Antonio May.
14       Q.  What time was that?
15       A.  Approximately, 2:00 in the morning Romanian time.
16       Q.  Any disagreement with 2:19?
17       A.  I would not disagree.
18       Q.  And was -- to your knowledge, was Mike Williams
19  in bed when that happened?
20       A.  Yes, sir.
21       Q.  What engine or generator were you engaged with
22  when the power went out and all of their engines
23  tripped?
24       A.  I believe, Generator 7.  I have written it -- or
25  I had written it in my notes.

[Page 71]

1       Q.  What is it -- I've seen a reference in your
2  handwriting to EGIIIP.
3       A.  Yes, sir, that's a controller.
4       Q.  What does that stand for, do you know?
5       A.  Engine -- I'm not sure exactly what it stands
6  for.  It's a NOV product for an engine controller.
7       Q.  Okay.  Now, there's seven of these in the engine
8  room?
9       A.  Yes, sir.
10       Q.  And you just happened to be the EGIIIP on
11  Engine 7 is where you were engaged?
12       A.  Yes, sir.
13       Q.  Now, when all the engines were tripped and the
14  rig went quiet and the emergency generators came on,
15  were you concerned about that?
16       A.  Yes, sir.
17       Q.  Was that a big deal?
18       A.  The engines tripped, that says time for -- or
19  that's a deal for us to respond to.
20       Q.  Is that a big deal?
21       A.  Yes, sir.
22       Q.  Is it a big problem for the engines to stop
23  functioning in the middle of the night?
24       A.  Yes, sir.
25       Q.  I don't think there's anything positive, but can

[Page 72]

1  you think of anything good that comes out of the engines
2  being tripped in the middle of the night?
3       A.  No, sir, that's why it's done during the daytime.
4       Q.  Well, even if you're going to do it at night, is
5  there -- I mean, is there a positive -- is there
6  something good that comes out of tripping the engines
7  during the daytime?
8       A.  Then, you don't lose any of the light outside,
9  sir.
10       Q.  And is that a good thing for the rig overall?
11       A.  No, sir.
12       Q.  Okay.  You would agree with me that it's not a
13  good idea for the -- for the engines to be tripped at
14  night or day due to human error, correct?
15       A.  That is correct, sir.
16       Q.  And how long was the rig -- were the engines down
17  before they were -- they were got back up and running?
18       A.  Approximately 20 minutes, sir.
19       Q.  After the rig lost power, did the -- after the
20  engines were tripped, did that -- did the SDI system
21  require a full block calibration?
22       A.  Yes, sir, anytime it goes down.  That took a very
23  short period of time.
24       Q.  Why is a full block calibration required there?
25       A.  To determine where the bottom of the top drive is

[18]  (Pages 69 to 72)

James Christopher Patterson   3/23/2016

[Page 73]

1  in the top.  They were circulating it -- or they were
2  circulating during the time that no drilling was going
3  on.
4      Q.  When you say "top drive" --
5      A.  This is the part that moves up and down that has
6  the rotating -- or that connects a rotating bit that
7  drills down.
8      Q.  You need to find out where exactly that part of
9  the drilling --
10     A.  Where -- oh, I'm sorry, sir.
11     Q.  -- where that equipment is, or elaborate?  I'm
12 trying to just understand fully what you just described.
13     A.  Yes, sir.  It's just determining where the top
14 drive unit itself is, how close it is to the deck, raise
15 it up to the top.  And then, say, this is where the top
16 of the derrick is and this is where the zero point is.
17     Q.  Okay.  And that takes about a half hour?
18     A.  If they are taking their time, yes, sir.
19     Q.  What's the quickest full block calibration you've
20 witnessed personally?
21     A.  About 20 minutes.
22     Q.  So, is between 20 and 30 minutes a reasonable
23 timeframe for a full block calibration?
24     A.  Yes, sir.
25     Q.  And does the rig have downtime when the SDI

[Page 74]

1  system undergoes a full block calibration?
2      A.  I do not know, sir.
3      Q.  Well, can you drill while it's going on a full
4  block calibration?
5      A.  No, sir, the rig was not drilling at the time.
6      Q.  Okay.  Do you know how long the rig wasn't
7  drilling during the full block calibration?
8      A.  The rig wasn't drilling during that entire period
9  of time, sir, before or after.
10     Q.  Were you involved in the full block calibration?
11     A.  No, sir.
12     Q.  And are you aware that one was conducted at
13 4:00 a.m. on June 1 after y'all tripped the engines?
14     A.  No, sir, I had heard that they had performed
15 another one that was all better.
16     Q.  You heard they performed another one, and it was
17 all better?
18     A.  No, I had heard that they had performed another
19 one; and -- but I was not informed at the time.
20     Q.  Okay.  So, you weren't informed that they'd
21 conducted a full block calibration that evening?
22     A.  I was informed afterwards that they had done one,
23 sir.
24     Q.  Okay.  And that didn't surprise you, did it?
25     A.  No, sir.

[Page 75]

1      Q.  That would be what you would expect after the
2  engines were tripped, correct?
3      A.  I believe so, sir.
4      Q.  Do you know if DODI on the Ocean Endeavor is
5  responsible to Exxon Mobil for rig downtime caused by
6  human error of DODI employees?
7      A.  We end up with a lot of scheduled downtime; so,
8  I'm not sure, sir.
9      Q.  You wouldn't dispute that, though, would you?
10     A.  No, sir.
11     Q.  And you wouldn't dispute that there are costs
12 associated with rig downtime to DODI?
13     A.  No, sir, I would not dispute that.
14     Q.  Let's go back to the evening before that.  On
15 May 31, 2015, Mike Williams asked you to perform the
16 reverse power testing?
17     A.  That's incorrect, sir.  He told Antonio May and
18 myself to assist Kenneth Johnson in doing engine
19 shutdown tests.
20     Q.  What's the difference between an engine shutdown
21 test and a reverse power test?
22     A.  A reverse power test is one of the engine
23 shutdown tests.
24     Q.  Okay.  So, he told you -- he told -- Mike
25 Williams told you, Antonio May and Kenneth Johnson,

[Page 76]

1  "Y'all do the engine shutdown test, which includes
2  reverse power testing"?
3      A.  No, he told Kenneth Johnson separately that he
4  was going to be doing the engine shutdown testing.  And
5  after the meeting, we met with him; and he ordered us to
6  assist Kenneth Johnson.
7      Q.  Okay.  What did you think you were assisting
8  Kenneth Johnson with, based on Mike Williams'
9  instructions?
10     A.  The engine shutdown testing.
11     Q.  What about the reverse power testing?
12     A.  That's part of the engine shutdown testing.
13     Q.  Okay.  Mike Williams had a separate meeting with
14 Kenneth Johnson than he did with you and Antonio May?
15     A.  Yes, sir.
16     Q.  Okay.  Again, just to be clear, Mike Williams --
17 I'm sorry, Kenneth Johnson is not an electrician or an
18 electronic technician, correct?
19     A.  That is correct.
20     Q.  And he is not authorized to -- to hook up
21 electrical cables to the engine?
22     A.  No, sir.  There were no cables that were hooked
23 up to the engine, sir.
24     Q.  Well, or the jumpers?
25     A.  That is correct, sir.

[19] (Pages 73 to 76)

James Christopher Patterson    3/23/2016

[Page 77]

1    Q. And he's not authorized to -- what was the
2 toolbox that you described you were using, what's the
3 name of it?
4    A. That is called a decade box, sir.
5    Q. Decade box.
6      Is he authorized to the work with the decade box?
7    A. He has the capacity to. I don't know whether or
8 not he chooses to use it. That's --
9    Q. Do you think DODI procedures permit him to use
10 the decade box on the engine?
11    A. Probably not -- or I would not say so, sir.
12    Q. Mechanics aren't allowed to do that, are they?
13    A. I don't believe so, sir.
14    Q. That's what electricians and electrician
15 technicians are for, right?
16    A. Yes, sir.
17    Q. Electrical technicians, excuse me.
18    A. Yes, sir.
19    Q. Okay. So, you state that Mike Williams told you
20 and Antonio May that you are to assist Kevin --
21    A. Kenneth.
22    Q. -- Kenneth Johnson with the engine shutdown
23 testing, which you knew involved reverse power testing?
24    A. Yes, sir.
25    Q. What time was that meeting at?

[Page 78]

1    A. This was immediately after the turnover; so, just
2 before 1800.
3    Q. This is, like, 5:50 or ten till 6:00 p.m.?
4    A. Somewhere around that time, sir.
5    Q. What time did you typically start your shift?
6    A. At 1800, sir.
7    Q. Okay. So, this is right before 6:00 p.m., you
8 typically had a five or ten minute meeting with Mike
9 about things that needed to be done or things to include
10 on the night's agenda?
11    A. Yes, sir.
12    Q. And on this evening you met with him as usual,
13 correct?
14    A. Yes, sir.
15    Q. And was that in the tour?
16    A. This was in his office, sir.
17    Q. Where is his office?
18    A. It's right next to the -- or it's right across
19 from the meeting room.
20    Q. And how long was that meeting?
21    A. A couple of minutes, sir.
22    Q. And Kenneth Johnson was not in that meeting?
23    A. No, sir, he had met with Mike Williams prior to
24 pre-tour meeting.
25    Q. And you weren't part of the meeting between Mike

[Page 79]

1 Williams and Kenneth Johnson, were you?
2    A. No, I was not, sir.
3    Q. Do you know where that meeting took place?
4    A. In Mike Williams' office, sir.
5    Q. Did you see Kenneth Johnson come out of the
6 office as you were walking, or how do you know that he
7 met with Kenneth Johnson just prior to you and Antonio
8 May meeting with him?
9    A. He met with him prior to the -- or prior to the
10 pre-tour meeting, which reviews currently what's going
11 on. And after that, Antonio May and myself went and met
12 with him. Kenneth Johnson for a few days had been going
13 before that pre-tour meeting to meet up with -- or to
14 meet up with Mike Williams in order to discuss what was
15 going on.
16    Q. So, did you have a pre-tour meeting and then a
17 different meeting with Mike?
18    A. Yes, sir.
19    Q. What was the discussed at the pre-tour meeting?
20    A. What was currently going on on the rig. And
21 then, Ronny Davis passing out the information, including
22 telling Mike -- or including telling Antonio May and
23 myself that our job would be to assist Kenneth Johnson
24 in the engine shutdown test.
25    Q. Given that they said that your job was only to

[Page 80]

1 assist, did that raise any questions in your mind given
2 that you're in charge of anything that is capable of
3 producing electric volts?
4    A. I'm not in charge of that one, sir.
5    Q. On that job?
6    A. I'm not in charge of that, sir.
7    Q. Who is in charge of that?
8    A. Kenneth Johnson in the sense the engineer is, and
9 our job -- we can't access the panel or be inside the
10 panel and monitor it. So, someone has to be in charge;
11 and that would be the mechanic, sir.
12    Q. Okay. Well --
13      We'll follow up on that in a bit.
14      MR. HOLMES: Whenever you get a chance, a
15 restroom break would be appreciated.
16      MR. STALEY: Sounds good. Let me see if
17 there's a --
18    Q. (By Mr. Staley) Okay. Very quickly. Did Mike
19 tell you that the ABS is coming the next day; so, he
20 needed to assist with the engine shutdowns --
21    A. Yes, sir.
22    Q. -- on the main engines?
23    A. Yes, sir.
24    Q. And you realized that DODI tested -- did these
25 tests in the advance of ABS inspections to make sure

[20] (Pages 77 to 80)

O'Neal Probst Wells - 713-521-1314

James Christopher Patterson    3/23/2016

[Page 81]

1  there were no problems, correct?
2      A. No, sir.
3      Q. You don't know that?
4      A. No, sir. This has been taken care of by -- or
5  it's taken care of by the daytime shift.
6      Q. Hold on. I didn't -- did I mention any shift?
7      A. No, sir.
8      Q. Okay. I didn't mention any shift.
9          I just asked you whether you realized that DODI
10  did these tests in advance of ABS inspections to make
11  sure there were no problems?
12      A. No, sir.
13      Q. You didn't realize that?
14      A. No, sir.
15      Q. Okay. Does it make sense to you that they do
16  that?
17      A. Yes, sir.
18      Q. Did you think you were qualified or unqualified
19  to perform the reverse power testing?
20      A. Qualified. I had not performed that test before,
21  sir.
22          MR. STALEY: All right. Why don't we take a
23  break? Does that work for you?
24          THE WITNESS: Yes, sir.
25          (Recess from 11:35 a.m. to 11:52 a.m.)

[Page 82]

1      Q. (By Mr. Staley) Mr. Patterson, we've had a short
2  break. You understand you're still under oath?
3      A. Yes, I do, sir.
4      Q. Are you still on your 90-day probation period at
5  your -- or your probation period with your new
6  employer --
7      A. Yes, I am, sir.
8      Q. -- Core-Tech?
9      A. Yes, I am, sir.
10      Q. What is your normal shift that you work?
11      A. From 2:00 p.m. to 10:00 p.m. And, normally, I --
12  normally, I work 10:00 a.m. to 10:00 p.m.
13      Q. And are you scheduled off for today?
14      A. I had to talk my boss in order to get the day
15  off, sir.
16      Q. Okay. Stepping back a minute. When you were
17  first hired at DODI in August of 2011, what was your pay
18  rate?
19      A. I do not recall off the top of my head, sir.
20  Somewhere around the high 30s, low 40s.
21      Q. And on June 2nd, 2015, what was your pay rate at
22  DODI?
23      A. 56.54.
24      Q. 56.54 per hour?
25      A. I do believe so, sir, yes.

[Page 83]

1      Q. Did you get a raise in connection with becoming
2  an Electronic Technician 1?
3      A. Yes, sir.
4      Q. Do you recall, roughly, how much an hour that was
5  a --
6      A. No, I do not, sir.
7      Q. But it sounds like you received at least a number
8  of different bumps from high 30s, low 40s to 56.54; is
9  that correct?
10      A. Yes, sir.
11      Q. Is it fair to say you received five to six
12  different raises?
13      A. I believe so, sir.
14      Q. Do you think you received, possibly, more than
15  that?
16      A. I'm not aware, sir. I know that, after I was
17  hired or after I became an Electronics Technician 1, I
18  was eligible for the fifth gen pay, which is an extra
19  ten percent on top of that.
20      Q. An extra ten percent on top of 56.54?
21      A. Yes, sir.
22      Q. I got you.
23          And is that paid on a month -- on a hitch basis,
24  or how do they calculate the ten percent on top of 56.54
25  per hour? Just how many hours you work, then you'd

[Page 84]

1  multiply it by your 56.54 pay rate; and then, you add
2  ten percent to it?
3      A. Yes, sir.
4      Q. Okay. And, I mean, I think this makes sense; but
5  you would have been hired in August of 2011, you would
6  have got a pay bump in 2012?
7      A. Yes, sir.
8      Q. You would have got a pay bump in 2013?
9      A. Yes, sir.
10      Q. And you would have got a pay bump in 2014?
11      A. Yes, sir.
12      Q. When was your last pay bump -- did you have one
13  in 2015 prior to your termination?
14      A. Yes, sir, it was -- everyone had ended up getting
15  a final one, and that was right before the last of the
16  raises -- or, not raises, bonuses.
17      Q. Okay. When are bonuses paid?
18      A. This last one was paid April of 2015 or so --
19      Q. Okay.
20      A. -- approximately.
21      Q. So, you think you got a wage bump in March of
22  2015?
23      A. Not a wage bump, a -- every -- or there was a
24  slight wage increase across the board; and the last of
25  the bonuses was paid out in 2015, sir.

[21] (Pages 81 to 84)

James Christopher Patterson   3/23/2016

[Page 85]

1    Q.  Okay.  And did you get an annual bonus, or was it
2    a -- were you eligible for annual bonus, or how did your
3    bonus work?
4    A.  There was a -- it was a three-year plan of 10
5    percent, 15 percent and 20 percent starting in 2012,
6    '13 -- or '12, '13 and '14, paid out the following year.
7    Q.  Okay.  So, in April of 2015, did you get a 15
8    percent bonus or a 20 percent bonus?
9    A.  I don't recall if it was 2015 or 2014 that was
10   the last one, sir.
11   Q.  Okay.  When was the across-the-board wage
12   increase that you described in early 2015, would that
13   have been in February or March?
14   A.  I do not recall, sir.
15   Q.  Sometime in 2015?
16   A.  I honestly do not recall exactly when that
17   happened, sir.
18   Q.  Okay.  Now, let me ask you just to describe what
19   all is involved in engine shutdown testing, in addition
20   to reverse power.
21       What are all the components of engine shutdown
22   testing?
23   A.  I know that there is a low oil pressure shutdown
24   and there is, I believe, two more; but I do not recall
25   those at this point, sir.

[Page 86]

1    Q.  Two others you don't know?
2    A.  I do not know, sir.  I can't recall.
3    Q.  And that's in addition to reverse power?
4    A.  Yes, sir.
5    Q.  So, you've got low oil pressure shutdown?
6    A.  Yes, sir.
7    Q.  And then, you have two other tests that you're
8    not sure what they are?
9    A.  I do not recall them, sir.
10   Q.  And then, you have the reverse power; is that
11   correct?
12   A.  Yes, sir.
13   Q.  So, there are four components?
14   A.  I do believe so, sir.  I may be recalling wrong,
15   but I believe that there were two or three other -- or
16   two or three mechanical engine shutdowns, as well.
17   Q.  Okay.  Now, you have your tour meeting with Mike
18   Williams; and he says assist Kevin -- excuse me --
19   Kenneth Johnson with the engine shutdown testing.
20       Did you -- what else occurred during this
21   meeting, if anything?
22   A.  Antonio May and myself reported to Mike Williams
23   that we had never performed this test before.
24   Q.  And what did he say?
25   A.  And he says get with -- or -- I don't want to --

[Page 87]

1    I wrote it in my report when it happened.  I don't
2    remember the exact words on there.  That's why I wrote
3    it after the events that occurred, sir; and this was
4    submitted to you.  But I'm not entirely 100 percent sure
5    at this point to recall back.
6    Q.  You're not sure what else happened during that
7    meeting?
8    A.  No, sir, this is why I wrote down everything that
9    happened --
10   Q.  Okay.
11   A.  -- that entire night; and I submitted it to you,
12   sir.
13   Q.  I understand.  I just want to know your memory,
14   though.
15       So, you meet with Mike; and he says, you know, I
16   need you to assist Kenneth Johnson with the engine
17   shutdown testing, which you knew included reverse power
18   testing.  And you said at that point in time, or you --
19   did Antonio May say that, or did you say that?
20   A.  Antonio May replied that we had never done that
21   before.
22   Q.  Okay.  And my next question is:  What else was
23   said during that meeting, and what do you recall was
24   said during that meeting?
25   A.  I do not recall at this point, sir.

[Page 88]

1    Q.  You don't know if Mike said anything further or
2    if you said anything further?
3    A.  I know that Mike said something further, but this
4    is why I wrote it down after the events that occurred
5    back -- or back last early June; and we have submitted
6    those to you, sir.
7    Q.  Well, I know that -- I mean, you also wrote a
8    statement out on June 1 on the rig --
9    A.  Yes, sir.
10   Q.  -- about the events, too, correct?
11   A.  Yes, sir.
12   Q.  Is that what you're, also, referring to?
13   A.  Both -- or both my journal and the accounts on
14   it, sir.
15   Q.  Okay.  I'm going to ask you more about that.  But
16   I want to know if you recall, as you sit here today
17   under oath, Mike William saying anything else during
18   that meeting?
19   A.  He'd said others; but under oath, I do not recall
20   everything that -- or everything that was transpired
21   during that, sir.
22   Q.  Okay.  Do you recall anything else that you said
23   during that meeting?
24   A.  I do not recall at this point anything else I
25   said during that meeting, no, sir.

[22]  (Pages 85 to 88)

James Christopher Patterson    3/23/2016

[Page 89]

1    **Q.** And the same question for Antonio May, do you
2    recall anything else that Antonio May said during that
3    meeting?
4        **A.** Not at this point, sir.
5        **Q.** Okay.  Now, that's like a 6:00 o'clock meeting,
6    correct?
7        **A.** Yes, sir.
8        **Q.** And my understanding is you didn't begin the
9    reverse power testing until after 2:00 a.m.; is that
10   right?
11       **A.** Yes, sir.
12       **Q.** Tell me what you did between -- between 6:00 p.m.
13   and 2:00 a.m. that didn't involve reverse power testing.
14       **A.** There were a couple of PMs and other issues that
15   I had taken care of; but I do not recall exactly what
16   happened or which these were concerned, but that's why I
17   documented everything afterwards.
18       **Q.** I'm asking for your memory.
19       **A.** I don't recall at this point, sir.
20       **Q.** Do you recall any particular task that you
21   conducted that evening, prior to engaging in the reverse
22   power testing?
23       **A.** Not at this point, sir.
24       **Q.** And you say you might have done a couple of PMs.
25   Do you know which PMs?

[Page 90]

1        **A.** No, sir.
2        **Q.** Did it involve electronic -- electrical
3    technician work?
4        **A.** I do not recall, sir.
5        **Q.** Were you assisting Antonio May with anything?
6        **A.** I do not recall, sir.
7        **Q.** Do you recall the area of the rig that you were
8    working in?
9        **A.** I was doing some technical work -- or I
10   remembered doing something in the LEL or the ET shop,
11   but I do not recall.  A lot of the days blend together
12   at this point, sir.
13       **Q.** When you say LEL --
14       **A.** The local -- the local equipment room --
15   correction, local equipment room.
16       **Q.** Do you know what you were doing in the local
17   equipment room?
18       **A.** No, I do not recall, sir.  That's why I
19   documented it after the events.
20       **Q.** Well, I'm not interested in -- at this point in
21   what you wrote down later.  I want to know what you can
22   tell me happened here today.  I'm going to ask you later
23   other questions, but right now I just want to know what
24   you can testify under oath as to your memory.  Okay?
25       **A.** Oh, okay.

[Page 91]

1        **Q.** So, on May 31, you have a meeting with Mike,
2    which you've described.  You have a meeting with Mike
3    Williams in which you and Antonio May are a part of.
4    And after that, you don't know what other tasks were on
5    your agenda; but you know you didn't do any reverse
6    power testing until around 2:00 a.m., correct?
7        **A.** Yes, sir.  We were helping -- I do recall helping
8    Kenneth Johnson look for the cables, because he was
9    taking -- or because he was going to be taking care
10   of -- or setting up for the low oil pressure testing.
11       **Q.** What cables?
12       **A.** There are cables that connect to some -- or to
13   some of the equipment.  I do not recall exactly which
14   cables; but these were made specifically for it,
15   apparently.
16       **Q.** For low pressure testing?
17       **A.** For the low oil pressure.
18       **Q.** Low oil pressure testing?
19       **A.** Low oil pressure shutdown.
20       **Q.** Okay.  Can you tell me what you just before you
21   started doing reverse power testing?
22       **A.** We were looking for the permits -- or not --
23   correction.  We were looking for the procedure and for
24   the decade box to try and find out how to do it, asking
25   Kenneth Johnson how this procedure went.

[Page 92]

1        **Q.** Okay.  You said you were looking for the
2    procedures, right?
3        **A.** Yes, sir.
4        **Q.** You didn't -- you didn't look for a work permit,
5    correct?
6        **A.** No, sir, Kenneth Johnson had stated that he'd
7    done that.
8        **Q.** I understand that, but you -- in your testimony a
9    second ago I think you inadvertently said you were
10   looking for the permit; but then, you corrected yourself
11   and said you were looking for the procedures, and I just
12   wanted to make sure.
13       You were looking for the procedures prior to
14   conducting the reverse power testing?
15       **A.** Yes, sir.
16       **Q.** You weren't looking for the permit, correct?
17       **A.** No, sir.
18       **Q.** Okay.  And you weren't looking for the JSA,
19   correct?
20       **A.** No, sir.
21       **Q.** Where were you looking for the procedures?
22       **A.** Antonio May and I were looking on our computers
23   to see if there was a procedure within there.  It had
24   been reported that there was something stored on the ET
25   computer about how to do this.

O'Neal Probst Wells - 713-521-1314
Houston/Galveston    Dallas/Fort Worth    Austin/San Antonio    Bryan/College Station    Corpus Christi

APPENDIX 12

DODI 934

James Christopher Patterson    3/23/2016

[Page 93]

1    Q. Did it occur to you that the JSAs may well have
2 something on this?
3    A. They may have. It did not occur at the time.
4    Q. Where else would you have looked for procedures,
5 besides JSAs?
6    A. On the ET computer. On -- there are lot of,
7 like, tribal knowledge procedures on how to do stuff
8 that are located on the ET computer, the electrician's
9 computer and the mechanic's computer.
10    Q. I mean, in retrospect, wouldn't it be common
11 sense to look in the JSAs here?
12    A. Not necessarily. Some of the JSAs include none
13 of the real procedures, just indicate dangers or other
14 aspects are associated with it.
15    Q. Well, if you -- wouldn't it be also common sense
16 to look at the JSAs to make sure you understand the
17 hazards?
18    A. The hazards were -- or the only hazards that were
19 really involved was power going out, and that's why we
20 had to make sure that that emergency generator was up
21 and ready.
22    Q. So, it's your testimony that it wouldn't make any
23 sense to look for the JSAs, if you wanted to avoid or
24 identify hazards?
25    A. No, sir, JSAs are used to identify any hazards.

[Page 94]

1    Q. So, would it be common sense to look at the JSA
2 to make sure you had a good understanding of the
3 hazards?
4    A. Sometimes, sir. For the hazards, yes, sir,
5 that's what we look for to see the potential hazards on
6 that part. And aside from that, we have in different
7 places different procedures; and just because we have a
8 JSA, it doesn't mean it's approved. And we're told many
9 times that, if it's not approved and you use it, you may
10 as well not have been using one in the first place.
11    Q. Well, I guess, would it have made sense for you
12 to have looked for an approved JSA?
13    A. Yes, sir, and I believe that -- I do not believe
14 that that one was approved at that time, sir.
15    Q. What do you --
16    A. I do not recall.
17    Q. You don't know, do you?
18    A. No, sir.
19    Q. I mean, in retrospect, would we be there today if
20 you had looked for the JSA?
21    A. If we had looked for the JSA and an issue had
22 still happened and the power gone down, to be quite
23 honest, sir, a piece of paper wouldn't really have
24 changed anything on that part, sir.
25    Q. Would you have ignored the procedures -- the

[Page 95]

1 steps identified in the JSA --
2    A. If I --
3    Q. -- do you think, if you had it?
4    A. If the procedure wasn't approved, then --
5    Q. I'm not talking about an unapproved procedure.
6 I'm talking about the approved JSA for reverse power
7 testing.
8        Do you think we'd be here today, if you had
9 looked for it?
10    A. I -- I believe that we'd still be here today,
11 sir.
12    Q. Because you would have shut down the rig, anyway?
13    A. No, sir. The reverse power testing had been done
14 only a couple of months prior. It still wasn't within
15 the year-long period.
16        MR. STALEY: I'm going to object to the
17 responsiveness.
18    Q. (By Mr. Staley) Did I ask you anything about
19 reverse power testing being conducted on prior
20 occasions?
21    A. Oh, no, sir, you asked --
22    Q. Okay. I asked you -- please, listen to my
23 question. Mr. Holmes will have the opportunity to ask
24 you any questions he wants at the end of the deposition
25 at the end of my questions.

[Page 96]

1        My question is is if you had the -- looked for
2 the JSA, and you got it and you followed the steps in
3 it, do you think we'd be here still today?
4    A. Yes, sir.
5    Q. Why?
6    A. If the JSA was not approved, we would -- I'm
7 sorry.
8    Q. I'm talking about an approved JSA, the one that's
9 approved. If you would have looked for and followed the
10 approved JSA, would we be here today?
11    A. I do not believe that the JSA was approved; and
12 if that was the case, I'd figures that we'd probably be
13 here for something else, sir.
14    Q. Why is it that you believe that the JSA wasn't
15 approved?
16    A. I recall at that period Antonio May stating that
17 the procedure wasn't approved.
18    Q. Did you ask what procedure he was referring to?
19    A. That was the ELECT-071.
20    Q. Did you ask what his basis for believing or
21 telling you that it wasn't approved?
22    A. Because it says right on there, when you pull up
23 the Check-6 program, approved or not approved.
24    Q. Would it surprise you to know that that JSA
25 procedure had been approved for several years?

[24] (Pages 93 to 96)

James Christopher Patterson   3/23/2016

[Page 97]

1    **A.** It's not supposed to be approved for several
2   years.  The one that you're speaking of came from the
3   Orion, and only supervisors had access to the Orion one.
4   The Check-6 one is the only one that we have access to,
5   and that was not the one that we were -- or that's not
6   the one that we have -- or that's the only one we have
7   access to.  We have no access to the Orion program, sir.
8        MR. STALEY:  I'm going to object to the
9   responsiveness.
10   **Q.** (By Mr. Staley)  Did you hear my question?
11   **A.** Yes, sir.
12   **Q.** What was my question?
13   **A.** Your question is do you know that we had -- do
14   you know that this procedure was approved for several
15   years.
16   **Q.** Right.  And what's the answer -- do you know
17   that?
18   **A.** The procedure within Orion was approved, but we
19   have no -- or us, as technicians, have no access to the
20   Orion program.
21   **Q.** Well, if you have questions about whether a JSA
22   is authorized or not authorized, who do you ask those
23   questions to?
24   **A.** If -- we don't need to ask the questions, because
25   on a Check-6 program, which we actually have access to,

[Page 98]

1   it will state on there approved or not approved.
2   **Q.** Well, you just told me that Antonio May told you
3   that he thought a JSA had not been approved.
4   **A.** Yes, sir.
5   **Q.** That's what -- when I asked you why you thought
6   that, that's what you said.
7        Do you recall that testimony?
8   **A.** Yes, sir.
9   **Q.** Okay.  If you had a question as to whether or not
10   a JSA had been approved or not, who would be the proper
11   person to ask?
12   **A.** On that part, then, I could check myself or ask
13   one of the people that I was working with on that, sir.
14   **Q.** Sure.  You could ask Mike Williams, couldn't you?
15   **A.** At 2:00 o'clock in the morning, sir?
16   **Q.** Sure.  On critical safety equipment?
17   **A.** On that, Kenneth Johnson had stated that he
18   already had all of the paperwork completed, sir.
19   **Q.** I'm going to -- that's not my question.  Did I
20   asked if Kenneth Johnson said he had the paperwork
21   completed?
22   **A.** No, sir.
23   **Q.** That wasn't a part of my question.
24   **A.** Understandable, sir.
25   **Q.** My question was:  Could you have asked Mike

[Page 99]

1   Williams?
2   **A.** Not -- or I could have woken him up, yes, sir.
3   **Q.** Could you have asked Randy Sutfin?
4   **A.** That was -- or we could have woken him up, sir.
5   **Q.** Okay.  Could you have asked the night toolpusher?
6   **A.** We could have asked him, sir.
7   **Q.** And what was his name?
8   **A.** His name is Ronny Davis.
9   **Q.** But you didn't get that far, did you?
10   **A.** No, sir, we stopped with the area supervisor.
11   **Q.** And the supervisor you're talking about is the
12   mechanic that doesn't supervise anybody?
13   **A.** He supervises two motormen; and he's in charge of
14   the engine, sir.
15   **Q.** You think he's in charge of the engine?
16   **A.** As according to GEMS policy, yes, sir.
17   **Q.** What policy states the mechanic is in charge of
18   the engine?
19   **A.** I do not recall, sir.
20   **Q.** Okay.
21   **A.** I can get that policy for you, sir.
22   **Q.** But it's your testimony that the mechanic is in
23   charge of the engine under DODI policy?
24   **A.** Yes, it is, sir.  The mechanic --
25   **Q.** Not anybody more senior to Kenneth Johnson?

[Page 100]

1   **A.** The mechanic and the maintenance supervisor, sir.
2   **Q.** Oh, so, the maintenance supervisor.  Would that
3   be the person above Kenneth Johnson?
4   **A.** Yes, but since the maintenance supervisor isn't
5   awake at night, it has to go through the mechanic, sir.
6   **Q.** And can Kenneth Johnson sign a work permit for
7   reverse power testing?
8   **A.** He can sign it, because it relates to the engine,
9   because he's the area supervisor, sir.
10   **Q.** Can he approve it for you to do?
11   **A.** No, that's required for the approving -- or the
12   approving person.
13   **Q.** Okay.  So, if you wanted to do this right, you
14   would have had to wake up Randy Sutfin to get him to
15   sign the permit, anyway, correct?
16   **A.** Yes, but with the -- since the area supervisor
17   Kenneth Johnson had stated that he already done that.
18   **Q.** And you didn't ask to look at it?
19   **A.** No, sir.
20   **Q.** Okay.  Well, had you asked to look at it, you
21   would have realized there wasn't such a permit, correct?
22   **A.** Yes, sir.
23   **Q.** And you would have said, well, you know what,
24   we've got to go wake up Randy Sutfin for a work permit
25   that we know has to happen for -- for reverse power

[25] (Pages 97 to 100)

James Christopher Patterson   3/23/2016

[Page 129]

1  emergency generators?
2    **A.** The emergency generators take less than a minute
3  to secure.
4    **Q.** A couple of switches?
5    **A.** Yes, sir.  Opening a breaker -- or opening a
6  breaker for the emergency power, closing the breaker to
7  the emergency bus; and then, letting the engine cool
8  down and placing it back in "off"; and then, in
9  "standby."
10   **Q.** Do you recall saying anything to Mike Williams
11 that evening?
12   **A.** I know that he spoke with us.  I do not recall
13 the -- I do not recall the conversations that
14 transpired, sir.
15   **Q.** Okay.  I want to drill down as much as I can.  If
16 you're telling me you can't remember, that's fine; but
17 is there anything at all that you recall Mike Williams
18 telling you in the minutes and hours after the reverse
19 power testing incident on June 1 or that you said to
20 him?
21   **A.** I do not recall what was stated.  I know there
22 were words exchanged, or there was a -- that we
23 exchanged words, Antonio May, myself and Kenneth
24 Johnson; but I do not recall what.
25   **Q.** And today you can't tell me, even in general

[Page 130]

1  terms, what those conversations were?
2    **A.** No, sir, it's almost a year ago, sir.
3    **Q.** I understand.  I just want to make sure I get the
4  best memory you have.  And that's your best memory,
5  right?
6    **A.** As of -- sir, that's why I wrote everything down
7  beforehand.
8    **Q.** We're going to get to your written statements
9  that day in just a few minutes.
10       MR. HOLMES:  When do you want to break for
11 lunch?
12       MR. STALEY:  I tell you what, let's -- let
13 me --
14       MR. HOLMES:  Yeah, just pick your moment.
15       MR. STALEY:  Sure.
16       MR. HOLMES:  Yeah.
17   **Q.** (By Mr. Staley)  Did you say anything to Antonio
18 May after the engines were tripped?
19   **A.** After the engines were tripped and Kenneth
20 Johnson said, "Ha, ha, what permit."  Then, we looked at
21 each other and said, "Oh, fuck."  And then, "Let's go
22 get everything back online."
23       MR. HOLMES:  Pardon your French.
24   **A.** Yes, pardon my language --
25   **Q.** (By Mr. Staley)  Hold on.  Let's take a step

[Page 131]

1  back.  What did you say to Kenneth Johnson after the
2  engines went down?
3    **A.** "At least we have a permit."
4    **Q.** And that's the permit you never saw or reviewed,
5  right?
6    **A.** Yes, sir, that he had reported that he had.
7    **Q.** And what was his -- I saw in your notes that
8  he -- you said you'd asked him -- you say you'd asked
9  him before the job if he had paperwork for it.
10   **A.** Yes, sir.
11   **Q.** And he said, "Yeah, I've got paperwork."  And
12 that's -- you said you took that by implication to mean
13 that he had a permit.
14   **A.** Yes, sir, the nomenclature on the rig is, if you
15 ask if you've got the paperwork for the job, that
16 directly states that you have the permit to work and the
17 JSA and the sharp card.
18   **Q.** What's a sharp card?
19   **A.** A sharp card is an additional card to write down
20 that you have done your tool -- or that everyone present
21 here, additional stuff to put on there.
22   **Q.** Okay.  And when did Kevin -- excuse me -- Kenneth
23 Johnson tell you that, "I've got the paperwork"?
24   **A.** Before we even started the procedure, sir.
25   **Q.** So, is that, like, closer to 6:00 or 7:00 or was

[Page 132]

1  that 2:00 a.m. when he said that?
2    **A.** Sometime in between there, sir.
3    **Q.** Can you --
4    **A.** I do not recall the time.
5    **Q.** Was it before midnight or after midnight?
6    **A.** I do not recall the time, sir.
7    **Q.** Do you recall where you were when you asked him?
8    **A.** We were in the port SCR room, sir.
9    **Q.** And you don't know if it was 7:00, 8:00, 9:00
10 o'clock, 10:00 o'clock, 11:00 o'clock or 12:00 o'clock
11 or 1:00 o'clock?
12   **A.** No, sir, I do not recall.
13   **Q.** Okay.  But he said, "I've got paperwork," right?
14   **A.** Yes, sir.  "I've got paperwork."
15   **Q.** Okay.  And at that point in time you didn't say,
16 "Well, cool, let me see the permit to work or the JSA or
17 the sharp card," you didn't ask for any of that, did
18 you?
19   **A.** No, sir.
20   **Q.** Okay.  So, moving forward, was there anything
21 else a part of this conversation that occurred sometime
22 between 6:00 and 2:00 a.m. with Kenneth Johnson in which
23 he got the paperwork, was there anything else said?
24   **A.** He was in a rush to get these done and get these
25 started, but I don't recall all the conversations.  He

[33] (Pages 129 to 132)

James Christopher Patterson    3/23/2016

[Page 133]

1  wanted to --
2    **Q.** Do you recall anything else he said?
3    **A.** He wanted to start with the reverse power.
4    **Q.** Okay.  Do you recall anything that you said?
5    **A.** Not at this point right now, sir, no, I do not
6  recall.
7    **Q.** Okay.  So, after the engines are tripped, you
8  say, "At least we have a permit" to Kenneth Johnson?
9    **A.** Yes, sir.
10   **Q.** And he says, "What permit?"
11   **A.** He laughed and said, "What permit?"
12   **Q.** Like he didn't know what you were talking about?
13   **A.** No, he -- like he didn't think anything would go
14  wrong.
15   **Q.** Can he get -- I mean, I think we've covered this;
16  but the OIM needs to sign off on this test, right?
17   **A.** Yes, sir.
18   **Q.** Okay.  And once -- after Kenneth said, "What
19  permit"; what did you say?
20   **A.** At that point I -- or at that point I knew that
21  he had messed up; and, subsequently, that we'd messed up
22  on that part.
23   **Q.** Okay.  Was anything else said between you and
24  Kenneth Johnson in this post engine tripping
25  conversation?

[Page 134]

1    **A.** No, sir, not at the moment.
2    **Q.** Did you --
3    **A.** We were focused on restarting the engines.
4    **Q.** Did you have the conversation with Antonio May,
5  that you referenced a minute ago, after this
6  conversation?
7    **A.** Yes, used a quick vulgarity; and then, we went
8  off to restore all the power.
9    **Q.** What did you say, I'm just curious, the
10  vulgarity, what did it start with?
11   **A.** I said, "Oh, fuck."
12   **Q.** Okay.  And you said that you then went to go
13  securing the generators -- I'm sorry, the breakers?
14   **A.** To restoring power, yes.  We went to go do our
15  parts to restore power.  And then, all the events get a
16  little fuzzy at this point, everything kind of mixed
17  together.
18   **Q.** Okay.  So, you know that -- that you have at
19  least some communication with Mike Williams; and it
20  involved securing the emergency generators, which only
21  took a while, right?
22   **A.** It took a very short period of time, yes, sir.
23   **Q.** What did you do once -- once the rig is up back
24  and running, 19 minutes later?  Have we covered any --
25   Are there any big events that occur while the rig

[Page 135]

1  is trying to get back up and started, and you checking
2  the breakers, making sure they are closed, and you've
3  secured the emergency generators; is there any other big
4  tasks that we've missed during this immediate aftermath
5  before the -- before everything comes back on?
6    **A.** No, sir.
7    **Q.** Okay.  So, roughly 19 minutes later, the rig is
8  back up and operating and the engines are up, right?
9    **A.** Yes, sir.
10   **Q.** And you know at some point they are going to do a
11  full block calibration; but you've done your immediate
12  task to make sure, you know, this emergency was
13  addressed and so the rig is back up and operating,
14  right?
15   **A.** Yes, sir.
16   **Q.** So, what happens next?  What do you do at 2:40,
17  for the rest of the night, what are y'all doing?
18   **A.** I do not recall, sir.
19   **Q.** Did you continue to work?  Did you -- I mean, did
20  you take a break?  Did you go to bed early?
21   **A.** No, sir, we continued to work and the next day
22  after that.
23   **Q.** Okay.  And do you recall any of the following --
24  the subsequent tasks that you completed after -- after
25  the rig was back up and operating?

[Page 136]

1    **A.** Helping every -- or people restore or bring their
2  computers back up, and --
3    **Q.** What is involved in that, just turning them on?
4    **A.** Turning them on.
5    **Q.** Okay.  So, that's like a five-minute task, right?
6    **A.** Yes, sir.  I do not recall everything else that
7  happened.
8    **Q.** I'm just asking for anything.  I just want to get
9  as best a picture of what happened afterwards after
10  this, you know, very big event, what you did for the
11  rest of the evening.
12   **A.** I do not recall, sir.  I remember we worked on --
13  or there was a lot of stuff that we worked on.
14   **Q.** A lot of stuff that you can't identify, other
15  than turning on computers?
16   **A.** I had to get a sample prepared -- or I had to get
17  a -- the procedure printed out for calibrating of the
18  oil/water separator.
19   **Q.** Why did that need to be done?
20   **A.** Because Kevin Henderson needed to be shown that
21  the next day and demonstrated how -- or demonstrated the
22  procedure.
23   **Q.** What was he doing that for?
24   **A.** He was doing that for -- I was told he needed to
25  get that done for -- prior to the ABS inspection.

[34]  (Pages 133 to 136)

James Christopher Patterson   3/23/2016

[Page 165]

1    **A.** A positive 14 volt DC.
2    **Q.** Okay. (Reading), a positive 14 volt supply to
3    the -- is it cathode?
4    **A.** Cathode, sir.
5    **Q.** -- end of the D46 in C3 of Gen 7 EGIII module.
6    We followed the procedure. Bracket, Note: Engine 7 was
7    started up and placed online to test and reverse -- to
8    test the reverse power shutdown of Gen 7 breaker 0200.
9        What is that symbol?
10   **A.** Approximately, sir.
11   **Q.** Approximately 200 -- are you saying approximately
12   2:00 a.m.?
13   **A.** Yes, sir.
14   **Q.** Okay. (Reading), The resistance was slowly
15   reduced. The mechanic reported the light for reverse
16   power started to illuminate. I increased the resistance
17   by 10 ohms. The mechanic reported that we needed to
18   hold it. I removed the 10 ohms added. The engine
19   slowed down, the light didn't illuminate and all
20   generator breakers opened.
21       Did I read that correctly?
22   **A.** Yes, sir.
23   **Q.** Is this an accurate indication of what happened?
24   **A.** Yes, sir.
25   **Q.** Okay. You said you worked with the mechanic to

[Page 166]

1    determine necessary tests and find any procedures or
2    schematics, as none of us had performed this test
3    before.
4        What procedures or schematics did you find?
5    **A.** I found the electrical schematics; and Kenneth
6    Johnson had reported that he'd gotten the paperwork,
7    sir.
8    **Q.** What were the electrical schematics paperwork
9    that you had gotten?
10   **A.** The electrical schematics were the schematics for
11   the EGIII module.
12   **Q.** And where were those located?
13   **A.** Those were located in the port SCR room.
14   **Q.** Port SCR room?
15   **A.** Yes, sir.
16   **Q.** Where in the port SCR room?
17   **A.** In the cabinet where we keep all of our
18   schematics, sir.
19   **Q.** Okay. Any other paperwork that you determined
20   was necessary or procedures that you found?
21   **A.** Yes, in the LEL or the local equipment room,
22   which is the ET shop --
23   **Q.** Uh-huh.
24   **A.** -- I had found on there what had been stated as
25   the procedure for performing reverse power testing.

[Page 167]

1    **Q.** Where is that document?
2    **A.** That is on the ET computer somewhere.
3    **Q.** Hold on. Where did you find it?
4    **A.** On the ET computer.
5    **Q.** Where in the ET computer?
6    **A.** I don't know where in the ET computer anymore,
7    sir. It was on there in approved procedures.
8    **Q.** Where in -- what file?
9    **A.** I do not --
10   **Q.** If I want to find it today, where can I find it?
11   **A.** Somewhere on the ET computer, sir. I don't know
12   where.
13   **Q.** Okay. So, you have no -- you didn't save a copy
14   and show anybody or attach it to your statement to say,
15   "Here's what we" -- "we thought these procedures were
16   the right ones and" --
17   **A.** I was not --
18   **Q.** -- "and" --
19   **A.** Go ahead, sir.
20   **Q.** -- "and here they are, this is what we followed."
21   You didn't do that, did you?
22   **A.** No, sir.
23   **Q.** Why not?
24   **A.** I wasn't anticipating getting fired the next day,
25   sir.

[Page 168]

1    **Q.** Well, you knew that you were writing a statement
2    for a downtime incident, right?
3    **A.** Yes, sir.
4    **Q.** And you knew disciplinary action was likely
5    coming, right?
6    **A.** It was possible, sir.
7    **Q.** But it didn't occur to you to attach the
8    procedures you'd followed?
9    **A.** No, sir.
10   **Q.** Is the Judge to believe your testimony that you
11   found procedures that you can't identify?
12   **A.** Yes, sir.
13   **Q.** And you can't tell me where to find them, other
14   than on a computer?
15   **A.** On the ET computer, yes, sir.
16   **Q.** Any particular folder?
17   **A.** Everything on the ET computer ends up getting
18   moved. They could have changed hard drives.
19   **Q.** Where was it when you got it on June 1?
20   **A.** It was on the computer in the ET files.
21   **Q.** Okay. And how many pages was it?
22   **A.** It was one page, sir.
23   **Q.** And what was the title of the document?
24   **A.** I do not recall, sir.
25   **Q.** Okay. Any more information that you can tell me

[42] (Pages 165 to 168)

O'Neal Probst Wells - 713-521-1314
Houston/Galveston    Dallas/Fort Worth    Austin/San Antonio    Bryan/College Station   Corpus Christi

DODI 953

James Christopher Patterson   3/23/2016

[Page 169]

1  about the procedure document that we can't locate or
2  identify?
3      A. No, sir. I reported on here that everything that
4  was done -- or everything that was done was stated on
5  the document there, as well.
6      Q. Okay. It states, (Reading), You identified
7  several items that were needed for the X3 oil press/temp
8  tests and reverse power shutdown. A procedure was found
9  for regulating and reducing the 14 volt supply to the
10  cathode end of D46 in C3 of Gen 7 EGIII module.
11      What is the X3 oil press/temp test?
12      A. "X" means time three. There are three oil
13  pressure/temperature tests.
14      Q. Okay.
15      A. That means each generator set had three tests.
16      Q. What procedure did you find for regulating and
17  reducing the 14 volt supply?
18      A. That was for the throttle signal, the one that I
19  don't remember -- recall the name of, sir.
20      Q. Okay. Do you know where I can find it?
21      A. I do not, sir. It's been over -- or it's been
22  close to a year.
23      Q. And you didn't attach it to your statement, did
24  you?
25      A. No, sir. We had to do the statement right away.

[Page 170]

1  There was no time to --
2      Q. Hold on.
3      A. -- go look someplace else, sir.
4      Q. I mean, you couldn't have come back and said,
5  "Hey, Terry, you know I wrote my" -- "I had to write my
6  statement down, but I wanted to give you the procedures
7  that I followed that I thought were correct; so, here
8  are the procedures; so, you should know that I tried to
9  follow procedures"?
10      A. After the fact, yes, sir.
11      Q. But you didn't do that?
12      A. Not at the time, sir.
13      Q. And you haven't done that to this day, right?
14      A. I don't have a copy of it, sir.
15      Q. Well, you didn't do it while you were on the rig,
16  right?
17      A. I did not do it that day, sir, no.
18      Q. And you didn't do it June 2nd, did you?
19      A. No, sir.
20      Q. And you didn't stop and ask the toolpusher or the
21  OIM or Mike Williams any questions about using the
22  correct procedure, correct?
23      A. Kenneth Johnson had stated that he had done that
24  before.
25      Q. Did I ask you about Kenneth Johnson?

[Page 171]

1      A. No, sir.
2      Q. Okay. What was my question?
3      Was my question: You didn't stop and ask the
4  toolpusher, OIM or Mike Williams any questions about
5  using the correct procedure?
6      A. No, sir, we'd reported to Mike Williams that we'd
7  never done the procedure before.
8      Q. I got you.
9      You didn't ask him, "Can you please help me with
10  the procedures? We think we found something on the
11  computer, but we want to make sure we do this right,
12  because this is critical safety equipment"?
13      A. No, sir --
14      Q. You didn't ask that, did you?
15      A. No, sir, we did not wake Mike Williams up to do
16  that.
17      Q. And you didn't wake the OIM up?
18      A. No, sir. Kenneth Johnson said that that -- or
19  indicated or implied that that was the procedure that
20  they had used before.
21      Q. And you didn't wake -- you didn't talk to the
22  toolpusher about it?
23      A. No, sir, the toolpusher is not an electrician or
24  an ET.
25      Q. Well, neither is Kenneth Johnson, is he?

[Page 172]

1      A. No, sir, but he is in charge of the engines.
2      Q. I understand, but you said you didn't wake the
3  toolpusher, because he's not an electrician or an ET.
4  Neither is Kenneth Johnson, right?
5      A. That's correct, sir.
6      Q. Now, for the dayshift, what time do they
7  typically -- they get off at 6:00, right?
8      A. Yes, sir.
9      Q. Do a lot of them workout?
10      A. Not really, sir.
11      Q. Okay. Do they kind of lounge and then go eat
12  dinner, typically?
13      A. Yes, sir. I don't really keep track of them,
14  but --
15      Q. I mean, just from being around the ship in your
16  four-and-a-half years or almost four years there --
17  excuse me -- the dayshift, would they -- would the guys
18  go watch TV for a while, kick back and relax after they
19  got off?
20      A. Sometimes, sir. Sometimes they would go to other
21  parts of the berthing area, talk with people and
22  sometimes they would --
23      Q. Sure. Socialize, right?
24      A. Yes, sir.
25      Q. And they'd probably go to bed around 10:00 or

[43] (Pages 169 to 172)

James Christopher Patterson    3/23/2016

[Page 173]

1    11:00?
2       **A.** I have no idea, sir.
3       **Q.** You didn't try to track down any of these guys
4    before they went to bed to make sure you had the right
5    procedures, did you?
6       **A.** No, sir.
7       **Q.** Now, this unidentified procedure, you're not
8    testifying that it told you to make the rig go dark, are
9    you?
10      **A.** No, sir, the procedure said nothing in there
11   about make the rig go dark.
12      **Q.** Next you state, (Reading), The resistance was
13   slowly reduced, the mechanic reported the light for
14   reverse power started to illuminate.  I increased the
15   resistance by 10 ohms.  The mechanic reported that we
16   needed to hold it.  I removed the 10 ohms.  The engines
17   slowed down, the light didn't illuminate and all
18   generators -- all generator breakers opened.
19      **A.** Yes, sir.
20      **Q.** So, you -- the reverse power light is supposed to
21   come on as part of the test, right?
22      **A.** Yes, sir, and Kenneth Johnson reported that the
23   breaker needs to trip.
24      **Q.** Well, in your Complaint -- we'll come back to
25   that.

[Page 174]

1       It's your understanding, during the reverse power
2    testing, that the light -- once the reverse power
3    testing light comes on, it has to stay on for a while?
4       **A.** I have no idea, sir.  I had not -- neither
5    Antonio May nor myself had done this test before.
6       **Q.** Okay.  Looking quickly at Exhibit 4, is there any
7    mention in there at all about you thought somebody else
8    had a work permit?
9       **A.** No, sir.
10      **Q.** Is there any mention that Kenneth Johnson told
11   you he had paperwork for it?
12      **A.** No, sir.
13      **Q.** Is there any mention that Kenneth Johnson had
14   told you that he had done it before?
15      **A.** No, sir.
16      **Q.** There's no mention that this persuaded you to
17   continue working on a reverse power tester?
18      **A.** No, sir.
19      **Q.** No mention that Kenneth Johnson said that he got
20   a permit, but then didn't, right?
21      **A.** No, sir.
22      **Q.** No mention that Kenneth Johnson said, "Ha, ha,
23   what permit"?
24      **A.** No, sir, this is the technical aspects of what
25   had occurred.

[Page 175]

1       **Q.** Well, we asked you if this was a truthful and
2    accurate statement; and you said it was, right?
3       **A.** Yes, sir.
4       **Q.** Okay.  You weren't trying to mislead people,
5    right?
6       **A.** No, sir.
7       **Q.** Okay.  But there's no mention whatsoever in here
8    about you saying, "Oh, at least we got a permit"?
9       **A.** No, sir.
10      **Q.** There's no motion of any response by Kenneth
11   Johnson saying, "Ha, ha, what permit"?
12      **A.** No, sir.
13      **Q.** And there's no mention in here that you thought
14   Mike Williams set you up in any way to shut the rig
15   down?
16      **A.** No, sir, that wouldn't be relevant in something
17   like this.
18      **Q.** Why not?
19      **A.** Because this is a technical -- or this is trying
20   to go about and reenact what was technically -- or what
21   had technically occurred during this time.
22      **Q.** It doesn't say anything about technical
23   requirements, does it?  Do you see any instructions on
24   here that only technical information should be provided?
25      **A.** No, sir.

[Page 176]

1       **Q.** Okay.  This is an "Injury/Illness Report" or
2    "Hand Written Description of Incident," right?
3       **A.** Yes, sir.
4       **Q.** There's no mention in here that you -- that you
5    felt you were set up, right?
6       **A.** No, sir.
7       **Q.** So, after the rig went dark and the emergency
8    generators came up and you got it back eventually up,
9    what kind of discipline did you expect?
10      **A.** I had no idea, sir.
11      **Q.** Did you tell Kenneth Johnson that any time a rig
12   goes dark, and you don't have a work permit or JSA,
13   there's always a chance you'll get fired?
14      **A.** No, sir.
15      **Q.** You had no specific expectation of discipline
16   after this incident, you just knew that it was very
17   likely?
18      **A.** I had the possibility -- I knew the possibility
19   of it was likely, sir.
20      **Q.** What discipline would you expect, given that you
21   didn't complete a JSA or work permit?
22      **A.** I'm not sure.  I'm not a supervisor.
23      **Q.** Just sitting here today, what discipline do you
24   think you should have received?
25      **A.** Either a verbal or written warning, sir.

[44] (Pages 173 to 176)

James Christopher Patterson    3/23/2016

[Page 177]

1    Q. What discipline would you expect for causing
2  approximately $21,000 in lost revenue due to downtime?
3    A. Either a verbal or a written warning, sir.
4    Q. And I think you testified to this; but you don't
5  have any personal knowledge as to who decided to
6  terminate your employment, correct?
7    A. No, sir.
8    Q. How did you learn you were being terminated?
9    A. The next day, when Mike Williams had come into
10  the -- or come into the gym after tour, he was smiling,
11  happy and said, "Come on, we need to go to the OIM's
12  office."
13      I was thinking, "Okay. I'm being written up."
14      I come in there, and he stands in the corner
15  smirking and smiling while I'm presented that --
16    Q. Show me the smile, the smirk that he gave.
17    A. Sir?
18    Q. Do your best impression of the smirk that he
19  gave.
20    A. I'm not really an impressionist, sir.
21    Q. Well, you said he smirked. How would you try to
22  imitate the smirk?
23    A. It was a big smile (indicating).
24    Q. Okay. Were you by yourself, or were you with
25  Antonio May?

[Page 178]

1    A. I was with Terry Manuel, Mike Williams, Randy
2  Sutfin and myself in the office.
3    Q. Okay. Other than Mike Williams telling you, come
4  on in Randy Sutfin's office and having a smile on his
5  face, was there anything else communicated?
6    A. Between him and myself; no.
7    Q. Okay. And when you got there, Randy Sutfin,
8  Terry Manuel and Mike Williams were in there, right?
9    A. Yes, sir.
10    Q. And who spoke to you and communicated that you
11  were going to be terminated?
12    A. Randy Sutfin.
13    Q. What did he say?
14    A. He said that I -- I don't recall the exact
15  conversation, sir; but he wanted to give me a little bit
16  of time before sending me home, and to make sure -- or
17  so that way I can get my bags packed; but this comes
18  from shore side.
19    Q. I got you.
20    A. So, that was the gist of.
21    Q. Well, did you appreciate having a little bit more
22  time to gather your things for the helicopter?
23    A. I was busy getting terminated; so, I didn't have
24  very much room for appreciation, sir.
25    Q. Would you have rather just found out the minute

[Page 179]

1  that the helicopter arrived?
2    A. I would rather have Kenneth Johnson had gotten
3  the permit; and we would have not been fired, sir.
4    Q. My question doesn't give that as an option.
5      If you're going to be fired, would you rather be
6  treated the way Randy Sutfin did and give you a little
7  advance warning so you have time to gather your things,
8  or would you rather be told right when the helicopter
9  arrives; so, you have to rush into it?
10    A. I'm sorry, sir. I'm trying to see how this is
11  really relevant.
12    Q. Don't worry about the relevance. Your attorney
13  and I can worry about that later.
14    A. Okay. On that part, then, I'd rather have a
15  little bit of time.
16    Q. Okay. Now, I know that no one likes to get
17  fired; and I'm not asking you to like getting fired, but
18  by -- Randy, by giving you that notice, was at least
19  trying to extend you some courtesy, correct?
20    A. Yes, sir.
21    Q. Anything else at this meeting that you recall?
22    A. Not that I recall at this time. There was a
23  little bit more; but I do not recall it at this time,
24  sir.
25    Q. Did you say anything?

[Page 180]

1    A. I do not recall, sir. I didn't agree with it.
2  And I did not argue, I did not yell. I said that I do
3  not agree. I signed my initials. And then, I walked
4  out and went back to my room to pack.
5    Q. So, you don't recall saying anything other than
6  "I don't agree with this," and just signing and quietly
7  leaving?
8    A. I do not recall stating anything else, sir.
9    Q. Okay. What happened next after you left Randy
10  Sutfin's office?
11    A. I went to my room and proceeded to pack.
12    Q. How long between the meeting about your
13  termination and when you were taken off the rig by
14  chopper?
15    A. I do not know, sir. That happened sometime
16  around 6:20-ish; and I do not recall what time the
17  helicopter had arrived. My watch had broken at that
18  time.
19    Q. Okay. I'm going to take you back now for just a
20  minute. You wrote your statement on -- at 6:30 or 7:00
21  o'clock on January 1, right?
22    A. Yes, sir.
23    Q. I'm sorry. June 1, excuse me.
24      And you were terminated the following morning,
25  right?

[45] (Pages 177 to 180)

O'Neal Probst Wells - 713-521-1314

Houston/Galveston    Dallas/Fort Worth    Austin/San Antonio    Bryan/College Station   Corpus Christi

DODI 956

James Christopher Patterson    3/23/2016

[Page 181]

1     A. Yes, sir.
2     Q. After you wrote the statement, did you go to bed
3   for that day?
4     A. Yes, sir.
5     Q. Did you workout, do you recall?  Do you remember
6   working out?
7     A. I did not finish my workout that day, sir, no.
8     Q. Okay.  Then, you went to bed.  And did you wake
9   up and perform your duties the next day?
10    A. Yes, sir.
11    Q. Okay.  And then, just as about you were
12  getting -- when you're getting off the shift, you have
13  the meeting with Randy Sutfin?
14    A. No, sir, this is after the next tour was over,
15  the next shift was over.
16    Q. What time of day was this meeting with Randy
17  Sutfin?
18    A. This meeting -- which meeting are you speaking
19  of, sir?
20    Q. The termination meeting?
21    A. The termination meeting was on the 2nd at
22  approximately 6:20, sir.
23    Q. AM?
24    A. Yes, sir.
25    Q. That's what I mean.

[Page 182]

1        So, on June 1 you write your statement, eat
2   dinner, go to bed, right?
3     A. Yes, sir.
4     Q. Then, you wake up; and you work your normal shift
5   from 6:00 p.m. to 6:00 a.m., right?
6     A. Yes, sir.
7     Q. And then, when Randy is up in the morning, he
8   asked -- Mike Williams asked you to go in his office.
9   At 6:00 a.m. -- around 6:00 a.m. on June 2nd, that's
10  when you have your termination meeting was, right?
11    A. Yes.
12    Q. During that period, during that 24-hour period,
13  did you have any discussions about the reverse power
14  shutdown incident with anybody else at DODI?
15    A. Not aside from with Antonio May and Kenneth
16  Johnson, I do not recall.
17    Q. From the time you wrote your statement to your
18  termination meeting, did you have any discussions with
19  Kenneth Johnson about the reverse power testing
20  incident?
21    A. I believe that we did.  I do not recall, though,
22  sir.
23    Q. You don't recall the substance?
24    A. No, sir.
25    Q. And what about Antonio May, did you have any

[Page 183]

1   conversations with Antonio May during that 24-hour
2   period post-statement pre-termination?
3     A. Yes, sir.
4     Q. Do you recall what the substance of that was?
5     A. Yes, sir, because before we had started our last
6   tour, Mr. Williams had -- Mr. Mike Williams had stated
7   that, "Oh, well, it's okay to do this procedure at
8   night; and you've done it before."  And showed the two
9   reports or showed the two PMs, and that had stated from
10  2012 and 2013 or 2011 and '12, I do not recall.  You
11  sent those the other day.  And when you looked up in the
12  corner, it said modified by Mike Williams on -- after --
13  or a few hours after the termination, sir.
14    Q. I'm going to ask you about those documents in a
15  bit; but you had a conversation with Mike Williams and
16  Antonio May about this, or did -- or is this only a
17  conversation you had with Antonio May?
18    A. This was a conversation with -- Mike Williams had
19  the conversation at us.  There was no feedback.  And
20  told us that it's perfectly fine doing this procedure at
21  night.
22    Q. Sure.
23    A. And he told us what to do and told me to train
24  Kevin Henderson on how to the oil separator maintenance
25  or preventative maintenance.

[Page 184]

1     Q. Okay.  What you'd printed out for him?
2     A. Yes, sir.
3     Q. Any other discussions with Mike Williams or
4   Antonio May in the 24 hours between your written
5   statement and your termination?
6     A. Yes, sir.  Antonio May was upset, because when we
7   looked closer at the maintenance or the maintenance log
8   on RigMS, it had stated that Mike Williams had modified
9   those two reports.
10    Q. What do you think he'd modified on it?
11    A. Why would he need to modify it?
12    Q. Are you aware that the software itself, if you
13  open it up, it automatically indicates that you've
14  modified the document?
15    A. Actually, it does not work that way, sir.
16    Q. Oh.  Are you -- how do you believe he modified
17  the document is my question?
18    A. As a supervisor, you can go in, you can change
19  any field within there.  I believe that we provided you
20  with the RigMS manual that actually states how you can
21  go in and do that.  But it does state that, if it is
22  modified, because you can open it, if you change it, if
23  you alter it, it says that it's modified by you.  If you
24  go in, open it, but don't save any changes, then, it
25  doesn't say modified, sir.

[46] (Pages 181 to 184)

James Christopher Patterson    3/23/2016

[Page 217]

1    **A.** I declined coming in as a 3 because that would
2    too huge of a pay -- or too huge of a job difference,
3    sir.
4    **Q.** I understand, but that was your decision not to
5    pursue it, sir?
6    **A.** Yes, sir, because the financial.
7    **Q.** I understand.  But the job offer was the job
8    offer was a different level, and it was subsea; and they
9    informally said, "You can have this job, if you want it.
10   Do you want it"?
11       And you said, "I can't take the pay cut.  I'm
12   staying here?"
13   **A.** Yes, sir.
14   **Q.** Okay.  And if you would have moved to subsea, you
15   would have had a different supervisor, right?
16   **A.** Yes, sir.
17   **Q.** Who was in charge at night without waking
18   somebody up?
19   **A.** The toolpusher.
20   **Q.** But you could always wake somebody up, if you had
21   a problem that required it, right?
22   **A.** That was an option, yes, sir.
23   **Q.** Now, prior to September 21 of 2015, did you ever
24   file any kind of complaint with the Department of Labor
25   against DODI relating to the Seaman's Protection Act?

[Page 218]

1    **A.** No, I did not, sir.
2    **Q.** And I think your complaint was initially
3    dismissed, and Mr. Holmes appealed it; and then, they --
4    you filed a new complaint or a revised complaint in
5    December of 2015.
6        Is that your understanding?
7    **A.** That is my understanding, sir.
8    **Q.** So, September 21, 2015 was the first time you
9    filed anything relating to the Seaman's Protection Act
10   with the Department of Labor, right?
11   **A.** I do believe so, sir.
12   **Q.** Okay.
13       MR. HOLMES:  When we get to a good place, we
14   could use another break --
15       MR. STALEY:  Sure.
16       MR. HOLMES:  -- when you get to a stopping
17   point.
18       MR. STALEY:  I mean, I'm going to get --
19   start talking about the Complaint.  Why don't we take a
20   ten-minute break?
21       MR. HOLMES:  Okay.
22       (Recess from 3:12 p.m. to 3:26 p.m.)
23   **Q.** (By Mr. Staley)  Mr. Patterson, we've taken
24   another short break.  You realize you are still under
25   oath?

[Page 219]

1    **A.** I do realize that I'm still under oath, sir.
2    **Q.** I'm going to ask you some about the issues you
3    describe in your Complaint, but I want to take a half
4    step back for a second.
5        I asked you -- tried to identify any
6    conversations you had on June 1 and June 2 about the
7    reverse power testing incident that tripped the seven
8    engines.  And I think you described some conversations
9    with -- with Kenneth Johnson right after the incident
10   happened, subsequent communications with Antonio May and
11   Mike Williams -- one conversation with Mike Williams.
12       In that same timeframe, did you have any
13   communications with your wife over e-mail?
14   **A.** I do not recall, sir.
15   **Q.** Is it possible?
16   **A.** It's definitely possible, sir.
17   **Q.** Do you think you maybe told her about the reverse
18   testing incident?
19   **A.** I do not recall, sir.
20   **Q.** Okay.  Ordinarily, how often would you e-mail
21   your wife?
22   **A.** Between daily to every couple of days.
23   **Q.** Okay.
24   **A.** It depends on what's going on, sir.
25   **Q.** Will you please look at your e-mails and see if

[Page 220]

1    you e-mailed your wife after the seven engines were
2    tripped until the time you were off the boat, off the
3    rig?  I'm not saying you need to do it on the record,
4    but --
5    **A.** Oh, okay.
6    **Q.** -- just please look for those.  If you have those
7    e-mails, then, please give them to your attorney.
8    **A.** Okay.  I will do, sir.
9    **Q.** Now, your -- the first incident you describe in
10   your Complaint was in the summer of 2012 involving a
11   submersible pump being pulled off the deck off the coast
12   of Egypt; is that correct?
13   **A.** Yes, sir.
14   **Q.** And you said the cable narrowly missed Nobuaki
15   Kobayashi.
16   **A.** Yes, sir.
17   **Q.** And you said that this incident -- this
18   particular incident did not involve Mr. May or
19   Mr. Patterson.
20   **A.** That is true, sir.
21   **Q.** Did this occur on the dayshift or the nightshift?
22   **A.** This occurred on the dayshift, sir.
23   **Q.** Were you working the dayshift then?
24   **A.** No, sir, I was working the nightshift.
25   **Q.** Okay.  So, did you only hear about this incident

[55] (Pages 217 to 220)

James Christopher Patterson    3/23/2016

[Page 221]

1  secondhand?
2      A.  Through Mr. Nobuaki and Mr. McKnight.
3      Q.  Okay.  You didn't witness any of these events
4  that you describe in the first paragraph of your
5  incidents on Page 5 of your Complaint?
6      A.  I did not personally witness the cable falling
7  and nearly killing anyone.
8      Q.  And you were working the nightshift at that time?
9      A.  Yes, sir.
10     Q.  Do you know what time of the day this occurred?
11     A.  No, sir.  They had reported on the incident to us
12  at the turnover log.
13     Q.  Did you -- do you know what month this occurred
14  during the summer of 2012?
15     A.  No, I do not recall, sir.
16     Q.  You weren't involved in any way with that
17  submersible pump being pulled off the deck, were you?
18     A.  No, sir.
19     Q.  And you don't know what time of day or night this
20  occurred -- or I should say day?
21     A.  No, I'm not aware, sir.
22     Q.  And what you put in here is a summary of what you
23  think Kobayashi and McKnight told you about it?
24     A.  Yes, sir.
25     Q.  Okay.  Did you take any action about this during

[Page 222]

1  the summer of 2012?
2      A.  No, sir.
3      Q.  And you weren't suspended during the summer of
4  2012, were you?
5      A.  No, sir.
6      Q.  Your pay wasn't cut during the summer of 2012?
7      A.  No, sir.
8      Q.  You've subsequently received raises, correct?
9      A.  Yes, sir.
10     Q.  And you weren't fired in the summer of 2012?
11     A.  No, sir.
12     Q.  You weren't demoted in the summer of 2012?
13     A.  No, sir.
14     Q.  And Nobuaki Kobayashi and Randy McKnight still
15  work for DODI, don't they?
16     A.  I have no idea, sir.
17     Q.  Did they on June 1, 2015?
18     A.  Yes, sir.
19     Q.  And you have no information relating to the
20  separation of their employment with DODI, do you?
21     A.  No, I do not, sir.
22     Q.  And you continued working through June from the
23  summer of 2012 through June 2nd, 2015, correct?
24     A.  Yes, sir.
25     Q.  The second incident you describe is a March

[Page 223]

1  2013 -- you say it's around March 2013, and you were
2  installing ballast pump remote stations.
3      Are you familiar with that incident?
4      A.  Yes, I am, sir.
5      Q.  You said Williams ordered the wrong cable?
6      A.  Yes, sir.
7      Q.  What day -- what week or day in March did this
8  occur?
9      A.  I do not recall, sir.
10     Q.  Why do you believe it happened in March?
11     A.  Because that was the timeframe that it occurred,
12  sir; and that's when I was on the -- that was the month
13  I was on the rig, sir.
14     Q.  Are you sure it didn't happen in February?
15     A.  I was not scheduled -- or I was not on the rig in
16  that February timeframe, I believe.
17     Q.  Okay.  You can't narrow it down in any way, shape
18  or form for me, other than around March 2013?
19     A.  No.  Inside of the one panels on there I did
20  write the date and time of when it was installed,
21  though.
22     Q.  Which panel?
23     A.  On the submersible remote panels.
24     Q.  Where are those?
25     A.  Those are located beneath the anchor winch -- or

[Page 224]

1  beneath the 56 and 12 anchor winches.
2      Q.  And where is that, specifically, located?
3      A.  That is located on the main deck just below --
4  right near where the submersible remote stations are
5  kept.
6      Q.  Okay.  Did you write March 2013 on there?
7      A.  I wrote the date on there.  I do not recall the
8  date that I wrote on there or is written on there.
9      Q.  You were working the nightshift?
10     A.  Yes, sir.
11     Q.  What shift was Mike Williams working during this
12  period?
13     A.  The dayshift.
14     Q.  And what time -- what time of day did you do this
15  job?
16     A.  After 6:00 p.m., and it was dark.
17     Q.  Okay.  You state that Williams ordered you to tie
18  and route a cable in areas under the rig that were
19  inaccessible and thus hazardous?
20     A.  Yes, sir.
21     Q.  Where did this order come from Williams, where
22  were y'all?
23     A.  We were in his office prior to the -- or in the
24  pre-tour meeting --
25     Q.  Okay.

[56]  (Pages 221 to 224)

O'Neal Probst Wells - 713-521-1314

Houston/Galveston    Dallas/Fort Worth    Austin/San Antonio    Bryan/College Station    Corpus Christi

DODI 967

James Christopher Patterson   3/23/2016

[Page 225]

1    **A.** -- or after the pre-tour meeting.
2    **Q.** So, 5:50?
3    **A.** Sometime after that, sir.
4    **Q.** He goes off work at 6:00, right, typically?
5    **A.** Yes, sir, but he also stays up; and he wanders
6    around.  He's the only maintenance supervisor; so, he
7    can be up at any time.
8    **Q.** So, you can't tell us what time this incident
9    occurred?
10   **A.** No, not exactly, sir.
11   **Q.** What kind of cable did he get?
12   **A.** He got a four conductor -- or he got a four
13   conductor cable.
14   **Q.** Four conductor cable.  And what kind did you
15   think was needed?
16   **A.** What was a needed was a five conductor cable,
17   sir.
18   **Q.** Okay.  Why could a four conductor cable not be
19   properly grounded?
20   **A.** It wasn't properly grounded.  It had to be -- he
21   wanted a remote start/stop station; and it's technically
22   impossible to create a remote start/stop station, unless
23   it's the primary station and unless there is a five
24   conductor cable.
25   **Q.** Okay.  And he told you to run cable in areas of

[Page 226]

1    the rig that were inaccessible and less hazardous?
2    **A.** Yes, sir.
3    **Q.** Where was that?
4    **A.** That was on what's the underside of the rig
5    directly over open water.
6    **Q.** How do you get there?
7    **A.** The best way to say is very carefully.  It has to
8    be -- it's a little hard to describe, but it's in places
9    that would have put us subject to falling overboard at
10   night.  And even with fall protection or a harness, that
11   would leave us dangling with no real possible way of
12   saving -- or with no real possible way of getting
13   rescued in an effective period of time, sir.
14   **Q.** What was the purpose of the cable?  What was it
15   needed to be -- why was the cable needed to be routed?
16   **A.** Because, according to Mike Williams, he wanted a
17   remote start/stop station; and that was closer
18   associated to it.
19   **Q.** Okay.  And he says he yelled at -- Williams
20   yelled at you and threatened you?
21   **A.** Yes, sir.
22   **Q.** He said there were other electricians looking for
23   jobs?
24   **A.** Yes, sir.
25   **Q.** Where did he yell at you?

[Page 227]

1    **A.** In his office.
2    **Q.** And was this at about 5:45, 6:00 o'clock, 6:15?
3    **A.** I don't know, sir.
4    **Q.** Was it after midnight?
5    **A.** No, sir.
6    **Q.** Was it before 8:00?
7    **A.** Most likely, sir.
8    **Q.** Was anyone else present?
9    **A.** Antonio May.
10   **Q.** Anybody else?
11   **A.** No, Antonio May, myself and Mike Williams.
12   **Q.** And in March 2013 you were an electrician
13   technician, correct?
14   **A.** Yes, sir.
15   **Q.** Now, you performed this job in a manner -- in a
16   different manner that didn't pose safety issues; and you
17   rerouted the cable in accessible areas and solved the
18   grounding issue by adding another cable?
19   **A.** Yes, sir, we found a different way of how to
20   accomplish this task.
21   **Q.** So, you found a way to perform that job safely?
22   **A.** Yes, sir.
23   **Q.** You were able to correct what you perceived was
24   the unsafe condition?
25   **A.** Yes, sir.

[Page 228]

1    **Q.** And you added another cable and routed it through
2    more accessible areas?
3    **A.** Yes, sir.
4    **Q.** And when you did that, Mike Williams was in bed,
5    right?
6    **A.** Yes, sir.
7    **Q.** Did anyone else assist you with this job, besides
8    Antonio May?
9    **A.** No, sir.
10   **Q.** Where did you obtain the other cable?
11   **A.** We had used the original cable, but had found a
12   different way how to wire it up, because -- because Mike
13   Williams had wanted an additional light.
14   **Q.** And where did you route it through more
15   accessible areas?
16   **A.** We ended up routing it along a different path
17   that wouldn't have put us over the water.
18   **Q.** What was the path?
19   **A.** The path was around the moon pool area and in the
20   overheads.
21   **Q.** Okay.  Do you think Mike Williams cared which
22   cable you used or which route you used, as long as you
23   got the job done?
24   **A.** Yes, he did, sir.
25   **Q.** Why do you think he cared?

[57] (Pages 225 to 228)

James Christopher Patterson   3/23/2016

[Page 229]

1    **A.** He was very -- very specific about the cable that
2  he ordered, and was upset if we didn't do exactly how he
3  stated to have it done.
4    **Q.** He's not around to micromanage your job, is he?
5    **A.** He does stay awake at -- or did stay awake at
6  nights; and did that frequently, yes, sir.
7    **Q.** No, in this instance, you specifically said he
8  was in bed.
9    **A.** Yes, sir, we waited until he was asleep before
10 starting this job, sir.
11   **Q.** Okay.  He wasn't micromanaging this, was he?
12   **A.** Not at that point, sir.
13   **Q.** Okay.
14   **A.** We made sure that he was in bed, first.
15   **Q.** Okay.  And you did it -- you found a way to do it
16 safely, which reduced the risk that you thought existed,
17 right?
18   **A.** Which we knew existed, yes, sir.
19   **Q.** And why do you think he cared which cable you
20 used or which route you used?
21   **A.** Because that was the cable that he ordered, and
22 he had already decided what needed to be done.
23   **Q.** Okay.  So, after you got this job done, the next
24 day did he come down and say, "Oh, you know what, y'all
25 used a five -- the five conductor cable, and I wanted

[Page 230]

1  you to use the four conductor cable; so, go back and
2  replace it"?
3    **A.** No, sir, we didn't tell him what we did.
4    **Q.** Okay.  When he discovered it, do you think he
5  didn't like the route that you used?
6    **A.** He didn't discover it, sir.
7    **Q.** How do you know?
8    **A.** Because he never went down to look and inspect it
9  after being shown that it worked.
10   **Q.** I didn't realize you worked dayshift and followed
11 Mike Williams around everywhere.
12   **A.** I do not, sir.
13   **Q.** Okay.  So, when you were in bed, you don't know
14 what he discovered, correct?
15   **A.** No, sir, he did this at night.
16   **Q.** Well, I mean, what would prevent him from looking
17 at the work you did during the day?
18   **A.** Nothing, sir.
19   **Q.** Okay.  So, you don't know whether he discovered
20 it or not, right?
21   **A.** I don't know.  After the fact he wanted us to
22 show him and prove that they were installed and show him
23 that the light worked, sir.
24   **Q.** Mr. Patterson, as you sit here, you don't know
25 one way or the other whether Mr. Patterson looked --

[Page 231]

1  followed up and looked at the job you did?
2    **A.** Not after the fact, sir --
3    **Q.** Okay.
4    **A.** -- just when he was with us, sir.
5    **Q.** I got you.
6      And this happened in March of 2013, right?
7    **A.** Approximately, sir.
8    **Q.** And here we are three years later, and you don't
9  know if any day in between then when you weren't around
10 or were sleeping or working out in the gym or eating
11 that he looked at the work you did, right?
12   **A.** No, sir, I'm not aware of that.
13   **Q.** And you'd be purely speculating if trying to talk
14 about that, right?
15   **A.** Yes, sir.
16   **Q.** Okay.  So, he obviously didn't voice any
17 complaint to you after you completed that job that it
18 needed to be redone, right?
19   **A.** That is correct.
20   **Q.** Now, after this incident around March of 2013,
21 you weren't suspended for it, were you?
22   **A.** No, I was not.
23   **Q.** Your pay wasn't cut?
24   **A.** No, it was not.
25   **Q.** You weren't -- in fact, you got raises after

[Page 232]

1  this, right?
2    **A.** Yes, I did.
3    **Q.** And you weren't fired in March of -- around March
4  2013?
5    **A.** That is correct.
6    **Q.** You weren't demoted?
7    **A.** That is correct.
8    **Q.** And you were still an ET on the nightshift
9  working on hitches, right?
10   **A.** Yes, I was.
11   **Q.** And the first you ever complained about this to
12 the Department of Labor was September 21 of 2015?
13   **A.** Yes, sir.
14   **Q.** So, just doing the math, that's about 30 months.
15   **A.** Yes, sir.
16   **Q.** Okay.  The next incident, around April 2013, he
17 asked you to adjust the gas detectors, right?
18   **A.** Yes, sir.
19   **Q.** Do you know when in April that this occurred?
20   **A.** I do not recall -- or I believe I wrote the date
21 somewhere; but I do not recall at this point, sir.
22   **Q.** Now, you just testified that you worked in March,
23 right?
24   **A.** Yes, sir.
25   **Q.** Would you have worked in April?

[58] (Pages 229 to 232)

James Christopher Patterson   3/23/2016

[Page 233]

1    **A.** It's a 28-day hitch, 31 days on and 25 days off,
2  sir.  There are a lot of overlapping periods in there,
3  sir.
4    **Q.** And you also testified you didn't work in
5  February, right?
6    **A.** I do not have a calendar with me at this time,
7  sir.
8    **Q.** But didn't you testify you didn't work in
9  February when I asked you --
10    **A.** To the best of my knowledge.
11    **Q.** So, I mean, are these dates you're throwing out,
12  are they just best approximations --
13    **A.** No, sir.
14    **Q.** -- or do you actually have knowledge that this
15  occurred in April?
16    **A.** I have knowledge that this occurred in April,
17  sir.  I wrote it down after the fact.
18    **Q.** Well, I know you did a lot of writing; but if you
19  wrote it down, why can't you tell us the date that it
20  occurred?
21    **A.** Because I wrote it down so that way I wouldn't
22  have to remember it, sir.
23    **Q.** You wrote it down just the month of April,
24  because you -- because you didn't want to remember the
25  day it occurred?

[Page 234]

1    **A.** No, sir.
2    **Q.** Well, why didn't you write down the day it
3  occurred, if you're taking notes?
4    **A.** Because I -- or for the fact that I didn't write
5  it down immediately at that time.  I wrote it a little
6  bit later.
7    **Q.** After you were terminated?
8    **A.** No, sir.
9    **Q.** But it was far enough down the road where you
10  couldn't remember the day, right?
11    **A.** I'd just written down what had happened, not
12  necessarily the date, sir.
13    **Q.** Right.
14        And you can't tell us today, or in your notes
15  from when you first wrote it down, the week or day it
16  occurred, right?
17    **A.** No, sir.
18    **Q.** What was your hitch in April of 2013?
19    **A.** I don't know, sir.
20    **Q.** Can you be more specific for the Judge when this
21  occurred?
22    **A.** I do not know when in April I was on the rig,
23  sir.
24    **Q.** Where is the gas detector?
25    **A.** They are located throughout the rig, sir.

[Page 235]

1    **Q.** What do they detect for?
2    **A.** They detect for explosive gases and hydrogen
3  sulfide.
4    **Q.** And what kind of gas detectors were they?
5    **A.** Digital gas detectors, sir.
6    **Q.** What was the brand?
7    **A.** I do not recall the brand.  I got the manual,
8  which I believe has been submitted to you, too, sir.
9    **Q.** What is the lower explosive limit defined as?
10    **A.** The lower explosive limit is the level at which
11  above will cause an explosive condition to -- or an
12  explosive condition can occur, sir, above which is the
13  alarm for it.
14    **Q.** How often are the alarm sensors on the gas
15  detectors calibrated?
16    **A.** Once per month, sir.
17    **Q.** At what setting was the gas detector set before
18  Mike Williams asked you to adjust it?
19    **A.** It was calibrated to zero and calibrated to 50
20  percent LEL.
21    **Q.** What setting did Mike Williams ask you to set it
22  to around April of 2013?
23    **A.** He asked me to tweak it so it would not go off as
24  early, but which would have taken it out of calibration.
25    **Q.** What was the calibration?

[Page 236]

1    **A.** Calibrating is having zero gas go to it, and
2  selecting it to have 50 percent controlled gas sample
3  going to it to set for its 0 to 50 percent scale to give
4  you a linear line for how much explosive gas will cause
5  a certain resistance.
6    **Q.** What did he tell you to move it to?
7    **A.** He told me to tweak it so it didn't go -- or so
8  it didn't go off so early.
9    **Q.** Okay.  And isn't it true that there's a range for
10  these detectors?
11    **A.** No, sir, that is not true.
12    **Q.** Do you know the unit of measurement for gas
13  detectors?
14    **A.** Yes, parts per million, sir.
15    **Q.** Parts per million?
16    **A.** Yes, sir.
17    **Q.** What parts per million?
18    **A.** Parts per million of methane gas -- or
19  correction.  Let me retract that.  For the hydrogen
20  sulfide, it is parts per million.  For the LEL or the
21  explosive gas, it is 50 percent concentration of the LEL
22  or the lower explosive limits.
23    **Q.** What are milliamps?
24    **A.** Milliamps are thousandths of an inch, sir.
25    **Q.** Is the acceptable threshold range on the gas

[59] (Pages 233 to 236)

James Christopher Patterson    3/23/2016

[Page 237]

1 detectors 35 to 45?
2    A. On the old detectors, yes; but those old
3 detectors were all replaced with digital detectors, sir.
4    Q. Actually, the reason -- I thought the reason Mike
5 had asked you to take a look at these gas detectors was
6 because they were having false positives.
7       Are you aware of that?
8    A. I was aware of that, sir.
9    Q. And they'd go down there, and they'd -- with a
10 portable detection equipment after the alarm went off,
11 and they would come in; and all the portable detectors
12 wouldn't show any gas.
13    A. That is correct, sir.
14    Q. Do you know who helped assist with those, I
15 guess, testing the false positive?
16    A. The safety department rep would be the person
17 responsible for going down and doing the gas detection
18 test.
19    Q. So, that would be Terry Manuel?
20    A. No, this would be the night one; and I'm not sure
21 of who it was at that time.
22    Q. Well, you're familiar that gas detectors do have
23 false positives, correct?
24    A. Yes, sir.
25    Q. And you experienced them on the Ocean Endeavor,

[Page 238]

1 correct?
2    A. Yes, sir.
3    Q. And the fact of the matter is they were occurring
4 in April 2013, right?
5    A. As was reported to me, sir.
6    Q. Do you know if the mud logger also verified that
7 these were false positives?
8    A. No, I did not ask the mud logger to verify. I
9 verified on the alarms themselves.
10    Q. Who was the mud logger?
11    A. I do not know, sir.
12    Q. Do you have any idea?
13    A. Who was the mud logger at the time?
14    Q. Yeah.
15    A. I do not know, sir.
16       If by mud logger you mean mud hand or the mud
17 engineer, sir, to correct?
18    Q. Either.
19    A. I do not know, sir.
20    Q. If a rig is experiencing false positives on its
21 gas detectors, what would you do to try to address the
22 false positives?
23    A. I would get a job permit, print out the JSA, get
24 permission from the OIM, replace -- or do a gas
25 calibration. If the gas calibration was not successful

[Page 239]

1 or it indicated that it failed or fell out of range,
2 then, I would replace the sensor; and then, recalibrate
3 it. Then, after that was done, I would return
4 everything to normal, reinstate the alarms, close out
5 the permit.
6    Q. When -- it's your testimony that you replaced
7 these alarms with -- these were new alarms installed, as
8 of April 2013?
9    A. They were installed before, during and after that
10 period, yes, sir.
11    Q. Okay. My understanding was the false positives
12 were on the older alarms?
13    A. No, sir.
14    Q. Did you hear the false positives?
15    A. No, sir.
16    Q. So, how do you know?
17    A. I was told by Mike Williams that they had gone
18 off.
19    Q. Okay. He said the new ones are going off, not
20 the old ones?
21    A. No, he did not indicate which ones were going
22 off.
23    Q. Okay. Well, is it true that there's an
24 acceptable threshold range on the gas detectors from 35
25 to 45?

[Page 240]

1    A. That is not true, especially for the newer ones,
2 sir.
3    Q. For the older ones it's true, correct?
4    A. No, sir, it has to be set for 35. If it falls
5 outside that range, it needs to be recalibrated.
6 Because then at that point you are now setting the zero
7 much higher, which means that, if you have a condition
8 occurring, it will -- or you will have a much smaller
9 time in between it reaching -- before it reaches the
10 explosive level.
11    Q. And what is your understanding of the model of
12 the old alarms?
13    A. Which aspects, sir?
14    Q. What brand were they?
15    A. I do not know that. I could take them apart, put
16 them back together and repair them, sir.
17    Q. Do you know the model?
18    A. No, sir, I can find the -- I can find manuals for
19 them online, though, sir, because most of them operate
20 about the same.
21    Q. What is your understanding as to when the alarms
22 were installed that were having the false positives?
23    A. That, occasionally, they would have false
24 positives; but the old adage is it's better to have a
25 false positive than not indicate when something goes

[60] (Pages 237 to 240)

James Christopher Patterson   3/23/2016

[Page 241]

1  off.
2       MR. STALEY: Object to the responsiveness.
3    Q. (By Mr. Staley) My question was: When was it
4  your understanding the alarms that were having false
5  positives were installed?
6    A. I do not know. They had -- most of those digital
7  meters had been there since I had been hired.
8    Q. Okay. And May told you not to do it because the
9  danger -- the danger of adjusting the detectors?
10   A. No, we needed to get the OIM's permission in
11 order to do it, sir, because that's a safety critical
12 system, much higher than the engine, sir.
13   Q. Your Complaint says May told you not to do it
14 because of the risk of danger. Is that not true?
15   A. Well, the danger aspect of doing that; but we
16 needed to get the OIM's permission, sir. And I offered
17 to get the OIM's permission.
18   Q. Did May tell you or not tell you not to do it?
19   A. He did not tell me not to do it. He said, "Do
20 not do it without the OIM" -- or "without permission."
21   Q. Okay. Your Complaint says otherwise.
22      Why would Mr. Patterson --
23      Okay. What you said was "Mike, I'll do it; but I
24 want to get a work permit"?
25   A. "I'll go talk to Johnny."

[Page 242]

1    Q. Did you hear my question?
2    A. You said, "Mike, I'll do it; but I'll get a
3  permit"?
4    Q. Yeah, I said, did you say, roughly, "Mike, okay,
5  I'll do it; but I want to get a work permit before I do
6  it"?
7    A. I said, "Okay, Mike. Let me go talk to Johnny."
8    Q. Okay. And "Johnny" is Johnny who?
9    A. Johnny Moore, the OIM.
10   Q. And where did Mike Williams -- where were you
11 when Mike Williams told you to forget it and not worry
12 about it?
13   A. We were in the port SCR room just near the
14 engines.
15   Q. Okay. So, you didn't refuse to do this, you just
16 said, "I want to go talk to Johnny about it," right?
17   A. Yes, sir.
18   Q. Okay. And did you ask Mike Williams -- and you
19 ended up not performing this job, right?
20   A. No, sir. Mike Williams said, "Never mind" or
21 "Forget it," one of the two. I do not recall which one;
22 so, I wrote it down.
23   Q. So, when he told you to forget it, you didn't
24 need to deal with the gas detectors for which you had
25 safety concerns?

[Page 243]

1    A. The safety concern would be adjusting it, sir.
2    Q. Right.
3    A. And we received zero false positives that entire
4  night, sir.
5    Q. I understand, but that's not my question.
6       You didn't have to deal with those anymore after
7  Mike told you "Don't worry about it," right?
8    A. That is correct.
9    Q. Do you know how the false alarms were
10 subsequently addressed?
11   A. No, sir.
12   Q. Now, I think you said this occurred around April
13 2013, you weren't suspended at that time or the month
14 after, right?
15   A. No, sir.
16   Q. You didn't get a pay cut?
17   A. No, sir.
18   Q. In fact, you got pay raises after that, right?
19   A. Yes, sir.
20   Q. And you weren't demoted?
21   A. No, sir.
22   Q. And you weren't fired in April of 2013 or shortly
23 thereafter?
24   A. No, sir.
25   Q. And the first time you complained to the

[Page 244]

1  Department of Labor about this incident was September 21
2  of 2015?
3    A. Yes, sir.
4    Q. Now, you mentioned the Deepwater Horizon in your
5  Complaint.
6       Are you under the impression that the Deepwater
7  Horizon accident was caused by having gas detectors
8  adjusted?
9    A. No, sir, that was a miscommunication on that.
10 That had to do with Mike Williams setting the bus
11 frequency to 63 hertz, which caused the subsea -- or
12 which ended up causing the subsea or uninterruptible
13 power supplies to shut down, which shut down the blowout
14 preventers' computers, which prevented operation, unless
15 it was done correctly.
16      MR. STALEY: Okay. I'm going to object to
17 the nonresponsive portion after "No."
18   Q. (By Mr. Staley) So, you don't believe that this
19 gas detector situation would have led to an incident
20 similar to the Deepwater Horizon accident?
21   A. If a gas level had come up and the gas detectors
22 were out of calibration or would not detect when
23 something had occurred, you can result in explosive --
24 or an explosive condition occurring.
25   Q. Is the answer "yes" or "no"?

[61]  (Pages 241 to 244)

James Christopher Patterson    3/23/2016

[Page 245]

1    A. It is possible.
2    Q. So, you think the Deepwater Horizon involved
3  similar things?
4    A. They are very different things, but still
5  involved -- theirs was a failure of -- or theirs was a
6  kick, produced a lot of gas that came up. Their
7  detectors had ended up going off, and it causing an
8  explosive condition to occur.
9    Q. Okay. I think we know this; but the Ocean
10 Endeavor didn't blow up in April of 2013, did it?
11   A. No, sir.
12   Q. You continued working on the Ocean Endeavor from
13 April of 2013 through June 2nd, 2015, correct?
14   A. Yes, sir.
15   Q. And so did Antonio May?
16   A. Yes, sir.
17   Q. All right. There was another incident in
18 mid-2013 you describe as Incident 4 in your Complaint.
19 You state Williams ordered you to work on top of anchor
20 winches to replace damaged blow motor on top.
21   A. Yes, sir.
22   Q. How was the blow motor damaged?
23   A. One of the impellers on the motor had ended up
24 falling through the vein and impacting the motor causing
25 it to short out, which sprung back up and destroyed the

[Page 246]

1  motor itself.
2    Q. Where are the anchor winches on the rig?
3    A. On the corners, sir.
4    Q. How high are they?
5    A. They are at deck level and up to about,
6  approximately, 8 to 12 feet high at the top.
7    Q. And when did Mike Williams tell you to do this,
8  at the tour meeting?
9    A. Right after the tour meeting. And then, he came
10 out with us and pointed out what he wanted done.
11   Q. Okay. And you state there was no place for fall
12 protection, and you refused and told the toolpusher that
13 you needed a platform to work on and more help, correct?
14   A. Yes, sir.
15   Q. Where was Mike Williams during this conversation?
16   A. He had left to go to bed, sir.
17   Q. Okay. And who was the toolpusher?
18   A. I'm trying to, sir. I do not recall off
19 the top of my head, sir.
20   Q. Wait a minute. You said you had a conversation a
21 conversation with the toolpusher that night, and you
22 were telling him about an unsafe condition; and you
23 wanted -- you needed a platform to work on and more
24 help, right?
25   A. Yes, sir.

[Page 247]

1    Q. And you don't know who that was?
2    A. I do not recall, sir.
3    Q. All right. And this was the nightshift, right?
4    A. Yes, sir.
5    Q. And Mike Williams was working the day, and he was
6  in bed when you did this?
7    A. Quite possibly, sir.
8    Q. What time of the night did this occur?
9    A. This had occurred during the -- towards the end
10 of the dayshift, and we worked through the entire night
11 to fix it, sir.
12   Q. Do you think Mike really didn't want you to use
13 your head and perform this job in a safe manner?
14   A. I think that he wanted things done his way, sir.
15   Q. So, he wanted you to do this in an unsafe manner?
16   A. I would say that is definitely -- or that was
17 definitely possible, sir.
18   Q. Tell me -- tell the Judge why you think Mike
19 Williams would be upset with you if you used fall
20 protection.
21   A. Not used fall protection, not done things his
22 way, sir.
23   Q. If you used fall protection, why do you think
24 Mike Williams would be upset with you?
25   A. It wasn't the fall protection aspect, sir. It

[Page 248]

1  was where to tie off, sir.
2    Q. Well, you and Mr. May later found a way to
3  complete this task when Williams was in bed?
4    A. Yes, sir.
5    Q. You arranged to hook yourselves to a crane so you
6  had reasonable fall protection?
7    A. Yes, sir.
8    Q. Is it your testimony to the Judge that Mike
9  didn't want you to use the crane?
10   A. He wanted things done his way; and we chose not
11 to do it his way because we deemed that unsafe, sir.
12   Q. Okay. And so, you performed the job in a way you
13 deemed safe, correct?
14   A. Yes, sir.
15   Q. And you were able to correct what you perceived
16 as the unsafe condition?
17   A. Yes, sir.
18   Q. And you hooked yourself up to a crane with
19 reasonable fall protection?
20   A. Yes, sir.
21   Q. And Mike Williams was in bed when this happened?
22   A. Yes, sir.
23   Q. Did anyone else assist you with this job?
24   A. Yes, sir.
25   Q. Who?

[62] (Pages 245 to 248)

James Christopher Patterson    3/23/2016

[Page 249]

1    **A.** Shannon Quattlebaum.
2    **Q.** Who is that?
3    **A.** He was the former night mechanic with us.
4    **Q.** Quattlebaum?
5    **A.** Quattlebaum, B-A-U-M.
6    **Q.** So, you, May, Patterson -- sorry -- Shannon, May
7    and yourself?
8    **A.** Yes, sir.
9    **Q.** Okay.  Did you have any follow-up conversations
10   with Mike about this job?
11   **A.** No, sir.
12   **Q.** Did you replace the damaged motor?
13   **A.** We replaced the damaged motor, yes, sir.
14   **Q.** What kind of motor did you replace it with?
15   **A.** We replaced it with an Eco-Line that we had in
16   the motor storage area, sir.
17   **Q.** Now, your Complaint says this incident occurred
18   in mid-2013?
19   **A.** Yes, sir.
20   **Q.** Can you be a little more specific?
21   **A.** Not really, sir.  If I had access to the logs, I
22   could.
23   **Q.** Would you tell the Judge what mid-2013 is?
24   **A.** If I go look through the logs, I can probably
25   find out where it is.

[Page 250]

1    **Q.** I mean, what are we talking; May, June, July,
2    August?  How many months are talking?
3    **A.** I don't know, sir.
4    **Q.** You can't tell the Judge anything more specific
5    about when this occurred, other than mid-2013?
6    **A.** I can look through the logs to find it or
7    determine when we did this, sir.
8    **Q.** I'm asking you here today under oath:  Can you
9    tell the Judge with anymore specificity than this
10   occurred in mid-2013?
11   **A.** Not without speculation and looking through the
12   logs, sir.
13   **Q.** What was your hitch during this period?
14   **A.** Say again, sir.
15   **Q.** What was your hitch during the mid-2013 period?
16   **A.** That would be nightshift, sir.
17   **Q.** No, your hitch, not your shift.
18   **A.** I don't know, sir.  I don't have the calendar --
19   or the shift calendar with me, sir.
20   **Q.** Okay.  So, you don't know what your hitch was
21   during the mid-2013 period?
22   **A.** No, sir.  But with that, everything was in the ET
23   logs.
24   **Q.** I understand.  I'm just trying to narrow down
25   when this might have occurred, other than mid-2013,

[Page 251]

1    because that's exceptionally vague.  But if you're
2    telling me you can't provide anymore additional
3    information about when this occurred, I'll move on to my
4    next question; but I want to try to nail this down, if
5    possible.
6    **A.** With reviewing the ET 2013 logs it can be found,
7    sir.
8    **Q.** But here today, it's not possible?
9    **A.** I do not have the logs with me, sir.
10   **Q.** Under oath, you can't testify with any more
11   specificity today?
12   **A.** Not specific.  It would be speculation, sir.
13   **Q.** Okay.
14   **A.** I can get you factual information, though.
15   **Q.** Well, mid-2013 is very vague, if borderline --
16       MR. HOLMES:  Object to the sidebar.
17   **Q.** (By Mr. Staley) -- factual.
18       Okay.  After this mid-2013 period incident
19   involving the anchor winches, you weren't suspended,
20   were you?
21   **A.** No, sir.
22   **Q.** And your pay wasn't cut?
23   **A.** No, sir.
24   **Q.** In fact, you got raises after that, right?
25   **A.** Yes, sir.

[Page 252]

1    **Q.** And you weren't demoted in mid-2013, were you?
2    **A.** No, sir.
3    **Q.** And you weren't fired in mid-2013?
4    **A.** No, sir.
5    **Q.** And you were still an electronic technician on
6    the nightshift working on hitches, right?
7    **A.** Yes, sir.
8    **Q.** And you continued working on the Ocean Endeavor
9    from mid-2013 through June 2nd, 2015, right?
10   **A.** Yes, sir.
11   **Q.** The same thing with Mr. May?
12   **A.** Yes, sir.
13   **Q.** And the first time you complained about this
14   incident to the Department of Labor was on
15   September 21, 2015, right?
16   **A.** Yes, sir.
17   **Q.** Did this incident bother you?
18   **A.** No, sir, it had become pretty normal there.
19   **Q.** All right.  The next incident you describe, on
20   Halloween 2013, you and May were working on a job that
21   involved hanging a heavy motor cable for the top drive?
22   **A.** Yes, sir.
23   **Q.** The top drive moves up and down during the
24   operation of the rig from a peak of around 110 feet to a
25   base of around 20 feet?

[63]  (Pages 249 to 252)

James Christopher Patterson   3/23/2016

[Page 253]

1    **A.** Yes, sir.
2    **Q.** The original plan was to connect the cable 110
3    feet above the deck, anchor it and low it to the deck
4    where the air hose is, essentially a small crane, so
5    that it could then -- it would then need to be lifted
6    only 20 feet to complete the job; is that correct?
7    **A.** Yes, sir.
8    **Q.** Your Complaint states that Mike Williams
9    instructed Frankie Sutton, the toolpusher, to connect
10   the cable at the 20 foot level, first; and then, have
11   the 110 foot section lifted manually; is that correct?
12   **A.** That's correct, sir.
13   **Q.** When did this conversation occur between Sutton
14   and Williams?
15   **A.** Between, I think, 7:00 -- I believe 7:00 and
16   8:00 p.m.
17   **Q.** And where did it occur?
18   **A.** On the drill -- on the drill floor.
19   **Q.** Were you and May present when this conversation
20   took place?
21   **A.** Yes, sir. May was on the drill floor, and I was
22   on what's called the -- or on the man lift basket
23   working on the top drive.
24   **Q.** So, were you participating in this conversation?
25   **A.** I was observant in the conversation that was

[Page 254]

1    happening right below me, sir.
2    **Q.** So, did you talk during this conversation?
3    **A.** No, sir, I was listening, sir.
4    **Q.** Okay. But you heard Mike tell Frankie Sutton
5    connect the cable at the 20 foot level, first; and then,
6    lift the 110 section manually?
7    **A.** Yes, sir.
8    **Q.** And you and May refused; and you pointed out that
9    the cable could -- if it dropped, people would die or
10   could die?
11   **A.** Yes, this was -- yes, this was pointed out to
12   Frankie Sutton, who objected to Mike.
13   **Q.** Okay. You told that to Sutton?
14   **A.** Yes.
15   **Q.** You didn't tell it to Mike?
16   **A.** No, sir.
17   **Q.** Okay. And then, several other people called for
18   the job to be stopped; but Williams said, "Anyone who
19   tries to stop the work will be on the next helicopter
20   off the rig"?
21   **A.** Yes, sir.
22   **Q.** Who were the other people that called for the job
23   to be stopped?
24   **A.** That would be -- Jason Merchant was one.
25   Larry -- I'm trying to remember his name. He was the

[Page 255]

1    derrick -- he was a former derrick hand. I do not
2    recall his last name.
3    **Q.** What was Jason Merchant?
4    **A.** The assistant driller.
5    **Q.** And Larry, last name unknown, derrick hand?
6    **A.** Yes, sir.
7    **Q.** Anybody else?
8    **A.** I do not -- or there were more people, but I do
9    not recall who they were.
10   **Q.** Who did Jason Merchant tell that the job needed
11   to be stopped?
12   **A.** Frankie Sutton.
13   **Q.** And Larry, last name unknown, derrick hand, who
14   did he tell?
15   **A.** Frankie Sutton.
16   **Q.** Okay. Where did Williams state, "Anyone who
17   tries to stop the work will be on the next helicopter
18   off the rig"?
19   **A.** When he was on the drill floor.
20   **Q.** He told everyone there?
21   **A.** Yeah, he told Frankie Sutton.
22   **Q.** You heard that?
23   **A.** Yes, I did, sir.
24   **Q.** What time was this statement made?
25   **A.** Approximately, the same time, sir.

[Page 256]

1    **Q.** And what was your response?
2    **A.** Mine was to stay out of the -- or stay out of the
3    way. There was nothing I could do, since I was hanging
4    from the man lift basket, sir.
5    **Q.** And how high were you up?
6    **A.** Approximately, 20 to 25 feet.
7    **Q.** Okay. Now, were all these people who tried to
8    stop the job on the next helicopter off the rig?
9    **A.** No, sir, we did it his way.
10   **Q.** Hold on. Your Complaint says that, quote,
11   "Anyone who tries to stop the work will be on the next
12   helicopter off the rig," end quote, right?
13   **A.** Yes, sir.
14   **Q.** Well, what do you recall telling people that the
15   job should be stopped, that's trying to get the job
16   stopped, right?
17   **A.** Yes, he stated it after the fact.
18   **Q.** Well, you said that anyone -- he said this before
19   the job was completed, right?
20   **A.** Yes, people had indicated beforehand.
21   **Q.** Okay.
22   **A.** People had stated beforehand.
23   **Q.** So, Jason Merchant wasn't sent off the rig on the
24   next helicopter?
25   **A.** No, sir.

[64] (Pages 253 to 256)

James Christopher Patterson   3/23/2016

[Page 257]

1    Q. Larry, the unknown last name, derrick hand,
2  wasn't sent off?
3    A. No, sir.
4    Q. You weren't sent off?
5    A. No, sir.
6    Q. Was Antonio May sent off?
7    A. No, sir.
8    Q. Was Larry Sutton -- or Frankie Sutton sent off?
9    A. No, sir.
10   Q. Was the job completed?
11   A. Yes, sir.
12   Q. Who completed the job?
13   A. All of us, with the exception of Mike Williams.
14   Q. And you assisted?
15   A. Yes, sir, on the top drive side.
16   Q. And May assisted, too, right?
17   A. Yes, sir, he was trying to pull up the cable up
18  110 feet, sir.
19   Q. And no one died or was injured with the heavy
20  motor cable, correct?
21   A. No, sir.
22   Q. And the job was safely completed without
23  incident, right?
24   A. No, sir, it was completed.  It was not safe,
25  though, sir.

[Page 258]

1    Q. Well, was someone injured?
2    A. No, sir.
3    Q. Okay.  Was there any equipment broken?
4    A. No, sir.
5    Q. Were there any incidents that you haven't
6  described?
7    A. No, sir.
8    Q. Okay.  When I say safely completed, it was
9  completed without incident that would cause an injury or
10  property damage or something like that?
11   A. Okay.  But with -- with all due respect, sir, if
12  the lights going out on the rig is increasing the
13  potential for danger, that would increase the potential
14  for danger a great deal, as well.
15   Q. No, I understand, but I'm talking about after the
16  fact.  Once this job was completed --
17   A. Yes, sir.
18   Q. -- was there any problem with any equipment or
19  people that worked on the job?
20   A. No, sir, we did it correctly.
21   Q. Okay.  And after this incident on Halloween of
22  2013, you weren't suspended?
23   A. No, sir.
24   Q. You didn't have a pay cut?
25   A. No, sir.

[Page 259]

1    Q. You, in fact, got raises?
2    A. Yes, sir.
3    Q. And you were not fired after Halloween of 2013?
4    A. No, sir.
5    Q. And you weren't sent off the rig for trying to
6  stop the job or making complaints about the job, were
7  you?
8    A. No, sir.
9    Q. And you were still an ET on the nightshift
10  working on hitches after this, correct?
11   A. Yes, sir.
12   Q. And you certainly weren't demoted after this
13  incident, correct?
14   A. No, sir.
15   Q. And you continued working through June 2nd, 2015,
16  right?
17   A. Yes, sir.
18   Q. The same with Mr. May?
19   A. Yes, sir.
20   Q. And you complained about this incident to the
21  Department of Labor for the first time in September
22  2015?
23   A. Yes, sir.
24   Q. Now, I've seen in your notes elsewhere that
25  you've described this accident occurring in Halloween of

[Page 260]

1  2012.
2      Are you aware of that?
3    A. Yes, sir.
4    Q. Which year did it occur?
5    A. It would have to be -- it would have to be
6  2012 -- or not 2012.  I'm thinking, sir.
7      It is in the ET notes.  I could find that out for
8  sure, which were also submitted to you, sir.
9    Q. Where was the rig located?
10   A. The rig was located in Egypt, sir.
11   Q. Okay.  You're familiar that the tow from Sicily
12  occurred in 2014 March; is that right?
13   A. Yes, sir.
14   Q. But you don't know whether the rig was in
15  Egypt -- well, I'm sorry.
16      You don't know whether it was 2012 or 2013 when
17  this incident occurred?
18   A. Then, that would put it at 2012, sir, because it
19  had been several months.  Frankie Sutton was still
20  there; and he had left the rig or he was sent to one of
21  the drillships in 2013, sir.
22   Q. So, in Paragraph 5 when it states on October 31,
23  2013, me and Patterson were working on a job that
24  involved a heavy motor cable on the top -- for the top
25  drive, that should say -- that's inaccurate; and it

[65] (Pages 257 to 260)

James Christopher Patterson   3/23/2016

[Page 297]

1  about this other than e-mail or keep a journal on your
2  own about this, right?
3      A. Nothing had been done about anything so far with
4  Mike Williams.
5      Q. Six weeks ago you just were given surgery and
6  medical bills --
7      A. Yes, sir.
8      Q. -- paid for?
9      A. Yes, sir.
10     Q. So, we know that DODI did that, right?
11     A. Yes, sir.
12     Q. Okay. So, you decided to keep a secret journal
13  about what you perceived is perceived problems or safety
14  issues or slights, instead of informing DODI, and that
15  includes this incident, right?
16     A. That includes this incident up until later on,
17  yes, sir.
18     Q. Don't you think it would have been beneficial if
19  you addressed this situation up front when it happened?
20     A. In retrospect? Not at all, sir.
21     Q. You'd rather just keep secret notes?
22     A. No, sir.
23     Q. Well, that's what you did, right?
24     A. Yes, sir.
25     Q. You didn't share those notes with DODI, right?

[Page 298]

1      A. There was no need to share them at the time, sir.
2      Q. Did I ask you whether there was a need?
3      A. I did not --
4      Q. Was that part of my question?
5      A. No, sir.
6      Q. Okay.
7      A. I did not share them with DODI, sir.
8      Q. Now, after this -- after you nearly passed out
9  from the refrigerant, you never spoke to anybody about
10  it at DODI, right?
11     A. Antonio May and --
12     Q. I count that. I mean, you never spoke to the
13  safety guys or anybody in health or Randy Sutfin or an
14  OIM about this, right?
15     A. I do not recall.
16     Q. As you sit here today, you're not aware of any of
17  that, right?
18     A. No, sir, people knew that it was one of those
19  things that was just slid under the rug.
20     Q. I'm not asking -- my question had nothing to do
21  with what you think people knew. I'm asking you what
22  you did.
23     A. No, sir, I did not make any formal discussions on
24  that.
25     Q. And after this incident in which -- it sounds

[Page 299]

1  like --
2      After the refrigerant was removed, did Mike
3  Williams and you and May replace the refrigerant?
4      A. Mike -- or Antonio May and myself replaced it,
5  yes, sir.
6      Q. Okay. And you completed that job?
7      A. Yes, we completed that job, sir, and verified
8  that the leak was -- or that it was -- or that it was
9  sealed and replaced -- or replaced that -- or replaced
10  the expansion valve. And we had started it, and I
11  believe that we left it for dayshift to complete the
12  charging.
13     Q. Okay. But you didn't refuse to fill the --
14  replace the refrigerant, did you?
15     A. No, sir, we had recommended removing all the
16  refrigerant before opening up the expansion valve --
17     Q. I understand.
18     A. -- because that is a liquid sign -- or a less
19  liquid sign that expands over 1,000 times.
20     Q. I understand. I didn't ask you anything about
21  that. I just wanted to make sure you didn't refuse to
22  finish that job, to the extent that you and May filled
23  the unit with a refrigerant?
24     A. I did not refuse to finish that job, sir.
25     Q. Okay. And after that job, we know your pay

[Page 300]

1  wasn't cut. In fact, you got raises. You weren't
2  demoted. You continued to work the same hitches as an
3  electronic technician working nights; and you weren't
4  suspended and you weren't fired in May or June of 2014,
5  correct?
6      A. That is correct.
7      Q. And you continued to working through June 2nd,
8  2015, right?
9      A. Yes, sir.
10     Q. The same with Mr. May?
11     A. Yes, sir.
12     Q. And you never complained about this to the
13  Department of Labor until September 2015?
14     A. That is correct, sir.
15     Q. Okay. The next incident you complained about is
16  on September 2014 Mr. Williams ordered you to violate
17  safety policy by hanging a light over 25 feet high with
18  no safety gear at tie-off points.
19     Do you recall that --
20     A. Yes, sir.
21     Q. -- Incident No. 8?
22     A. Yes, sir.
23     Q. Do you know what day of week you performed this
24  job?
25     A. I do not recall the exact date of that job, sir.

[75] (Pages 297 to 300)

James Christopher Patterson   3/23/2016

[Page 301]

1  I believe that it was in our logs, though.
2    Q. Okay. So, sitting here today, you're unable to
3  narrow down anything more than September 2014?
4    A. Yes, sir.
5    Q. And if it was in your notes that you took but
6  didn't show anybody at DODI about, if you'd written a
7  specific date down, you would have it in here, wouldn't
8  you?
9    A. I don't know, sir.
10   Q. Would there be a reason for you not to include
11 dates that are in your log of grievances?
12   A. Not intentionally, sir.
13   Q. Do you know what time of night you performed this
14 job?
15   A. We refused to perform the job just after
16 turnover, sir.
17   Q. Did Williams supervise this job?
18   A. He did not supervise it. He ordered it done,
19 sir.
20   Q. Who else was present?
21   A. Antonio May and myself, sir.
22   Q. Isn't part of your job to try to figure out the
23 safest way to change light bulbs?
24   A. Yes, sir.
25   Q. Isn't it part of your job to comply with safety

[Page 302]

1  rules and wear proper safety gear?
2    A. Yes, sir.
3    Q. Does Mike Williams need to spell out each and
4  every safety rule that you need to follow for every job?
5    A. No, sir.
6    Q. Does anybody else need to spell out each and
7  every safety rule you need to follow for every job when
8  they are assigning you a task?
9    A. No, sir.
10   Q. Would you tell the Judge why DODI or Mike
11 Williams would care whether you used -- would want you
12 not to use a safety belt or a double lanyard?
13   A. There was no place to connect to, sir.
14   Q. Why would -- why would Williams not want you to
15 use a sail lead block?
16   A. Because you'd have to actually climb over 25 feet
17 up over a Fiberglas rail cover that went down another
18 four feet and use over a 25-foot ladder to get into the
19 middle of the ceiling, which is about from the wall to
20 about here with nothing in between, no connection point
21 up there (indicating). And ordered to mount a sail lead
22 block, when there was no place to actually connect it
23 to, sir. So, we'd have to do an unsafe act in order to
24 do that. That's why we requested another way --
25   Q. Okay. So, it's your testimony you couldn't use a

[Page 303]

1  safety belt, you couldn't use a double lanyard, and you
2  couldn't use a sail lead block for this job?
3    A. No, sir, there was none attached and none
4  available, sir.
5    Q. Is it your testimony there's none available?
6    A. The sail lead block, the safety harnesses are
7  available; but with there being no place to attach,
8  you'd have to climb unassisted using a ladder that's
9  taller than DODI allows in order to hold ourselves
10 suspended and figure out a way of how to actually
11 connect to somewhere on --
12   Q. Okay. So, they are available, you're just saying
13 that they couldn't be used for this particular task?
14   A. No, sir, it was not available -- or it was not
15 possible. It would be a dangerous task for no purpose.
16   Q. Okay. So, they weren't available is your
17 testimony?
18   A. The ceiling is over 25 feet high --
19       MR. HOLMES: He's just asking you whether
20 the safety equipment was available.
21   A. The safety equipment was available.
22       MR. HOLMES: Yeah.
23   Q. (By Mr. Staley) Okay. I'm not saying -- it's
24 separate and apart whether -- what the answer is whether
25 you can perform on this task.

[Page 304]

1    A. Yes, sir.
2    Q. But they have these ladder safety tools
3  available, correct?
4    A. They do have sail lead blocks and they do have
5  other safety equipment, sir.
6    Q. You testified a second ago about the limit of the
7  ladder that you are allowed to climb on at DODI. What
8  is the limit that you just described?
9    A. I believe it was 12 feet, sir.
10   Q. And where would I find that rule?
11   A. GEMS policy. I believe we submitted it to you,
12 as well, sir.
13   Q. Do you know which section?
14   A. Not off the top of my head, sir.
15   Q. Okay. So, no one could climb on a ladder more
16 than 12 feet high?
17   A. That was what we -- we had read the information,
18 and what was ordered was a sliding ladder that was no
19 longer allowed.
20   Q. Do you have a copy of the DODI card that you
21 filled out?
22   A. No, I do not, sir.
23   Q. Did you talk to anyone about the DODI card you
24 filled out?
25   A. Yes, I did, sir.

[76] (Pages 301 to 304)

James Christopher Patterson  3/23/2016

[Page 305]

1  Q. Who?
2  A. I talked to John Green, who is an Exxon rep,
3  the -- I do know that name of the other -- or the other
4  Exxon rep who we spoke with.  We spoke with Jeremy
5  Valone, who is the toolpusher.
6  Q. Valone?
7  A. Yes.
8  Q. He's a DODI toolpusher or --
9  A. He is a DODI toolpusher, sir.  He goes by the
10  nickname Rico.
11  Q. Now, was this at a tour meeting that you raised
12  this issue?
13  A. Before the tour meeting I had raised the issue;
14  and at the tour meeting I had raised the issue, as well,
15  sir.
16  Q. And you read from the GEMS manual to explain why
17  you thought it was improper?
18  A. Antonio May had read from the GEMS manual to
19  explain why it was improper, sir.
20  Q. What did GEMS manual say about it?
21  A. I do not recall, sir; but we do have a copy of
22  it.
23  Q. And you read that John Green at Exxon Mobil --
24  or, I'm sorry, May did?
25  A. Yes, sir, and to the rest of the group there,

[Page 306]

1  sir.
2  Q. Which would have included Jeremy Valone, the
3  toolpusher?
4  A. Yes, sir.
5  Q. Anybody else?
6  A. The safety department rep; Josh, I do not recall
7  his last name; and --
8  Q. Okay.  What did they say in response to that?
9  A. Nothing.  They got very quiet, sir.
10  Q. Okay.  And now you go on to state, Exxon Mobil
11  apparently ordered Diamond Offshore to buy proper
12  ladders for the work platforms.
13  Why do you say that Exxon Mobil apparently
14  ordered DODI to buy new ladders?
15  A. Because after the event, Exxon ordered or had
16  Diamond Offshore order these.
17  Q. Okay.  You're just referring to the mere fact
18  that DODI ordered new ladders?
19  A. After the fact, yes, sir.
20  Q. Okay.  So, you're unaware of any communication
21  between Exxon Mobil and DODI about this, are you?
22  A. I'm not aware of any communication between them,
23  sir.
24  Q. That's just speculation?
25  A. Yes, sir.

[Page 307]

1  Q. Now, you state that --
2  Did you have any conversations with Williams
3  about ladders after this?
4  A. Not afterwards, sir.
5  Q. Okay.  You said Williams learned about this and
6  was surprisingly -- not surprisingly was furious, the
7  hostility became even greater.
8  Why do you say the hostility became greater?  How
9  was he hostile to you?
10  A. I've written several times addressing what I can
11  in my letter to Ken Falke.  He was a very bullying --
12  Q. Very what?
13  A. He was very bullying, creating a hostile work
14  environment.
15  Q. Okay.  How was he a bully to you?
16  A. He had power over me.  He would --
17  Q. Well, I mean, what you've described so far --
18  let's just take you from September 2014.  You'd been
19  employed for DODI for three years?
20  A. Yes, sir.
21  Q. And at this stage you were written up in 2012 for
22  the audit, right?
23  A. Yes, sir.
24  Q. The verbal?
25  A. Yes, sir.

[Page 308]

1  Q. Was that a verbal?
2  A. Yes, sir.
3  Q. Other than that, what action had Mr. Williams
4  taken against you?
5  A. Small parts, like, making the extremely difficult
6  or hard jobs be done at night was one part.  Demeaning,
7  speaking poorly about us to us, yelling, screaming.
8  Q. Do you think the day electronic technicians had
9  it easy?
10  A. Easier, yes, sir.
11  Q. I got you.
12  You think you were -- you got the harder jobs is
13  what your testimony is?
14  A. Yes, sir.  I had --
15  Q. Are you --
16  A. Go ahead, sir.
17  Q. Are you aware that there are DODI employees on
18  the Ocean Endeavor that would not take work to you,
19  because if they asked you to do it, they always found or
20  often found that you would give excuses for why you
21  couldn't do it?
22  A. I cannot think of a single one, sir.
23  Q. Well --
24  Okay.  So, you think he gave you some tougher
25  work assignments at night; is that correct?  Is that how

[77] (Pages 305 to 308)

James Christopher Patterson   3/23/2016

[Page 309]

1    he reflected his hostility?
2       A. Mostly his hostility was the yelling and
3    screaming.
4       Q. You think he's the only one -- you're the only
5    one that he yelled and screamed at?
6       A. Oh, no, sir. He made sure to make all the
7    electrical people miserable.
8       Q. I mean, it's okay to have personality
9    differences, and you obviously didn't like Mike; and,
10   you know, he -- based on your testimony, y'all didn't
11   see eye to eye on a lot of things, right?
12      A. No, sir.
13      Q. I know that rigs are a different work environment
14   than what I work in, right?
15      A. Yes, sir.
16      Q. And people might be more blunt out there while
17   working on the rig, right?
18      A. Yes, sir.
19      Q. I don't encounter situations that involve an
20   engine -- me having to work on an engine that could shut
21   down a rig, right?
22      A. Right, sir.
23      Q. I know that's bigger deal than even me asking you
24   questions under oath, right? I might -- safety of other
25   people are not affected by my questions to you, right?

[Page 310]

1       A. That's correct, sir.
2       Q. Do you think -- do you think there were other
3    people employed by DODI on the Ocean Endeavor that may
4    not have seen eye to eye with you, other than Mike
5    Williams?
6       A. Oh, of course, sir.
7       Q. Who do you think maybe had a different view of
8    how jobs could be performed that worked on the Ocean
9    Endeavor?
10      A. I'm not really sure, sir. I was able to get
11   along with most people on that rig, sir.
12      Q. When you were in the military, were you deployed
13   to -- did you see any combat?
14      A. That's confidential information, sir.
15      Q. Whether you -- whether you were deployed to
16   combat?
17      A. That would be -- or as I was told on my
18   departure, it was considered secret.
19      Q. Okay. I'm not asking you about what you did.
20      A. Yes, sir.
21      Q. Did you work in Iraq?
22      A. No, sir.
23      Q. Did you work in Afghanistan?
24      A. No, sir.
25      Q. Did you work in Pakistan?

[Page 311]

1       A. No, sir, I was stationed on a submarine.
2       Q. Okay. Were you in the Middle East?
3       A. No, sir.
4       Q. Were you in the Mediterranean?
5       A. No, sir.
6       Q. I'm not aware of any combat outside of that area
7    that the United States was involved in, you know, since
8    you were in -- since you were in high school. Am I
9    missing something about combat that -- am I missing any
10   other big combat zones?
11      A. There's other stuff; but that's why it's
12   considered confidential and top secret, sir.
13      Q. Okay. And is it your testimony that you're
14   refusing to answer questions about it?
15      A. I cannot answer, sir. I was -- I had to sign a
16   statement that I would actually be punishable with
17   Federal law if I disclosed anything related to that,
18   sir.
19      Q. In addition to the statement that you signed, are
20   you refusing to answer questions about it today?
21      A. No, sir.
22      Q. Okay. So, where were you stationed on the
23   submarine?
24      A. Where was the submarine stationed, or what was --
25      Q. Where was your patrol?

[Page 312]

1       A. My patrol was the Pacific.
2       Q. Okay. And did you -- did you engage in
3    hostilities with a foreign government while you were on
4    the submarine?
5       A. That is still considered secret information, sir.
6       Q. I understand. And you can tell me you're
7    refusing to answer the question, that's fine.
8       A. Yes, sir.
9       Q. I'll accept that answer, and I won't ask it to
10   you, again; but if you just tell me that you signed a
11   statement, that's not answering my question as to
12   whether or not you'll answer questions about it.
13         Do you understand?
14      A. Okay. Then, I refuse to answer that question,
15   sir.
16      Q. Okay. So, you won't -- will you not disclose
17   whether or not you ever -- or were a combat veteran?
18      A. I was not considered a combat veteran, sir. I
19   was in post September 11th by that part, yes; but I was
20   not in a specific combat zone, sir.
21      Q. And how long were you stationed on the submarine
22   in the Pacific?
23      A. After I finished nuclear power school, I was
24   stationed there from June of 2008 through September of
25   2002.

[78] (Pages 309 to 312)

O'Neal Probst Wells - 713-521-1314
Houston/Galveston    Dallas/Fort Worth    Austin/San Antonio    Bryan/College Station    Corpus Christi

APPENDIX 36

DODI 989

James Christopher Patterson   3/23/2016

[Page 313]

1     MR. HOLMES:  '98 you mean.
2     A. Or '98.  Correction, '98.
3     Q. (By Mr. Staley)  '98 through 2002; so, almost
4  four years.
5     A. A little over four years, sir.
6     Q. Okay.  A little over.
7        When you were discharged from the military, were
8  you diagnosed with post traumatic stress?
9     A. Sir, that is considered private health care
10  information; and I would appreciate this not being
11  placed on the record.  I have not given any written
12  acknowledgment for anyone to disclose this information.
13     Q. It's actually in a lot of your own documents that
14  you produced in this case.
15        You know that?
16     A. It's not been produced by me, sir.
17     Q. I think it has.
18     A. No, sir, it was produced by Mike Williams.
19     Q. Okay.  Because you told him you had PTSD?
20     A. Because I told Randy Sutfin, and Randy Sutfin
21  informed Mike Williams in front of me.
22     Q. Well, wasn't the issue whether or not you were
23  going to accept the dayshift?
24     A. Yes, sir, and that's why I went to Randy Sutfin
25  as a last effort to inform him of -- that Mike was

[Page 314]

1  causing issues due to his hostility towards me.
2     Q. Okay.  I'm asking you when you were diagnosed
3  with PTS.
4     A. This would be in early of 2015, sir.
5     Q. Okay.  So, your six years in the military and
6  four years plus on the submarine, when you were
7  discharged from the military, you didn't have any post
8  traumatic stress?
9     A. I had not been diagnosed with PTSD at that point,
10  no, sir.
11     Q. Okay.  Did you experience it?
12     A. Yes, I had, sir.
13     Q. Okay.  So, it went undiagnosed; but it was
14  something you experienced while you were in the
15  military?
16     A. I would prefer that my medical information not be
17  brought into this, sir.
18     Q. Well, unfortunately, it's actually relevant just
19  to the -- your declining the -- part of the allegations
20  in this lawsuit is that you sought other jobs and that
21  you wanted a different shift.
22     A. Yes, sir.
23     Q. And DODI made several offers to you about that,
24  and you declined them for different reasons.  You
25  declined the pay cut opportunity on subsea, and you

[Page 315]

1  declined the dayshift opportunity where you would report
2  half to Tommy Wells and half -- only half to Mike
3  Williams.  And you make the complaint -- you make the
4  allegation in the Complaint that DODI didn't do anything
5  when you asked for shift opportunities.  And we know
6  that's not true, because they offered you these other
7  opportunities; but you declined.  And the reason that
8  you gave for declining one of them is that you have PTS.
9  And I simply want to know how long you've had it.
10     A. I was diagnosed in 2015, sir.
11     Q. How long have you experienced it?
12     A. I don't know, sir.  For a long period of time,
13  sir.
14     Q. Okay.  So, is it fair to say that you started --
15  you know, you had experienced it when you were
16  discharged from the military?
17     A. I am not a psychologist, sir.  I'm not qualified
18  to answer that question.
19     Q. Okay.  You don't know what you experienced?
20     A. No, sir, I was not diagnosed until last year,
21  sir.
22     Q. And until you were diagnosed, you had -- you
23  didn't experience any post traumatic stress?
24     A. I had -- on looking back at things, my condition
25  had been getting worse.  Every time I would be on the

[Page 316]

1  rig and working for Mike Williams would cause flare-ups.
2     Q. Did you have any PTS at A&M?
3     A. No, sir, I do not recall having any issues, just
4  high stress levels.  I really don't know, sir.
5     Q. All right.  After September 2014, you continued
6  working for DODI through June 1 -- June 2nd, 2015 in the
7  same position as an ET on the nightshift working on
8  hitches, right?
9     A. Yes, sir.
10     Q. And you received pay increases after September
11  2014, correct?
12     A. Yes, sir.
13     Q. You weren't fired or suspended, and you weren't
14  demoted after September 2014, correct?
15     A. Up until September 14th, no, sir.
16     Q. Hold on.  You weren't demoted?
17     A. Not demoted, sir.  I was written up that
18  following month.
19     Q. I understand.  And you understand that, I guess,
20  you and -- one of the things you and Mike didn't see eye
21  to eye on is what kind of work was appropriate for you
22  to do at night, right?
23     A. Yes, sir.
24     Q. And the fact that he thought, from his
25  perspective, that you were doing a lot more of lower

[79]  (Pages 313 to 316)

O'Neal Probst Wells - 713-521-1314

James Christopher Patterson   3/23/2016

[Page 317]

1  level electrician work at night with Antonio May doing
2  jobs together that didn't require two people, that was
3  his perception, correct?
4      A.  That was his perception; but a false perception,
5  sir.
6      Q.  I understand you disagree with him; but that was
7  Mike's perception of things, right?
8      A.  Yes, sir.
9      Q.  And he had multiple conversations with you after
10  looking at your nightly logs about working less, being
11  less reliant with working on -- with Antonio May on
12  tasks that were -- that didn't call for it, right, he
13  mentioned that?
14      A.  He claimed that, yes, sir.
15      Q.  And you like to set your own priorities, right?
16      A.  I'm capable of adjusting my priorities, yes, sir.
17      Q.  That wasn't my question.
18         You like setting your own priorities, right?
19      A.  I like setting my priorities, sir.
20      Q.  And you liked working with Antonio May?
21      A.  Yes, sir.
22      Q.  And y'all did a lot of work together at night?
23      A.  We did a lot of work together at night.
24      Q.  And there are fewer people around to supervise,
25  right?

[Page 318]

1      A.  There are a few -- or there are fewer people to
2  supervise, yes, sir.
3      Q.  There are fewer at night than there are during
4  the day to supervise, right?
5      A.  Yes, sir.
6         (Exhibit 11 marked)
7      Q.  (By Mr. Staley)  Okay.  I'm going to hand you
8  what's marked as Deposition Exhibit No. 11.  Do you
9  recognize it?
10      A.  I do recognize it, sir.
11      Q.  And this is a "Supervisor's Conference Record"
12  that Mike gave you on October 25th, 2014?
13      A.  Yes, sir.
14      Q.  And it's a "Work Performance" "Written" warning,
15  correct?
16      A.  Yes, sir.
17      Q.  And "Subject of discussion," it says, (Reading),
18  Jim is spending more time doing electrical work than
19  doing electronics, when there are many jobs requiring
20  his attention.  He has been warned many times about
21  prioritizing his tasks in a more efficient way.  He must
22  do a better job of checking on parts for critical
23  equipment.
24         Do you see that?
25      A.  Yes, I do see that, sir.

[Page 319]

1      Q.  And this wasn't the first time he mentioned to
2  you that he thought you were doing more electrical than
3  electronics, right?
4      A.  Yes, sir.
5      Q.  Prior to this incident, how many times had he
6  talked to you about -- prior to this conference record
7  on October 25th, how many times had he informally talked
8  to you about electronic versus electrician work?
9      A.  I can only recall one, sir.
10      Q.  Okay.  And where was that conversation held?
11      A.  That was in his office when he was ordering
12  Antonio and I to work separately and do not work
13  together.
14      Q.  Okay.  And when did that happen?
15      A.  I do not recall, sir.
16      Q.  Was it prior to this conference record?
17      A.  That was prior to this conference record, sir.
18      Q.  Now, he writes, (Reading), The expectation is for
19  Jim to devote the majority of his time to electronic
20  work.  He must be checking on parts for all equipment in
21  his department, no matter who orders the parts.  He need
22  to ensure he is giving and getting good handover notes.
23  Jim must ensure all computers are checked out and ready
24  for installation before they go to the shelf in the
25  storeroom.  If there are programming issues, he needs to

[Page 320]

1  work with the electronics superintendent in Houston and
2  myself to ensure the equipment is ready.  He must ensure
3  that we have critical spares for all electronic
4  equipment.
5         Did I read that correctly?
6      A.  You read that correctly.
7      Q.  As an electronic technician, do you think you
8  should spend a majority of your work on electronic work?
9      A.  Yes, sir, but once I finish all the electronics
10  work, if I have time where everything is done, there are
11  other -- or we're one rig, and if other people need
12  help, I'll help the mechanic, I'll help the electrician,
13  I'll help out the drillers and ADs.
14      Q.  I understand that you can help other people out,
15  but you should spend the majority of your work on
16  electronic work, right?
17      A.  If I have work to be done, then, I will do it.
18      Q.  You don't have any disagreement with that
19  statement, do you?
20      A.  That I spend --
21      Q.  That you should spend a majority of your work
22  doing electronic work as an electronic technician?
23      A.  If there's electronic work to do.  If there's no
24  work to do.
25      Q.  And checking on parts for equipment in your

[80]  (Pages 317 to 320)

James Christopher Patterson   3/23/2016

[Page 353]

1    A. No, sir, it's been well of a year -- or it's been
2 about a year, sir.
3    Q. All right. You weren't suspended, your pay
4 wasn't cut, you weren't fired or demoted in April or May
5 of 2015, right?
6    A. No, sir.
7    Q. And you continued to work as an electronic
8 technician through June 2nd, right?
9    A. Yes, sir.
10    Q. And nothing about your shift changed during that
11 period, right?
12    A. No, sir.
13    Q. And the first you complained about this incident
14 was with your DOL Complaint on September 21, 2015?
15    A. Yes, sir.
16    Q. Now, you then claim in the Complaint that there
17 was -- that Williams on April 25th asked you to
18 decommission and start removing the Rigsaver system?
19    A. Yes, sir.
20    Q. And you checked with the storekeeper, who
21 informed you that he hadn't received any e-mails to
22 decommission or to remove the system from service?
23    A. That's correct, sir.
24    Q. Why would the -- why would the storekeeper be
25 involved in whether or not property was decommissioned?

[Page 354]

1    A. Because he is the one responsible for all the
2 equipment in the warehouse area, and he is the one who
3 has to be informed if anything is decommissioned or has
4 to be sent back shore side, because it's valuable space
5 in inventory; and he is the one who is specifically
6 responsible for making sure that everything gets
7 collected and sent back shore side.
8    Q. Okay.
9    A. So, he would be the point of contact for that,
10 sir.
11    Q. Did you doubt that there was an order to
12 decommission the Rigsaver system?
13    A. Yes, sir.
14    Q. Why?
15    A. It's a rig critical system and the storekeeper,
16 who is required to be informed about all of that stuff,
17 did not inform me of this.
18    Q. Where is the procedure that says the storekeeper
19 is going to be informed if you decommission the
20 Rigsaver?
21    A. I don't know of any procedure, sir; but the
22 storekeeper is the one who sends equipment back shore
23 side.
24    Q. Okay. So, are you speculating on that front?
25    A. No, sir, this is if something is decommissioned

[Page 355]

1 or if something has to be returned shore side, we give
2 it to storekeeper.
3    Q. Wouldn't Houston make that decision?
4    A. But it would still have to be reported to them.
5    Q. But the answer to my question was what? "Yes,"
6 Houston would make that decision?
7    A. Yes, Houston would make that decision, sir.
8    Q. Okay. Do you know what the real name for
9 Rigsaver is?
10    A. Not off the top of my head, sir.
11    Q. Okay. Have you ever heard of RigStat?
12    A. I have heard of RigStat, sir.
13    Q. Why did you believe that there wasn't an
14 instruction to remove Rigsaver?
15    A. Because Mike Williams had stated it, and I had
16 asked for or would ask for --
17    Q. Did you think you're entitled to an e-mail before
18 you follow your supervisor's instructions?
19    A. No, sir.
20    Q. Well, then, why were you asking for proof of his
21 instructions?
22    A. I wasn't asking for proof from him, sir. I was
23 asking from the storekeeper.
24    Q. Right. Why do you think you're entitled to prove
25 from the storekeeper?

[Page 356]

1    A. Because if we have to remove a system that may be
2 critical to rig operations, then, that would be cause
3 for immediate termination, sir.
4    Q. Well, if your supervisor said to remove it, and
5 it's been ordered to remove, wouldn't you be saying,
6 "Listen, my supervisor specifically instructed me to
7 remove it," you don't need a work permit for this?
8    A. You do need a work permit for it, sir.
9    Q. I got you.
10    And is the storekeeper the one to sign that work
11 permit?
12    A. No, sir.
13    Q. Okay. Who would sign the work permit for this?
14    A. That would be the night toolpusher, sir.
15    Q. Okay. Or the OIM?
16    A. Or the OIM, sir.
17    (Exhibit 13 marked)
18    Q. (By Mr. Staley) Okay. I'm going to hand you
19 what's marked as Deposition Exhibit No. 3 -- 13, excuse
20 me.
21    Have you seen this e-mail?
22    A. Not since -- or I had not seen it prior to the
23 information requested that we received, sir.
24    Q. So, does it look like an e-mail from February 10,
25 2015, about two-and-a-half months prior to Mike Williams

[89] (Pages 353 to 356)

O'Neal Probst Wells - 713-521-1314

James Christopher Patterson   3/23/2016

[Page 357]

1  tell you to remove the RigStat system?
2      A. Yes, sir.
3      Q. Is it an e-mail from Ken Falke ordering Mike to
4  remove the system from the rig?
5      A. It's informing him that he can remove the system
6  from the rig.
7      Q. Okay. And attached to it is the actual material
8  requisition, right?
9      A. Yes, sir, and that would be with the storekeeper.
10     Q. Isn't the Rigsaver system a piece of equipment
11 that was created in the wake of Katrina?
12     A. I don't know, sir.
13     Q. Do you know how dated it was?
14     A. I had worked and repaired the system numerous
15 times, sir, or worked on the system, sir.
16     Q. Do you know how dated it was?
17     A. No, I do not, sir.
18     Q. Okay. That was my question. It wasn't did you
19 work on the system long.
20         You knew that the equipment was ten years old,
21 right?
22     A. No, I did not, sir.
23     Q. Working on it, you didn't realize that?
24     A. No, sir.
25     Q. And you realized that it really wasn't very

[Page 358]

1  effective equipment, right, it was obsolete?
2      A. I didn't realize that, sir.
3      Q. Well, now that you've had the benefit of seeing
4  Exhibit 13, are you now satisfied that Mike Williams had
5  every right to instruct you to remove the RigStat
6  system; and there wasn't anything nefarious about it?
7      A. Yes, sir, except for that part where he told us
8  or when we stated what could we do -- or what do we do
9  with the spares, and him saying that you can take it
10 home, make a wind turbine at home out of it, if you
11 want.
12     Q. Do you think that was a joke?
13     A. No, I do not, sir.
14     Q. Do you think he really thought you'd take it home
15 and make a wind turbine out of it?
16     A. Yes, sir.
17     Q. Because you have wind turbines at your house?
18     A. No, sir.
19     Q. Well, then, why would he think you would want a
20 wind turbine?
21     A. He makes different kinds of jokes than that, sir.
22     Q. Well, would he think you would use a wind turbine
23 at your house?
24     A. I don't know, sir. I'm not Mike Williams.
25     Q. Okay. Did you ask him, "What do you mean? Why

[Page 359]

1  do you think I'd like a wind turbine"? Did you ask him
2  that?
3      A. No, there was no point in asking him that
4  question, sir, that would be considered theft of
5  property.
6      Q. So, you just assumed that he was serious with
7  whatever comments he made to you about it?
8      A. With the previous of him attempting to retaliate
9  and causing us to get fired, yes, sir.
10     Q. I mean, here, you didn't believe that you were
11 supposed to remove the Rigsaver system, right?
12     A. Right, that's why I conferred with the
13 storekeeper; and the storekeeper had not received this.
14     Q. And surprisingly he was out of the loop, because
15 he's never been involved with the Rigsaver system,
16 correct?
17     A. That is correct, and it's not -- it wasn't
18 critical for -- it wasn't critical for the system to be
19 removed immediately.
20     Q. Should the Judge just determine that you didn't
21 want to deal with what Mike Williams instructed you to
22 do?
23     A. No, of course not, sir. I did everything that
24 Mike Williams instructed me to do on everything.
25     Q. Hold on. When he ordered you to remove the

[Page 360]

1  RigStat equipment on April 25th, did you do it?
2      A. No, sir, I did not do it.
3      Q. Okay. All right. I thought you said you
4  always -- you did what he asked you to do?
5      A. I did not say that I always did what he asked me
6  to do. I did what I could do safely, sir.
7      Q. Do you think it would be unsafe to remove the
8  RigStat equipment?
9      A. If it was critical to rig operations or if it was
10 still in use for determining or for locating a rig, if
11 an emergency happened, yes, sir.
12     Q. If it's obsolete equipment that's not working and
13 you remove it, do you think it's going to cause an
14 unsafe condition?
15     A. If it was obsolete equipment that was still in
16 use, yes, it would cause an unsafe condition, sir.
17     Q. Did you hear my question?
18     A. Yes, sir.
19     Q. And what was the answer to my question?
20     A. That if it's obsolete equipment and if it's still
21 in use, because we had plenty of obsolete equipment on
22 the rig that was still in use; and if it's still in use
23 and you remove it, then, it could potentially cause an
24 issue.
25     Q. What if it's not working properly, would it be

[90] (Pages 357 to 360)

James Christopher Patterson   3/23/2016

[Page 361]

1  safety critical then?
2  **A.** Yes, it would still be safety critical.
3  **Q.** You loved this equipment, but you didn't want to
4  take it home for a wind farm?
5  **A.** Of course not, sir.
6  **Q.** I mean, you didn't -- did you tell anybody in
7  April of 2015 that Mr. Williams told you to -- that you
8  could take this home for a wind turbine?
9  **A.** Antonio May, myself and the storekeeper, sir.
10 **Q.** Okay.  You didn't tell anybody else?
11 **A.** There was no need to, sir.
12 **Q.** Did I ask whether there was a need to?
13 **A.** No, sir.
14 **Q.** Okay.  Did you tell anybody else?
15 **A.** Not to my recollection, sir.
16 **Q.** Okay.  Thank you.
17     And after this incident, you worked through
18 June 2nd, right?
19 **A.** Yes, sir.
20 **Q.** No pay cut, you worked the same on everything?
21 **A.** Yes, sir.
22 **Q.** And the same thing with May?
23 **A.** Yes, sir.
24 **Q.** Okay.  At the end of this hitch you complained
25 again to HR, but Ms. Dugger said -- would say only that

[Page 362]

1  she was sick of hearing about you and Williams?
2  **A.** Yes, sir.
3  **Q.** Did she think this was a personality dispute?
4  **A.** I don't know, sir.
5  **Q.** Did you ask?
6  **A.** No, sir.
7  **Q.** Why not?
8  **A.** If she had indicated to me that she was sick and
9  tired of hearing about it, then there's nothing else
10 that I can get from that, sir.
11 **Q.** Well, didn't they just offer you a day position
12 that you would have two weeks with Tommy Wells and only
13 two weeks with Mike Williams?
14 **A.** Yes, sir.
15 **Q.** And you declined it, right?
16 **A.** Yes, sir.
17 **Q.** So, regardless of what you say Ms. Dugger told
18 you during this conversation, they were offering you
19 other positions?
20 **A.** It was the same position on the same rig, sir.
21 **Q.** With a different supervisor half the time, right?
22 **A.** But it would be a lot more -- it would be a lot
23 more time with Mike --
24 **Q.** "Yes" or "no"?
25 **A.** With a different supervisor half the time, sir.

[Page 363]

1  **Q.** Right.  And they also offered you the subsea gig
2  that you refused, right?
3  **A.** That's because of the pay cut.
4  **Q.** I understand.  Your decisions are your decisions;
5  but they offered you other options, right?
6  **A.** Yes, sir.
7  **Q.** Now, installing new software.  What is nefarious
8  about the software installation on May 29th?
9  **A.** By what do you mean as nefarious, sir?
10 **Q.** Why was it suspicious that he asked you to
11 install the software?
12 **A.** There's nothing suspicious about it, sir.
13 **Q.** You received permission with a strict one-hour
14 time limit.  Aren't there always strict time limits for
15 downloading software and they can always change, the
16 windows can change, depending on rig conditions?
17 **A.** Yes, sir, but we were in hole and circulating.
18 Had anything happened at that point, the well would have
19 collapsed in -- or the well had a potential for
20 collapsing in.
21 **Q.** Okay.  And you go on to state here that you
22 aborted 45 minutes after the software because the
23 problems could cause system damage and safety concerns.
24 You said after Patterson and May were terminated
25 Williams had the software installed, and the rig was

[Page 364]

1  shut down for a week.
2  **A.** Yes, as according to the ETs who were on the rig.
3  **Q.** Who were the ETs that told you that?
4  **A.** That would be Nick Coverstone and Kevin
5  Henderson.
6  **Q.** So, it's your testimony that they told you that
7  there was a week of downtime due to the software
8  installation in June of 2015?
9  **A.** The ABS, anti -- or ACS, anticollision system
10 issues due to the software.
11 **Q.** Hold on.
12     After Mr. Patterson and Mr. May were terminated,
13 Williams had the software installed; and the rig was
14 shut down for a week as a result.
15 **A.** Yes, the system affected the anticollision
16 system, which that part would cause for rig downtime,
17 sir.
18 **Q.** Do you have any personal knowledge about this
19 alleged incident of the rig being shut down for a week
20 in June 2015?
21 **A.** No, sir.
22 **Q.** Okay.  So, all you've heard from this is hearsay
23 and speculation?
24 **A.** Yes, sir.
25 **Q.** Okay.  Now, who is the OIM who said you said

[91] (Pages 361 to 364)

James Christopher Patterson   3/23/2016

[Page 365]

1   don't proceed with the software update?
2      A.  Randy Sutfin.
3      Q.  Okay.  And Mike, subsequently, had a conversation
4   with Randy; and he said, "You can do it, but only do it
5   for an hour, you have an hour time window"?
6      A.  Before that he had told him, "No, I don't want
7   this done while we're down in the hole and the well
8   could collapse."  I made my recommendation not to do it
9   and to wait for a period where we would have a larger
10  window and wouldn't subsequently cause the well to
11  collapse in upon itself.
12     Q.  Okay.  So, you tried to complete this task,
13  right?
14     A.  Yes, sir.
15     Q.  And it wasn't -- you were running out of time for
16  the time that was provided, right?
17     A.  Yes, sir.
18     Q.  Williams told you we have one hour to do this,
19  right?
20     A.  No, I was talking -- I talked with the
21  toolpusher, Ronny Davis, who said that he can give me
22  one hour.
23     Q.  Okay.  And this was at night?
24     A.  This was just after turnover, sir.
25     Q.  And did you have any subsequent conversations

[Page 366]

1   with Williams about the one hour?
2      A.  No, sir, this had happened at night, sir.
3      Q.  I understand it happened at night, but you said
4   it was just after turnover.
5      A.  Yes, sir.
6      Q.  So, that means 6:00 or 7:00, right?
7      A.  That's between 6:00 and 9:00, yes, sir.
8      Q.  Okay.  He's not asleep at that point, right?  He
9   could be doing a lot of things; but he's not sleeping,
10  right?
11     A.  I don't know, sir.
12     Q.  You don't know?
13     A.  I don't know, sir.
14     Q.  Okay.  After this incident, the next day you
15  weren't disciplined in any way for it?
16     A.  No, sir, I was not disciplined that day.
17     Q.  And you didn't have your pay cut the next day?
18     A.  No, sir.
19     Q.  And you didn't -- you weren't terminated until
20  after the rig shutdown incident, right?
21     A.  That is correct, sir.
22     Q.  And you didn't complain to anybody about this
23  incident until a DOL Complaint on September 21, 2015,
24  right?
25     A.  That is correct, sir.

[Page 367]

1      Q.  Okay.  On the 30th of May, you were asked to
2   install four fluorescent light bulbs on the derrick that
3   would involve a 40-foot beam about 115 feet above the
4   deck in the dark.  If a bulb fell or shards of glass
5   could fall on crew members on the deck below causing
6   injury.
7         Okay.  And you refused to do this order?
8      A.  Yes, sir.
9      Q.  Did you tell Williams you're not doing it, or did
10  you just not do it?
11     A.  Antonio May said that we're not doing that job,
12  it is the derrick man's job, because that is
13  unaccessible up there.
14     Q.  Okay.
15     A.  The lights are meant to be equipped disconnect
16  with a plug, a twist lock plug; and to be taken off --
17  and for them to be taken off rail so that way they can
18  taken down and safely changed, and then brought back up,
19  re-secured; and then, plugged in and locked in place,
20  sir.
21     Q.  And did the derrick -- you said the derrick man
22  should do it?
23     A.  It's the derrick man's responsibility, sir.
24     Q.  Did they do it?
25     A.  They had not at that period.  They were busy --

[Page 368]

1   or they were busy with other jobs, sir.
2      Q.  Okay.  And did you have any subsequent
3   conversations with Williams about your -- did you have
4   any conversation with Williams about a refusal to do
5   this job?
6      A.  Not after that, sir.
7      Q.  You didn't have any conversation, period, with
8   Williams about refusing to do that job, right?
9      A.  Afterwards Antonio May had said that we're not
10  going to do that; and then, talked to the toolpusher and
11  stated that --
12     Q.  I understand.  My question is:  Did you have any
13  conversation at any point in time about the refusal to
14  do that job with Mike Williams?
15     A.  No, sir.
16     Q.  There you go.
17        Okay.  We've talked about the reverse testing
18  incident.  You make an allegation that the maintenance
19  records that have been produced have a notation in the
20  corner that say modified by Mike Williams on them.
21     A.  Yes, sir.
22     Q.  And you're unable to identify today what you
23  think could have been modified, if anything, in the
24  substance of the records?
25     A.  Yes, I can't indicate exactly, because we have no

[92] (Pages 365 to 368)

James Christopher Patterson 3/23/2016

[Page 369]

1 access to the original logs, sir.
2    Q. Well, hold on. Here is -- I'm going to show you
3 Deposition Exhibit No. 14.
4       (Exhibit 14 marked)
5    Q. (By Mr. Staley) What do you think was modified
6 on there?
7    A. It could have been name. It can be comments. It
8 can be date closed.
9    Q. Are you aware that you can't modify comments?
10    A. You can -- as a supervisor, you can modify
11 anything on this part that you choose, sir.
12    Q. Are you aware that, if you try to change it, it
13 won't actually modify the text, it will only put your
14 entry in below it?
15    A. Actually, it does not do that, sir. When Ken
16 Falke had modified and reopened a PN that Nick
17 Coverstone had closed, because he found it insufficient,
18 he had deleted all of the comments, re-opened it and
19 returned to -- or returned it into the system, sir.
20     Modification --
21    Q. Would you show me -- do you have that document?
22    A. No, I don't, sir.
23    Q. Okay. Do you have any documents that reflect
24 what you just described?
25    A. No, I don't, sir.

[Page 370]

1    Q. Okay.
2    A. I have the RigMS technical manual that can give
3 you all of the information, though, sir.
4    Q. I understand. But you can't identify in
5 Exhibit 14 what you think was modified?
6    A. No, but it did have Mike Williams modifying these
7 two logs a few hours after the event occurred; and we
8 don't know why he would modify these two logs,
9 specifically, sir.
10    Q. You don't know if he modified anything on them,
11 right?
12    A. I know modified it, because it says last modified
13 by him, sir.
14    Q. You don't know if he changed a single line on
15 there, right?
16    A. If he changed or added or changed one of the
17 lines and saved it as that, that would cause a
18 modification. If he made absolutely no change at all to
19 it, then, it would not say modified by, sir.
20    Q. What if he pushed save?
21    A. If he'd made no changes, it wouldn't indicated
22 modified by him, sir.
23    Q. What would it do if he just saved it? What would
24 it indicate then?
25    A. It would indicate exactly as it did before. If

[Page 371]

1 you wish I can --
2    Q. So, it wouldn't reflect -- it wouldn't reflect
3 that you were even in the document if you saved it?
4    A. It can indicate it on the access log; but not the
5 modified by log, sir.
6    Q. I got you.
7     And this is your sworn testimony that, if you
8 open up the RigMS system and view the document and save
9 it, it won't show a modification on the top left-hand
10 corner?
11    A. It will not show a modification in the top
12 left-hand corner, sir. I've --
13    Q. Okay.
14    A. We've provided you --
15    Q. I just want to make sure I understand your
16 testimony --
17    A. Yes, sir.
18    Q. -- just to the question asked, not a bunch of
19 other stuff.
20    A. I got it, sir.
21       (Exhibit 15 marked)
22    Q. (By Mr. Staley) Okay. I'm handing you
23 Exhibit 15. Is this some EEOC related correspondence
24 that you drafted for Antonio May?
25    A. It appears to be that way, sir.

[Page 372]

1    Q. And it seems to me that you're kind of trying to
2 help -- I mean, you're suggesting that Mike Williams
3 fired your guys because your wife is black and because
4 Antonio May is black; is that correct?
5    A. That is definitely a possibility, sir.
6    Q. So, do you believe that you were fired because
7 your wife is black?
8    A. I believe that is one of the causes, sir.
9    Q. Do you believe it's the primary cause?
10    A. I believe it is the primary motivating cause,
11 sir.
12    Q. Okay. So, you think he's motivated primarily by
13 racial antipathy towards your wife?
14    A. That is definitely -- or that is definitely -- I
15 would say that, sir.
16    Q. Okay.
17    A. I cannot be 100 percent, because I'm not in his
18 mind, sir.
19    Q. No, I understand. But that's what you believe
20 here today, right?
21    A. Yes, sir, the animosity towards me did not appear
22 to start until after he found out that my wife was
23 black.
24    Q. I got you.
25     So, when did he find out that your wife was

[93] (Pages 369 to 372)

O'Neal Probst Wells - 713-521-1314
Houston/Galveston    Dallas/Fort Worth    Austin/San Antonio    Bryan/College Station   Corpus Christi

DODI 1004

Antonio Carl May    3/29/2016

**[Page 1]**

2016-SPA-1
2016-SPA-2

IN THE MATTER OF JAMES      )
PATTERSON AND ANTONIO MAY,  )
          Complainants,     )
                            )
VS.                         )
                            )
DIAMOND OFFSHORE, INC.,     )
          Respondent.       )

ORAL DEPOSITION OF ANTONIO CARL MAY
March 29, 2016

     Oral deposition of ANTONIO CARL MAY was
taken on March 29, 2016, in the Law Offices of David C.
Holmes, 13201 Northwest Freeway, Suite 800, Houston,
Texas, from 10:00 a.m. to 5:10 p.m., before Dickie
Zimmer, Certified Shorthand Reporter, pursuant to Notice
and the Federal Rules of Civil Procedure and under the
following agreement of counsel for the respective
parties that:

     The deposition may be signed by the witness

before any Notary Public or officer authorized to

administer oaths.

**[Page 3]**

1                  INDEX
2
3   TESTIMONY OF:  ANTONIO CARL MAY
4   EXAMINATION BY:                    PAGE
5      Mr. Staley.................  4
       Mr. Holmes................. 285
6      Mr. Staley................. 291
7           EXHIBIT INDEX
8   NO.     DESCRIPTION       PAGE
9    1   DODI Permit to Work (DODI 0599)....... 82
     2   Job Safety Analysis Worksheet Dated
10       7-10-13 (DODI 0505-06)...............  85
     3   Screen Shot of JSA Editor Last Edited
11       8-14-15 (DODI 0869)..................  90
     4   Injury/Illness Report of May
12       (DODI 0512)..........................  92
     5   Supervisor's Conference Record Dated
13       6-2-15 (DODI 0018-19)................ 113
     6   Charge of Discrimination Dated 6-23-15
14       (Patterson-May 379).................. 124
     7   EEOC Intake Questionnaire Dated
15       6-9-15 (Patterson-May 391-394)....... 125
     8   Diamond Offshore Worldwide Competency
16       Program Dated 9-22-08 (DODI 0207-11... 140
     9   Employee Training, Licensing and
17       Scheduling Class as of 3-14-14
         (Patterson-May 495).................. 144
18   10   Diamond Offshore Working Safely is a
         Condition of Your Employment (DODI 13) 144
19   11   Salary Chart for May and Patterson
         (DODI 0866).......................... 147
20   12   Supervisor's Conference Record Dated
         2-26-13 (DODI 0037).................. 150
21   13   Handwritten Note by Patterson Dated
         3-15-14 (DODI 0688).................. 187
22   14   RigMS Screen Shot (DODI 0855-56)..... 246
     15   Diamond Offshore Services Limited
23       CV of May (DODI 0014)................ 261
     16   Letter From Patterson to Ladera
24       Received 7-22-15 (Patterson-May 385-6) 293
25

**[Page 2]**

1        A P P E A R A N C E S
2
3   FOR THE COMPLAINANTS:
       Law Offices of David C. Holmes
4      13201 Northwest Freeway, Suite 800
       Houston, Texas  77040
5      Phone:  713.586.8862
       Fax:  713.586.8863
6      Email:  dholmes282@aol.com
       By:  David C. Holmes
7
8
9   FOR THE RESPONDENT:
       Ogletree, Deakins, Nash, Smoak & Stewart, P.C.
       One Allen Center
10     500 Dallas Street, Suite 3000
       Houston, Texas  77002
11     Phone:  713.655.5758
       Fax:  713.655.0020
12     Email:  jim.staley@olgetreedeakins.com
       By:  Jim Staley
13         Alice Liu
14
15  ALSO PRESENT:
       William "Chip" Rice
16
17
        * * * * * * * * * * * *
18
19
20
21
22
23
24
25

**[Page 4]**

1           ANTONIO CARL MAY,
2   having been first duly sworn, testified as follows:
3              EXAMINATION
4   BY MR. STALEY:
5      Q.  Good morning, Mr. May.
6      A.  Good morning.
7      Q.  Will you state your full name for the record,
8   please?
9      A.  Antonio Carl May.
10     Q.  And what is your address?
11     A.  5710 Jackie Lane, Beaumont, Texas  77713.
12     Q.  And how long have you lived at that address?
13     A.  I've lived at that address for about three-and-
14  a-half years.
15     Q.  Have you ever given a deposition before?
16     A.  Not one of this kind.
17     Q.  I got you.
18         What kind of -- when you say "not one of this
19  kind," have you ever given testimony under oath before?
20     A.  No, no, not under oath.  I worked with the Bureau
21  of Prisons for a while.
22     Q.  Okay.  And would they want -- I guess, if there
23  was an altercation between inmates or something, would
24  you be required to give a statement about it?
25     A.  Yes.

O'Neal Probst Wells - 713-521-1314
Houston/Galveston    Dallas/Fort Worth    Austin/San Antonio    Bryan/College Station    Corpus Christi

APPENDIX 44

DODI 802

Antonio Carl May    3/29/2016

[Page 29]

1  required for the test?
2      A. Yes, they are.
3      Q. Three mechanics could do it?
4      A. Yes, three mechanics can do it.
5      Q. Under the JSA protocol?
6      A. Under the -- under the -- not the JSA protocol,
7  but it's under the task at hand that the mechanic can do
8  it.
9      Q. Okay. I'm asking -- I'm not asking you whether,
10 like, from a competence perspective whether he can do
11 it; but under the JSA protocol.
12     A. Under the JSA protocol it's for -- it calls for
13 all three of us.
14     Q. I understand. So, under the JSA protocol, three
15 mechanics couldn't do it without anybody else, correct?
16 They would require an electrician and an electrical
17 technician, right?
18     A. According to the -- according to the protocol,
19 the JSA protocol that they put forth, yes.
20     Q. Okay. And a mechanic is not authorized to
21 perform electrical work, is he?
22     A. In that case -- in that case, the mechanic -- the
23 mechanic -- the mechanic is required to do that test.
24     Q. I understand he's required to do that test; but
25 he's not -- a mechanic is not authorized to perform

[Page 30]

1  electrical work, is he?
2      A. Well, no, not --
3      Q. Okay.
4      A. -- not as far as changing -- the only thing --
5  he's required to a point where he can change out
6  electrical motors, and he can do some electrical tests
7  on his engines.
8      Q. But he's not -- he's not -- a mechanic is
9  typically not an electrician; you would agree with me,
10 right?
11     A. Yes, he's not an electrician. Right.
12     Q. Okay. And it's your understanding that -- I
13 mean, in your eight years at DODI, did you ever, you
14 know -- were you ever asked to rewire something with
15 mechanics, or were you working with an electrical
16 technician or another electrician to assist with that
17 task?
18     A. Yes. A mechanic asked me, yes.
19     Q. I got you.
20        What kind of scenario was that?
21     A. It was a rewiring -- it was rewiring
22 electrical -- burned out electrical wires on the
23 engines.
24     Q. I got you.
25        And who was that mechanic?

[Page 31]

1      A. Kenneth Johnson.
2      Q. I got you. Okay.
3        Now, I'm going to ask you a little bit about
4  June 1. And I'm familiar with your Complaint
5  allegations in this case, and I've read your statements
6  that you gave; but my questions are pretty narrow.
7        On June 1, 2015, did you get -- you get a work
8  permit for the reverse power testing?
9      A. No, because the rig mechanic, which is the area
10 supervisor, told us that he had the paperwork.
11     Q. I understand. My question is simply very narrow.
12 You didn't get one, correct?
13     A. I had no need to, sir.
14     Q. I understand. That wasn't my question, though.
15 I didn't ask if you had a need to. I asked if you did.
16     A. Like I said, the rig mechanic stated he had --
17        MR. HOLMES: You can just say, "No, I didn't
18 get one"; and we can move on.
19     A. No.
20     Q. (By Mr. Staley) Okay. You did not get one,
21 correct?
22     A. No, I didn't get one.
23     Q. Okay. And you did not review a permit to work
24 for the reverse power testing job on June 1, did you?
25     A. No.

[Page 32]

1      Q. And you did not see a work permit for the June 1
2  reverse power testing?
3      A. No.
4      Q. Who can sign a work permit for reverse power
5  testing? Who can authorize it?
6      A. Who can authorize it? The authorizing can be
7  done by either the OIM or one of his appointed people,
8  which --
9      Q. As I understand it -- correct me if I'm wrong --
10 for reverse power testing, it requires the OIM's
11 authorization?
12     A. Yes.
13     Q. A toolpusher can't -- a night toolpusher can't
14 sign that one?
15     A. No, a toolpusher can't sign that.
16     Q. Okay. And very narrowly, you didn't ask Randy
17 Sutfin to sign a work permit on June 1 for the reverse
18 power testing?
19     A. No.
20     Q. And you didn't --
21        I guess, given the work involved and the role
22 that you played, why didn't you insist on seeing a
23 signed work permit?
24     A. Well, the thing was I trusted -- I trusted the
25 rig mechanic. The rig mechanic was the area supervisor.

[8] (Pages 29 to 32)

Antonio Carl May   3/29/2016

[Page 33]

1  We was told to assist the rig mechanic.  And it was just
2  a matter of trusting him.  And we asked did he have the
3  paperwork; and he said, "Yes."
4     Q.  Okay.  And other than trust, you would agree with
5  me that the work permit protocol doesn't allow for you
6  to just simply trust somebody, you're supposed to review
7  the work permit, correct?
8     A.  We were supposed to review it, and that's what I
9  said, that's where we messed up at.  We trusted him to
10  have the paperwork, and he said he had it.
11     Q.  Now, the same kind of questions.  So, on June 1,
12  2015, you did not complete a JSA for the reverse power
13  testing?
14     A.  No.
15     Q.  And you didn't participate in the JSA for the
16  reverse power testing on June 1?
17     A.  Did I participate in the JSA?  What you mean by
18  that?
19     Q.  It wasn't like somebody else was doing the JSA,
20  and you're watching and following them on it.  There was
21  no JSA, correct?
22     A.  There was no JSA.
23     Q.  So, you didn't complete it yourself, you didn't
24  participate in it and you didn't review it, right?
25     A.  I didn't review -- no.

[Page 34]

1     Q.  Okay.  Now, you would agree, in retrospect, it
2  was a mistake for you not to either obtain a work permit
3  or insist on reviewing the work permit that was for the
4  reverse power testing on June 1?
5     A.  Can you repeat that, again?
6     Q.  Sure.
7        In retrospect, you would agree with me that it
8  was a mistake for you not to either obtain a work permit
9  or review a signed work permit?
10     A.  No, I wouldn't agree with you.  I'm not going to
11  agree with you, no.
12     Q.  It wasn't a mistake?
13     A.  That would I agree with you --
14     Q.  Hold on.  Please, listen carefully to my
15  question.
16        Was it a mistake on June 1 for you to either not
17  get a work permit yourself or review a signed work
18  permit that somebody else received?
19     A.  My -- my thing, like I told you, trusting the
20  mechanic; and --
21     Q.  I didn't ask you about trust.  Please, just
22  listen to my question.  I understand what you said
23  before about trusting the mechanic.  That's not what my
24  question is about.  It's narrower.
25     A.  No.

[Page 35]

1     Q.  In retrospect --
2     A.  No, sir.
3     Q.  -- was it a mistake for you not to ask to review
4  a signed work permit?
5     A.  No, sir.
6     Q.  You don't think you should have?
7     A.  No, sir.
8     Q.  Why?
9     A.  Because like I said, I was told to assist the
10  mechanic; and the mechanic assured me that he had all of
11  the paperwork in place.
12     Q.  You wouldn't want to, in retrospect, see a signed
13  work permit?
14     A.  If he had -- it was -- like I said, I trusted the
15  mechanic.
16     Q.  I understand.  That wasn't my question.  I
17  understand you trusted the mechanic.  My question is --
18     A.  Yes, I would -- I would want to see it.  I should
19  have asked for it.  And that's what I said, that's where
20  the trust come in at.  I should have asked for it.
21     Q.  So, in retrospect, it was a mistake for you not
22  to insist on seeing a signed work permit, correct?
23     A.  Yes, it should have been -- yeah, it was a
24  mistake.
25     Q.  Okay.  In retrospect, was it a mistake for you

[Page 36]

1  not to complete or participate in a JSA for the reverse
2  power testing?
3     A.  It was --
4        Could you repeat that, again --
5     Q.  Sure.
6     A.  -- because --
7     Q.  In retrospect, was it a mistake for you on
8  June 1, 2015 not to complete or participate in a JSA for
9  the reverse power testing?
10     A.  Like I -- it goes back to what I just said about
11  the mechanic.  This was based on trust --
12     Q.  I understand.
13     A.  This was based on trust --
14        MR. HOLMES:  Let him finish.
15     A.  This was based on trust, and the thing -- the
16  thing was the mechanic -- the mechanic stated that he
17  had everything in place; and I trusted him, because it
18  was a known fact between us, if he -- if I say I got
19  everything, I make sure I have everything; and he don't
20  have to worry about it.  And that's what it -- that's
21  what it boiled down to.
22     Q.  (By Mr. Staley)  Okay.
23        MR. STALEY:  I'm going to object to the
24  responsiveness.
25     Q.  (By Mr. Staley)  My question is narrower.  I

[9]  (Pages 33 to 36)

Antonio Carl May   3/29/2016

[Page 53]

1  malfunction.
2      Q.  Okay.  Well, if an employee hypothetically trips
3  the engines and the rig has downtime due to the engines
4  being tripped and there's a full block calibration that
5  has to occur later because of the downtime, does that
6  cost DODI revenue?
7      A.  Yeah, due to equipment malfunction.
8      Q.  Okay.  So, if you -- if an engine is tripped,
9  that's what you're calling an equipment malfunction,
10  right?
11      A.  Yes, that would be an equipment malfunction.
12      Q.  Okay.  I understand what you're saying there.
13      So, if an employee trips the engines and the
14  engines go down and there's a malfunction in that
15  equipment and there's downtime, that activity -- that
16  event costs DODI revenue?
17      A.  Yeah, if an employee trips it.  But the engine
18  can also trip on its own --
19      Q.  I understand.
20      A.  -- and it's the same thing.
21      Q.  I understand.  There can be downtime for non-
22  employee reasons.  There's absolutely -- that absolutely
23  is the case, and I'm -- I'm not asking about that right
24  this instance; but if -- if you're doing a task that you
25  haven't done before, is it a good idea to follow the JSA

[Page 54]

1  procedure for that task?
2      A.  Yes, it's good to follow it.  Yes.
3      Q.  Okay.  On May 31, 2015, did Mike Williams tell
4  you to complete the reverse power testing with
5  Mr. Johnson and Mr. Patterson?
6      A.  We was -- we was told to assist -- to assist them
7  with it.
8      Q.  What time was that meeting?
9      A.  We usually meet with him after -- after our 6:00
10  o'clock turnout; so, it was probably right around --
11  probably about 6:15.
12      Q.  And was that in the tour?
13      A.  It was after the tour meeting.
14      Q.  Where was this meeting?
15      A.  In Mike Williams' office.
16      Q.  Okay.  And how long was the meeting?
17      A.  It usually lasts about 15, 20 minutes.
18      Q.  And was it just you, Patterson, Mike Williams and
19  Kenneth Johnson, or who was at this meeting?
20      A.  It was just me and Patterson --
21      Q.  Okay.
22      A.  -- and Mike Williams.
23      Q.  Did Mike Williams say that ABS is coming the next
24  day; so, you need to assist with the -- the reverse
25  power testing?

[Page 55]

1      A.  ABS -- if I recall, it was -- it was supposed to
2  have been, like, a week or so before or two weeks before
3  ABS got there.
4      Q.  Okay.  So, Mike said, "ABS is coming in a couple
5  of weeks; so, you need to assist with the reverse power
6  testing on the main engines"?
7      A.  Assist the mechanic, yes.  Assist the mechanic
8  with it.
9      Q.  You understand why DODI wants to test the reverse
10  power before the ABS inspections, correct?
11      A.  Yes.  To make sure it's working, I guess.
12      Q.  Did you think you were unqualified as an
13  electrician to perform the reverse power testing?
14      A.  I didn't think I was unqualified.  I had never
15  did the task before.
16      Q.  Now, tell me what you did on Engine 7, the steps
17  that you took on June 1.
18      A.  I didn't take any steps.  I was -- I was just
19  there -- I was there doing what I was seeing, assisting.
20      Q.  Okay.  Tell me the steps of your assistance.
21  What did you do?
22      A.  I stood there and watched.  I stood there and
23  watched Mr. Patterson.  I didn't touch anything.
24      Q.  Okay.  You were in the SCR room?
25      A.  Yes, I was in the SCR room.

[Page 56]

1      Q.  And that's the silicone control rectifier room?
2      A.  Exactly.
3      Q.  And the energy generators are in the back of the
4  engine room?
5      A.  "Energy generators"?
6      Q.  Or the engines, are they in the back?  Where are
7  they in the room?
8      A.  They are in the engine room -- they are in the
9  motor room, which is the engine room.
10      Q.  And is that next to the SCR room?
11      A.  It's outside -- outside the wall about 30 or 40
12  feet away.
13      Q.  Now, Mr. Patterson testified that he had
14  something called a -- what he called a decade box.
15      Have you ever heard of a decade box?
16      A.  No.
17      Q.  Okay.  He said he had a box that had some jumpers
18  on it, and the was -- that was the tool he was using
19  on Engine 7; is that your recollection?
20      A.  If you're talking about the resistor -- there's a
21  resistor box, but I didn't know what -- it's called a
22  resistor box.
23      Q.  Okay.  I'll go with resistor box.
24      Did he have a box there next to Engine 7?
25      A.  Yes.

[14] (Pages 53 to 56)

Antonio Carl May   3/29/2016

[Page 65]

1    Q. Did you say anything to Kenneth Johnson?
2    A. Did I say anything? The only thing I asked -- I
3  didn't say anything to him at the -- I didn't say
4  anything to him.
5    Q. Okay. Now, after --
6    Did Kenneth Johnson say anything else, other than
7  the indicator -- the reverse power indicator light went
8  off?
9    A. The only thing was -- the only thing that was
10  said is Mr. Patterson asked Kenneth Johnson, "Where is
11  the paper" -- Where is the permit?" Kenneth Johnson
12  laughed, "What permit?"
13    Q. I'm going to ask you more about that in a second;
14  but how soon after the rig -- the lights went out did
15  Mr. Patterson ask Mr. Johnson for the permit?
16    A. He asked him at that moment.
17    Q. I mean, was it seconds or was it --
18    A. He asked -- as soon as the lights went out; and
19  he asked him, "Where is the paperwork?"
20    Q. Was it before the emergency generators kicked in?
21    A. They emergency generators had already kicked in.
22  It only takes the emergency generators 30 seconds to
23  kick in.
24    Q. That's what I'm trying to find out. I'm trying
25  to get a timeframe from you.

[Page 66]

1    So, the lights go out; and within 30 seconds the
2  emergency generator is up. Is that what you're saying?
3    A. Yes.
4    Q. And how soon after that did Mr. Patterson ask
5  Mr. Johnson to see a work permit?
6    A. At that -- at that moment.
7    Q. So, within a minute of the --
8    A. Within a few -- a few minutes of doing it, of the
9  lights coming back on.
10    Q. Okay. So, within two to three minutes; is that
11  fair --
12    A. I can't give you a time on it. I don't know how
13  long.
14    Q. Okay. As you sit here today, I'm asking -- I'm
15  just asking for your best recollection. But as you sit
16  here today, you don't know how long after --
17    A. No -- no, sir.
18    Q. -- the emergency generators kicked in that
19  Mr. Patterson asked Mr. Johnson for a permit?
20    A. No, sir, I don't.
21    Q. And Patterson's response was, "What
22  permit"?
23    A. No, Kenneth Johnson's.
24    Q. I'm sorry. I said Patterson. I apologize.
25  That's my bad. Strike that.

[Page 67]

1    Mr. Patterson asked Mr. Johnson to see the work
2  permit; and Kenneth Johnson says, "Ha, ha, what permit"?
3    A. Exactly.
4    Q. Okay. Did you have any conversation with
5  Mr. Johnson during this period?
6    A. No.
7    Q. Did you have any conversation with Mr. Patterson
8  during this period?
9    A. We talked about what happened; and then, that's
10  about it.
11    Q. Okay. So, the way I -- the timeframe that you've
12  identified with your testimony is you're in the engine
13  room for about five minutes watching Mr. Patterson stand
14  next to the control module and Mr. Johnson behind the --
15  where the indicators are.
16    And after about five minutes, Mr. Johnson says,
17  "The reverse power light went off." And then, almost
18  immediately thereafter the rig goes dark. And within 30
19  seconds, the generator is up and running. And within a
20  few minutes, Mr. Patterson asks Mr. Johnson about the
21  permit.
22    Is that the best timeframe that you can --
23    A. That's about the best I can give you.
24    Q. Okay. Now, the emergency generators come on, you
25  all three are in the room. What do you do next? What

[Page 68]

1  do you do at that stage?
2    A. What we do at that stage is we go and try to get
3  the power back up.
4    Q. Okay. Specifically -- I'm talking just you for
5  this moment -- tell me the steps that you took, the
6  specific tasks you were doing during -- in the
7  aftermath.
8    A. After what I was doing is we have a procedure --
9  we have a procedure on getting power back up, and I was
10  up reading the procedure to get the power back up.
11    Q. Okay. Where were those procedures located?
12    A. They are located right there on the wall beside
13  the switch control.
14    Q. Now, so, you stayed in the room and were trying
15  to identify the procedures to get the rig -- the
16  generators back up and running?
17    A. Exactly. And then, once I did that, I went up
18  to the -- I had to leave out of the control room to go
19  up to the transformer room to reset breakers.
20    Q. Okay. Now, I'm going to stop you there.
21    You are looking on the wall of the engine room to
22  find the proper procedures to get the generators back
23  up.
24    A. Uh-huh.
25    Q. Is Mr. Patterson in the room at that point in

[17] (Pages 65 to 68)

O'Neal Probst Wells - 713-521-1314

Houston/Galveston    Dallas/Fort Worth    Austin/San Antonio    Bryan/College Station  Corpus Christi

DODI 818

Antonio Carl May   3/29/2016

[Page 245]

1    **A.** We have rescue qualified people with the drilling
2    crew, and we informed him that we're going to need the
3    drilling crew to help us.
4    **Q.** Okay. And he said, "Okay"? Did he say anything
5    in response?
6    **A.** I didn't know what he -- he just -- he just
7    said -- he just looked at us, and -- I can't remember
8    what he said.
9    **Q.** Okay. And where were you when you told him?
10   **A.** In the quarters.
11   **Q.** "In the quarters"?
12   **A.** Yes, probably in front of his office. I can't
13   remember exactly where I told him at.
14   **Q.** Okay. Do you know what time you told him?
15   **A.** No.
16   **Q.** Was it at the beginning or the end of your shift?
17   **A.** I can't -- I can't recall.
18   **Q.** Okay. Now, I guess on May -- this occurred on
19   May 30th, according to your Complaint. On May 31 your
20   pay wasn't cut, you weren't demoted; and you continued
21   working the same job you always had, right?
22   **A.** Yes.
23   **Q.** You weren't written up for this, right?
24   **A.** No.
25   **Q.** And you continued working until the reverse power

[Page 246]

1    incident on June 1, for which a JSA and work permit were
2    not completed, right?
3    **A.** I continued working, yes -- until June, yes.
4    **Q.** Okay. So, on June 1 -- or I guess on May 31, the
5    evening, is when you have the tour meeting with -- or
6    post-tour meeting with Williams where he tells you and
7    Mr. Patterson to assist with the reverse power testing?
8    **A.** Yes.
9    **Q.** Okay. And we've already been over the events and
10   how the rig went -- the engines were tripped; so, I
11   don't want to re-cover that with you.
12           MR. HOLMES: I haven't heard anything about
13   that.
14   **Q.** (By Mr. Staley) So, in Incident 16, you say
15   Williams tried to claim that May had performed the
16   procedure in 2011 and 2012 so he should have known
17   better. This was not true.
18           Didn't you at least assist with the finishing of
19   the reverse power testing on other occasions?
20   **A.** No.
21   **Q.** You allege that Williams modified the maintenance
22   records on June 1, 2015 by adding a false entry showing
23   Mr. May had completed the prior work.
24   **A.** Yes.
25           (Exhibit 14 marked)

[Page 247]

1    **Q.** (By Mr. Staley) Just taking a half step back.
2    On the reverse power incident, you didn't refuse to
3    complete that task, did you?
4    **A.** No.
5    **Q.** Now, in connection with the modified records, I'm
6    handing you what's marked as Deposition Exhibit No. 14,
7    which is what I believe -- what I believe are the
8    records that you claim are modified by Mr. Williams; is
9    that correct?
10   **A.** Yes.
11   **Q.** What do you claim that he modified on this
12   record?
13   **A.** He modified everything on here.
14   **Q.** Every single entry he modified?
15   **A.** Every single entry and plus the comments.
16   **Q.** Okay. Tell me what he modified on Line 1.
17   **A.** He didn't modify any of the statements on here --
18   **Q.** I thought you said everything --
19   **A.** -- as far as the tasks --
20   **Q.** -- that's why I'm asking.
21   **A.** I'm talking about as far as -- as far as the
22   complete action over here in the far right-hand corner.
23   **Q.** Okay. The comments that says, (Reading), All
24   went good with the test, Antonio May 3 --
25           MR. HOLMES: 30?

[Page 248]

1    **Q.** (By Mr. Staley) 3-22-2012; is that correct?
2    **A.** No.
3    **Q.** That's what you're talking about, right?
4    **A.** Yes.
5    **Q.** You're saying he modified that by adding your
6    name to it?
7    **A.** Yes.
8    **Q.** Okay. Anything else on here that you claim he
9    modified?
10   **A.** That's it.
11   **Q.** Okay. The next page, what is it that you claim
12   that he did -- that he modified here?
13   **A.** The entry --
14           MR. HOLMES: Which entry?
15   **A.** -- on the comment.
16   **Q.** (By Mr. Staley) It says, PM cannot be -- cannot
17   be done to engine being down -- cannot -- it says, PM
18   cannot be due to engine being down.
19           You're claiming he wrote that?
20   **A.** I didn't.
21   **Q.** Okay. I mean, this isn't even claiming that you
22   performed a reverse power test, does it?
23   **A.** Exactly. Like I say --
24   **Q.** I guess, why do you think he modified this to
25   show that you didn't perform a test before?

[62] (Pages 245 to 248)

Antonio Carl May 3/29/2016

[Page 249]

1    **A.** That's a question you need to ask Mr. Mike
2  Williams.
3    **Q.** As you sit here, what do you think of that? Why
4  would you think he would modify something to show
5  that -- to put your name on a record that says the PM
6  cannot be done due to the engine being down?
7    **A.** Like I said, all I know is, sir -- all I can
8  know, sir, is I didn't put this in here.
9    **Q.** Okay. Are you aware, if you try to add comments
10 to RigMS, you can only supplement them, you can't delete
11 any comments?
12   **A.** Exactly. You can add to it, yes.
13   **Q.** Right. You can add to it, you can't delete,
14 right?
15   **A.** Exactly.
16   **Q.** Now, these records relate to alleged events that
17 occurred in 2011 and 2012, right?
18   **A.** Exactly.
19   **Q.** This doesn't have anything to do with any events
20 that occurred on June 1, right?
21   **A.** Yes, it does.
22   **Q.** Where does it talk about June 1 on here?
23   **A.** It doesn't talk about -- well, it talks about
24 June 1 on there, it says modified by Mike Williams up
25 there in the top right-hand corner.

[Page 250]

1    **Q.** But as far events described in here themselves,
2  do these relate to events that allegedly occurred on --
3  it looks like March 24, 2012; and it looks like
4  February 2nd, 2011, right?
5    **A.** Yes --
6    **Q.** That's what these records purport to reflect,
7  right?
8    **A.** On their part, yes.
9    **Q.** Okay. They're not describing events -- other
10 than the modified thing on here, the marker, they're not
11 describing any events that occurred on June 1, 2015,
12 right?
13   **A.** I don't understand where you're trying -- where
14 you're going with that.
15   **Q.** This isn't describing any event that occurred on
16 June 1, other than the modification, you know the record
17 itself?
18   **A.** That's -- that's it.
19   **Q.** Right. The record itself describes something
20 happened in 2012 --
21   **A.** I understand that, sir.
22   **Q.** -- and 2011; is that correct?
23   **A.** Yes.
24   **Q.** And the only thing relating -- anything relating
25 to June 1 is the modify date, right?

[Page 251]

1    **A.** Yes.
2    **Q.** So, this document, for instance, didn't cause you
3  not to use a JSA on June 1, right?
4    **A.** No.
5    **Q.** And this document didn't cause you not to get a
6  work permit on June 1, right?
7    **A.** No.
8    **Q.** And this document didn't cause you and the people
9  you were working with to trip the engines on June 1,
10 right?
11   **A.** No.
12   **Q.** It didn't cause the emergency generator to come
13 up, right?
14   **A.** No.
15   **Q.** And your written statement about the events on
16 June 1 that is reflected on Exhibit 4, this has nothing
17 to do with what's reflected on Exhibit 14, right?
18 You're describing, on Exhibit 4, what happened on June
19 1, right?
20   **A.** Yeah, they asked what happened; and that's what I
21 did.
22   **Q.** And you're not describing anything in Exhibit 14,
23 are you?
24   **A.** No.
25   **Q.** Okay. Now, as you sit here today, do you think

[Page 252]

1  Kenny Johnson was a part of the conspiracy to get you
2  fired?
3    **A.** I don't -- I can't say. I don't know. I don't
4  know what the motive behind him with this.
5    **Q.** Do you think he was involved?
6    **A.** I don't know.
7    **Q.** As you sit here today, you can't think of any
8  reason why he would be involved, do you?
9    **A.** I can't answer that one for you, sir.
10   **Q.** You don't know as you sit here?
11   **A.** I can't answer it for you, sir.
12      MR. HOLMES: Well, you can just say "I don't
13 know."
14   **A.** Yeah, I don't know -- I don't know, the same.
15   **Q.** (By Mr. Staley) Do you have any reason to
16 believe as you sit here that Kenny Johnson was involved?
17   **A.** I don't know, sir.
18   **Q.** Do you think he was out to get you?
19   **A.** I don't know, sir.
20   **Q.** Didn't you consider him a friend of yours?
21   **A.** No, sir.
22   **Q.** Y'all didn't eat lunch together some?
23   **A.** We all ate lunch together.
24   **Q.** Did you dislike Kenny Johnson prior to June 1,
25 2015?

[63] (Pages 249 to 252)

Antonio Carl May    3/29/2016

[Page 285]

1    **Q.** Where have you applied other than those jobs?
2    **A.** I've applied with the railroad.
3    **Q.** What kind of a position was that?
4    **A.** Just a position as a laborer.
5    **Q.** And was that in Beaumont?
6    **A.** Yes, I don't -- I don't know what area it was.
7    It would have been in the Texas area.
8    **Q.** And who was the railroad, what railroad was it?
9    **A.** Union Pacific.
10   **Q.** And did you hear anything back from them?
11   **A.** No.
12   **Q.** As you sit here, do you have any reason to
13   believe that DODI decisionmakers acted with malice in
14   connection with your termination?
15   **A.** I don't know, sir.
16          MR. STALEY:  I'll pass the witness.
17          MR. HOLMES:  Okay.
18          (4:53 p.m.)
19          EXAMINATION
20   BY MR. HOLMES:
21   **Q.** First of all, let me tell you, do you know what
22   the term reinstatement means in the legal context?
23   **A.** As far as the legal context of giving my --
24   offering me the job back?
25   **Q.** You understand that under certain circumstances a

[Page 286]

1    court or an administrative law judge of an agency might
2    be able to order them to give you a job back.  Do you
3    know anything about that?
4          MR. STALEY:  Objection, leading.
5    **A.** No.
6    **Q.** (By Mr. Holmes)  Okay.  Prior to today, have you
7    even given any thought to whether, if a judge or an
8    administrative law judge were to order them take you --
9    you know, give you your job back, how would you react to
10   that?
11         MR. STALEY:  Object, leading.
12   **Q.** (By Mr. Holmes)  Have you given the matter any
13   thought?
14   **A.** No, I haven't.
15   **Q.** Okay.  Let's take a look at Exhibit 14, which is
16   the screen shot here of --
17         What do you call this system?
18   **A.** That's the --
19   **Q.** Rig --
20   **A.** -- RigMS.
21   **Q.** Okay.  There's a line over here -- it's real hard
22   to read this, but there's a bar here at top that
23   contains various information; numbers and asset numbers
24   and things like that.  And over in the right-hand column
25   there is an entry "Person Doing Work."

[Page 287]

1          Do you see that?
2    **A.** Uh-huh.
3    **Q.** It says "May," comma, "Antonio."
4          Do you see that?
5    **A.** Yes.
6    **Q.** All right.  Were you the person who did this work
7    that is reflected in this screen shot?
8    **A.** No.
9    **Q.** Okay.  The second page is the other one, which is
10   the 2011.  And, again, "Person Doing Work," "May,
11   Antonio," right?
12   **A.** Yes, sir.
13   **Q.** Were you the person who did the work that is
14   reflected in -- on that screen shot?
15   **A.** No, sir.
16   **Q.** Okay.  Did Mr. Williams mention these prior jobs
17   to you before you were terminated?
18   **A.** Yes.
19   **Q.** What did he say?
20   **A.** When I went in the office, he said -- he told
21   us that -- he said something about the job, and I told
22   him I never did it before.
23   **Q.** Yeah.
24   **A.** And he looked at me and said, "Yes, you have."
25         And I said, "No, sir, I've never did it before."

[Page 288]

1    And I said, "It's always been done on days."
2          "No, it's done on nights.  It can be done on
3    nights, too; and you have done it."
4          I said -- I still told him, you know, I disagreed
5    with him, I didn't do it.
6          "Well, in RigMS it says you did."
7          So, at that point that's when I went -- that's
8    when I went into the RigMS and went back, and I scrolled
9    all the way through -- all the way back to 2011, and
10   that was year after -- a year after we installed this
11   system.
12   **Q.** The RigMS system?
13   **A.** Yes, the RigMS system.
14         MR. STALEY:  I'm going to object to the
15   nonresponsive portion of this answer.
16         Continue.
17   **A.** And I seen that -- I seen that he had -- that he
18   had made modifications on this, which we have records
19   showing that on these days it was done by other people,
20   which -- and we keep daily logs.  And these are done
21   by -- on this dates, all these -- these engines were
22   done.  And I have never -- I've never -- I've never did
23   this PM, never.
24   **Q.** (By Mr. Holmes)  All right.  So, let's be clear
25   what your contention is.  Is it your contention that

[72] (Pages 285 to 288)

O'Neal Probst Wells - 713-521-1314

Antonio Carl May   3/29/2016

[Page 289]

1    Mr. Williams modified these documents to bolster the
2    case for firing you?
3         MR. STALEY:  Objection, leading.
4    **A.** Yes.
5    **Q.** (By Mr. Holmes)  All right.  You were asked a
6    question along the lines of is there any reason why you
7    think you were fired, other than being African-American,
8    a question along those lines.  The record will show what
9    it says.
10        Why do you think you were fired?
11   **A.** I don't think I was fired because I was African-
12   American.  I think I was fired because of related --
13   related things to being -- for letting them know that he
14   was violating the safety rules.
15   **Q.** You think there are possible multiple reasons?
16   **A.** It's multiple.
17   **Q.** Okay.  And can you read Mr. Williams' mind or
18   anybody else's mind there to say which one of those
19   reasons?
20   **A.** No.
21   **Q.** Okay.  The last thing, Exhibit No. 3, which is
22   this document.  You can look on my copy, it's fine.
23   What is this -- this is an -- it says "JSA Editor," or
24   do you know what this screen represents?
25   **A.** Yes, it's when you -- you actually go into here

[Page 290]

1    and you edit it, when you do an edited portion of it;
2    and you go in, and you make -- you make your changes.
3    And then, you add your risk assessments to it.  And this
4    is -- after you make this -- after you make this up,
5    then, it prints -- it goes into the system and adds all
6    the stuff that you need on the JSA.
7    **Q.** Okay.  Now, on June 1st or thereabouts, when you
8    were doing the reverse power coupling, did you look up
9    to see if there was a JSA like this in the system?
10   **A.** Yes, but it wasn't.
11   **Q.** There was no JSA like this in the system?
12   **A.** No.
13   **Q.** In fact, it says up here in the top column, "Last
14   Edited," August 14th, 2015.
15        Do you see that?
16   **A.** Yes.
17   **Q.** Were you still working for them then?
18   **A.** No.
19   **Q.** This printout down here -- the other corner, it
20   looks like this is March 28th, 2016, which I guess would
21   be yesterday.  And, of course, you're not working for
22   them now --
23   **A.** No.
24   **Q.** -- right?
25        So, just to be completely clear.  On June 1st,

[Page 291]

1    2015, did you have this job safety analysis that is
2    Exhibit -- let me see.  You've got the numbered
3    exhibits.
4    **A.** It's here somewhere.  There it is.
5    **Q.** Yeah, this one is the one I'm looking for.
6    Exhibit 2.
7         Was this available to you?
8         MR. STALEY:  Objection, leading.
9    **A.** No.
10        MR. HOLMES:  All right.  That's all I've
11   got.
12        MR. STALEY:  Redirect.
13        (4:59 p.m.)
14        EXAMINATION
15   BY MR. STALEY:
16   **Q.** Do you remember -- looking at Exhibit 2, you
17   testified earlier in your deposition that this was
18   available at any computer available on the rig; isn't
19   that correct?
20   **A.** It can be, yes.  It can be available on any
21   computer, yes.
22   **Q.** I got you.
23        It's available in the Check-6 --
24   **A.** If it was in the Check-6, it would be available.
25   **Q.** That's not what you testified to, though, was it?

[Page 292]

1    **A.** If it's in the Check-6, it would be available.
2    **Q.** Okay.  And you testified this was available in
3    Check-6, didn't you?
4    **A.** I didn't say it was available in Check-6.
5    **Q.** I thought you said you could look at this at any
6    computer available --
7    **A.** If it's -- if it's there, sir.
8    **Q.** Right.  And you testified it was in Check-6;
9    right?
10   **A.** No, sir.
11   **Q.** What did you think -- what do you think "C6"
12   stands for?
13   **A.** It could mean anything.
14   **Q.** Do you think it means Check-6?
15   **A.** I don't know, because -- I don't know.
16   **Q.** You knew what electrician -- what "ELECT" stood
17   for --
18   **A.** Yeah, because that's on all of them.
19   **Q.** And when was this approved?  When was this JSA
20   approved?
21   **A.** It was approved on 7-10-2013.
22   **Q.** I got you.
23        And you tried to perform the reverse power
24   testing on June 1, 2015, right?
25   **A.** Yes.

[73]  (Pages 289 to 292)

1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

NO. 3:16cv103

JAMES PATTERSON and ANTONIO MAY

VERSUS

DIAMOND OFFSHORE DRILLING, INC.


Deposition of RANDY SUTFIN, 400 Paris
Street, Folsom, Louisiana 70437, taken in the
offices of Ogletree, Deakins, Nash, Smoak &
Stewart, 701 Poydras Street, Suite 3500, New
Orleans, Louisiana 70139 on Monday,
April 24, 2017.


APPEARANCES:


    LAW OFFICES OF DAVID C. HOLMES
    Attorneys at Law
    BY:  DAVID C. HOLMES, Esquire
    13201 Northwest Freeway, Suite 800
    Houston, Texas 77040

        ATTORNEYS FOR  PLAINTIFFS


    OGLETREE, DEAKINS, NASH, SMOAK & STEWART
    Attorneys at Law
    BY:  JAMES R. STALEY, Esquire
    500 Dallas Street, Suite 3000
    Houston, Texas  77002-4709

        ATTORNEYS FOR DEFENDANT


REPORTED BY:

        LINDY ROOT

        Certified Court Reporter

        Registered Professional Reporter

38

1   They were spending too much time together.
2   Two different jobs. Electrician. Two
3   different people.
4       Jim was not getting — he wasn't getting
5   his job done. There was a lot of
6   correspondence back and forth to Houston.
7       He was basically an ET who works on
8   computers and PLC's and programming and
9   software.
10      Electrician changes light bulbs.
11      We don't pay this guy the amount of money
12  we do to change light bulbs.
13      So that's what this is about.
14  Q. Who would initiate this write-up?
15  A. Oh, I don't remember. It says on here
16  supervisor Mike Williams.
17  Q. Do you know if Mr. Williams was the one who
18  originally prepared this document?
19  A. Yeah. He prepared this document, because he
20  was not happy with the work performance. Just
21  work performance. Written work performance
22  documentation.
23  Q. Do you recall that after this there was a bit
24  of back and forth between Mr. Patterson and
25  Houston?

40

1   time with this. I told him we got a lot of
2   software issues, a lot of computers.
3       He said, well, we are working together on
4   this. That's when I told him also that it's
5   your job to work on these software issues.
6       It's his job to change light bulbs.
7       That basically was it.
8   Q. Were you aware Mr. Patterson was making some
9   accusations against Mr. Williams?
10  A. No.
11      MR. STALEY:
12          Objection. Vague.
13      THE WITNESS:
14          No, I wasn't. I need to read this.
15      This is this guy talking anyways. This
16      last page of this is hogwash.
17  EXAMINATION BY MR. HOLMES:
18  Q. Well, my question was simply whether you ever
19  did anything to investigate it?
20  A. No. There's nothing to investigate.
21  Q. All right.
22      (Exhibit #6 was marked for
23      identification.)
24      Exhibit #6. Take a second to read this.
25      My question to you is going to be what do

39

1   A. I'm not aware of that.
2   Q. Go to the next page of this document.
3       This by the way what is attached here is
4   not an attachment to the conference report.
5       These are some other documents, but these
6   were all produced together.
7   A. I wasn't privileged to this. This is Ms.
8   Dugger. No. I was not privileged to that.
9       Janelle Dugger, Jim Patterson, and then I
10  was copied on this.
11      Yeah. This is just hearsay by Patterson
12  here on this one.
13  Q. You did not do anything following up on this?
14  A. No. This was just a — It's a written I told
15  you you were doing bad, and he's upset about
16  it, and so he's going to — There's nothing to
17  this. This is all blown off, gone.
18  Q. But did you ever look into any of it?
19  A. I asked Mike what his performance was. He
20  said he is doing more electronic work than ET
21  work. That's all there was to it.
22  Q. Did you ever look into any of the things
23  Mr. Patterson was saying?
24  A. Yeah. I asked Patterson why he thinks he
25  doesn't have to — why he is spending more

41

1   you recall about this?
2   A. Yeah. We wanted him working days for benefit
3   of the company.
4   Q. Why is that?
5   A. Because he was a very smart individual. We
6   could get him doing different things. At the
7   time I can't remember who his back to back
8   was. He wasn't up to his level.
9       Jim Patterson was a very smart guy. We
10  wanted him working days, and that's when he
11  told me that he can't be micromanaged. He
12  needs no supervision. He can't have a
13  supervisor. He has to work nights
14  uncontrolled. He told that to the rig
15  manager, my boss also.
16      I mean we allowed this to go on. You
17  know, we accepted that. Okay. Work nights
18  then.
19      We wanted him to work days. He told us he
20  can't be micromanaged and can't have a
21  supervisor, which I thought was very odd.
22      Basically that's what it is. That's all
23  there was to this.
24  Q. Okay. This was actually on May 31, 2015.
25      Right?

11 (Pages 38 to 41)

Randy Sutfin

42

1  A. Okay.
2  Q. As it happens it was that night that the
3     reverse power testing took place?
4  A. Okay. All right. All right.
5  Q. Let me finish glancing through my notes.
6  A. So we allowed him to do something, and he
7     didn't follow procedure.
8     Yeah. Yep. So yep.
9  Q. Were you still around when Mike Williams got
10    fired?
11 A. No. I was -- Meaning around where?
12 Q. Were you -- Well, let me start that over.
13    Are you aware that Mike Williams got fired
14    sometime in 2016?
15 A. Yes. I was aware of this.
16 Q. Were you still on the same rig as Mike
17    Williams at the time?
18 A. Yes.
19 Q. Okay. At that point had you gone back to
20    toolpusher?
21 A. No.
22 Q. You were still OIM?
23 A. Uh-huh (affirmative response).
24 Q. Okay. As you understand it what happened with
25    Mike Williams?

43

1     What caused him to get fired?
2  A. He did not follow up with site surveys and a
3     permit to work. He violated company policies.
4     Basically Diamond has a big accountability
5     program for permit to work. He did not follow
6     up and properly do the site survey on the
7     permit to work, and therefore he was gone.
8  Q. Okay. Were you in the chain of supervision
9     for that incident?
10 A. At the beginning, yes.
11 Q. Okay. What happened?
12    You say at the beginning?
13 A. At the beginning there was a permit to work.
14    JSA. Mike actually walked me through what is
15    going to happen.
16    Later on that day things went sour.
17    Smoke, rig went in the dark.
18    Find out that the site survey was not
19    followed properly. They did not lock out the
20    proper breakers that should have been locked
21    out. The site survey was not followed
22    properly.
23    Subsequently the work permit was not done
24    properly, and a man almost got killed. That
25    was it. I mean --

44

1  Q. Okay. All right. Are you still working on
2     the Ocean Endeavor?
3  A. No.
4  Q. What rig are you on?
5  A. Ocean Blackhawk.
6  Q. Where is it located?
7  A. Gulf of Mexico.
8  Q. Off the coast of Louisiana?
9  A. Yes.
10    MR. HOLMES:
11       Okay. That's all I have got. I pass
12    the witness.
13    MR. STALEY:
14       Pass the witness.
15    (Conclusion.)
16
17
18
19
20
21
22
23
24
25

45

1     REPORTER'S CERTIFICATE
2
3     This certification is valid only for a
      transcript accompanied by my original signature
4     and original required seal on this page.
      I, Lindy Root, Certified Court Reporter in and
5     for the State of Louisiana, as the officer before
      whom this testimony was taken, do hereby certify
6     that the above-mentioned witness, after having
      been duly sworn by me upon authority of R.S.
7     37:2554, did testify as hereinbefore set forth;
      that this testimony was reported by me in the
8     stenotype reporting method, was prepared and
      transcribed by me, or under my personal direction
9     and supervision, and is a true and correct
      transcript, to the best of my ability and
10    understanding; that the transcript has been
      prepared in compliance with transcript format
11    guidelines required by statute or by rules of the
      board, and that I am informed about the complete
12    arrangement, financial or otherwise, with the
      person or entity making arrangements for
13    deposition services; that I have acted in
      compliance with the prohibition on contractual
14    relationships, as defined by Louisiana Code of
      Civil Procedure Article 1434 and in rules and
15    advisory opinions of the board; that I have no
      actual knowledge of any prohibited employment or
16    contractual relationship, direct or indirect,
      between a court reporting firm and any party
17    litigant in this matter, nor is there any such
      relationship between myself and a party litigant
18    in this matter. I am not related to counsel or
      to the parties herein, nor am I otherwise
19    interested in the outcome of this matter.
20
21
22
23    LINDY ROOT, CCR, RPR
24    CERTIFIED COURT REPORTER
25    REGISTERED PROFESSIONAL REPORTER

12 (Pages 42 to 45)

# UNITED STATES DEPARTMENT OF LABOR
# OFFICE OF ADMINISTRATIVE LAW JUDGES
# BOSTON, MASSACHUSETTS

**Issue Date: 12 July 2016**

ALJ NO:  2014-SPA-00004

------------------------

*In the Matter of:*

JOHN R. LOFTUS,
*Complainant,*

*v.*

HORIZON LINES, INC.,
*Respondent,*

*and*

MATSON ALASKA, INC.,
*Successor-in-Interest.*

------------------------

*Before*:  Jonathan C. Calianos, Administrative Law Judge

*Appearances*:

Charles C. Goetsch, Esq., Charles C. Geotsch Law Offices, LLC, New Haven, Connecticut, for the Complainant

Kevin S. Joyner, Esq., Ogletree, Deakins, Nash, Smoak & Stewart, P.C., Raleigh, North Carolina, for the Respondent

------------------------

## DECISION AND ORDER AWARDING DAMAGES

### I.    Statement of the Case

This proceeding arises under the whistleblower protection provisions of the Seaman's Protection Act ("SPA"), 46 U.S.C. § 2114(a), as amended by Section 611 of the Coast Guard Authorization Act of 2010, P.L 111-281, and as implemented by 29 C.F.R. § 1986.  On June 20, 2013, John Loftus ("Loftus" or "Complainant") filed a complaint with the U.S. Department of Labor's Occupational Safety and Health Administration ("OSHA") alleging his employer, Horizon Lines, Inc. ("Horizon"), unlawfully retaliated against him.  Specifically, Loftus alleges Horizon constructively discharged him for reporting to the United States Coast Guard ("USCG") and its agent, the American Bureau of Shipping ("ABS"), what he believed to be violations of maritime safety law and regulations on the ship he worked as Master.

On August 6, 2014, OSHA's Assistant Regional Administrator issued an order dismissing Loftus's complaint on behalf of the Secretary of Labor ("Secretary") concluding a prior arbitration proceeding concerning the same allegations correctly resulted in Horizon's favor. ALJX-1.[1]  On September 3, 2014, Loftus appealed the Secretary's order to the Office of Administrative Law Judges and the case was transferred to me.

I held a three day formal evidentiary hearing in Boston, Massachusetts, on May 5th, 6th, and 7th of 2015.  Four days before, Loftus filed a Motion in Limine Regarding Video and Arbitration Documents, and the parties filed Joint Pre-Trial Stipulations.  ALJX-10 & 11.  The following nine witnesses testified:  The Complainant; Maritime experts Kevin O'Halloran, Walcott Becker, James Staples, and Mark Bisnette; and Horizon employees Pete Strohla, Timothy Close, Gregory Hohm, Andrew Philips, and John Hazel.

Several exhibits were admitted including Administrative Law Judge Exhibits 1 through 11.  TR at 780.[2]  I admitted Complainant's Exhibits ("CX") 1 through 47 in full including CX-25A and CX-37A; CX-48 was only marked for identification, and CX-49 and 50 were only admitted to the extent the information was discussed during examinations.  TR at 780-81.  Additionally, I admitted Respondent's Exhibits ("RX") 1 through 38 in full with the exception of RX-32, which is limited to the flow sheet.  TR at 781.

At the close of trial, I ordered the parties to cross-reference their exhibits to identify all duplicates, which the parties did resulting in the following information:

| Complainant's Exhibits | Respondent's Duplicative Exhibits[3] |
|---|---|
| 6 | 3 and 22 |
| 8 | 28 |
| 14 | 21 |
| 15 | 26 |
| 16 | 27 |
| 18 | 5 |
| 19 | 16 |
| 20 | 17 |
| 21 | 2 |

---

[1] Administrative Law Judge Exhibits appear as "ALJX-[#]."

[2] Transcript references are denoted "TR at [#]."

[3] Respondent's duplicative exhibits are noted in parenthesis where applicable.

- 2 -

On June 10, 2015, the parties filed a Joint Motion to Amend Caption to reflect Horizon's recent merger with Matson Alaska, Inc., which I granted the same day.  I received briefs[4] from both parties on July 31, 2015, along with a List of Trial Transcript Typographical Error Corrections from the Complainant; on September 25, 2015, the transcript was amended and reissued to reflect the correct testimony.  The record is now closed.

## II.   Stipulations

The parties have stipulated to the following facts:

1) Loftus was a Master (i.e., Captain) for twenty years, including on a Horizon ship, the Horizon Trader ("Trader"), from approximately April of 2007 to May 28, 2013, when Horizon informed him that he would not be rejoining the Trader as Master; and

2) In October of 2011, Loftus engaged in protected activity.

ALJX-10.

## III.   Issues Presented

The following issues are disputed:

1) Did Loftus engage in protected activity in August of 2012, February of 2013, and April of 2013?

2) Did Horizon know Loftus engaged in protected activity?

3) Did Loftus's protected activity contribute to Horizon's decision to take adverse action against him?

4) Did Horizon demonstrate by clear and convincing evidence that it would have taken the same adverse action against Loftus notwithstanding his protected activity?

5) What, if any, economic damages is Loftus entitled to including back pay, front pay, litigation costs, and attorney fees?

6) What, if any, compensatory damages for emotional distress is Loftus entitled to?

7) What, if any, punitive damages should be imposed against Horizon?

ALJX-10.

Based on the record as a whole, I find that Horizon violated Loftus's right to be free from retaliation under the SPA.  *See* 46 U.S.C. § 2114(a).  Loftus proved by a preponderance of the evidence that he engaged in protected activity in October of 2011, August of 2012, and February and April of 2013 by reporting and threatening to report to the USCG and ABS what he believed to be safety violations on the ship he sailed as Master.  Further, I find that Horizon knew of

---

[4] "Compl. Br. at [#]" refers to Loftus's brief, and Horizon's brief is cited as "Resp. Br. at [#]."

APPENDIX 58

Loftus's protected activity and that his protected activity was a contributing factor in Horizon's decision to take adverse action against him. Horizon did not prove by clear and convincing evidence that it would have demoted Loftus absent his protected activity. Accordingly, I find that Loftus is entitled to $655,198.90 in back pay plus interest compounded on a daily basis, $10,000 in compensatory damages for emotional distress, $225,000 in punitive damages, and reasonable litigation costs including attorney fees.

## IV. Basic Legal Framework[5]

The SPA prohibits Seamen from being unlawfully retaliated against for engaging in conduct deemed protected activity. Specifically, § 2114(a) provides as follows:

> A person may not discharge or in any manner discriminate against a seaman because . . . the seaman in good faith has reported or is about to report to the Coast Guard or other appropriate Federal agency or department that the seaman believes that a violation of a maritime safety law or regulation prescribed under that law or regulation has occurred.

46 U.S.C. § 2114(a). An underlying goal of the SPA is to facilitate the Coast Guard's enforcement of maritime safety laws and regulations. *Gaffney v. Riverboat Servs.*, 451 F.3d 424, 444 (7th Cir. 2006). "The statute accomplishes this goal by guaranteeing that, when seamen provide information of dangerous situations to the Coast Guard, they will be free from the 'debilitating threat of employment reprisals . . . .'" *Id.*, quoting *Passaic Valley Sewerage Comm'rs v. U.S. DOL*, 992 F.2d 474, 478 (3d Cir. 1993).

In determining whether Horizon violated Loftus's rights under the SPA, I must follow the procedures set forth in the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR21"). Title twenty nine, Part 1986 of the Code of Federal Regulations provides that the "SPA incorporates the procedures, requirements, and rights described in the whistleblower provision of the Surface Transportation Assistance Act (STAA), 49 U.S.C. § 31105." 29 C.F.R. § 1986.100(a). Section 31105 of the STAA in turn states that "[a]ll

---

[5] In his brief, Loftus cites the ARB's *en banc* decision in *Powers v. Union Pac. R.R. Co.*, ARB No. 13-034, ALJ 2010-FRS-030 (Mar. 20, 2015), as controlling precedent with respect to the broader legal framework applicable here, and more notably, for analyzing the contributing factor element in determining whether he has made a *prima facie* case; however, on May 23, 2016, the ARB vacated *Powers v. Union Pac. R.R. Co.*, ARB 13-034, ALJ 2010-FRS-030 (ARB Apr. 21, 2015, reissued with full dissent), to revisit the effect of the "contributing factor" analysis addressed in *Fordham v. Fannie Mae*, ARB No. 12-061, ALJ No. 2010-SOX-051 (Oct. 9, 2014). Compl. Br. at 4-6, 18-19, 25. Consequently, I consciously omit any reference to the *Powers* decision as it is no longer good law and has no bearing on the outcome of this case.

- 4 -

complaints initiated under this section shall be governed by the legal burdens of proof set forth in section 42121(b)" of AIR21. 49 U.S.C. § 31105(b); 49 U.S.C. § 42121(b).

There is a two-pronged burden-shifting framework applicable to whistleblower cases that incorporate the legal standards set forth in AIR21. 42 U.S.C § 42121(b); *Bechtel v. Admin. Review Bd.*, 710 F.3d 443, 447 (2d Cir. 2013); *Araujo v. N.J. Transit Rail Operations, Inc.*, 708 F.3d 152, 157 (3d Cir. 2013); *Allen v. Admin. Review Bd.*, 514 F.3d 468, 475-76 (5th Cir. 2008); *Harp v. Charter Commc'ns, Inc.*, 558 F.3d 722, 723 (7th Cir. 2009); *Hutton v. Union Pac. R.R. Co.*, ARB No. 11-091, ALJ No. 2010-FRS-020, slip op. at 5 (ARB May 31, 2013). Loftus has the initial burden of satisfying prong one of the two-part AIR21 test. *See* 42 U.S.C § 42121(b); *Bechtel*, 710 F.3d at 447; *Araujo*, 708 F.3d at 157; *Allen*, 514 F.3d at 475-76; *Harp*, 558 F.3d at 723; *Hutton*, ARB No. 11-091, slip op. at 5. In doing so, Loftus must demonstrate the following four elements by a preponderance of the evidence: (1) He engaged in protected activity; (2) Horizon knew he engaged in protected activity; (3) He suffered an adverse action; and (4) His protected activity was a contributing factor in Horizon's adverse action against him. *See* 42 U.S.C § 42121(b); *Bechtel*, 710 F.3d at 447; *Araujo*, 708 F.3d at 157; *Allen*, 514 F.3d at 475-76; *Harp*, 558 F.3d at 723; *Hutton*, ARB No. 11-091, slip op. at 5. If Loftus makes out a *prima facie* case by satisfying all four elements under the first prong of AIR21's analytical framework, the burden then shifts to Horizon to show by clear and convincing evidence that it would have taken the same adverse action against Loftus notwithstanding his protected activity. *See Araujo*, 708 F.3d at 157; *Cain v. BNSF Ry. Co.*, ARB No. 13-006, ALJ No. 2012-FRS-019, slip op. at 3 (ARB Sept. 18, 2014).

## V.   Factual Background

### A.   Loftus's Maritime Background

At the time of trial, Loftus was a sixty-six-year-old man who was born on February 23, 1949, and spent his entire adult life working in the maritime industry. ALJX-10; TR at 147-48. Loftus's academic achievements include a Bachelor of Science degree in engineering and transportation from Kings Point, formal training from the U.S. Merchant Marine Academy, and a Third Class Engineer's License. TR at 148. In addition to his educational background, Loftus worked in the maritime industry for approximately forty-two years with experience as First Mate, Second Mate, Chief Mate, and Master. TR at 147-48, 208. Loftus has at least twenty years of experience specifically sailing as Master, having done so as early as 1985, while

- 5 -

working for U.S. Lines. ALJX-10; TR at 147-48. During his career, Loftus has sailed on a variety of vessels including tankers, LASH ships, dry cargo ships, and container ships. TR at 148.

> B.    Loftus's Employment with Horizon

In 1992, Loftus joined Horizon's predecessor (Sealand) and within one year, he was sailing as Master, Relief Master, and Chief Mate. TR at 147. In April of 2007, Loftus began sailing as Master of the Trader – an 813 foot long container ship operated by Horizon. ALJX-10; TR at 148. A container ship primarily carries dry cargo and relies on shore cranes to load and unload ISO containers, i.e., the boxes used for storing cargo. TR at 148. As Master of the Trader, Loftus spent half of the year sailing the Atlantic Ocean between Elizabeth New Jersey, Jacksonville, Florida, and San Juan, Puerto Rico. *See* TR at 152, 159, 169, 394-95.

> 1. *March 2011 and Onward – MARPOL*

Beginning in March of 2011, Horizon started emphasizing to its employees the Importance of complying with MARPOL, an acronym for the International Convention for the Prevention of Pollution from Ships. CX-29 at 181-82; TR at 155, 374. MARPOL is the regulatory code controlling marine pollution, which the USCG and ABS are charged with enforcing. CX-38 at 289; TR at 150-51, 155, 478. MARPOL regulations applied to the Trader, and both Loftus, as Master, and Horizon were subject to personal civil and criminal liability for any violations. CX-38 at 289; TR at 159-60.

Enthusiasm for MARPOL compliance came on the heels of negotiations with the United States Department of Justice that resulted in Horizon pleading guilty to violating MARPOL pursuant to a plea agreement that was finalized in January of 2012. CX-29 at 181-82; CX-30 at 183; CX-47 at 302; TR at 374, 378-80, 446. In exchange for the Government's plea deal, Horizon paid a $1.5 million fine, agreed to adhere to a comprehensive Environmental Compliance Plan ("ECP"), and served three years of probation. CX-29 at 181-82; CX-30 at 183; CX-47 at 302; TR at 374, 378-80, 446. Both a summary of the ECP and the ECP itself indicated that noncompliance was cause for the Government to revoke or modify its plea agreement with Horizon, which would have had substantial financial and operational implications. CX-30 at 184; CX-47 at 303. Bobby Griffins, a member of Horizon's Board of Directors, likewise told Loftus that Horizon could not have withstood another MARPOL violation or it would have been forced to shut down. TR at 162.

- 6 -

As part of the ECP, Horizon was required to communicate to employees in the first quarter of every year its commitment to safety, quality, and the environment. CX-47 at 308. For example, on March 14, 2011, CEO Stephen Fraser sent an email to all relevant personnel, including Loftus, which read as follows:

> In addition to improving our current policies, we also want to stress that all Company personnel must familiarize themselves with, and follow, the requirements set forth in MARPOL and the SMS. All Company personnel, upon discovery of any issue which may bring into question a vessel's compliance with environmental (or any) laws, are to immediately bring the matter to the attention of senior management, or if preferred, utilize the Company's Ethics Hotline by calling 1-866-850-2115.

CX-29 at 181-82. Further, the ECP's instruction to Masters read: "[c]ompliance with such requirements will be incorporated as a positive factor in crew appraisals. Failure to comply with such requirements will be incorporated as a negative factor in crew appraisals and may lead to dismissal." CX-47 at 310.

### 2. *October 2011 – Loftus Complaint*

On October 15, 2011, Loftus emailed Fraser and Vice President of Operations, Bill Hamlin, indicating he reported to the USCG and ABS what he believed to be huge safety violations onboard the Trader including repeated power box fires. CX-1 at 1-7; TR at 149-51, 166-67. In the email, Loftus documented a long history of "derelict" equipment on the Trader and said he had contacted Horizon repeatedly over a ten year span to fix the problems, but to no avail. CX-1 at 1-7. Loftus concluded his email by saying "I have some major concerns about the safety, and crew, and I do not intend to compromise that for OTS, or anyone else." CX-1 at 2.

The USCG ultimately conducted an investigation in response to Loftus's complaints. TR at 152. Specifically, the USCG visited the Trader when it was docked in Jacksonville and again when it was docked in San Juan. *Id.* During both trips, the USCG condemned a substantial amount of equipment on the Trader. *Id.* In the aftermath, Horizon had to take hazardous power boxes out of service and rent power packs instead. *Id.*

### 3. *August 2012 – Loftus Complaint*

On August 25, 2012, Loftus emailed several people on Horizon's management team to report "a number of disturbing problems that need to be addressed." CX-2 at 8-10; TR at 155, 167-68, 253-54, 655, 710; *see also* CX-5 at 28-45; TR at 157, 333 656. Loftus's email

- 7 -

specifically listed thirteen items that he believed violated both Horizon's internal policies as well as the USCG safety regulations. CX-2 at 8-10; TR at 155, 167-68, 253-54, 655, 710; *see also* CX-5 at 28-45; TR at 157, 333 656. Before concluding his email, Loftus said "[t]his ship needs HELP, and GUIDANCE, in order to operate safely, stay within regulatory compliance, and follow the Horizon Lines requirements of the safety & Environmental Management System." CX-2 at 10.

Two days following Loftus's email, Vice President of Engineering, Ed Washburn, and Vice President of Operating Services and General Manager of Ocean Transportation Services, Pete Strohla, both flew to San Juan to inspect the Trader. CX-3 at 23; TR at 155, 319. Upon arrival, Washburn and Strohla went to Loftus's room unannounced, and Washburn immediately searched Loftus's refrigerator for alcohol. CX-3 at 23; TR at 155. During the visit, Loftus said that if Horizon did not contact either the USCG or ABS regarding his safety concerns, then he would contact the agencies himself. TR at 155-56, 319-20. Horizon contacted ABS and, after an inspection, the agency gave Horizon thirty days to fix equipment that was not in compliance with safety regulations. CX-3 at 24; TR at 155-56.

### 4. *February 2013 – Loftus Complaint*

In February of 2013, Loftus expressed safety concerns to Josh Dietrich from ABS who conducted the Trader's annual inspection. TR at 158-59. During Dietrich's visit, Loftus questioned how the ABS could "possibly let a ship go to sea in that condition with manholes open and valves that didn't work, fuel systems didn't work, bilge valves didn't work, fuel valves[,]" and so on. TR at 158-59. After the inspection, Strohla called Loftus to ask if he was the individual who contacted Dietrich about the Trader's condition, and Loftus acknowledge that he did contact Dietrich. TR at 159.

### 5. *March 2013 – The "Incident"*

On March 6, 2013, Loftus was sailing the Trader from San Juan to Elizabeth when Chief Mate Robert McCarthy, second in command, was severely injured while performing a task on deck. TR at 169, 180. Set forth below is a chronological timeline of the events leading up to McCarthy's injury and what followed in the aftermath.

#### a. March 6 – Early Morning

On the morning of March 6, 2013, Loftus awoke at approximately 5:15 a.m. under the belief that a severe storm was impending. TR at 169-70. At that time, Loftus described the sea

- 8 -

as being "relatively calm" but expected conditions to get a lot worse over the following twelve to twenty-four hours. *Id.*  To prepare for the storm, Loftus had his crew start securing personal rooms and work areas at least two days prior. TR at 170.  The day before, Loftus made five trips around the entire ship to monitor the crew's progress in getting ready for what was expected to be the storm of the century. *Id.*

By 6:30 a.m., Loftus notified the crew that the deck was secure – i.e., no one was allowed on deck without permission – by posting a notice prominently on the board by the galley. TR at 172.  At around 8 a.m., Chief Mate McCarthy asked Loftus if he could go on deck to read the reefers, i.e., refrigerated containers – a task he performed every morning. TR at 172.  Loftus permitted McCarthy to read the reefers but instructed a second man to accompany him. *Id.*  A second man accompanied McCarthy, and they successfully maintenanced the reefers as usual. *See id.*

At some point before 9 a.m., Loftus had "a discussion" with McCarthy in the mess hall asking if the trash cans on the deck back aft had been removed pursuant to a conversation from the night before. TR at 171.  McCarthy said that he was unsure if the cans had been removed, so Loftus decided to check the deck himself. *Id.*  Upon checking the deck, Loftus found six-to-eight trash cans in the angle iron corral that were not tied down very well; one or two cans were flapping in the wind, and Loftus believed there was no way they would stay onboard during the expected storm. TR at 171-72.

Concerned about a possible MARPOL violation if any trash cans were to go overboard, Loftus asked McCarthy to supervise a crew and put a net over the cans in the corral to secure them. TR at 175.  McCarthy suggested taking the cans off the deck and moving them inside, and Loftus agreed that moving the cans inside was a good idea. CX-19 at 128 (RX-16); TR at 175, 752-53.  At this time, the ship was traveling at a high rate of speed of 20 knots, and the wind was also about 20 knots; the seas were short and choppy, but having little to no effect on the movement of the ship. CX-32 at 190; CX-33 at 207; TR at 126, 139-40, 176.  No one expressed reservations about going on deck to secure the cans. TR at 178.

Upon arriving on deck to secure the cans, McCarthy noticed that the chain on a large swinging door had popped off the slip hook. CX-18 at 124 (RX-5); CX-19 at 127 (RX-16).  McCarthy ordered one of his crew members to get a rope for securing the door because he "was afraid that it would pop off and that the door would slam shut." CX-19 at 129(RX-16).  As

- 9 -

McCarthy waited for the rope, the door swung open and hit him, and he was thrown to the ground. CX-19 at 129 (RX-16); TR at 574-75.

Loftus learned of McCarthy's accident right after it occurred, at approximately 9:30 a.m., and immediately ran to his aid. TR at 180. The weather conditions were not much different than when Loftus initially made the decision to send a crew on deck to secure the cans. TR at 180-81. Approximately ten-to-twelve individuals assisted with caring for McCarthy after the accident; people repeatedly moved back and forth on the main deck getting a back board, neck brace, medical kit, blood pressure test, and so on. TR at 181. No other crew members had difficulty standing, carrying, or moving on deck, and no one else was injured while helping McCarthy. *Id.*

> b. <u>March 6 – Early Afternoon</u>

At some time around noon or so, the Trader's shoreside Vessel Superintendent, John Hazel, instructed Loftus to perform drug and alcohol tests on all parties involved in the accident, and shortly thereafter, indicated a MEDEVAC would be airlifting McCarthy off the ship for hospital transport. CX-25 at 169; CX-25A; TR at 182, 184-85, 196. Loftus described the following regarding the ship's movement and the sea conditions as he prepared for McCarthy's evacuation, which is depicted in a video that was admitted as RX-7:

> I had to come left about 120 degrees, which put the swell on the port side of the ship, and then we started rolling to 35 degrees. And we rolled 35 degrees constantly until the time I got to the rendezvous point, and that's – that's what you see, is that bad weather in that video.

TR at 182. At 5:19 p.m., McCarthy was finally off the Trader and en route to Norfolk General Hospital – almost eight hours after the accident occurred. CX-25 at 168; TR at 182. Once the Trader was back on its normal course, it was only rolling seven degrees, which is what it was doing in the morning when McCarthy was initially injured. TR at 182-83.

After the evacuation, Loftus emailed Hazel to inform him that he had only tested McCarthy for alcohol because no one else had been directly involved in the accident. CX-25 at 167; CX-25A. The Bosun (also spelled Boatswain) and two daymen were in the vicinity at the time, but displayed no reasonable signs of intoxication having worked all day preparing for the MEDEVAC's arrival. CX-25 at 167; CX-25A. Upon Hazel's insistence, Loftus tested the Bosun and two daymen for alcohol and their tests all come back negative. CX-25 at 166; CX-25A; TR at 185.

- 10 -

c.   March 6 – Early Evening/March 7 – Early Morning

At approximately 8:00 p.m., the weather deteriorated quickly.  TR at 183.  The ship was rolling to fifty degrees, the wind was 100 knots, and the main deck was under water.  TR at 183-89.  At one point, Loftus took the ship into a swell at a forty-five degree angle, and the Trader dropped into a hole.  TR at 189.  It was the worst weather Loftus had ever seen in his entire career, and at one point, he thought he might lose the ship.  TR at 183, 189.

Loftus spent between thirty-six to forty-eight hours on the bridge with no sleep, trying to safely maneuver the Trader through the storm to its destination in Elizabeth, New Jersey.  TR at 184.  As Loftus described it, there is no comparison between the weather during the morning of March 6th, and the weather on the night of March 6th and early morning of March 7th.  TR at 183.  "It was like a calm lake compared – even at 1700 when they took him off, that weather there was nothing.  That was like nothing compared to what we went through.  It was the most horrendous and horrific thing I've ever been through." *Id*

As Loftus tried to safely navigate the Trader through this storm, Hazel continued demanding that Loftus get urine samples from the Bosun and two daymen to test them for drugs.  CX-25 at 164-66; CX-25A.  Loftus finally told Hazel, "I AM NOT LEAVING THE BRIDGE TO DO DRUG TEST.  SAFETY OF THE SHIP FIRST."  CX-25 at 164; CX-25A.  Hazel responded to Loftus that drug testing the Bosun and two daymen "is a requirement and not an option."  CX-25 at 164; CX-25A; TR at 615.  In all, Hazel demanded that Loftus test the involved crewmembers for drugs and alcohol at least nine times.  CX-25 at 164-69; CX-25A; TR at 184-85.

d.   March 8 – Early Morning

At 8:00 a.m. on March 8, 2013, Loftus safely reached the Trader's destination in Elizabeth.  TR at 186.  The Trader was in good condition as it reached port.  *Id.*  There was no loss of life or cargo, and no damage to the hull or the containers on deck.  *Id.*  Other ships Loftus observed coming into port had "boxes hanging over the side, container sides knocked out, cargo strewn all about," and so on.  TR at 190.

Immediately, Hazel demanded that Loftus administer drug tests on the Bosun and two daymen, reiterating that it was not an option.  TR at 187.  Loftus explained that the drug testing process was meticulous and took him at least fifteen minutes per person to complete.  TR at 188.

- 11 -

At the time of this request for drug testing, Loftus had not slept for approximately two days.  TR at 187.

### 6.  *April 2013 – Loftus Complaint*

On April 2, 2013, Loftus emailed USCG Marine Inspector, Ralph Savercool, regarding the conflict between mandatory drug testing requirements and a Captain's duty and authority to do what is safe.  CX-27 at 179.  During his correspondence with the USCG, Loftus explained the circumstances of his experience in March of 2013, asking the following:

> Is a Master, who has been up for over 48 hours, safe to do testing after docking, and coming through weather as we came through[?]  What about rest, so the Master can address the next emergency?  What is the priority?  Why can't this testing duty fall upon a shore side vendor?  Is rest a reason to delay the testing? Should a Master, remove his mind from the safety of the vessel to meet a time deadline?  Someone needs to address these questions.  Otherwise, a more serious marine incident may be caused.

CX-27 at 177.

The USCG acknowledged Loftus's concerns as legitimate, but indicated Loftus had to speak with his shoreside managers – the agency could only intervene if Horizon actually violated the regulations.  CX-27 at 176.  Later that same day, Loftus emailed Horizon's Designated Person and Environmental Compliance Manager, Andrew Phillips, regarding his concerns, but did not disclose that he already contacted the USCG.  CX-26 at 175; TR at 196, 297.  Loftus also communicated his concerns to Josh Diedrich from ABS.  CX-28 at 180; TR at 195, 493.

### 7.  *April 2013 – Management Meeting With Loftus on the Trader*

On April 11, 2013, Loftus was scheduled to go on vacation as part of his normal rotation when Phillips and Gregory Hohm, Horizon's Chief Compliance Officer, unexpectedly boarded the Trader to meet with him.  CX-15 at 99-100 (RX-26); CX-16 at 101-04 (RX-27); TR at 196-97, 202, 362, 368, 414, 665.  The meeting, also attended by Vessel Superintendent Hazel and Loftus's Relief Master, John Nicoll, concerned the Environmental Compliance status of the Trader and Loftus's emails to Phillips regarding drug testing requirements and safety.  CX-15 at 99-100 (RX-26); CX-16 at 101-04 (RX-27); TR at 196-97, 202, 362, 368, 414, 665.  During the meeting, Loftus revealed that he had contacted the USCG and ABS regarding the concerns he expressed to Phillips on April 2nd.  CX-15 at 99-100 (RX-26); CX-16 at 101-04 (RX-27); TR at 196-97, 202, 362, 368, 414, 665.  Specifically, Loftus explained that while his focus on safely navigating the Trader was unaffected by Hazel's numerous drug testing demands, he was

- 12 -

worried that the persistent orders could have been distracting to less experienced Masters. TR at 200. In response, Phillips told Loftus that Hazel was merely following his legal obligations under the USCG regulations, and that he should contact Horizon before reaching out to regulatory agencies so that it looks like the company knows what it is doing. CX-15 at 99 (RX-26); TR at 198-99, 664, 667-70. Phillips did, however, tell Loftus that he "was the only one who could have made a determination about whether the request should have been ignored to ensure the safety of the crew and ship." CX-15 at 99 (RX-26).

After the April 11th meeting, Horizon formed a group charged with determining what, if any, discipline to impose on Loftus for the McCarthy incident – a "root cause" investigation team had already been formed at some point in March to determine the cause. RX-32 at 113; TR at 368-71, 445, 497, 715, 731. The "root cause" investigation team was comprised of Hazel, Horizon Consumer Master Mike Smith, Horizon Producer Master Mark Ruppert, and Manager of Safety, Security, and Environmental Health, Peter Sutton. RX-32 at 111; TR at 617. The disciplinary team formed after the April 11th meeting was comprised of the following people from Horizon's senior management: Strohla; Hohm; General Counsel and Secretary, Michael Zendan; Senior Vice President of Operations, Bill Hamlin; Vice President of Human Resources, Mark Blankenship; and Director of Safety, Security, and Environmental Health Captain, Timothy Close. RX-32 at 113; TR at 368-71, 445, 715.

### 8. *May 2013 – Loftus Termination*

On May 28, 2013, Loftus received a letter from Strohla informing him that he was being removed from his position as Master, but could work as Chief Mate upon completing leadership and communication skills training. CX-8 at 49-50 (RX-3 & RX-22); TR at 196, 204, 373, 383, 445, 448. The reasons cited for Loftus's discipline were as follows:

> The HL Management Team was immediately drawn to the lack of good judgment demonstrated by the Master in deciding to send crew outside into heavy weather, after the deck had been secured, to address loose garbage can lids. It was commented in several personal statements that the weather was as bad as anyone had experienced in recent memory. The HL Investigating Team observed that 'the risks involved in going on deck in the weather described far outweighed the benefit of securing the garbage cans.' These observations, combined with the failure of the Senior Officer to require a Job Safety Analysis in these notably hazardous conditions, is a clear indication of poor decision making and an inadequate safety climate onboard the Horizon Trader while under your command. Horizon Lines has lost confidence in your ability to fulfill the

- 13 -

responsibilities as Master of a Horizon Lines vessel, therefore you will not be rejoining the Horizon Trader as Master.

*Id.* (internal citation omitted); *see also* TR at 196, 204, 373, 383, 445, 448.

When he received the letter, Loftus had over six years of belongings stored on the Trader, but was not allowed to personally retrieve them. TR at 208-09. Crewmembers searched and packed Loftus's belongings for him, and the Bosun, Steward, and two apprentices delivered the items to him on the dock in a pickup truck, adjacent to his former ship, the Trader. *Id.* After receiving his belongings, while standing on the dock, Loftus had to unpack and go through everything because he could not fit it all in his car. TR at 209.

Horizon offered Loftus two different Chief Mate positions. RX-30 at 109; RX-33 at 115; TR at 740. On June 6, 2013, Horizon offered Loftus a Relief Chief Mate job on the Horizon Navigator, which was part of the Puerto Rico run. RX-30 at 109; TR at 740. On June 25, 2013, Horizon assigned Loftus to a Relief Chief Mate position on the Horizon Pacific, a West Coast ship docked in Oakland, California. RX-33 at 115; TR at 740. Loftus refused to accept these demoted positions and terminated his employment with Horizon, which ultimately led to the present case before me. RX-31 at 110; RX-34 at 116; TR at 213, 740.

## VI.    Discussion

A.    Protected Activity and Horizon's Knowledge

### 1.  *October 2011*

Loftus's reports to the USCG and ABS in October of 2011 satisfy the first two elements of his *prima facie* case. The parties stipulated that Loftus's conduct in October of 2011 was protected activity, and I accept the parties' stipulation. ALJX-10. Further, the uncontroverted evidence supports that on October 15, 2011, Loftus emailed Fraser and Hamlin indicating that he reported the safety concerns to the regulatory agencies. CX-1; TR at 149-51. Therefore, I find Horizon had knowledge of this protected activity when it disciplined Loftus.

### 2.  *August 2012*

Similarly, Loftus has demonstrated that his internal complaint to Horizon in August 2012 constitutes protected activity that Horizon was aware of. Preliminarily, Horizon does not deny Loftus engaged in protected activity in August of 2012, but instead argues that his alleged protected activity, if any, was not a contributing factor in its decision to demote him. Resp. Br. at 18-19. Horizon admits in its brief that Loftus engaged in protected activity at some point in

- 14 -

2012, but does not cite to a specific time frame. Resp. Br. at 23 n.19. Accordingly, for completeness of the record, I will discuss below how the evidence supports my finding that Loftus engaged in protected activity in August of 2012, and how Horizon had knowledge of it.

The SPA affords seamen extensive protection against retaliation for threatening to report safety concerns to regulatory agencies. *See* 46 U.S.C. § 2114(a). Consistent with other Federal whistleblower statutes, the SPA's provisions defining protected activity should be interpreted broadly. *See, e.g., Clean Harbors Envtl. Servs., Inc. v. Herman*, 146 F.3d 12, 20-21 (1st Cir. 1998) (construing STAA antiretaliation provisions broadly to facilitate policy goals of ensuring corporate compliance with safety regulations through accountability); *Passaic Valley Sewerage Comm'rs*, 992 F.2d at 478 (discussing "broad remedial purpose" of Clean Water Act in expansively interpreting its whistleblower provisions); *Bechtel Constr. Co. v. Sec'y of Labor*, 50 F.3d 926, 932 ("[I]t is appropriate to give a broad construction to remedial statutes such as nondiscrimination provisions in federal labor laws."). This is especially true as it pertains to internal complaints so as to "leverage the government's limited enforcement resources" by encouraging seaman to report substandard working conditions to their employers thereby facilitating the SPA's goal of corporate compliance with safety regulations. *Clean Harbors Envtl. Servs., Inc.*, 146 F.3d at 19. "[F]ailure to protect internal complaints may have the perverse result of encouraging employers to fire employees who believe they have been treated illegally before they file a formal complaint." *Minor v. Bostwick Labs., Inc.*, 669 F.3d 428, 437 (4th Cir. 2012).

Loftus informed Strohla and Washburn that he had safety concerns he would report to the USCG or ABS if Horizon did not, which is something he notably had a well-documented history of doing. CX-1 at 1-7; CX-2 at 8-10; TR at 155-56, 167-68, 253-54, 319-20, 655, 710; *see also* CX-5 at 28-45; TR at 157, 333, 656. At the time, Horizon had only served approximately eight months of its three year probationary term for similar safety violations. *See* CX-29 at 181-82; CX-30 at 183; CX-47 at 302; TR at 374, 378-80, 446. Given the practical implications of any additional infractions, it is doubtful Horizon would have voluntarily contacted the regulatory agencies absent Loftus's threat. *See* CX-30 at 184; CX-47 at 303; TR at 162. Considering the underlying purpose of the SPA is to ensure corporate compliance with safety regulations by encouraging employees to bring attention to possible violations, I find Loftus engaged in known protected activity in August of 2012.

- 15 -

### 3. *February and April 2013*

Finally, evidence concerning Loftus's communications with the USCG and ABS from February and April of 2013 similarly satisfy the first two prongs of his *prima facie* case. Horizon argues Loftus's contact with the regulatory agencies was not protected activity because he did not "report" any safety infractions – he merely inquired about the regulations. Resp. Br. at 19, 22. In support, Horizon relies on the Fifth Circuit's decision in *Garrie v. James L. Gray, Inc.*, 912 F.2d 808, 812 (5th Cir. 1990), which distinguished between "reports" and mere inquiries under the SPA. Resp. Br. at 19, 22.

The facts in *Garrie* are distinguishable from the case at Bench. In *Garrie*, the complainant, a skipper on a marine vessel, was required to work more than twelve hours a day, which he believed violated 46 U.S.C. § 8104(h). 912 F.2d at 809. For clarification, the complainant called the USCG and asked whether "the regulation regarding maximum working hours" was still effective. *Id.* (internal citation and quotation marks omitted). The complainant did not identify his employer, did not request that any action be taken against his employer, and expressly indicated that he did not wish to file a formal complaint. *Id.* Shortly thereafter, the complainant told his supervisor that "the Coast Guard had confirmed his understanding of the applicable maximum working hours and that it was . . . his intention to refuse to work more than twelve hours per day." *Id.* The complainant was subsequently laid off and he filed suit in Federal court alleging that he was unlawfully discharged in retaliation for reporting to the USCG what he believed to be a safety violation under 46 U.S.C. § 2114. *Id.* at 809-10.

The court ultimately held that the complainant had no claim for wrongful discharge under § 2114 because his communication with the USCG was not a "report" and was therefore not protected activity, nor did his communication facilitate the SPA's purpose. *Garrie*, 912 F.2d at 812-13. In reaching this conclusion, the court reasoned: "[h]e sought information, but did not provide it. He did not file a complaint, nor did he reveal the name of his employer or the vessel upon which he was employed – information without which the Coast Guard could not investigate or prosecute a violation." *Id.* at 812. Accordingly, the complainant "merely made an inquiry" as opposed to a "report" that would have afforded him protection from retaliatory discharge. *Id.*

#### a. February 2013

In February of 2013, Loftus's communications with the ABS went beyond mere inquiries. On direct examination, the following colloquy took place:

- 16 -

Q.  And what did you say to ABS Inspector Josh Dietrich about safety violations on the Horizon Trader?

A.  Well, I complained to him about the condition of the ship sailing from San – not from San Juan, from China, and I asked him how the ABS could possibly let a ship go to sea in that condition with manholes open and valves that didn't work, fuel systems didn't work, bilge valves didn't work, fuel valves. I gave him the whole thing.

. . .

Q.  What happened next in relation to your complaint to ABS inspector Dietrich about the safety of the Trader?

A.  Pete Strohla called me . . . and he said that the ABS inspector in New York had mentioned to the port engineer, Mike Popovich, that one of the officers was complaining about the condition of the ship sailing from shipyard in China, and then he asked me if I was the person and I replied yes, I was.

TR at 158-59; *see also* TR at 254-255, 257-258, 346-348. Loftus made Dietrich aware of several safety concerns that were still outstanding from August 2012. TR at 255, 258, 346-348.

Loftus's testimony supports that he believed there had been numerous safety violations aboard the Trader when it sailed from China, and he conveyed this information to Dietrich with the hopes that it would facilitate bringing the ship into compliance; this interpretation is buttressed by the fact that Loftus's long history of complaints to Horizon alone often went unaddressed. *See* CX-1 at 1-7; CX-2 at 8-10; TR at 149-51, 158-59. Unlike in *Garrie*, Loftus did not ask Dietrich any questions, but instead expressed disbelief that the ABS allowed the Trader's problems to persist for as long as it had citing a long, detail-specific list of items that warranted immediate action. *See* TR at 158-59; *see also* CX-2 at 8-10; CX-5 at 28-45. Further, I credit Loftus's testimony that he told Strohla about his protected activity. *See* TR at 158-59.[6]

b.  <u>April 2013</u>

In April of 2013, Loftus made more than mere inquiries to the USCG and ABS concerning drug testing requirements and safety. *See* CX-27 & 28. Upon a perfunctory review of his exchanges with the USCG, it appears that Loftus only sought clarification about the regulations by repeatedly saying "I have questions." CX-27 at 179. In analyzing his emails more deeply, however, it is clear that Loftus's communications are not limited to just inquiries as

_____

[6] I recognize there is a discrepancy between Loftus and Strohla on this point. Strohla testified that he does not recall talking to Loftus about his communications with Dietrich. TR at 714; *see also* Resp. Br. at 20. Strohla's memory lapse is bit too convenient and unconvincing. Loftus testified credibly throughout this proceeding and I find Strohla's testimony to be less credible in general.

- 17 -

Horizon suggests. *See id.* In his first email to the USCG, Loftus discussed his experience surrounding McCarthy's accident, and said the following about Horizon: "In my case, I believe they lost sight of the overall safety of the ship and crew, in favor of a piece of paper certifying a test was done. To me this is a breach of the broader concepts of the ISM code." *Id.* In subsequent emails, Loftus demonstrated his firm understanding of the regulations by explaining "safety of the vessel and environment is paramount. I believe the ISM Code is specific in this area." *Id.* at 176.

Unlike in *Garrie*, Loftus tried to convince the USCG to take action against Horizon over the course of three emails. *See id.* at 176-79. In response, the USCG told Loftus that even if Horizon's drug testing policy itself violated the regulatory code, the agency could not do anything about it until actual conduct or inaction beyond the written policy that violated the regulations took place. *See id.* at 176. To be specific, in its final response to Loftus, the USCG stated as follows:

> I understand what you are saying, being a Master myself. But it comes down to what your company wants to do and how they wrote their policy on meeting the regulations. They are the ones responsible to get it done, not the USCG. We can't tell them how to do it, we tell them what's required. When and if they break any of the regulations about drug and alcohol testing is when we can have a say. All the tools for them are the regs I sent you. I really don't know what else to tell you.

CX-27 at 176. It seems as though if Horizon's drug testing policy led to an injury or damage because a master was distracted by the repeated unreasonable demands of Horizon to do drug testing, the USCG may have been more inclined to investigate. The exceptional judgment of Loftus to focus on the safety of his ship instead of yielding to Hazel's flawed demands essentially left Horizon's policy untested in circumstances involving a master with less experience.

Similarly, Loftus did more than just inquire about the regulations when he emailed the ABS. *See* CX-28 at 180. Specifically, Loftus's email to Dietrich disclosed that he had filed a Corrective Action Report with Horizon over what transpired following McCarthy's accident and explained how the company put the Trader at risk by demanding that drug tests be administered under the dangerous circumstances that existed at the time. *Id.* In concluding, Loftus said "I appreciate your formal follow up." *Id.* Loftus did not ask any questions. *Id.* Strohla and Hohm

- 18 -

admit that on April 11, 2013, Loftus disclosed the nature of his protected activity.  CX-15 at 99 (RX-26); CX-16 at 104 (RX-27); TR at 197.

Horizon argues further that Loftus's communications with the USCG and ABS were not made in good faith because Loftus knew he exercised poor judgment when McCarthy was injured, and he needed a way to protect himself.  Resp. Br. at 23-24.  The evidence does not support Horizon's contention.  Loftus had a long history of reporting safety violations to both Horizon and regulatory agencies for no other reason than to operate a safe ship.  *See* CX-1 at 1-7; CX-2 at 8-10; CX-5 at 28-45; TR at 155-57, 167-68, 253-54, 319-20, 333, 655-56, 710.  Loftus's actions in putting safety first is well documented throughout his career at Horizon.  *See* CX-1 at 1-7; CX-2 at 8-10; CX-5 at 28-45; TR at 155-57, 167-68, 253-54, 319-20, 333, 655-56, 710.  Moreover, the evidence supports that Loftus genuinely believed that Horizon's drug policy violated safety regulations, and he was worried that a less experienced Master would risk safety by heeding illogical shore side demands.  CX-15 at 99-100 (RX-26); CX-16 at 101-04 (RX-27); TR at 196-97, 200, 202, 362, 368, 414, 665  Where Loftus's communications with the USCG and ABS in February and April of 2013 go beyond mere inquiries and facilitate the goals of the SPA, I find them to be protected activity under 46 U.S.C. § 2114(a); I likewise find that Horizon knew about Loftus's protected activity from February and April of 2013 when it demoted Loftus in May of 2013.

B.    Adverse Action

The parties do not dispute that Loftus suffered an adverse action.  Compl. Br. at 14; Resp. Br. at 26 n.22.  Rather, the parties disagree as to the severity of the action taken against Loftus.  *See* Compl. Br. at 29; Resp. Br. at 26 n.22.  Horizon argues that Loftus was demoted, and Loftus argues that he was "constructively discharged."  *See* Compl. Br. at 29; Resp. Br. at 26 n.22, 27-29.  To make a *prima facie* case, however, Loftus need only prove that Horizon's action against him was adverse – the severity of the action is irrelevant.  *See* 42 U.S.C § 42121(b); *Bechtel Constr. Co.*, 710 F.3d at 447; *Allen*, 514 F.3d at 475-76; *Harp*, 558 F.3d at 723; *Hutton*, ARB No. 11-091, slip op. at 5.  I find Loftus's disciplinary letter dated May 28, 2013, where Horizon removed him from his position as Master is sufficient to satisfy the third prong of his *prima facie* case.  CX-8 at 49 (RX-3 & RX-22).

- 19 -

C.   Contributing Factor

Loftus's protected activity contributed to Horizon's decision to discipline him.  Under the contributing factor standard, Loftus need not prove that his protected activity was the only reason for Horizon's adverse action against him.   The ARB has repeatedly emphasized that "a contributing factor is any factor which, alone or in connection with other factors, tends to affect in any way the outcome of the decision." *Williams v. Domino's Pizza*, ARB 09-092, ALJ 2008-STA-052, slip op. at 5 (ARB Jan. 31, 2011) (internal quotation and citation omitted). *See also Araujo*, 708 F.3d at 158; *Hutton*, ARB No. 11-091, slip op. at 8; *Sievers v. Alaska Airlines*, ARB No. 05-109, ALJ No. 2004-AIR-028, slip op. at 4 (ARB Jan 30, 2008).   The goal of the contributing factor standard is to ensure that whistleblowers need not prove protected activity was a substantial, significant, predominant, or motivating factor in an adverse action taken against them. *Araujo*, 708 F.3d at 158.  Hence, Loftus need only prove that Horizon's adverse action against him was motivated, at least in part, by his protected activity. *Walker v. Am. Airlines, Inc.*, ARB No. 05-028, ALJ No. 2003-AIR-017, slip op. at 18 (ARB Mar. 30, 2007).

Loftus may demonstrate his protected activity was a contributing factor in Horizon's adverse action against him through either direct or circumstantial evidence. *DeFrancesco v. Union R.R. Co.*, ARB No. 10-114, ALJ No. 2009-FRS-009, slip op. at 6-7 (ARB Feb. 29, 2012). The types of circumstantial evidence Loftus may use to prove a contributing factor include but are not limited to the following:

> temporal proximity, indications of pretext, inconsistent application of an employer's policies, an employer's shifting explanations for its actions, antagonism or hostility toward a complainant's protected activity, the falsity of an employer's explanation for the adverse action taken, and a change in the employer's attitude toward the complainant after he or she engages in protected activity.

*Id.* at 7.  Importantly, Loftus's evidence need not directly imply that Horizon had any discriminatory motive or animus toward him; irrespective of Horizon's motives, adverse actions against employees cannot be based on protected activities, such as whistleblowing. *Araujo*, 708 F.3d at 158; *Peterson v. Union Pac. R.R. Co.*, ARB No. 13-090, ALJ No. 2011-FRS-017, slip op. at 3 (ARB Nov. 20, 2013); *Hutton*, ARB No. 11-091, slip op. at 7; *Menendez v. Halliburton, Inc.*, ARB No. 12-026, ALJ No. 2007-SOX-005, slip op. at 13-14 (ARB Mar. 15, 2013) (reissued Mar. 20, 2013); *DeFrancesco*, ARB No. 10-114, slip op. at 6.  As discussed below, based on the totality of the circumstances, I find that Loftus has satisfied his burden of proving, by a

- 20 -

preponderance of the evidence, that his protected activity contributed to Horizon's decision to demote him.

### 1.  *Temporal Proximity*

While temporal proximity alone is insufficient to establish causation, the time between the protected activity and the adverse action can support a finding that the protected activity contributed to the adverse action. To be probative, the temporal proximity of the adverse action must be reasonably close in time to the protected activity. *Lally v. Tyco Electronics,* 2010-ERA-00004, slip op. at 10 (ALJ May 10, 2010) (*citing Clark County School District v. Breeden*, 532 U.S. 268, 273-74 (2001) (concluding that 20 months is too remote in time to show causation); *Keener v. Duke Energy Corp.*, ARB No. 04-091 (ARB. July 31, 2006) (13-month gap too long to infer causation); *Evans v. Washington Public Power Supply Sys.*, ARB No. 96-065 (ARB July 30, 1996) (one year gap too long). However, in whistleblower cases, "[j]udges have drawn inferences of causation when the adverse action happened . . . as much as about one year later." *Halloum v. Intel Corp.,* 2003-SOX-7 HTML at 12 (ALJ Mar. 4, 2004) (*citing Thomas v. Ariz. Pub. Serv. Co.,* 1989-ERA-13 (Sec'y Sept. 17, 1993)).

Loftus's conversations in February of 2013 with ABS Inspector Dietrich regarding the Trader's condition and Loftus's communications with USCG and ABS in April of 2013 concerning Horizon's drug testing policy all occurred within sixteen weeks of the May 28, 2013 adverse action. The close temporal proximity of these events support an inference that Loftus's protected activity was a contributing factor in Horizon's adverse action against him.

### 2.  *Hostility Toward Loftus's Protected Activity*

The evidence similarly supports that Horizon displayed hostility towards Loftus's protected activity. William Barclay, Horizon's Manager of Safety and Designated Person, confirmed that "it did not always bode well shore side" when Loftus reported safety concerns to the regulatory agencies. CX-40 at 291; *see also* Compl. Br. at 15. Walcott Becker, Jr., the Trader's Vessel Superintendent until September of 2012, testified that his immediate supervisor, Vice President and General Manager of Ocean Transportation Services, Joe Breglia, twice attempted to terminate Loftus in 2012 for reporting safety concerns to the USCG and ABS. Breglia was not successful in terminating Loftus because Becker correctly advised him that doing so would be improper given Horizon's internal policy of encouraging employees to report safety concerns. TR at 353-54.

- 21 -

While Breglia was replaced by Strohla and therefore no longer employed by Horizon at the time of Loftus's discipline, Breglia's sentiments are illustrative of management's attitude toward his protected activity. Becker admits that even he once told Loftus, out of frustration, that he should be fired over his frequent communications with the regulatory agencies. TR at 355. Additionally, Phillips testified that Horizon's informal policy was for employees to exhaust internal procedures before contacting regulatory agencies. TR at 669-70. This preference was further exhibited during Strohla's meeting with Loftus in April of 2013, when Loftus informed Strohla that he contacted the USCG and ABS regarding Horizon's drug testing policy and Strohla responded as follows: "Please contact us first so it at least looks like we know what we're doing." TR at 198; *see also* CX-15 at 99-100 (RX-26); CX-16 at 101-04 (RX-27). Interestingly, Strohla is also the individual ultimately responsible for Loftus's discipline. TR at 715.

### 3. *Disparate Treatment*

Horizon treated Loftus differently than it did other employees who violated Horizon's objective policies and procedures. CX-9 at 51; CX-10 at 52; TR at 395, 397, 491. For example, one Captain violated Horizon's Zero Tolerance Policy concerning the possession and use of alcohol on ships. CX-9 at 51. Acknowledging the Captain's serious lack of judgment, Horizon only suspended him from May to August, at which time he was given "another chance as a Master." *Id.*

On another occasion, a First Assistant Engineer was reprimanded for inadequately supervising maintenance work on his ship. CX-10 at 52. The Engineer's reprimand letter read as follows:

> The on-going failure to address the poor mechanical condition of the Ship's Service Diesel Generator's lube oil strainer; to ensure system pressure gauges were properly calibrated and to ensure adequate supervision of planned maintenance activities all were directly causal in the failure of the Ship's Service Diesel Generator and the damages to the generator crankshaft bearing and crankshaft . . . Your actions reflect a disregard of the company's Safety and Environmental Management System, existing regulations and good engineering practices.

*Id.* Yet, the Engineer was only suspended without pay for one month. *Id.*

Horizon's argument that Loftus's disparate treatment results from a change in management is unconvincing. *See* TR at 398-99, 490, 709, 747. Preliminarily, Hazel was

- 22 -

involved with both the Engineer's discipline and the investigation leading to Loftus's discipline. CX-10 at 51; TR at 617.  Despite the composition of Horizon's "new" management team, the uncontroverted evidence is that demoting a master to chief mate was unprecedented. *See* TR at 208, 747.  It would have been practically impossible for Loftus to operate effectively as Chief Mate because the position is not only more physically demanding than a Master, but he also would have received little to no respect from his crew.  CX-32 at 197-98; CX-33 at 209; TR at 213.  Strohla himself admitted that no captain has ever been demoted or terminated based on the subjective decision of a senior management team, as occurred here.  TR at 747.

Further, Loftus was denied an opportunity to personally retrieve six years' worth of belongings aboard the Trader despite Horizon's past practice of allowing other disciplined employees to do the same.  TR at 209.  Loftus did not pose a threat as demonstrated by his continued employment for three months following the McCarthy incident, and I am hard pressed to see a reasonable justification for Horizon's actions as it relates to new management or accountability.  CX-8 at 49 (RX-3 & RX-22); TR at 196.  According to Loftus, Horizon fired people "on ships for alcohol abuse, fighting, knife fighting, whatever; I've never seen anybody treated like this where they couldn't come back and get their gear."  TR at 209.  Horizon's argument that it hoped to save Loftus from the humiliation of retrieving his belongings himself is unavailing because he was not given an option either way.  In fact, their actions proved to be more humiliating by leaving Captain Loftus on an open dock next to his former ship to collect six years-worth of personal belongings.

Even more disconcerting about Loftus's treatment is Horizon's argument that he was not terminated – it is Horizon's position that he was only demoted.  Resp. Br. at 26 n.22, 27-29.  If Horizon thought it would be too humiliating for Loftus to simply obtain his own belongings from the ship, then it is nonsensical for it to also argue that Loftus could have worked effectively in a demoted Chief Mate position.  I accept and credit Loftus's testimony that such a demotion created an untenable situation vis-à-vis his ability to command any respect in the demoted position.

Finally, regardless of who comprised the management team, the investigation into the McCarthy accident did not comport with Horizon's objective policies.  *See* TR at 450.  Horizon's objective procedures required that McCarthy's accident be investigated by a team consisting of the following:  one or two shipmates, the supervisor over the person involved, and an Officer or

- 23 -

Vessel Superintendent. *See id.* Horizon alleges that because Loftus was directly involved in the incident, it was in its best interests to have an investigation team comprised of different people than called for in the procedures. TR at 450, 495-96. The team included Vessel Superintendent Hazel, Captain Mike Smith, Captain Mark Rupert, and Manager of Safety, Security, and Environmental Compliance, Peter Sutton. TR at 617. Significantly, Hazel was also sufficiently involved with the McCarthy incident so as to raise suspicion of his possible bias; yet, Horizon assigned him to the investigation team anyways. *See* CX-25 at 164-74; CX-25A; TR at 617. Based on all of the foregoing, I find that Loftus proved the fourth and final element of his *prima facie* case.

    C.    <u>Horizon's Affirmative Defense</u>

Horizon did not prove by clear and convincing evidence that it would have demoted Loftus irrespective of his protected activity. "The 'clear and convincing evidence' standard is the intermediate burden of proof, in between 'a preponderance of the evidence' and 'proof beyond a reasonable doubt.'" *Araujo*, 708 F.3d at 159 (internal citation omitted). This means that Horizon must prove it "is highly probable or reasonably certain" that it would have taken adverse action against Loftus irrespective of his protected activity. *Williams*, ARB No. 09-092, slip op. at 6, *quoting Brune v. Horizon Air Indus., Inc.*, ARB No. 04-037, ALJ No. 2002-AIR-008, slip op. at 14 (ARB Jan. 31, 2006) (internal quotations omitted). In its brief, Horizon argues that Loftus "was demoted **solely** as the result of his 'serious lapse of judgment,' which led directly to McCarthy's severe injury." Resp. Br. at 26 (internal citation omitted) (emphasis in original).[7] In Loftus's disciplinary letter, however, Horizon cites poor decision making and an inadequate safety climate onboard the Trader as the primary factors justifying Loftus's discipline; the letter specifically references the horrific weather conditions that existed when McCarthy was injured as well as "the failure of the Senior Officer to require a Job Safety

---

[7] This argument is concerning given the testimony of Horizon's Chief Compliance Officer, Greg Hohm. He testified that after meeting with Loftus on April 11, 2013, he knew Loftus needed to be terminated or demoted and this was <u>before</u> any investigation concerning the McCarty incident was completed. TR at 368-369, 407-410, 438. Hohm reported directly to the Board of Directors of Horizon and he informed the Board that discipline was required here. TR at 359, 371. He carried significant authority with the board and claims he was responsible for the decision to hire Pete Strohla, the person who signed the May 28, 2013 letter demoting (terminating) Loftus. TR at 359, 371, 400. He was also responsible for forming (and serving on) the senior management team that was charged with determining the ultimate discipline Loftus was to receive. TR at 367-369. In testimony, Hohm conceded there was at least one additional reason beyond the McCarthy incident as to why Loftus was terminated. TR at 428. All of this contradicts counsel's argument that Loftus was demoted solely because of a serious lapse in judgment leading to McCarthy's injury.

Analysis." CX-8 at 49 (RX-3 & RX-22). For the reasons discussed below, I find that it is highly unlikely that Horizon would have demoted Loftus absent his protected activity. There is virtually no evidentiary basis to support any of the reasons advanced by Horizon to justify its adverse action.

### 1. *The Weather*

According to the demotion letter authored by Strohla, Horizon disciplined Loftus because he exercised poor judgment in sending a crew on deck in weather "as bad as anyone had experienced in recent memory." CX-8 at 49-50 (RX-3 & RX-22). However, the uncontroverted evidence establishes that at the time of McCarthy's accident, the weather conditions were fairly common and described as "moderate" in the Trader's log book. CX-8 at 49 (RX-3 & RX-22); CX-32 at 190-91; CX-33 at 205-06; CX-34 at 241, 249; CX-35 at 255, 258, 260; TR at 133, 139, 176-77. The following four expert witnesses testified in this case: Kevin O'Halloran, Walcott Becker, James Staples, and Mark Bisnette. CX-32 through CX-35; TR at 48, 74, 112, 254. All four experts agree that the weather was not bad when McCarthy was injured. CX-32 at 190-91; CX-33 at 205-06; CX-34 at 241, 249; CX-35 at 255, 258, 260; TR at 133, 139. For one, the wind force was only seven to eight knots, which is not out of the ordinary. CX-32 at 191; CX-33 at 206; CX-34 at 241; CX-35 at 255; TR at 66, 126-27, 139. The seas were rough, but the Trader was only rolling and pitching moderately with no water spray splashing over the bow or on deck, and no one else was injured while assisting McCarthy. CX-32 at 190-91; CX-33 at 206-07; CX-35 at 259; TR at 181. Lastly, the Trader was travelling at its maximum service speed of 20 knots, which it could not do without sustaining serious damage to the ship if the seas were very rough; the fastest any ship could travel in rough seas without sustaining damage is approximately 14 knots. CX-32 at 190; CX-35 at 258; TR at 66. The Trader did sail through what some may consider the storm of the century, but that did not occur until well after McCarthy was injured and removed from the ship over 8-10 hours later. TR at 133, 136, 139, 179-81, 183.

Horizon made no effort to verify the actual weather at the time of McCarthy's accident. The Senior Management Team responsible for determining Loftus's discipline did not review any official weather data nor consult with any weather experts. TR at 387, 455-56. Not a single person on Loftus's disciplinary team had any maritime experience to make any independent conclusions about the weather based on the evidence presented alone. RX-32 at 113; TR at 368-71, 443-45, 474. The disciplinary team's inexperience in maritime matters is obvious from its

- 25 -

failure to consider the Trader's rolling, how many knots it was making, and what the true and apparent wind speeds were at the time of the accident. TR at 386-87, 455-56, 724. The only evidence that the disciplinary team relied on concerning the weather was the investigation team's report. TR at 386-87, 455-56, 724. The disciplinary team did not use any objective criteria to define the "heavy weather" it cited in Loftus's disciplinary letter and completely disregarded any inconsistencies concerning the weather on March 6th. TR at 432, 525. The weather could not have been a real factor in assessing discipline to Loftus.

### 2. *Job Safety Analysis ("JSA")*

According to Horizon policy, a JSA was not required before sending a team out to secure the trash cans because it is considered a routine task. CX-32 at 193, 199; CX-33 at 208; TR at 54, 59, 67, 88, 250-51. The disciplinary team never made a determination as to whether a JSA was actually required under the circumstances, yet cites the lack of a JSA as a reason supporting Loftus's discipline. CX-8 at 49 (RX-3 & RX-22). As a member of Loftus's disciplinary team, Close testified that there was an inadequate assessment of risk "because [Loftus] failed to conduct or require the job safety analysis." TR at 510-11. Contrary to Close's testimony, however, Loftus testified that his standing orders required a JSA any time a job was started or assigned. TR at 250-251. He further clarified that because McCarthy was assigned the task of securing the trash cans, McCarthy was responsible for completing the JSA under the standing order. TR 250. If McCarthy thought the job was a repetitive, routine task, pursuant to Horizon policy, he could have dispensed with the formality of a JSA. TR at 250-251.

Loftus went above and beyond what was actually required of him when it came to JSAs. *See* TR at 250-51. He discussed JSAs at every drill and even bought small plastic holders to attach to the bulkheads in every room so that JSA books were always available. TR at 250. Even if a JSA was required under the circumstances, it was Chief Mate McCarthy's job to do it; immediate supervisors conduct JSAs – not assigning Masters. CX-33 at 208; TR at 177. Strikingly, Horizon did not discipline McCarthy for failing to conduct a JSA. The fact that Horizon cited the lack of a JSA as grounds for disciplining Loftus before even determining whether Loftus was required to perform one, demonstrates the superficial nature of Horizon's investigation. Horizon appears to be manufacturing reasons to justify its illegal behavior of retaliating against Captain Loftus.

- 26 -

### 3. *Applicable Standard of Care for a Master*

The experts who testified were uniform in their opinion that Loftus acted consistent with the standard of care of an experienced Master, using good judgment by sending a crew on deck to secure the trash cans with the approaching storm. CX-32 at 198; CX-33 at 205-06; CX-34 at 249. For one, the weather was not severe enough to prevent crew members from going on deck, despite the deck being secured. CX-33 at 205-06; TR at 126-27, 173-74. It is common for seamen to work on a secured deck, and if anything, Loftus securing the decks as early as he did is an indication of the safe atmosphere he promoted on his ship. CX-32 at 191; CX-34 at 250; TR at 66-67, 126-27, 173-74. Loftus also only sent experienced mariners on deck to perform the task of securing the trash cans, and no one expressed any reservations about it. CX-35 at 258; TR at 140, 178. In fact, it was actually McCarthy's idea to bring the trash cans inside; Loftus initially only asked that a net be placed over the cans. CX-35 at 258; TR at 98-99, 104, 109-10, 175. Additionally, while McCarthy began securing the cans in the container, he realized the chain and latch used to secure the container door was not adequate to hold the door open and instructed another crew member to get some rope to better secure the door. RX 16 at 58. While McCarthy was waiting for the rope and standing in the way of the door, the latch failed (as he expected), and the door knocked him to the ground. *Id.* McCarthy's standard of care in this entire investigation was never questioned by Horizon.

Furthermore, Loftus's efforts to avoid a MARPOL violation were reasonable under the circumstances. CX-35 at 255; CX-38 at 289; TR at 107, 177, 494. The applicable MARPOL provision reads as follows: "No person on board any ship may discharge into the sea, or into the navigable waters of the United States, plastic or garbage mixed with plastic, including, but not limited to, synthetic ropes, synthetic fishing nets, and plastic garbage cans." 33 C.F.R. § 151.67; *see also* CX-38. It was Loftus's duty as Master to ensure MARPOL compliance. *See* 33 C.F.R. § 151.63; *see also* CX-38 at 289; TR at 435, 446, 449, 482, 494, 624. Any MARPOL violation could have personally subjected Loftus to a civil penalty, but a knowing violation could have resulted in conviction of a class D felony. *See* 33 C.F.R. § 151.04; *see also* CX-38 at 289; TR at 108. While there is an accidental loss exception to § 151.67 of MARPOL, it applies only if "all reasonable precautions have been taken before and after the occurrence of the damage, to prevent or minimize the accidental loss." 33 C.F.R. § 151.77; *see also* CX-38 at 289.

- 27 -

Given the weather conditions that existed several hours after the accident, there was a good chance that any trash cans left on deck would have been washed overboard by the storm. TR at 108-09, 189-90. As Captain James Staples opined in his report: "In today's world of regulations a Master must be diligent when it comes to all regulations whether it SOLAS, MARPOL or ISPS. The Master must have the foresight to keep the vessel safe and in compliance which is always a balancing act." CX-35 at 255. Where the weather was not sufficiently severe to preclude experienced seamen from going on deck to secure the trash cans, it is unlikely the USCG would conclude that the accidental loss exception applied in the likely event of a violation. *See* CX-32 at 190-91; CX-33 at 205-06; CX-34 at 241, 249; CX-35 at 255, 258, 260; TR at 133-34, 139.

In light of its vulnerability at the time during which the McCarthy accident occurred, it is unbelievable that Horizon would not have considered MARPOL as part of its investigation. *See* CX-29 at 181-82; CX-30 at 183; CX-47 at 302-03; TR at 162, 374, 378-80, 435, 446, 449, 482, 494, 624. Horizon had been stressing MARPOL compliance since early March of 2011, and even stated in its ECP and ECP summary that noncompliance with MARPOL regulations was cause for termination. CX-29 at 181-82; CX-30 at 183; CX-47 at 302-03; TR at 162, 374, 378-80, 446. On March 6, 2013, Horizon was serving probation and could not afford any MARPOL infractions or it very likely would have gone out of business. CX-29 at 181-82; CX-30 at 183; CX-47 at 302-03; TR at 162, 374, 378-80, 446. The fact that Horizon failed to consider MARPOL as part of its investigation of Loftus is further evidence that the investigation was merely window dressing used to disguise its true motives for disciplining Loftus.

### 4. *Loftus's Reputation for Safety*

Horizon's contention that Loftus's decision-making on March 6, 2013, highlighted "an inadequate safety climate onboard the Horizon Trader" is overwhelmingly unsupported by the record and is rejected as a fabrication. CX-8 at 49 (RX-3 & RX-22); *see also* CX-1 at 1-7; CX-2 at 8-10; CX-4 at 26-27; CX-5 at 28-45; CX-32 at 193; CX-40 at 291; CX-44 at 296; CX-42 at 294; CX-34 at 250; TR at 206, 461, 558. In addition to the reasons discussed above, no one ever questioned the safety culture of Loftus on any vessel before the McCarthy incident nor did he have any prior record of discipline. TR at 206, 461, 633, 643. Hazel admitted that he frequently visited the Trader for inspections and never saw anything to raise safety concerns. TR at 633,

- 28 -

643. To the contrary, Hazel confirmed that a strong safety culture existed aboard the Trader and the vessel was in very good condition under Loftus's command. TR at 633, 643.

All of the experts in this case are unanimous that Loftus was at the top of his game when it came to safety concerns. CX-32 at 193, 199; CX-33 at 205; CX-34 at 250; CX-35 at 259. Becker, who conducted several audits of the Trader while Loftus was master stated: "Captain Loftus, in my experience and opinion, was the most safety conscientious Master in the entire Horizon Lines fleet." CX-32 at 199. Staples opined, "Captain Loftus has always put the safety of the vessel and crew first . . . ." CX-35 at 259. Bisnette characterized Loftus's commitment to safety as "unflinching," and said that he was nothing "but a competent, professional mariner with an unusually strong commitment to the safety of his vessel and crew." CX-34 at 249-50.

We need look no further than to the events of March 2013 to discern the kind of Master John Loftus was. Phillips admits that Loftus did a very good job sailing the Trader back to port in such extreme conditions. TR at 688. A Maersk ship sailing into New York lost eighty containers over the side of the ship during the storm, and Loftus observed "other ships coming in [and] out of the pilot station, boxes hanging over the side, container sides knocked out, cargo strewn all about." TR at 189-90. Yet, Loftus sailed the Trader out of the storm without any loss of life, cargo, or heavy damage to the vessel. TR at 186, 364. In his conclusion, Captain Staples writes "Captain Loftus should have been given an award [for sailing the Trader out of the storm as he did] . . . I would sail with or under Captain Loftus anytime and have complete faith that he would have my safety his main concern." CX-35 at 261.

In addition to his safe handling of the Trader in March of 2013, Loftus's commitment to safety is evident from the numerous Corrective Action Requests he submitted to Horizon over the years, as well as his repeated communications with regulatory agencies regarding his safety concerns. CX-1 at 1-7; CX-2 at 8-10; CX-4 at 26-27; CX-5 at 28-45; CX-32 at 193; CX-40 at 291; CX-44 at 296; CX-42 at 294; CX-34 at 250; TR at 206, 461, 558. Becker, for example, articulated the following in his report:

> Over the twenty-three years that I have been in the marine industry and in the US Coast Guard Marine Inspection before that, other than Captain Loftus, I can recall no other Captain who reported to the regulatory agencies in lieu of resolving the safety issues within their companies . . . Under Captain Loftus, Safety Ride deficiencies were corrected quickly and Safety Meeting Minutes were detailed and any outstanding items were followed up and corrected. Maintenance Meeting notes were found to be complete and contained several comments on the status of

- 29 -

> the equipment and planned correction/completion dates.  Horizon Lines instituted
> a program to reduce personal injuries fleetwide and the HORIZON TRADER had
> reduced personal injuries, compared to previous years.

CX-32 at 193; *see also* CX-12 at 54-57.  In fact, there was a corresponding Corrective Action
Request submitted to Horizon for all of Loftus's protected activity.  CX-1 at 1-7; CX-2 at 8-10;
CX-4 at 26-27; CX-5 at 28-45; CX-32 at 193; CX-40 at 291; CX-44 at 296; CX-42 at 294; CX-
34 at 250; TR at 155, 157, 167-68, 191-92, 206, 253, 333, 362, 461, 558, 655-56, 710.  More
often than not, Loftus resorted to reporting safety concerns to the regulatory agencies because of
Horizon's consistent failure to correct hazardous conditions aboard the Trader.  *See* CX-1 at 1-7;
CX-2 at 8-10; CX-4 at 26-27; CX-5 at 28-45; CX-32 at 193; CX-40 at 291; CX-44 at 296; CX-
42 at 294; CX-34 at 250; TR at 155, 157, 167-68, 191-92, 206, 253, 333, 362, 461, 558, 655-56,
710.  Loftus was clearly a thorn in Horizon's side.

In metering out its punishment, the disciplinary team used no objective criteria to reach
the conclusion that it lost confidence in Loftus.  TR at 461.  Hohm testified that he lost
confidence in Loftus because Loftus did not safely manage the Trader and was unsure of his
authority as Master which was demonstrated by his communications with the USCG and ABS in
April of 2013.  TR at 428.  Conversely, Close stated that Loftus's continual communication with
the regulatory agencies did not bother him, rather he lost confidence in Loftus due to his failure
to conduct a JSA.  TR at 510-12, 531.  Strohla testified that he barely put any weight on whether
Loftus was distracted by Hazel's emails after the McCarthy incident.  TR at 737.  Rather, Strohla
blamed his loss of confidence in Loftus on sending a crew on deck in extremely poor weather
conditions.  TR at 766.

The term "disciplinary team" seems to be a misnomer as there was clearly no consensus
on why the "team" was disciplining Loftus.  Horizon engaged in these machinations of forming a
disciplinary team and a root cause investigation team to mask the true reasons for its actions – to
discipline Loftus for his protected activity.  As Greg Hohm testified, he knew after his surprise
meeting to the Trader on April 11, 2013 that Loftus needed to be fired or demoted.  TR 368-369.
The disciplinary decision was made before any investigation was complete, and Horizon put
forth a lot of smoke and mirrors to justify the course forged by Hohm.  If Horizon truly wanted
to conduct a root cause investigation, why did it not consider the following:  (1) Why were
containers placed onboard the Trader with inferior latching mechanisms?; or (2) The extent of
Chief Mate McCarthy's culpability in causing his own injuries by failing to do a JSA and for

- 30 -

standing in front of a container door that he knew was not secure? Had Horizon considered these other issues in its root cause analysis, its sights would not have been trained on Loftus.

Based on the foregoing, it is an easy call to find that Horizon did not satisfy its burden of proving it "is highly probable or reasonably certain" that it would have demoted Loftus absent his protected activity.

## VII.  Damages

Loftus is entitled to damages. A successful whistleblower complainant under the SPA is entitled to "compensatory damages, including backpay with interest and compensation for any special damages sustained as a result of the discrimination . . . ." 49 U.S.C. § 31105(b)(3)(A)(iii); *see also* 29 C.F.R. § 1986.100(a). Further, relief "may include punitive damages in an amount not to exceed $250,000." 49 U.S.C. § 31105(b)(3)(C).

Preliminarily, neither party discusses how the existence of a successor-in-interest, Matson Alaska, Inc., changes my analysis in awarding damages here. Given Matson's knowledge of this litigation prior to its purchase of Horizon and its post-hearing participation in this proceeding by seeking an amendment to the case caption, I find that any arguments against imposing liability on Matson have been waived. All liability is imposed jointly and severally against Horizon and Matson.

I.   Back Pay

Loftus is entitled to $655,198.90 in back pay. CX-37A; TR at 323. Under the SPA, successful whistleblower complainants are automatically entitled to an award of back pay. *Assist. Sec. of Labor for Occupational Safety & Health, & Bryant v. Mendenhall Acquisition Corp.*, ARB No. 04-014, ALJ No. 2003-STA-36, slip op. at 5 (ARB June 30, 2005); *Assistant Sec'y & Moravec v. H.C. & M Transp., Inc.*, 90-STA-44, slip op. at 10 (Jan. 6, 1992). It is well settled that the purpose of back pay is to make Loftus whole by restoring him to the position he would have been in absent Horizon's unlawful discrimination. *Albermarle Paper Co. v. Moody*, 422 U.S. 405, 421 (1975); *Blackburn v. Martin*, 982 F.2d 125, 129 (4th Cir. 1992); *Mendenhall Acquisition Corp.*, ARB No. 04-014, slip op. at 5; *Johnson v. Roadway Express, Inc.*, ARB No. 01-013, ALJ No. 99-STA-5, slip op. at 13 (Dec. 30, 2002); *McCafferty v. Centerior Energy*, ARB No. 96-144; ALJ No. 96-ERA-6, slip op. at 17 (ARB Sept. 24, 1997).

Loftus's back pay must be "calculated in accordance with the make-whole remedial scheme embodied in Title VII of the Civil Rights Act, 42 U.S.C.A. § 2000e et seq. (West 1988)."

- 31 -

*Mendenhall Acquisition Corp.*, ARB No. 04-014, slip op. at 5; *see also Fuhr v. School Dist. of City of Hazel Park*, 364 F.3d 753, 760 (6th Cir. 2004); *Polgar v. Florida Stage Lines*, ARB No. 97-056, ALJ No. 94-STA-46, slip op. at 3 (ARB Mar. 31, 1997). If applicable, back pay generally runs from the date of discriminatory discharge until the date of reinstatement, but there is no fixed method for determining an appropriate award. *Pettway v. Am. Cast Iron Pipe Co., Inc.*, 494 F.2d 211, 260-61 (5th Cir. 1974); *Mendenhall Acquisition Corp.*, ARB No. 04-014, slip op. at 6; *Cook v. Guardian Lubricants, Inc.*, ARB No. 97-005, ALJ No. 95-STA-43, slip op. at 14 n.12 (ARB May 30, 1997); *Polewsky v. B&L Lines, Inc.*, 90-STA-21, slip op. at 5 (May 29, 1991). "Because back pay promotes the remedial statutory purpose of making whole the victims of discrimination, 'unrealistic exactitude is not required' in calculating back pay, and 'uncertainties in determining what an employee would have earned but for the discrimination, should be resolved against the discriminating [party].'" *McCafferty*, ARB No. 96-144, slip op. at 18 (internal quotation marks omitted), *quoting EEOC v. Enterprise Assn. Steamfitters Local No. 638*, 542 F.2d 579, 587 (2d. Cir. 1976), *quoting Hairston v. McLean Trucking Co.*, 520 F.2d 226, 233 (4th Cir. 1975). *See also NLRB v. Browne*, 890 F.2d 605, 608 (2d Cir. 1989) (holding once successful plaintiff establishes gross amount due, burden shifts to defendant to prove facts mitigating liability). Loftus's back pay calculation need only be reasonable and supported by the evidence. *See Mendenhall Acquisition Corp.*, ARB No. 04-014, slip op. at 6; *Cook*, ARB No. 97-005, slip op. at 14 n.12; *Pettway*, 494 F.2d at 260-61.

Horizon argues that, if anything, Loftus is only entitled to $61,406.07 – the difference between a Master's total annual income equaling $307,030.32, and a Chief Mate's total annual income equaling $245,624.25. Resp. Br. at 26-27 n.24. In support, Horizon argues that Loftus was not "constructively discharged," so he had an ongoing duty to mitigate his damages by accepting one of the Chief Mate positions he was offered. Resp. Br. at 27-32. Alternatively, Horizon argues that Loftus should have made reasonable efforts to secure other employment, which he did not. Resp. Br. at 32.

In its brief, Horizon cites *Alicea Rosado v. Garcia Santiago*, 562 F.2d 114, 118-19 (1st Cir. 1997) and *Serrano-Cruz v. DFI Puerto Rico, Inc.*, 109 F.3d 23 (1st Cir. 1997) – two cases involving employees who resigned – to bolster its argument that Loftus is only entitled to the difference in income between Master and Chief Mate. Resp. Br. at 30-31. In *Rosado*, the plaintiff worked for the Commonwealth of Puerto Rico for almost twenty years, and from 1965

- 32 -

to 1975 was the District Director of the Barranquitas Office of the Department of Social Services but classified as a Social Worker V.  562 F.2d at 116.  In 1974, Puerto Rico began participating in the federal food stamp program, and the plaintiff's location was selected as one of the first distribution sites.  *Id.*  The food stamp program did not operate as well as planned, and the plaintiff was asked by his regional supervisor to explain why.  *Id.*  In response, the plaintiff wrote a letter outlining his criticisms of how the program was being run locally suggesting "irregularities" existed in the program, and he concluded by suggesting a number of possible remedies.  *Id.*  Copies of the plaintiff's letter were sent to his immediate supervisors, including the defendant.

Upon receiving a copy of the letter, the defendant called the plaintiff in for a meeting on June 20, 1975.  *Id.*  During the meeting, the defendant expressed dissatisfaction with the program "irregularities" described in the plaintiff's letter to the regional supervisor and cautioned him to be more conscientious of his choice of words moving forward.  *Id.*  Thereafter, a heated discussion between the plaintiff and the defendant ensued.  *Rosado*, 562 F.2d at 116.

Approximately one month after the meeting, the plaintiff received a letter from the defendant transferring him to a different location to handle adoption matters effective August 1, 1975.  *Id.*  The plaintiff's commute to his original location was fifteen minutes, and his commute to the new location may have taken almost two hours each way in heavy rush hour traffic.  *Id.* at 120.  The plaintiff never reported to his new location.  *Id.* at 116.  Around one month after he was scheduled to report to his new location, the plaintiff filed suit alleging the defendant violated his First and Fourteenth Amendment rights.  *Id.*

Before ultimately remanding the case, the First Circuit Court of Appeals discussed the legal standard to be applied in evaluating whether a plaintiff has been constructively discharged.  *Id.* at 119.  The court said "[b]efore a 'constructive discharge' may be found, entitling the employee to quit working altogether . . . the trier of fact must be satisfied that the new working conditions would have been so difficult or unpleasant that a reasonable person in the employee's shoes would have felt compelled to resign."  *Rosado*, 562 F.2d at 119.  In other words, the transferred position must "have been significantly more demanding."  *Id.* at 120 n.4.  Mere loss of prestige is not reason enough to justify quitting – a more severe reduction in the quality of working conditions is required.  *Id.*  "Doubtless a drastic increase in commuting time and

- 33 -

unreimbursed costs might at some point become sufficiently onerous to justify an employee in quitting." *Id.* at 120. The court wrapped up its discussion by instructing as follows:

> Should it be found that Alicea's transfer did not amount to a constructive discharge, he would not be entitled to recover damages for lost wages as he had a duty to remain on the job collecting his regular pay until relief from the [new] assignment was afforded by legal process. We remand the case on the issue of damages for lost wages so that the district court can address itself specifically to this issue, and especially to the commuting burdens imposed by the transfer and whether they would have led a reasonable person to resign until relief was secured.

*Id.*

Likewise, in *Serrano-Cruz*, the plaintiff worked as a comptroller, and her duties included managing the security system for the defendant's stores, supervising employees and scheduling vacations, handling the keys to the stores, and attending security and employee management meetings. 109 F.3d at 24. As comptroller, the plaintiff also assumed accounting responsibilities such as maintaining payroll accounts and preparing quarterly reports. *Id.*

In February of 1994, the plaintiff's supervisors gradually started to reduce her responsibilities. *Id.* The plaintiff lost managerial control over the store keys, the security system, personnel selection, and she was excluded from meetings she had formerly attended. *Id.* By June 1994, the plaintiff received a letter saying she was on a ninety day probationary period for negligently handling rent payments. *Id.*

In July, before the end of her probationary period, the defendant sent a letter transferring her to a newly created position as "retail manager," which entitled her to the same salary and benefits as her comptroller role. *Id.* As a retail manager, the plaintiff would have supervised and been responsible for the retail operation of the defendant's San Juan International Airport stores. *Id.* at 25. The plaintiff did not accept the transfer and formally resigned in August of 1994. *Id.* Thereafter, the plaintiff filed suit alleging age discrimination. *Serrano-Cruz*, 109 F.3d at 24.

The First Circuit affirmed the district court's grant of summary judgment in favor of the defendant, concluding the plaintiff did not demonstrate a *prima facie* case of constructive discharge. *Id.* at 27-28. To be specific, "Serrano considers the move from comptroller to 'retail manager' to be a devastating change in status, but cannot point to specific problems that would arise, other than the fact that she is unqualified to 'push' merchandise." *Id.* at 27. The court

- 34 -

quoted its definition of "constructive discharge" from *Rosado*, and said that loss of prestige alone is insufficient to constitute a "constructive discharge." *Id.*

Both *Rosado* and *Serrano-Cruz* actually strengthen Loftus's argument that he was "constructively discharged." Loftus not only felt humiliated and intimidated by the transfer to Chief Mate, but testified that it would have been impractical for him to operate effectively in that role. TR at 213. For one, Loftus said that the transfer would have prevented him from gaining respect from his crew, which is a critical component of operating effectively as Chief Mate considering he would have been the primary safety officer on the ship. *Id.* Further, a Chief Mate's responsibilities are much more physically demanding than a Master's, which is why the position is generally filled by young people. *Id.* Loftus is sixty-six-years-old and would have physically struggled to carry out the duties essential to the Chief Mate's role. *See id.* Finally, Loftus testified it would have been challenging and uncomfortable to work second in command to another Master given he was one of the most senior Masters in the Horizon fleet preceding his discipline. *Id.*

The record supports Loftus's argument that it would have been difficult for him to perform successfully as Chief Mate. Becker, for example, opined as follows:

> Demoting Captain Loftus from a Master to a Chief Mate would be devastating. He would be looked upon as a failure by his peers, he would be subjected to more physical labor than he has experienced in several years, and he would lose the respect of the seaman working under him and have a difficult time getting them to carry out their assigned duties.

CX-32 at 197. A Master, for example, administers the vessel, and Chief Mate, among other physically demanding tasks, stands watch for eight hours, oversees the Deck Gang, reads the reefers, and is called out for vessel arrivals and departures. CX-32 at 197-98. Captain O'Halloran explained that the Chief Mate is second in command on the vessel and needs complete respect from the entire crew to promote and maintain a superior safety climate, which Loftus would never achieve after being removed from his position as Master. CX-33 at 209.

Further, the Chief Mate positions offered to Loftus would have transferred him to nonpermanent positions on completely different runs. One job was to serve as temporary relief Chief Mate on the Horizon Navigator, which traveled to Puerto Rico. RX-30; TR at 739-40. The second job was a similar position on the Horizon Pacific – a West Coast ship also in an alternative trade lane. RX-33; TR at 740. Horizon acknowledged that it offered the West Coast

- 35 -

position to Loftus because his unfamiliarity with the crew could ease the transition into the demoted position. TR at 740-741. Additionally, Loftus accepting either position would have resulted in him taking a significant pay cut.

For the foregoing reasons, I find that Loftus was constructively discharged when offered the Chief Mate positions because his new duties as Chief Mate would have been so difficult and demanding that a reasonable person in his shoes would have felt compelled to resign. Loftus's salary and benefits at the time of his discipline totaled $313,708.32 per year. CX-37 at 288; CX-37A; TR at 210-13. Horizon ceased operations on January 15, 2015. TR at 217-18, 394-95, 464. If Loftus continued working as Master and chose to retire when Horizon stopped operating in January of 2015, he would have received $100,000 as a severance payment. TR at 323, 744. Because I do not find that Loftus is entitled to front pay for reasons discussed later in this opinion, I find that he should be awarded $655,198.90 plus interest compounded on a daily basis, which represents the following: $555,198.90 in lost wages and benefits from his removal as Master on May 28, 2013 up until Horizon ceased operations on January 15, 2015, plus a severance payment of $100,000. CX-37 at 288; CX-37A.

Horizon argues further that even if Loftus is entitled to back pay, the amount should be reduced because he failed to mitigate his damages. An unlawfully discharged employee is burdened with mitigating damages by seeking suitable alternative employment. *Parrish v. Immanuel Med. Ctr.*, 92 F.3d 727, 735 (8th Cir. 1996); *Abdur-Rahman v. Dekalb Cty.*, ARB Nos. 12-064, -067, ALJ Nos. 2006-WPC-2 & 3 (ARB Oct. 9, 2014). It is Horizon's burden to demonstrate that the back pay award should be reduced for Loftus's failure to mitigate his damages. *Johnson*, ARB No. 99-111, slip op. at 14.

Horizon has not satisfied its burden of demonstrating that Loftus failed to mitigate his damages. Loftus testified that he has been unemployed since Horizon demoted him on May 28, 2013. TR at 214-15. Since then, Loftus has flown to Houston and visited nine drilling companies in an attempt to get involved with the oil and gas industry. TR at 214. Loftus explains that he had some productive discussions with Nobel Drilling. *Id.* Likewise, Loftus says he developed a good rapport with individuals at Hornbeck Marine and Edison Chouest. *Id.* Loftus even took a week long course at the Kongsberg School for Dynamic Positioning that cost him approximately $6,000. TR at 214-15. While none of Loftus's leads ultimately panned out, I

- 36 -

find that he satisfied his duty to mitigate damages, and therefore, no amount will be deducted from his backpay award.  TR at 215.

II.    Front Pay

Loftus is not entitled to front pay.  Front pay is an appropriate remedy under the SPA when reinstatement is impossible or impractical.  *Williams*, ARB No. 09-092, slip op. at 10; *Mendenhall Acquisition Corp.*, ARB No. 04-014, slip op. at 8.  "The person discriminated against should only recover damages for the period of time he would have worked but for wrongful termination; he should not recover damages for the time after which his employment would have ended for a nondiscriminatory reason." *Blackburn*, 982 F.2d at 129; *see also Bartek v. Urban Redevelopment Auth.*, 882 F.2d 739, 747 (3d Cir. 1989) ("Since . . . [the plaintiff] was not precluded from a position that he was entitled to at the time of judgment, the district court correctly denied him front pay damages."); *Martinez v. El Paso Cty.*, 710 F.2d 1102, 1106 (5th Cir. 1983) (affirming reduction of back pay award where job at issue was eliminated). Furthermore, front pay awards cannot be unduly speculative.  *Mendenhall Acquisition Corp.*, ARB No. 04-014, slip op. at 10.  Litigants seeking front pay must provide the trier of fact "with the essential data necessary to calculate a reasonably certain front pay award" including the amount, length of time, and applicable discount rate of the award.  *Mendenhall Acquisition Corp.*, ARB No. 04-014, slip op. at 9-10, *quoting McKnight v. Gen. Motors Corp.*, 973 F.2d 1366, 1372 (7th Cir. 1992) (internal quotations omitted).

Here, no position exists for which Loftus is being unlawfully denied.  It is uncontroverted that Loftus's position was eliminated in January of 2015 when Horizon ceased operations.  TR at 212, 744.  Loftus contends that the Master position existed at the *time of the retaliatory action*; however, the critical period I must consider in determining whether a front pay award is appropriate is at the *time of trial*.  Where Horizon stopped operating in January of 2015, Loftus's position no longer existed at the time of trial in May of 2015.  TR at 212, 323, 744.  An award of front pay is intended to make Loftus whole – not to put him in a better position than he would have been in had Horizon not unlawfully retaliated against him.  *See Blackburn*, 982 F.2d at 129. Even had Horizon not retaliated against Loftus, he would have only maintained his employment with Horizon until January of 2015.  *See* TR at 212, 323, 744.

Even if Horizon still had a position for Loftus which was being unlawfully denied at the time of trial, his claim for front pay is still unduly speculative.  Loftus argues that he planned on

- 37 -

working until approximately 2024, which is when he will turn seventy-five years old. Compl. Br. at 30. During trial, however, Loftus testified that he has Parkinson's disease. TR at 348. Loftus admits that Parkinson's is a progressive degenerative disease that can affect the mobility of various body parts. TR at 348-49. At the time of trial, Loftus was already experiencing tremors in his right hand and foot. TR at 349. While Loftus claims he has "20 good years" left, he is not a medical expert. TR at 350. Without a medical expert opinion supporting his claim to twenty good years, an award of front pay here would be too speculative. Accordingly, I find that an award of front pay is not appropriate here.

III.   Compensatory Damages

Loftus is entitled to $10,000 in compensatory damages for emotional harm. The STAA, and in turn the SPA, does not define "compensatory damages." *Hobson v. Combined Transport, Inc.*, ARB Nos. 06-016, -053, ALJ No. 2005-STA-035, slip op. at 7 (ARB Jan. 31, 2008). Consequently, the ARB has looked to BLACK'S LAW DICTIONARY for guidance, which defines the term as "[d]amages sufficient in amount to indemnify the injured person for the loss suffered." *Id.* (internal quotation marks omitted), *quoting* BLACK'S LAW DICTIONARY 416 (8th ed. 2004). "Compensatory damages" is synonymous with "actual damages," which is money awarded to "compensate for a proven injury or loss; damages that repay actual losses." *Id.* (internal quotation marks omitted), *quoting* BLACK'S LAW DICTIONARY 416 (8th ed. 2004). The underlying goal of compensatory damages is to compensate individuals for not only pecuniary losses, but also for harms including emotional distress, personal humiliation, mental anguish, and loss of reputation. *See, e.g., Rosado*, 562 F.2d at 120-21; *Hobson*, ARB Nos. 06-016, -053, slip op. at 7; *Simon v. Sancken Trucking Co.*, ARB Nos. 06-039, -088, ALJ No. 2005-STA-040, slip op. at 8 (ARB Nov. 30, 2007); *Hobby v. Georgia Power Co.*, ARB Nos. 98-166, -169, ALJ No. 90-ERA-30, slip op. at 30 (ARB Feb. 9, 2001).

It is Loftus's burden to demonstrate by a preponderance of the evidence that he suffered emotional harm caused by Horizon's unlawful retaliation against him. *See Simon*, ARB Nos. 06-039, -088, slip op. at 8. Awards for emotional damages "generally require that a plaintiff demonstrate both (1) objective manifestation of distress, e.g., sleeplessness, anxiety, embarrassment, depression, harassment over a protracted period, feelings of isolation, and (2) a causal connection between the violation and the distress." *Simon*, ARB Nos. 06-039, -088, slip op. at 8, *quoting Martin v. Dep't of the Army*, ARB No. 96-131, ALJ No. 1993-SWD-001, slip

- 38 -

op. at 17 (ARB July 30, 1999) (internal quotations omitted). Reasonable compensatory awards for emotional distress can be based upon Loftus's testimony alone, and there is no fixed limit on the amount that can be awarded. *See Hobson*, ARB No. 06-016, -053, slip op. at 8; *Hobby*, ARB No. 98-166, slip op. at 31.

In establishing an appropriate amount of compensatory damages, it is instructive to compare awards issued in similar cases including those issued under alternative discrimination or discrimination-related statutes. *Hobby*, ARB No. 98-166, slip op. at 31. In *Hobson*, for example, an ALJ awarded an STAA whistleblower $5,000 for the anxiety and stress he experienced as a result of his unlawful discharge. ARB No. 06-016, -053, slip op. at 8. The ARB upheld the ALJ's award by reasoning it was supported by substantial evidence where "Hobson testified that he suffered emotional distress. And although Hobson's testimony was unsupported by medical evidence, it was also unrefuted and, according to the ALJ, credible." *Id.* at 8-9.

Conversely, in *Simon*, an ALJ awarded a successful STAA whistleblower $5,000 for emotional harm and the ARB reversed the award. ARB Nos. 06-039, -088, slip op. at 8. The ARB determined that the award was not supported by substantial evidence considering the plaintiff did not testify about any emotional distress or humiliation he suffered nor was there any documentary evidence supporting mental anguish or loss of reputation. *Id.* Similarly, in *Rosado*, the district court found that the plaintiff was constructively discharged and awarded $10,000 in compensatory damages for emotional harm. 562 F.2d at 120-21. Before ultimately remanding the case, the First Circuit Court of Appeals suggested the award was clearly excessive based on the evidence presented, which merely showed that the plaintiff experienced some pressure and embarrassment. *Id.*

- 39 -

The record as a whole supports awarding Loftus compensatory damages for emotional distress.[8]  Loftus testified credibly that after Horizon removed him as Master he suffered from anxiety, sleeplessness, and humiliation.  TR at 215.  Additionally, Loftus said that his situation with Horizon weighs on his mind constantly, in part, because he would like to clear his name.  TR at 216.  As he put it, "I've had an unblemished career, and they've slandered my name horribly."  TR at 216.  Before Horizon's adverse action toward him, Loftus had a well-supported reputation for being a Master who always put his crew and safety first.  CX-35 at 255.  Captain James Staples wrote in his report, "I never sailed with Captain Loftus, but have heard of his exemplary care and attitude towards the safety of his crew and vessel."  CX-35 at 255.  Loftus's concerns about his tarnished reputation are legitimate considering how small the U.S. Flag marine industry is, and how quickly word travels within it.  *See* CX-32 at 197; TR at 215.  Marine experts Becker, O'Halloran, and Staples unanimously agreed that Loftus's discipline would have made it very difficult for him to function effectively as Chief Mate given the inherent lack of respect he would garnish from his crew.  CX-32 at 197; CX-33 at 209; CX-35 at 255.

Horizon only exacerbated Loftus's humiliation and emotional distress through the method by which it imposed the adverse action against him.  After his demotion, Horizon refused to allow Loftus to personally obtain his belongings from the Trader.  TR at 209.  Instead, Horizon directed the crew of the Trader to search, pack, and deliver six years' worth of Loftus's

---

[8] I acknowledge that Loftus spent approximately $6,000 in an effort to secure alternative employment; however, the evidence does not support awarding him a compensatory award for pecuniary losses in that amount.  In *Hobson*, for example, in addition to awarding compensatory damages for emotional distress, the ALJ awarded the complainant $20,000 for money he spent to buy a tractor in securing alternative employment.  *Hobson*, ARB No. 06-016, -053, slip op. at 8.  The ARB reversed the pecuniary award based on the following:

> Hobson did not prove that he suffered the actual loss of a $20,000 tractor as a result of being unlawfully discharged.  Rather, he chose to buy the $20,000 tractor to go to work for Moore Freight in June 2005.  Awarding Hobson $20,000 for the tractor does not restore Hobson to the same position he would have had but for the discharge.  Instead, it amounts to a windfall.

*Id.*  Here, Loftus traveled to Houston to speak with representatives from gas and oil companies, and also took a week long course at his own expense.  TR at 214.  Similar to *Hobson*, however, Loftus did not prove that he suffered the foregoing losses as a direct result of his constructive discharge from Horizon.  Instead, the evidence supports that Loftus flew to Houston and took a week long course so that he could secure a position working in the oil industry.  *Id.*  In *Hobson*, the ARB was unpersuaded by the plaintiff's argument that "but for" his unlawful discharge he would not have been put in a position where it was necessary to buy a $20,000 tractor.  *See Hobson*, ARB No. 06-016, slip op. at 8.  Where I am bound by the ARB's decision in *Hobson*, I too must find that Loftus's testimony that he spent $6,000 to take a week long course in seeking alternative employment is insufficient by itself to warrant a pecuniary damages award for that amount.  Awarding Loftus $6,000 for the course will not restore him to the same position he would have been in but for his discharge.

- 40 -

personal belongings to him while he waited on the dock. *Id.* Loftus testified, "I had to unpack it, open up all the boxes, throw out stuff on the dock. I couldn't possibly get it all in my car. It was just a big humiliation and intimidation scene for everybody to see." *Id.* Given the totality of the evidence on this score, I find that Loftus is entitled to $10,000 for his emotional harm.

IV.     Punitive Damages

Loftus is entitled to $225,000 in punitive damages. It is well-established that there are both procedural and substantive limitations on the amount of punitive damages that I can award. *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 416 (2003); *Cooper Indus., Inc. v. Leatherman Tool Group, Inc.*, 532 U.S. 424, 432, 434-35 (2001); *BMW of N. Am. v. Gore*, 517 U.S. 559, 559, 575 (1996). "Elementary notions of fairness enshrined in our constitutional jurisprudence dictate that a person receive fair notice not only of the conduct that will subject him to punishment, but also of the severity of the penalty" that may be imposed. *Campbell*, 538 U.S. at 417. A grossly excessive punitive damages award, for example, bolsters no legitimate purpose and serves as an arbitrary deprivation of property. *Id.*; *Pacific Mut. Life Insur. Co. v. Haslip*, 499 U.S. 1, 42 (1991). Hence, I must consider the following three guideposts in determining the appropriateness of a punitive damages award in this case:

> (1) the degree of reprehensibility of the defendant's misconduct;
> (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and
> (3) the difference between the punitive damages awarded . . . and the civil penalties authorized or imposed in comparable cases.

*Campbell*, 538 U.S. at 418. *See also Cooper*, 532 U.S. at 424; *Gore*, 517 U.S. at 559, 575.

Neither the SPA nor its corresponding regulations contain any guidance on when awarding punitive damages is warranted or how to calculate an equitable amount. *Youngermann v. United Parcel Serv., Inc.*, ARB No. 11-056, ALJ No. 2010-STA-047, slip op. at 4 (ARB Feb. 27, 2013). Likewise, U.S. Department of Labor jurisprudence concerning punitive damages awards in whistleblower cases, and the SPA in particular, is limited. In light of the foregoing, Title VII precedent is a valuable source of guidance. *Id.* Specifically, the ARB highlighted the following in *Youngermann*:

> Recourse to Title VII case law to assist in our adjudication of punitive damage awards under whistleblower statutes is particularly instructive given the similar purposes of promoting prevention and remediation in the two Acts, coupled with the fact that Title VII punitive damage provisions, like those under STAA, contain statutory caps on punitive damage awards.

- 41 -

*Id.* I do acknowledge, however, that significant differences exist between whistleblower statutes and other antidiscrimination laws, so I will not adopt such principles absent "careful and critical examination." *Id.* (internal quotations omitted), *quoting Williams*, ARB No. 09-018, slip op. at 12-13 n.59, *quoting Fed. Exp. Corp. v. Holowecki*, 552 U.S. 389, 393 (2008). With all of the preceding considerations in mind, I address the critical guideposts in determining an appropriate punitive damages award.

### 1. *Reprehensibility*

Horizon's conduct was reprehensible. "[T]he most important indicium of the reasonableness of a punitive damages award is the degree of reprehensibility of the defendant's conduct." *Campbell*, 538 U.S. at 419; *Gore*, 517 U.S. at 575. The United States Supreme Court has instructed courts to consider the following in establishing reprehensibility: whether the harm suffered by the plaintiff was economic or physical; whether the defendant's conduct demonstrated a reckless disregard or indifference to the safety or health of others; whether the plaintiff was financially vulnerable; whether the defendant's conduct was habitual as opposed to an isolated incident; and whether the defendant acted with intentional malice, deceit, trickery, or mere accident. *Campbell*, 538 U.S. at 419; *Gore*, 517 U.S. at 576-77. The mere existence of one of the foregoing factors does not necessarily warrant a punitive damages award, and the absence of all of the preceding factors renders a punitive damages award suspect. *Campbell*, 538 U.S. at 419; *Gore*, 517 U.S. at 575. It is presumed that Loftus is made whole for the harm he has suffered by compensatory damages, so punitive damages should only be awarded if Horizon's conduct is so reprehensible as to justify imposing further sanctions to achieve punishment or deterrence. *Campbell*, 538 U.S. at 419; *Gore*, 517 U.S. at 575.

I find that Horizon's persistent indifference to Loftus's safety concerns was unreasonable. Over the course of several years, Loftus made repeated attempts to have Horizon address safety issues on board the Trader, but to no avail; as a result, he was forced to contact regulatory agencies as a last ditch effort to bring the ship into compliance with regulations. *See* CX-1 at 1-7; CX-2 at 8-10; TR at 149-51, 158-59. Loftus's final contact with the USCG and ABS concerned a conflict between drug testing requirements and safety as it pertained to the McCarthy incident. CX-15 at 99-100 (RX-26); CX-16 at 101-04 (RX-27); TR at 196-97, 202, 362, 368, 414, 665. Horizon personnel admitted that Loftus was in the best position to evaluate whether it was safe to perform drug tests at the time and he ultimately determined that it was not.

- 42 -

CX-15 at 99 (RX-26). Yet, shoreside personnel nevertheless demanded at least nine times that Loftus perform drug tests – all of which occurred while he sailed through what many people deemed the storm of the century. CX-25 at 164-69; CX-25A; TR at 183, 189.

Contrary to what Horizon argues, there is no question that Loftus was well aware of his authority and responsibilities as Master, which is clear from his clean track record and stellar reputation. Rather, Loftus was worried about an inexperienced Master getting distracted by shore side personnel's unreasonable demands to perform drug testing when it was not safe to do so. *See* CX-25 at 164-69; CX-25A; CX-15 at 99-100 (RX-26); CX-16 at 101-04 (RX-27); TR at 200. Instead of focusing on the real issue at hand – namely, the conflict between drug testing requirements and safety – Horizon latched onto the McCarthy incident as pretext for Loftus's termination. *See* CX-8 at 49 (RX-3 & RX-22). Additionally, the manner in which Horizon arranged to deliver Captain Loftus's personal belongings after his demotion (termination) was calculated to inflict further harm and humiliation to him. Having the crew he once directed pack and deliver six years' worth of belongings to Captain Loftus on the dock adjacent to the ship he once commanded, exhibits extreme disregard for Loftus's emotional well-being.

The need to deter others from engaging in similar conduct is uniquely critical in the SPA whistleblower context given such claims involve public safety, and an adverse outcome "may have a chilling effect on the willingness of other seamen to report a violation." *Gaffney*, 451 F.3d at 464-65. This is especially true considering how small the marine industry is, and how quickly word travels within it. CX-32 at 197; TR at 215. Horizon's retaliation against Loftus is exceptionally troublesome considering his reputation for being an exemplar of safety, which is exactly what the SPA is designed to promote. CX-40 at 291.

Horizon went to great lengths to cloak its wrongful actions with the appearance of legitimacy, adding to the reprehensibility of its conduct. Its decision to engage in adverse conduct was cast well before any investigation was complete. The investigations distorted the facts to hide the true reasons for Horizon's adverse actions. By admission of former Horizon employee, Walcott Becker, Horizon was out to fire Captain Loftus because of all the CARs he filed as well as his repeated reports to regulatory authorities. Indeed, Andrew Phillips reprimanded Loftus for reporting safety concerns to regulatory agencies instructing him to contact Horizon first so that it looks like the company knows what it is doing. Such a policy is

- 43 -

contrary to the intent of the SPA and is further evidence of why Horizon's conduct is reprehensible.

### 2. *Disparity Between Compensatory Award and Punitive Damages*

The ratio between compensatory and punitive damages here is reasonable. The Supreme Court has refused to develop any bright lined rule concerning the permissible ratio between compensatory and punitive damages, but has nevertheless indicated awards exceeding a single-digit ratio might be subject to constitutional challenge. *Campbell*, 538 U.S. at 425, 429 (reversing and remanding $145 million punitive damages award where compensatory damages were only $100 million). There was a 2.35:1 punitive to compensatory damages ratio in *Gaffney*, and a 2.89:1 ratio in *Polek v. Grand River Navigation*, 872 F. Supp. 2d 582, 590 (E. Dist. of Mich. 2012) – two comparable SPA whistleblower cases. *Gaffney*, 451 F.3d at 440 n.16; *see also Tisdale v. Fed. Express Corp.*, 415 F.3d 516, 520-21 (6th Cir. 2005) (affirming punitive damages award in Title VII case that was almost seven times the back pay award). Here, the damages for back pay and emotional distress equal $665,198, yielding a 1:2.95 ratio of punitive to compensatory damages. Based on precedent as well as the Supreme Court's guidance that ratios not exceed single digits, I find that the ratio here is reasonable.

### 3. *Comparable Cases*

Awarding Loftus $225,000 in punitive damages is within the bounds of reasonableness based on comparable cases. There is minimal SPA precedent and even fewer SPA cases analyzing punitive damages awards; however, the jurisprudence that does exist supports such an award in this case. In *Gaffney*, for example, ten licensed merchant marine officers of a large 2,803 gross ton gaming vessel, the *M/V Showboat*, alleged that they were terminated in retaliation for reporting safety concerns to the USCG. 451 F.3d at 431-32. Specifically, the officers wrote a letter expressing concern that "the relaxation of licensing requirements for the engineers on the *M/V Showboat* . . . substantially reduces passenger safety by not requiring experienced personnel to crew the vessel." *Id.* at 433. The named plaintiff testified that the letter was sent to the USCG for clarification on licensing requirements. *Id.* There was additional correspondence with the USCG following the initial contact, but the focus of the appeal was the last letter sent where the plaintiffs requested a thirty-day extension to file an appeal that challenged the relaxation of the *M/V Showboat's* licensing requirements. *Id.* at 433. At some point, the plaintiffs discussed their concerns with management, and Riverboat was made aware

- 44 -

of the plaintiffs' protected activity. *Id.* at 435. Thereafter, the defendant sent the plaintiffs termination letters – some of which listed the plaintiffs' protected activity as the reason for termination. *Id.* at 436.

The Seventh Circuit affirmed a punitive damages award totaling $200,000 – $25,000 for each of the prevailing plaintiffs. *Gaffney*, 451 F.3d at 465. The court said that the award was within the bounds of reason because the lower court did not abuse its discretion by finding the defendant acted willfully and wantonly in terminating the plaintiffs. *Id.* at 464-65. One finding, for example, was that the defendant did not reconsider its adverse action against the plaintiffs upon learning that it was unlawful to terminate employees for reporting safety concerns to the USCG. *Id.* at 463-64. Moreover, the defendant specifically removed the offending language from some of the termination letters suggesting it knew its conduct was seriously wrong, but terminated the plaintiffs anyways. *Id.*

Similarly, in *Polek*, the plaintiff alleged that he was terminated in retaliation for his good faith report to the USCG regarding safety concerns. 872 F. Supp. 2d at 583. Specifically, the plaintiff reported a hull fracture to the USCG where "[d]espite Plaintiff repeatedly expressing his concern not only for his own safety, but the safety of his fellow shipmates, Defendant disregarded his legitimate concerns." *Id.* at 589. The defendant did not try to ascertain the nature and extent of the hull fracture yet continued to operate the vessel. *Id.* Instead, the defendant ignored the plaintiff's concerns deeming them the "non-sensical ravings of a junior engineer," and encouraged him to quit if he did not feel safe. *Id.* (internal citation omitted). After reporting to the USCG, the defendant fired the plaintiff and he took an out-of-state job working in oil fields. *Id.*

The court ultimately upheld a $100,000 punitive damages award. *Id.* at 591. In doing so, the court reasoned that despite securing new employment within three months, the defendant put the plaintiff in a financially vulnerable position by forcing him to find a new job during a recession with a termination on his record. *Id.* Moreover, the event leading to the plaintiff's termination was not an isolated incident, and conversations with and concerning the plaintiff could have been interpreted as malicious. *Polek*, 872 F. Supp. 2d at 589. Lastly, the defendant blatantly disregarded the plaintiff's safety concerns. *Id.*

This case is comparable to *Gaffney* and *Polek*. For example, a member of Loftus's disciplinary team was Horizon's General Counsel, Michael Zenden, who should have known that

- 45 -

it was unlawful to terminate Loftus for reporting safety concerns to the USCG and ABS. *See* RX-32 at 113; TR at 368-71. This is further supported by Becker's testimony that he knew Loftus could not be fired for reporting safety concerns to the USCG and ABS; while Becker played no disciplinary role, his awareness of this prohibition highlights how likely it is that Horizon's management was also aware of the illegality of disciplining Loftus for his protected activity. *See* TR at 353-54. Nevertheless, Horizon constructively discharged Loftus for engaging in protected activity and attempted to conceal the true nature of its retaliation. *See* CX-8 at 49 (RX-3 & RX-22).

Further, the events leading up to Loftus's termination were not isolated. *See* CX-1 at 1-7; CX-2 at 8-10; CX-5 at 28-45. Horizon's inaction in addressing Loftus's safety concerns was an ongoing occurrence dating back as far as the early 2000s. *See* CX-1 at 1-7; CX-2 at 7-10; CX-5 at 28-45. Horizon repeatedly ignored Loftus's requests for corrective action aboard the Trader until it had to act because of regulatory agency interference. *See* CX-1 at 1-7; CX-2 at 7-10; CX-5 at 28-45. Finally, Horizon put Loftus in a particularly vulnerable position financially where he is not only sixty-six-years-old, but also has Parkinson's disease. TR at 147-48, 348-49. Wherefore, I find that awarding Loftus $225,000 in punitive damages is reasonable under the circumstances of this case.

V.    Interest

Loftus is entitled to interest on his back pay award. Under 29 C.F.R. § 20.58(a), the Secretary of Labor instructs that "[t]he rate of interest prescribed in section 6621 of the Internal Revenue Code shall be sought for backwages recovered in litigation by the Department." *See also Mendenhall Acquisition Corp.*, ARB No. 04-014, slip op. at 10; *Drew v. Alpine, Inc.*, ARB No. 02-044, 02-079, ALJ No. 2001-STA-47, slip op. at 4 (ARB June 30, 2003). In turn, 26 U.S.C. § 6621(a) provides that "[t]he underpayment rate established under this section shall be the sum of . . . the Federal short-term rate determined under subsection (b), plus . . . 3 percentage points." Moreover, the interest accrues, compounded daily, until Horizon pays Loftus the damages award. *See Jackson Hosp. Corp. v. United Steel, Paper & Forestry, Rubber, Mfg., Energy, Allied Indus. & Serv. Workers Int'l Union*, 356 NLRB No. 8, 2010 WL 4318371, at *3-4 (2010); *see also* 78 Fed. Reg. 8390, 8404 (Feb. 6, 2013).

VI.   Costs and Attorney Fees

Loftus is entitled to reasonable litigation costs including attorney fees.  Under 49 U.S.C. § 31105, "the Secretary of Labor may assess against the person against whom the order is issued the costs (including attorney fees) reasonably incurred by the complainant in bringing the complaint."  On July 31, 2015, Loftus filed a fee application.  Horizon has thirty days from the date of this order to file any opposition to the fee requested.

## VIII.   Order

Based upon the foregoing, I find that Horizon violated Loftus's right to be free from retaliation under the Seaman's Protection Act.  *See* 46 U.S.C. § 2114(a).  Loftus proved by a preponderance of the evidence that he engaged in protected activity in October of 2011, August of 2012, and February and April of 2013, by reporting and threatening to report to the regulatory agencies what he believed to be safety violations aboard the Horizon Trader.  I also find that Horizon knew of Loftus's protected activity and that his protected activity was a contributing factor in Horizon's decision to take adverse action against him.  Horizon did not prove by clear and convincing evidence that it would have disciplined Loftus notwithstanding his protected activity.  Accordingly, it is hereby ORDERED that:

1.  Horizon Lines, Inc. and Matson Alaska, Inc. shall pay John R. Loftus $655,198.90 in back pay plus interest compounded on a daily basis.

2.  Horizon Lines, Inc. and Matson Alaska, Inc. shall pay John R. Loftus compensatory damages in the amount of $10,000 for his emotional distress resulting from Horizon's adverse action against him;

3.  Horizon Lines, Inc. and Matson Alaska, Inc. shall pay John R. Loftus punitive damages in the amount of $225,000; and

4.  Horizon Lines, Inc. and Matson Alaska, Inc. shall pay John R. Loftus's reasonable attorney's fees and costs.  Should the Respondent object to any fees or costs requested in the pending fee application, the parties shall discuss and attempt to informally resolve the objections.  Any agreement reached between the parties as a result of these discussions shall be filed in the form of a stipulation.  In the event that the parties are unable to resolve all issues relating to the requested fees and costs, the Respondent's objection shall be filed not later than **30 days** following service of this Decision and Order.  **Any objection must be accompanied by a certification that the objecting party**

- 47 -

made a good faith effort to resolve the issues with the **Complainant** prior
to the filing of the objection.

**SO ORDERED.**



Digitally signed by JONATHAN
CALIANOS
DN: CN=JONATHAN CALIANOS,
OU=ADMINISTRATIVE LAW JUDGE,
O=US DOL Office of Administrative Law
Judges, L=Boston, S=MA, C=US
Location: Washington DC

**JONATHAN C. CALIANOS**
Administrative Law Judge

Boston, Massachusetts

APPENDIX 103

**DIAMOND**

## SUPERVISOR'S
## CONFERENCE RECORD

Date: _2-Jun-15_

**From:** Supervisor: _Michael Williams_    Position: _Maintenance Supervisor_

Department/Rig: _Ocean Endeavor_    Location: _Flamingo I_

Employee

**About:** Employee: _James Patterson_    Position: Electroonic Technician 1 ID #: _19714_

**Reason for Conference:** _____ Verbal    _X_ Written

_____ Promotion Readiness    _____ Safety    _____ Misconduct    _____ Attendance

_____ Commendation    _____ Work Performance    _X_ Policy Violation    _____ Other _____

1.    Subject of discussion:
On the morning of June 1 at 0219 hours James along with the rig electrician and rig mechanic were testing the reverse power circuit. This was being done in preparation for the upcoming ABS inspection. When the test was performed the rig went in the dark, because the JSA was not followed. There was no permit to work filled out and the JSA (Elect-0071) was not printed out or procedure in the JSA followed. This work was on critical rig equipment and the rig went on downtime because of this. Rig operations and safety were compromised due to their negligence.

2.    Previous conferences (subject & date):
October 25 2014, for work preformance

3.    Standards expected/corrective action required:
Permit to work and a JSA should have been performed and followed this would have prevented the rig's power failure. SEMS 3.5 Job Safety Analysis -The JSA shall be applied to all safety-critical jobs, tasks and procedures, and no completely new task will be performed without a JSA being completed. JSAs will be completed for at least every task listed on the JSA task list. SEMS 3.4 PTW policy-The objective of the system is to ensure that certain work is adequately defined, planned and authorized, and the hazards are identified and a mechanism exists for their control.   Continued on next page.

4.    Consequences of not meeting above standards:

**Employee Comments:** _____ I do not agree with the above statements.    _____ I agree with the above statements.

I have read and received a copy of this report.

Employee Signature

**Recommended Personnel Action:**    *(Please note that all proposed actions require Personnel Department review.)*

_____ Promotion    _____ Demotion    _____ Probation    _X_ Termination    _____ None at this time

Supervisor: _____    Safety Rep.: _____

OIM/Toolpusher: _____    Department Mgr.: _____

Personnel Mgr.: _____    Department VP.: _____

3-Aug-10

**DIAMOND**

**SUPERVISOR'S CONFERENCE RECORD**

Date: 2-Jun-15

**From:** Supervisor: Michael Williams

Department/Rig: Ocean Endeavor

Position: Maintenance Supervisor

Location: Flamingo 1

**About:** Employee: Antonio May

Position: Electrician 1

Employee ID #: 16679

**Reason for Conference:** _____ Verbal    X Written

_____ Promotion Readiness    _____ Safety    _____ Misconduct    _____ Attendance

_____ Commendation    _____ Work Performance    X Policy Violation    _____ Other _____

1.    Subject of discussion:
On the morning of June 1 at 0219 hours Antonio along with the rig electronics technician and rig mechanic were testing the reverse power circuit. This was being done in prepartion for the upcoming ABS inspection. When the test was performed the rig went in the dark, because the JSA was not followed. There was no permit to work filled out and the JSA (Elect-0071) was not printed out or procedure in the JSA followed. This work was on critical rig equipment and the rig went on downtime because of this. Rig operations and safety were compromised due to their negligence.

2.    Previous conferences (subject & date):
Feb. 26, 2013 Work preformance

3.    Standards expected/corrective action required:
Permit to work and a JSA should have been performed and followed this would have prevented the rig's power failure. SEMS 3.5 Job Safety Analysis -The JSA shall be applied to all safety-critical jobs, tasks and procedures, and no completely new task will be performed without a JSA being completed. JSAs will be completed for at least every task listed on the JSA task list. SEMS 3.4 PTW policy-The objective of the system is to ensure that certain work is adequately defined, planned and authorized, and the hazards are identified and a mechanism exists for their control.    Continued on next page.

4.    Consequences of not meeting above standards:

**Employee Comments:** _____ I do not agree with the above statements.    _____ I agree with the above statements.

I have read and received a copy of this report.    Refuse to sign

Employee Signature

**Recommended Personnel Action:**    *(Please note that all proposed actions require Personnel Department review.)*

_____ Promotion    _____ Demotion    _____ Probation    X Termination    _____ None at this time

Supervisor: _____    Safety Rep.: _____

OIM/Toolpusher: _____    Department Mgr.: _____

Personnel Mgr.: _____    Department VP.: _____

3-Aug-10

# SUPERVISOR'S
# CONFERENCE RECORD

**DIAMOND** O F F S H O R E

Date: _02-Jun-15_

**From:** Supervisor: Michael Williams  Position: _Maintenance Supervisor_
Department/Rig: Ocean Endeavor  Location: _Flamongo-1_

**About:** Employee: _Kenneth Johnson_  Position: Mechanic 1 Employee ID #: _16091_

**Reason for Conference:** __X__ Verbal  _____ Written

_____ Promotion Readiness _____ Safety _____ Misconduct _____ Attendance

_____ Commendation _____ Work Performance _____ Policy Violation _____ Other

1. __Subject of discussion:__
Kenneth was requested to assit some other crew members with a job they were doing. Later it was determined that the other crew did not do a permit to work and did not go over the JSA for that job.

2. __Previous conferences (subject & date):__
None

3. __Standards expected/corrective action required:__
When someone request Kenneth to assist with a job, he should check the PTW and JSA before assisting on any job. If the paperwork is not correct then he should refuse to proceed until all procedures and paperwork are in place.

4. __Consequences of not meeting above standards:__
Disciplinary actions up to and including termination.

**Employee Comments:** _____ I do not agree with the above statements. __✓__ I agree with the above statements.

I have read and received a copy of this report.  _____
              Employee Signature

**Recommended Personnel Action:** *(Please note that all proposed actions require Personnel Department review.)*

_____ Promotion _____ Demotion _____ Probation _____ Termination __X__ None at this time

Supervisor: _Michael R Williams_  Safety Rep.: _____
OIM/Toolpusher: _____ Department Mgr.: _____
Personnel Mgr.: _____ Department VP.: _____

03-Aug-10

CONFIDENTIAL    DODI 1057

**From:** ENDEAVOR_ET
**Sent:** 09 July 2014 04:23 AM
**To:** Falke, Ken
**Subject:** Personal question

Good day Ken,

I have a very blunt question that has been weighing on me for quite some time now. I will follow up with things that have led me to ask you in this way. Am I that horrible of an ET that my job is in jeopardy? I ask because I have personally heard Mike make the following statements to us and to other people in earshot of us: "People get written up and run off for shoddy work", "I haven't run anyone off in a while", "You guys might want to get your resumes ready", "If you keep working like that you may find yourself looking for another job", "That Jimbo thinks he's so smart", "Jimbo better look out, he might not make it to Subsea" and "People are easier to replace than equipment". Following this are Mike telling Jonathan Wilborn that "Subsea made a mistake in hiring Jimbo" and when I approached him, he confirmed his doubt in my abilities. The extreme micromanagement clearly demonstrates a complete lack in trust or confidence in his people (especially electrical department). Blaming the Electricians and ETs for anything that goes wrong (our problem or not), taking credit for anything that goes right and openly criticizing us (and bragging about finally getting to write us up) to others is very demoralizing. Compounding this is showing outright distain if we have an idea that is different as there is no place for any input from us, while berating our work and threatening us with write ups and implied termination. These are clear signs that we are not meeting some unspoken goal, as discussions with him and the OIMs have not alleviated these hostile working conditions. This is the reason I put in for the Drill ships, for the new DP, for the second round of drill ships and for Subsea. With this extended delay is letting me go to Subsea, outright rejection for going to a Drill ship or the new DP and hearing that no one on this rig is deemed promotable is a clear sign that I should let my wife put my resume on Rigzone and see if anyone is interested. As Mike has told us (Electrical department), on more than one occasion, we "are lucky to have this job".

This is the reason behind my question sir, please pardon the bluntness of my question.

Very Respectfully,

Thanks and Regards,
**Jim Patterson**
Electronics Technician
Ocean Endeavor
Endeavor_et@dodi.com

Good day Ms. Dugger,

As per our conversation yesterday, I have quickly gathered some emails and done a write up rebuttal.

Electrical work v electronics work – The first aspect relates to electrical department work, as there is no specific 'Electrician department' and 'Electronics Technician departments'. My rebuttal to this first claim is that after completing all ET specific tasks, I do utilize my free time to assist the Electrician to help complete required tasks. Assisting the Electrician takes the form of helping find parts, diagnose a system issue, following Mike's orders for completing one of his personal audits or any other number of audits that come our way. This is done for safety due to night and rig conditions. Noted at the write up meeting was working on lighting, as being an issue. The stated job was manually lifting a 75 pound 1000W light near an edge, to a height of 6 feet and carefully position it on a dark platform, in the rain with lots of debris and items stored around it. Said light had a strong likelihood of causing injury to the Electrician, such as when Mike overrode my stop work authority in March and I got hurt. Collaboration allows for superior solutions, greater work output, less down time and a reduced probability of an injury or fatality. In other words, Mike Williams has ordered the Electrician and I to work separately on several occasions. These occasions we have completed our individually required tasks, but have cooperated on tasks that would be dangerous for one person to complete alone. I have been yelled at and berated for choosing to utilize my spare time (after required tasks are completed) for assisting the Electrician in Rig Work.

A good example to further drive this point:

After securing for Radio silence on the night of 19th of April, 2013 – Mike berated Antonio May and I, in from of Randy Sutfin (OIM),  because we hadn't completed the entire Marine department radio silence checklist, while screaming at us "WE'RE NOT A FUCKING UNION, YOU ARE RESPONSIBLE FOR EVERYONE'S STUFF!!!". This seems to go at odds with being written up for completing my tasks, then assisting other personnel with their workload (to keep the rig running).

As for task prioritization and time utilization, I was employed as a project engineer where I coordinated a $3 million dollar NOV facility upgrade (on time and under budget) while developing National Oilwell Varco's Lockout/Tagout program (from the ground up, early completion and with a $150 budget) while working a weekend job as a Maintenance Electrician, completing my dissertation for my Master's degree and taking care of my new born child. For a more Endeavor basis, I completed all my PMs, completed Mike's daily task lists, required shipyard work and spent over a week as the ONLY ET on the rig in the shipyard, while commissioning and several days ill, while NEVER falling behind nor requiring any overtime and I still was able to help other personnel complete their work safely (when required). Another example to provide: JK had worked on the local Drawworks panel for over 2 years before disabling it. Mike Williams ordered me to work on June 26th (as well as his other high priority shipyard items). I discovered the one cause, but was pulled off for higher priority work. I was able to work on it starting on June 30th, but did not complete it due to more pressing tasks. Mike berated me for not having completed it 100% the following morning. The next shift I had the system (which had been down for several years) back in service and tested 100% complete. Mike never mentioned a word about it.

Specifying as to the critical equipment issue, on September 4th at 17:55 (Romania time), at the pre-tower meeting I proposed redesigning the hydratong controller box (due to lack of spare parts (to be addressed later) and excessive downtime). I was met with extremely hostile resistance and yelled at (as witnessed by Antonio May and Kenny Johnson) for proposing it. This was further followed up by him bringing up the issue for lack of parts. As part of his yelling at us, he ordered us to submit orders for parts while he was there so we would get our critical spares. I have attached a copy of the 10 pages of critical spares orders I placed that night. Mike Williams was informed that these were critical spares and every single item on these 10 pages was cut. .

If Mike Williams does not deem these, nor replacing the tools required to do these jobs necessary, then by what means are we to be written up? If there is a list of critical spares he has deemed necessary for us to

order, he has not conveyed it and I am not a mind reader. I do have a difficult time grasping the justification for being written up for not anticipating that my list of critical spares would be completely cut in his presence. I do not believe that it is fair for my job to be placed in peril for this. Am I honestly expected to spend my own money and smuggle equipment to the rig?

My note taking and pass over notes are probably the best in the Ocean Endeavor Maintenance Department, feel free to ask anyone as the likely complaint is too much information. Please feel free to review RigMS and I will happily provide our daily logs, notes and daily emails since I first showed up August 2011. My turnover notes are thorough but concise as to share information of particular importance and outstanding items. Mike Williams has issue with not being able to understand all the words I use, but no other ETs have this problem. I leave myself available via phone or email should anything ever slip through the cracks. I have included three (x3) separate events used as evidence against me. The folder listed as Crane Camera (which I have made a timeline), the Anchor winch pan and tilt issue, and the Anchor winch monitor computer issue. If necessary, I will construct a timeline to give some depth and light to this.

As to directing ALL responsibility of computers (before they are even received) to me ("Jim must insure all computers are checked out and ready for installation before they go on the shelf in the store room") seems to be stretching the direct responsibility to me quite excessively. This statement carries the direct implication that it is MY responsibility alone, and that contacting him immediately upon discovering said software issue is insufficient and worth being written up for. Furthermore as to ensuring all computers and devices have proper software prior to being placed on the shelf, ETs do not receive equipment. Our Rig Manager has ordered that when a piece of equipment is checked out, it cannot be returned. We do not have the space in the ET shop to store all this equipment. When we install equipment and it does not have the required software, we inform the Maintenance Supervisor. We were not made aware that we should bypass him (and I believe he meant Electrical Superintendent, not Electronic Superintendent) to resolve software issues. As to the specific issue Mike is referring to, I have attached notes in the Anchor Winch file including his being made aware of the situation from initial installation until we received our new Anchor Winch monitoring computer. I made Mike Aware after the shift of 02-Feb-2014 when I found that there was an issue and the old hard drive was stolen from the computer in our shop.

I have already mentioned the 10 pages of critical spares that Mike watched get cut (attached to this email).

As part of being held accountable for tracing every part for every job in the Electrical department, we track the project shelf frequently (daily or every other day). The crane camera in question (resulting in this write up) was placed on order by me, entered into the unplanned work order by me, the FR was provided to Mike Williams by me. I retrieved the part out of the store room (because I happened to see it); I staged it for installation and coordinated with deck crew. I installed and tested it, followed by returning it to service and cleared it from the unplanned work orders. Several days later, I am being written up for it? Had I not placed these items in the unplanned work, would I have been written up?

The following gives some scenarios as to possible motivation to Mike Williams is fabricating evidence and falsifying blame to write me up and run me off.

I realized Mike Williams wanted to have me run off on April 9th, 2013 approximately 6:20pm – He came to the Port SCR room and ordered me to adjust the LEL gas detector so it didn't go off at such a low level (as witnessed by the Antonio May) and that "since you aren't really changing it that much, you don't need the OIM's permission". When I said "Sure, I'll go talk to Johnny and get a permit", he told me "Never mind".

This previous hitch, ordered to install lighting in the forward end of the Mud pump room. Informed Mike that there were no tie off points for installing this light 25' in the air and that GEMS does not allow the use of

ladders that high. Our order was to "Do it when no one is looking". I wrote a stop card with the GEMS reference due to the safety and violation of GEMS.

I am in a rush to submit this report as Mike Williams will retaliate against me for submitting this rebuttal. Please forgive my rushed tone and please contact me should you have any further inquiries. If necessary, I have a much more detailed log and notes. (Please note that if required, these logs primarily focus on Mike Williams overriding stop work authority, causing near misses, racial comments about Egyptians, ordering unsafe equipment returned to service and covering up when a person got injured, witnesses to said, threats of write ups, a detailed account of how he tried to sabotage me going to Subsea and all events in kind from October 30th 2012 through current). I hope that this provides you sufficient countervailing proof as to rebuff these accusations against me. I am out here trying to do my best because I work to support my family. While I am loyal to Diamond Offshore, this appears to be an effort to run me off, please just let me know so I can find another employer. I would prefer resigning to being fired over false accusations in a hostile work environment.



Jim Patterson <j27pat@gmail.com>

## Addendum to Rebuttal to write up by Mike Williams

3 messages

**ENDEAVOR_ET** <Endeavor_et@dodi.com>                Wed, Oct 29, 2014 at 1:54 PM
To: "Dugger, Janelle" <jdugger@dodi.com>
Cc: "Jim Patterson (j27pat@gmail.com)" <j27pat@gmail.com>, ENDEAVOR_OIM
<Endeavor_OIM@dodi.com>

Good day Ms Dugger,


   As an addendum to the information provided, GEMS section 1.2.3 (Handling Unsatisfactory Performance
& Behavior), the process is verbal warning, followed by written warning, then probation. As I have received
no verbal warnings (with the exception of the department audit over 26 months ago), no write ups, no
documents nor any counselling and I have not heard anything about our performance evaluations that
occurred last hitch. Due to this, it looks like Mike Williams is trying to bypass company procedures to run
me off. I am not sure if he has ever had anyone else wrongfully terminated before, but he appears to be
pushing hard to run me off by ignoring company policies and procedures. Thank you for your time and
please forgive my incessant push on this issue, but he is placing my family in jeopardy and I will not just
stand by and let him wrongfully terminate me.



Thanks and Regards,

**Jim Patterson**

Electronics Technician

Ocean Endeavor

Endeavor_et@dodi.com



---

**From:** Dugger, Janelle
**Sent:** 29 October 2014 03:43 PM
**To:** ENDEAVOR_ET
**Cc:** ENDEAVOR_OIM; Jim Patterson (j27pat@gmail.com)
**Subject:** RE: Rebuttal to write up by Mike Williams


Hi Jim,


I have received your statement and will review with my manager. I will contact you as needed.

Thank you,


*Janelle Dugger*

*Sr Staffing Coordinator*

*Direct* 281.492.5335

*Fax* 281.492.5359


**From:** ENDEAVOR_ET
**Sent:** Tuesday, October 28, 2014 11:00 PM
**To:** Dugger, Janelle
**Cc:** ENDEAVOR_OIM; Jim Patterson (j27pat@gmail.com)
**Subject:** Rebuttal to write up by Mike Williams


Thank you for your time Ms Duggar,


Attached is a my statement, rebuttal, and some quick emails to support my claims. Again, thank you for your time and for the opportunity to redress my concerns.


Very Respectfully,


Thanks and Regards,

**Jim Patterson**

Electronics Technician

Ocean Endeavor

Endeavor_et@dodi.com


---

**Jim Patterson** <j27pat@gmail.com>                              Wed, Oct 29, 2014 at 2:03 PM
To: Naquita Patterson <nslpatterson@gmail.com>

[Quoted text hidden]

---

**Jim Patterson** <j27pat@gmail.com>                              Wed, Dec 9, 2015 at 6:46 PM
To: Jim Patterson <j27pat@gmail.com>

---------- Forwarded message ----------
From: **ENDEAVOR_ET** <Endeavor_et@dodi.com>
Date: Wed, Oct 29, 2014 at 1:54 PM
Subject: Addendum to Rebuttal to write up by Mike Williams
To: "Dugger, Janelle" <jdugger@dodi.com>
Cc: "Jim Patterson (j27pat@gmail.com)" <j27pat@gmail.com>, ENDEAVOR_OIM
<Endeavor_OIM@dodi.com>

[Quoted text hidden]

2016-SPA-1
2016-SPA-2

IN THE MATTER OF

JAMES PATTERSON

and

ANTONIO MAY

Complainants

v.

DIAMOND OFFSHORE, INC.

Respondent.

## COMPLAINT

In accordance with the Notice of Hearing and Pre-Hearing Order dated November 13, 2015, Complainants file this Complaint.

I.    Principal Contentions of Fact and Law

The Department of Labor dismissed the complaint without conducting any investigation, without requiring any response from the Respondent, and without giving Complainants any opportunity to respond to the basis for the dismissal.  For clarity, we will separate our contentions regarding the dismissal from our contentions regarding the underlying claims.

A.    Contentions Regarding the Dismissal

This is a claim under the Seaman's Protection Act, 46 U.S.C. § 2114.  In rejecting the claim, the Department of Labor completely misconstrued the statute and its own regulations:

(1)    The Department found that, because complainants were working in foreign waters on a vessel flying a foreign flag, neither OSHA nor the U.S. Coast Guard have jurisdiction.  This is irrelevant.  While the SPA was limited to complaints to the

Coast Guard prior to 2002, the current version of the statute contains no such limitation. Likewise, the SPA is not limited to the territorial jurisdiction of OSHA (*i.e.,* the geographical area in which OSHA regulates workplace safety).

(2)     Instead, the SPA applies to a "seaman," which is defined as "any individual engaged or employed in any capacity on board a vessel owned by a citizen of the United States." 46 C.F.R. § 1986.101(m). There is no requirement that the vessel be flagged in the United States, and in fact there are an enormous number of vessels owned by Americans that fly the flags of other countries.

(3)     Complainants allege that the *Ocean Endeavor* is owned by Diamond Offshore, which is an American company based in Houston, Texas. The Department made no findings to the contrary, and in fact this can be verified from publicly available sources and from Diamond Offshore's own web site. Because Complainants were employed on board a vessel owned by Diamond Offshore, they were "seamen" within the meaning of the SPA.

(4)     In an odd footnote, the Department stated that Diamond Offshore is not a "person" because "Coverage is limited to include an individual who is a citizen of the United States." The Department's own regulations are to the contrary. 46 C.F.R. § 1986.101(j) ("*Person* means one or more individuals or other entities, including but not limited to corporations, companies, associations, firms, partnerships, societies, and joint stock companies.").

(5)     The Department also finds that Complaints are not "employees" within the meaning of the SPA. However, the SPA does not use the term "employee." The SPA covers "seamen." Complainants were unquestionably covered by the SPA.

(7)     The Department also noted that Complainants did not make a complaint to the U.S. Coast Guard.  This has not been a necessary element of an SPA claim since 2002.

(8)     In another odd footnote, the Department claims that the *Ocean Endeavor* is "A deep sea oil rig, which is not used as a means of transportation."  This is incorrect.  The *Ocean Endeavor* is a mobile semi-submersible drilling rig.  This is a "vessel" under the Department's own regulations.  46 C.F.R. § 1986.101(p) ("*Vessel* means every description of watercraft or other artificial contrivance used, or capable of being used, as a means of transportation on water.").  *Ocean Endeavor* can be, and in fact regularly is, used as a means of transportation on water.

(9)     Finally, the Department concluded that Complainants did not allege a prima facie complaint based on its other findings.  The Department misconstrued the statute and disregarded its own regulations.  The Department's conclusion was wrong.

Accordingly, the Department was wrong in literally every respect.

B.     Contentions on the Merits

Mr. Patterson and Mr. May complained about serious safety violations that posed imminent risks to themselves and other employees.  Over the course of two to three years, they refused to perform their duties under unsafe conditions.  This lead to increasing levels of retaliation from their immediate supervisor.  They reported all of this to senior personnel at Diamond Offshore, as well as to HR personnel.  However, no corrective actions were taken.  Ultimately, the supervisor concocted a flimsy pretext for firing Mr. Patterson and Mr. May, and Diamond Offshore went along with it.

The Seaman's Protection Act prohibits retaliation under circumstances such as those presented by the present case:

(1)      A person may not discharge or in any manner discriminate against a seaman because—

        . . . .

     (B)      the seaman has refused to perform duties ordered by the seaman's employer because the seaman has a reasonable apprehension or expectation that performing such duties would result in serious injury to the seaman, other seamen, or the public;

        . . . .

     (D)      the seaman notified, or attempted to notify, the vessel owner or the Secretary of a work-related personal injury or work-related illness of a seaman . . .

(2)      The circumstances causing a seaman's apprehension of serious injury under paragraph (1)(B) must be of such a nature that a reasonable person, under similar circumstances, would conclude that there is a real danger of an injury or serious impairment of health resulting from the performance of duties as ordered by the seaman's employer.

(3)      To qualify for protection against the seaman's employer under paragraph (1)(B), the employee must have sought from the employer, and been unable to obtain, correction of the unsafe condition.

46 U.S.C. § 2114(a).  All of the elements are present.

## II.    <u>Protected Activity and Adverse Actions</u>

Mr. Patterson worked for Diamond Offshore as an Electronics Technician 1, beginning on August 8, 2011.  Mr. May worked as an Electrician 1, beginning on October 7, 2011.  They were assigned to the *Ocean Endeavor*, which is a mobile drilling rig owned by Diamond Offshore.  Both Mr. Patterson and Mr. May were seaman and were credentialed as such.

During the relevant time period, the *Ocean Endeavor* was operating in the Black Sea and the Mediterranean.  Mr. Patterson and Mr. May are U.S. citizens.  They worked "hitches" on the *Ocean Endeavor* – a few weeks on, followed by a few weeks off.

During their employment, Mr. Patterson and Mr. May encountered a number of different safety issues on the *Ocean Endeavor*.  Most of these issues related to a supervisor, Mike Williams (Rig Maintenance Supervisor), who refused to follow safety procedures and placed the lives of the crew at risk.  Mr. Patterson and Mr. May requested that Diamond Offshore correct the dangerous conditions, and they refused to perform their duties in situations where they had a reasonable apprehension of serious injury to themselves, their crewmates, or the public.  This resulted in a rising level of retaliation, culminating in their termination.

These incidents began in 2012 and continued into 2015.  Some of the major incidents were the following:

(1)     In the summer of 2012, Mr. May and Mr. Patterson observed an incident in which a submersible pump was being pulled up to the deck while the rig was operating in the waters off of Egypt.  The hydraulic mechanic (Danny McKnight) stopped the operation to properly tie up and secure the cable.  Williams overrode the stop order and threatened McKnight for stopping work.  Moments later, the cable broke loose and fell about 50 feet to the deck.  The cable narrowly missed Nobuaki Kobayashi, and it would have seriously injured or killed him if McKnight had not pulled him out of the way.  Williams fled the area when this happened.  This incident was just the beginning of a long pattern of safety violations involving Williams.  This particular incident did not directly involve Mr. May or Mr. Patterson.

(2)     Around March 2013, Mr. May and Mr. Patterson were working on installing ballast pump remote stations.  Williams ordered the wrong cable for the job.  The cable could not be grounded properly, which posed a risk of severe and possibly fatal electrical shock.  In addition, Williams ordered Mr. May and Mr. Patterson to tie

and route the cable in areas under the rig that were inaccessible and thus hazardous. Mr. May and Mr. Patterson pointed out that this would be dangerous and requested to run the cable in a different path. Williams yelled at them and threatened them. He said that that there were a lot of other electricians looking for jobs. Nonetheless, Mr. May and Mr. Patterson refused his order and performed the job in a different way that did not pose safety issues. They re-routed the cable in accessible areas and solved the grounding issue by adding another cable.

(3)     Around April 2013, Williams ordered Mr. Patterson to adjust the LEL (lower explosive limit) gas detector so that it would not go off at such a low level. Williams did not want the alarm to be going off so often. This would have presented a major safety hazard. In fact, this could have led to an incident similar to the Deepwater Horizon disaster. Williams told Mr. Patterson to do this without seeking permission from the OIM (offshore installation manager). Mr. May told Mr. Patterson not to do it because of the great risk of danger, and that he needed to insist on a permit from the OIM because this was critical equipment. Mr. Patterson declined to do this without getting a permit, at which point Williams told him to forget about it.

(4)     In mid-2013, Williams ordered Mr. Patterson and Mr. May to work on top of the anchor winches to replace the damaged blower motor on top. There was no place to connect fall protection, even though this work would be performed at a dangerous height. Mr. Patterson and Mr. May refused to do this, telling the Tool Pusher (the shift manager) that this was unsafe and that they needed a platform to work on, plus more help. Williams ordered them to do it anyway. Mr. Patterson

and Mr. May later found a safe way to complete the task when Williams was gone. They arranged to hook themselves to a crane so that they had reasonable fall protection.

(5)     On October 31, 2013, Mr. Patterson and Mr. May were working on a job that involved hanging a heavy motor cable for the top drive.  The top drive moves up and down during the operation of the rig, from a peak of around 110 feet to a base of around 20 feet.  The original plan was to connect the cable 110 feet above the deck, anchor it, and lower it to the deck with the air horse (essentially a small crane), so that it would then need to be lifted only 20 feet to complete the job.  Williams instructed the Tool Pusher (Frankie Sutton) to connect the cable at the 20 foot level first, then have the 110 foot section lifted up manually.  This was enormously dangerous, because a cable falling from 110 feet could easily kill multiple people on the deck.  Mr. Patterson and Mr. May refused.  In fact, Mr. Patterson pointed out that, if they did this, the cable could drop, and people could die.  Several other people called for the job to be stopped, but Williams said "Anyone who tries to stop the work will be on the next helicopter off the rig."

(6)     The rig finished its operations in the Mediterranean in early 2014 and sailed to Sicily for refitting prior to the next job, which would be in the Black Sea off of Romania.  Around March 2014, Williams ordered Mr. Patterson and Mr. May to climb to the top of the rig in order to unwire all light fixtures on the top.  Mr. Patterson and Mr. May pointed out that the top was filled with loose debris and scrap metal, that there was no solid footing or lighting, and that it was raining.  Mr. Patterson and Mr. May suggested alternatives, such as leaving the light fixtures

connected or cutting the stations while leaving the cable intact and connected. Williams started yelling at them, but they refused to follow the unsafe instructions. Mr. Patterson approached the offshore installation manager (OIM), Randy Sutfin, and reported the unsafe conditions.  Sutfin replied "I'm getting out of here tomorrow.  It's not my problem."  Williams eventually threatened Mr. Patterson and Mr. May with a write up, and they reluctantly complied.  Mr. Patterson lost his footing and was seriously injured, needing surgery for two large hernias that required surgery.  Williams claimed that Mr. Patterson was faking the injury.  He told Mr. May that Mr. Patterson just wanted to skip the trip to the Black Sea.  He apparently claimed that Mr. Patterson was sent home due to a problem with his appendix.  After this point, Williams' hostility toward Mr. Patterson and Mr. May started to intensify.

(7)    Around this time, Williams ordered Mr. May and Mr. Patterson to replace an expansion valve in a refrigeration unit.  Mr. May said that he would remove all of the refrigerant from the unit, as required by the EPA.  Williams said that this would take too long and ordered them to just replace it.  They told him that this would vent CFCs into the atmosphere and that there would not be any ventilation in the area to provide breathable air.  They refused to do this.  Williams then opened the valve himself, venting the gasses into the room, and nearly causing Mr. May and Mr. Patterson to pass out due to oxygen deprivation.

(8)    Around September 2014, Williams ordered Mr. Patterson and Mr. May to violate company safety policy by hanging a light over 25 feet high with no safety gear or tie off points.  They asked him to follow safety procedures and pointed out that this

was dangerous.  Williams responded by telling them to "do it when no one is looking."  Mr. Patterson and Mr. May wrote a "DODI card" (Diamond Offshore Drilling, Inc.) to report this incident and refused to complete the task.  At the daily "tower meeting" the next day, Mr. May raised this issue in the presence of the Tool Pusher and the representative of ExxonMobil (the client).  He read from the GEMS (Global Excellence Management System) manual to explain why this was improper.  ExxonMobil apparently ordered Diamond Offshore to buy proper ladders with work platforms.  Williams learned about this and, not surprisingly, was furious.  The hostility became even greater.

(9)     During the next hitch, Williams retaliated by writing up Mr. Patterson, Mr. May, and another employee, and placing them on a 90 day probation period.  Mr. Patterson protested the matter and provided a detailed account of the activities on the Ocean Endeavor to Janelle Duggar, who is an HR representative for Diamond Offshore in Houston.  Mr. Patterson told Ms. Duggar that Williams would retaliate for the reporting of safety violations.  Mr. Patterson and Mr. May asked to be moved to a different shift so that they would not have to interact as much with Williams, but Diamond Offshore said that there was nothing it could do.

(10)    Mr. Patterson and Mr. May continued to interact with Williams from time to time, especially when the shifts overlapped.  In April 2015, Williams ordered Mr. Patterson and Mr. May to replace all of the fluorescent lights and safety netting in the bottom of the rig column.  This was as much as 100 feet underwater.  Safety policy required working phones for cases of emergencies, but the phones were not working.  Williams was sending Mr. Patterson and Mr. May into a dangerous spot

by themselves with no phone contact.  They refused to do this, proposing instead to replace the non-functional phones.  Williams exploded, yelling "We're trying to save Diamond money!  Those phones are too damn expensive, so just do the damn job!"  Mr. Patterson and Mr. May informed the night barge captain, who put in a stop work order until the phones were all replaced or repaired.

(11)   Williams responded by trying to set up Mr. Patterson and Mr. May for termination. On April 25, 2015, he ordered Mr. Patterson and Mr. May to decommission and start removing the "rig saver" system.  He told them that they could "just take home any of the stuff that you want."  This was an invitation to commit theft, which would have been grounds for immediate termination.  Mr. Patterson checked with the store keeper, who informed him that no e-mails had been received to decommission or remove the system from service.  Mr. Patterson also talked to the OIM, who confirmed that taking the scrap home would be considered theft.  Mr. Patterson stated in his night report that he would decommission and remove the system after he received an e-mail with authorization.  This never happened.

(12)   At this point, Mr. Patterson and Mr. May knew that Williams was trying to get them fired.  In fact, Mr. May remarked to Mr. Patterson that Williams would have to get rid of him as part of getting rid of Mr. Patterson.  At the end of that hitch, Mr. Patterson complained again to HR, but Ms. Duggar would only say that she was sick of hearing about him and Williams.

(13)   On May 29, 2015, Williams ordered Mr. Patterson to install new software. Installing this software was a big deal because the workers could not get in and out of the hole if the software was not working.  Mr. Patterson talked to the OIM, who

told Williams not to proceed with the software update.  On May 30, 2015, Williams again ordered Mr. Patterson to install the software.  Mr. Patterson received permission this time, but with a strict one hour time limit.  After 45 minutes, Mr. Patterson aborted the software update because of problems that could cause system damage and raise safety concerns.  After Mr. Patterson and Mr. May were terminated, Williams had the software installed, and the rig was shut down for a week as a result.

(14)   Also on May 30, 2015, Williams ordered Mr. Patterson and Mr. May to install four-foot fluorescent bulbs up on the derrick.  This would involve walking on a 40 foot beam about 115 feet above the deck in the dark, and some of the lights were around 210 feet up.  If a bulb fell or broke, shards of glass could fall onto crewmembers on the deck below, causing severe injury or death.  Originally, Williams ordered Mr. May to do this alone, but he refused because it was dangerous and because there were no "rescue at height" qualified people on the night shift.  Williams then ordered Mr. May and Mr. Patterson to do the job together.  Mr. Patterson and Mr. May pointed out that the fixtures were designed to be taken down and repaired, but Williams replied "Well, just don't drop anything."  They refused the order and informed the Tool Pusher (Ronnie Davis) and the drilling crew.  Mr. May reported this to the OIM and the rig supervisor, Lee Morgan.

(15)   On the following day, Williams finally succeeded in his efforts at getting rid of Mr. Patterson and Mr. May.  Williams ordered them to assist the mechanic (Kenneth Johnson) with engine shutdown testing, even though they told Williams that they had never done it before.  They told the same thing to Johnson, but Johnson insisted

that he had the permit to do the work and that he had done it before.  This persuaded Mr. Patterson and Mr. May to cooperate.  During the test, an indicator light came on, but Johnson insisted on continuing the test.  The test failed, shutting down the engines and causing the emergency power to come on.  Mr. Patterson said, "At least you got a permit."  Johnson replied, "Haha, what permit?"  Mr. Patterson and Mr. May knew that they had been set up.

(16)    Williams tried to claim that Mr. May had performed the procedure in 2011 and 2012, "so he should have known better."  This was not true.  Williams modified the maintenance records at 8:39 a.m. on June 1, 2015, adding a false entry showing that Mr. May had completed the prior work.

(17)    In any event, Williams and Diamond Offshore used this incident as a pretext to terminate Mr. Patterson and Mr. May.  Significantly, they did not terminate Johnson, who was actually in charge of the procedure in question.

(18)    Since the termination, it appears that Diamond Offshore has been further retaliating by blackballing Mr. Patterson and Mr. May.  Neither of them have found new employment.

## III.    Relief Sought

The Seaman's Protection Act incorporates by reference the remedial provisions applicable to the Surface Transportation Assistance Act:

> A seaman alleging discharge or discrimination in violation of subsection (a) of this section, or another person at the seaman's request, may file a complaint with respect to such allegation in the same manner as a complaint may be filed under subsection (b) of section 31105 of title 49. Such complaint shall be subject to the procedures, requirements, and rights described in that section, including with respect to the right to file an objection, the right of a person to file for a petition for review under subsection (c) of that section, and the requirement to bring a civil action under subsection (d) of that section.

46 U.S.C. § 2114(b). The remedies under the STAA are as follows:

> (A)     If the Secretary of Labor decides, on the basis of a complaint, a person violated subsection (a) of this section, the Secretary of Labor shall order the person to—
>
> > **(i)**     take affirmative action to abate the violation;
> >
> > **(ii)**    reinstate the complainant to the former position with the same pay and terms and privileges of employment; and
> >
> > **(iii)**   pay compensatory damages, including backpay with interest and compensation for any special damages sustained as a result of the discrimination, including litigation costs, expert witness fees, and reasonable attorney fees.
>
> **(B)**     If the Secretary of Labor issues an order under subparagraph (A) of this paragraph and the complainant requests, the Secretary of Labor may assess against the person against whom the order is issued the costs (including attorney fees) reasonably incurred by the complainant in bringing the complaint. The Secretary of Labor shall determine the costs that reasonably were incurred.
>
> **(C)**     Relief in any action under subsection (b) may include punitive damages in an amount not to exceed $ 250,000.

49 U.S.C. § 31105(b)(3).

Accordingly, the remedies sought by Complainants are the following:

(1)     Back pay, including lost benefits;

(2)     Reinstatement or alternatively front pay (as we presume that Diamond Offshore will take the position that reinstatement is impracticable);

(3)     Punitive damages of $250,000.00 for each complainant;

(4)     Pre- and post-judgment interest; and

(5)     Reasonable attorneys' fees and costs.

For purposes of this Complaint, the back pay calculations will be through December 1, 2015. Back pay is continuing to accrue, and we will note the rate at which it is accruing.

Mr. Patterson and Mr. May were being paid at a base rate of $56.46 per hour with bonuses and retirement contributions.  In 2014, their gross income was approximately $255,000 each, for a monthly average of $21,250 each.  Their back pay through December 1, 2015 is $127,500 each ($21,250 per month x six months).  This back pay is continuing to accrue at a rate of $21,250 per month, and this is the rate at which Mr. Patterson and Mr. May seek front pay.

Mr. Patterson and Mr. May also seek the following lost benefits: (1) retirement contributions (around $17,500 in 2014); and (2) health insurance benefits, which resulted in COBRA payments of $1852 per month.  Mr. Patterson and Mr. May seeks additional damages for taxes and penalties resulting from a loan and a withdrawal from their 401(k) accounts, which was necessitated by their unemployment.  Mr. May also seeks damages arising out of child support deficiencies due to his unemployment.

## IV.    Stipulations

We understand that the Notice of Hearing and Pre-Hearing Order anticipates that counsel for Complainants will "have communicated with the other parties in a good faith effort to reach stipulations to the maximum extent possible."  However, no attorney has made an appearance for Respondent.  In fact, no corporate representative has made an appearance for Respondent.  There is literally no one for Complainants to contact about stipulations.

Accordingly, there are no stipulations at this time.  However, we confirm that we will cooperate in good faith to develop stipulations once Respondent designates a representative.

Respectfully submitted,

_____

David C. Holmes, Attorney in Charge
State Bar No. 09907150
Law Offices of David C. Holmes
13201 Northwest Freeway, Suite 800
Houston, Texas 77040
Telephone: 713-586-8862
Fax: 713-586-8863
dholmes282@aol.com

ATTORNEY FOR COMPLAINANTS

## **CERTIFICATE OF SERVICE**

I certify that a true and correct copy of this pleading was sent by certified mail, return receipt requested, to Diamond Offshore Drilling, Inc., 15414 Katy Freeway, Suite 100, Houston, Texas 77094-1810 on December 4, 2015:

_____

David C. Holmes